DONALD W. SEARLES, Bar Code: DS0898
JENNIFER T. CALABRESE (*pro hac vice application pending*)
ANSU N. BANERJEE (*pro hac vice application pending*)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
(323) 965-3998

19CV-5705

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>    vs.<br><br>ANATOLY HURGIN, ALEXANDER AUROVSKY, ABILITY COMPUTER & SOFTWARE INDUSTRIES LTD, AND ABILITY INC.,<br><br>          Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC"), for its complaint against Anatoly Hurgin ("Hurgin"), Alexander Aurovsky ("Aurovsky"), Ability Computer & Software Industries Ltd. ("Ability"), and Ability Inc., alleges as follows:

## SUMMARY

1.    This action involves violations of the antifraud and proxy solicitation provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") by Hurgin and Aurovsky, and the Israeli company they controlled, Ability, in connection with Ability's December 2015 merger with Cambridge Capital Acquisition Corporation ("Cambridge"), a U.S. publicly-traded special purpose acquisition company.

2.     To convince Cambridge's shareholders and prospective investors to vote in favor of the proposed merger, the defendants – who stood to make millions of dollars if the merger were to be approved – misled and withheld critical information from Cambridge's shareholders, the majority of whom resided in the United States, and lied to Ability's auditors. Those lies took many forms. In the investor roadshows leading up to the shareholder vote and in proxy materials sent to shareholders, the defendants lied about Ability's ownership of a new, "game-changing" cellular interception product that would generate significant and recurring revenues. They also presented shareholders with a seemingly impressive backlog of existing customer orders and a pipeline of probable future orders that appeared to support their financial forecasts. But none of this was true. Ability, in fact, did not own its new "game changing" product, and any revenue from the sale of the product would have to be shared with its real owner. Also, the majority of Ability's so-called order backlog was, in fact, not supported by actual, signed purchase orders. In addition, and also unbeknownst to the shareholders, a large part of the order backlog was with Ability's largest and most significant customer – a Latin American police agency – that were based only on oral agreements with management who had been terminated as a result of the then-recent prison escape of a notorious international narcotics trafficker.

3.     Based on this rosy but false picture of Ability's existing business and projected future revenues, Cambridge's shareholders voted to approve the merger in December 2015. As a result of the merger, Hurgin and Aurovsky each received over $9 million in cash, and are entitled to receive an additional $6 million each in the form of put options. Ability received about $19 million.

4.     The truth about Ability came to light soon after the shareholder vote and the merger's consummation in December 2015. In May 2016, Ability Inc., the newly named public company, announced in its fiscal year 2015 financial statements that it did not, in fact own its

"game changing" product; rather it was subject to a short-term reseller agreement under which Ability was required to share 50% of its sales revenues with the true owner of that product. Ability Inc. also reported that its impressive backlog of orders and pipeline of future orders had failed to materialize and that revenue in the fourth quarter of 2015 had dropped precipitously, resulting in net losses. But all of this news came too late for Cambridge's shareholders, who had unwittingly approved the merger based on defendants' fraudulent conduct. Ultimately, Cambridge's shareholders lost about $60 million due to the merger.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], and 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. By virtue of the conduct alleged in this complaint, Hurgin, Ability, and Ability Inc., directly or indirectly, violated Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and Sections 10(b) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(a)], and Rules 10b-5 and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.14a-9], and Aurovsky violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) & (3)], Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)], and Rule 14a-9 thereunder [17 C.F.R. § 240-14a-9].

6.     The SEC seeks permanent injunctions against the defendants; disgorgement of their ill-gotten gains from the unlawful activity set forth in this complaint, together with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and an officer and director bar against Hurgin, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)], and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)].

8.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

9.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Ac [15 U.S.C. § 78aa(a)], because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. During the time of the misconduct, shares of Cambridge traded on the Nasdaq Capital Market ("NASDAQ"), an electronic securities exchange located in this district. In addition, the special meeting of Cambridge's shareholders to vote upon the proposed merger with Ability was held in this district; Ability Inc.'s transfer agent for the business combination is located in this district; the consummation of the transaction took place in this district; the merger agreement between Cambridge and Ability is governed by and to be construed in accordance with the laws of the State of New York; and defendants' investor roadshows promoting the Cambridge-Ability merger occurred in this district.

## THE DEFENDANTS

10.      **Ability Computer & Software Industries Ltd.** was a private company based in Tel Aviv, Israel. Ability was founded in 1994 by Hurgin and Aurovsky. After its December 2015 merger with Cambridge, Ability became a wholly-owned subsidiary of Ability Inc. Throughout this Complaint, Ability Computer & Software Industries Ltd. is referred to as "Ability" and Ability Inc.

is referred to as "Ability Inc."

11.      **Ability Inc.**, originally called Cambridge Holdco Corp. ("Holdco"), was a wholly-owned subsidiary of Cambridge Capital Acquisition Corporation, a special purpose acquisition company.  On December 23, 2015, Cambridge and Ability consummated a reverse merger where Cambridge merged with and into Holdco, Holdco changed its name to Ability Inc., and Ability, the formerly private Israeli company, became a wholly-owned subsidiary of Ability Inc.

12.      Ability Inc. acts as a holding company and operates through its wholly-owned subsidiary Ability.  As a result of the merger, Ability Inc. became a public company.  It is a foreign private issuer whose common stock trades on the NASDAQ under the symbol "ABIL."  The stock is registered with the SEC pursuant to Exchange Act Section 12(b).

13.      **Anatoly Hurgin**, age 60, was Ability's co-founder, co-owner, and chief executive officer, and is currently Ability Inc.'s co-controlling shareholder, CEO, and chairman of the board. Hurgin resides in Caesarea, Israel, holds no securities licenses, and has never been registered with the SEC in any capacity.

14.      **Alexander Aurovsky**, age 66, was Ability's co-founder, co-owner, and chief technology officer ("CTO"), and is currently Ability Inc.'s co-controlling shareholder, CTO, and a board member.  Aurovsky resides in Ramat Gan, Israel, holds no securities licenses, and has never been registered with the SEC in any capacity.

## OTHER RELEVANT ENTITY

15.      **Cambridge Capital Acquisition Corporation**, incorporated in Delaware, was a West Palm Beach, Florida-based special purpose acquisition company, or "SPAC."  It was formed for the purpose of entering into a merger, share exchange, asset acquisition, reorganization or similar business combination with one or more yet-to-be-identified target businesses.  Through a plan of reorganization, Cambridge merged with Ability in December 2015. After the merger, the

surviving public company was renamed Ability Inc. Prior to the merger, Cambridge's common stock was registered with the SEC pursuant to Exchange Act Section 12(b), and traded on the NASDAQ under the symbol "CAMB."

## FACTUAL ALLEGATIONS

### A.    Formation of Cambridge as a "SPAC" and its IPO

16.    Special purpose acquisition companies, or "SPACs," are companies formed specifically to acquire another company.  SPACs typically raise capital for the acquisition through an initial public offering ("IPO"), and that capital is held in trust for a specific period of time, often 18 to 24 months.  SPACs generally offer the IPO investors some guaranteed payment for holding their capital during the trust period, as well as warrants for the stock of the company that is ultimately acquired.

17.    Cambridge was incorporated as a SPAC by its CEO (the "Cambridge CEO") in October 2013. Cambridge completed its IPO on December 23, 2013, and raised approximately $81 million.

18.    Cambridge had a limited period of time – two years – to acquire a target company with the capital raised in its IPO. Under the terms of the IPO, the $81 million in SPAC capital was held in trust and would be released back to the Cambridge shareholders (plus interest) if Cambridge did not close a deal to acquire another company no later than 24 months after the IPO.

19.    Therefore, Cambridge had to find a target company, conduct due diligence, solicit shareholder interest, and hold a shareholder vote to approve a merger with the target company by December 23, 2015, or all of the money it had raised in its IPO would have to be returned to the Cambridge shareholders.

20.     Once Cambridge identified a potential merger candidate, the proposed business combination would have to be presented to Cambridge shareholders by a proxy statement for a shareholder vote. Shareholders who voted to approve the merger would become shareholders in the newly formed public company and receive warrants to purchase additional shares of the new company at a set price. Shareholders who did not want to invest in the merger candidate could elect to redeem their shares, receiving warrants and a return of their original investment in the SPAC with a 1% profit.

**B.     Cambridge Identifies Ability as a SPAC Target**

21.     As the summer of 2015 neared, and with the December 23, 2015 deadline fast approaching, Cambridge had still not yet identified a target with which Cambridge shareholders would vote in favor of merging.

22.     In or around June 2015, Cambridge identified Ability as a possible acquisition candidate.

23.     Ability was a Tel Aviv, Israel-based small business that sold cell phone and satellite interception products. It was co-founded and owned by the two individual defendants, Hurgin, its CEO, and Aurovsky, its CTO.

24.     Hurgin and Aurovsky have worked together for more than 20 years and speak to each other almost daily.

25.     At the time, Ability was a small company, with only about twelve employees and a few contractors providing administrative and support services like bookkeeping. It had approximately $5.6 million in revenues in 2013, and $22.1 million in revenues in 2014. It primarily sold its products through resellers and agents, who then sold the products to end-user government agencies.

### C.     Ability's Initial Revenue Forecast, Backlog, and Pipeline

26.     In connection with the proposed merger, and in an effort to portray Ability as an attractive merger candidate, in or about August 2015, Hurgin created, or caused to be created, a financial forecast for Ability that was sent to Cambridge.  An Excel spreadsheet was provided to Cambridge and laid out the specifics of this financial forecast.

27.     Hurgin's revenue forecast stated that Ability would earn approximately $110 million in fiscal year ("FY") 2016.  There were two significant components of this forecast: (1) the "backlog," which was the amount of customer orders Ability already had in place; and (2) the "pipeline," which was made up of the probable future orders for the coming period.

28.     Hurgin represented in the spreadsheet that the backlog of orders was about $35.2 million for the last two quarters of FY 2015 and about $30.5 million for all of FY 2016, for a total of $65.7 million.  The spreadsheet contained a list of the customer orders that made up this backlog figure.

29.      The spreadsheet incorrectly represented that the backlog was backed by actual purchase orders from Ability's customers.

30.     A key component of Ability's backlog of customer orders was its arrangement with Ability's single largest customer, a Latin American police agency.  The police agency was Ability's only customer in Latin America, and it accounted for 63% of Ability's revenues in FY 2013, 31% of its revenues in FY 2014, and 68% of its revenues for the first three quarters of FY 2015.

31.     Of the $65.7 million in backlog revenue for the last two quarters of 2015 and all of FY 2016, 80% of it, or about $52 million, was from that police agency.

32.     Hurgin represented in the spreadsheet that Ability's pipeline of possible future orders from customers for the last two quarters of FY 2015 and all of FY 2016 was about $53.5 million.

33.    Because a pipeline of future orders is not certain, Hurgin, in the spreadsheet, further applied a probability percentage to each potential order in the pipeline (*i.e.*, the probability of securing the order from the customer). This resulted in a probability-weighted pipeline of about $11.5 million for the last two quarters of FY 2015 and about $17 million for FY 2016, for a total probability-weighted pipeline of about $28.5 million.

34.    As a result, the backlog of existing orders plus the probability-weighted pipeline of future orders would result in a total of $46.7 million in revenue for the last two quarters of FY 2015, and a total of $47.5 million in revenue for all of FY 2016.

**D.    The Prometheus and Economics Partners Reports**

35.    In or about August 2015, Cambridge retained various professionals in connection with proposed merger with Ability. One was Prometheus Financial Advisory Ltd. ("Prometheus"), which was engaged to issue an independent fairness opinion for the Cambridge shareholders that opined about the fairness of the proposed price that Cambridge would pay for Ability.

36.    Cambridge also retained Economics Partners, LLC ("Econ. Partners") to conduct due diligence on Ability's revenues and expenses, and to prepare a "Quality of Earnings" report that analyzed the revenues and expenses.

37.    Both Prometheus and Econ. Partners received and relied on information provided by Ability and Hurgin, including the August 2015 spreadsheet that detailed the $110 million FY 2016 revenue forecast and the $65.7 million in backlog orders.

38.    Econ. Partners separately conducted due diligence on Ability, including on the $65.7 million in backlog.

39.    As part of that analysis, Econ. Partners asked Ability for copies of all of its purchase orders supporting its backlog figure.

40.     When Ability was unable to provide copies of purchase orders for much of the backlog, Ability acknowledged to Econ. Partners in or about August 2015 that about two-thirds of Ability's backlog had no purchase orders in place.

41.     Econ. Partners issued its Quality of Earnings report on August 13, 2015. The report found that only 34% of the $65.7 million in backlog was backed by signed purchase orders; the other 66% were only verbal agreements with customers.

42.     As a result, Econ. Partners reported, a "high rate of projects with no PO's in the backlog could indicate a significant risk."

43.     Econ. Partners also expressly noted that there was a risk that "most" of the backlog was from "one Latin America Country's customer"—the Latin American police agency, Ability's largest customer.

44.     In connection with the work for its fairness opinion, Prometheus developed its own revenue forecast for Ability for FY 2016. Prometheus' revenue forecast for Ability was $108 million for FY 2016; only $2 million less than Hurgin's spreadsheet's $110 million revenue forecast for that year.

45.     Prometheus issued its fairness opinion on September 1, 2015. The 30-page opinion made clear that Prometheus had relied on the representations of Ability's management and, unlike Econ. Partners, had not conducted its own due diligence review.

46.     The fairness opinion set forth Prometheus' analysis of Ability's financial history and prospects. It included Prometheus' $108 million revenue forecast for FY 2016.

47.     It also had a section devoted to Ability's backlog. In that section, Prometheus stated: "According to [Ability]'s management, it has a backlog (comprised of signed purchase orders) of $65.7 million in projects around the globe, of which 80% are with Latin American clients." It

further stated that, "[a]ccording to management, the backlog only includes projects in progress that are planned to be completed through 2015-2016, and excludes later phases of projects that are planned for later than 2016."

48.     Based on its valuation of Ability and its related analysis, Prometheus concluded that the consideration of cash and shares that was being proposed to acquire Ability was "fair from a financial point of view."

49.     Thus, the Econ. Partners report and the Prometheus fairness opinion presented starkly different views about Ability's backlog. While Econ. Partners noted that most of the backlog orders were not signed and that this presented "significant risk," the Prometheus opinion reported that the entire $65.7 million backlog was "comprised of signed purchase orders."

50.     On or about August or September 2015, Cambridge CEO asked Hurgin about the finding in Econ. Partners' Quality of Earnings report that not all of Ability's backlog was supported by purchase orders.

51.     Hurgin acknowledged to Cambridge's CEO that the entire backlog was not supported by actual purchase orders, but told Cambridge's CEO that the backlog revenue numbers were still reliable because, for example, some customers had budgeted for the purchases or made partial payments on the orders.

52.     Later, in November 2015, Ability provided Cambridge's CEO with an updated Excel spreadsheet with revised information about the backlog.

53.     Unlike the prior version of the spreadsheet, this revised spreadsheet correctly noted that about 66% of the backlog orders had no purchase orders in place.

**E.      The Two Successive Roadshows Soliciting Approval for the Merger**

54.     On September 6, 2015, Cambridge and Ability entered into and signed an Agreement and Plan of Reorganization (the "Merger Agreement").  The agreement was signed on behalf of

Cambridge by the Cambridge CEO, and on behalf of Ability, by its CEO, Hurgin.

55.     The next step was to solicit and obtain shareholder approval for the proposed merger.

56.     To pay for the merger with Ability, including the compensation due to Hurgin, Aurovsky, and Ability, the Cambridge CEO estimated that Cambridge would need at least $50 million from existing shareholders or new investors voting in favor of the Ability-Cambridge merger, to consummate the proposed business combination.

### 1.     The Failed September 2015 Roadshow

57.     Between September 24, 2015 and October 1, 2015, Hurgin, along with Cambridge's CEO and others, conducted an investor roadshow in New York City.

58.     The purpose of the roadshow was to attempt to convince existing Cambridge shareholders and prospective investors to vote in favor of the proposed Ability-Cambridge merger.

59.     Ability's current valuation and prospects for future growth were important to making the merger proposal attractive to Cambridge shareholders and prospective investors.

60.     On September 17, 2015, before the roadshow, Cambridge filed its first draft of the proxy statement on a Form S-4 with the SEC. Attached to the proxy statement was the Prometheus fairness opinion, which included revenue forecasts, backlog, and pipeline figures for Ability, and which erroneously reported that Ability's backlog of $65.7 million was backed by signed purchase orders.

61.     The Econ. Partners' report, which made clear that the majority of the backlog was not backed by signed purchase orders and presented "significant risk," was not included in that September 17, 2015 filing or in any other filing with the SEC.

62.     During the roadshow, shareholders and prospective investors were presented with a PowerPoint slideshow that included Ability's financial information. The slideshow showed substantial increases in revenue and net income from FY 2013 to the first two quarters of FY 2015

(from about $5.6 million to $43 million in revenue, and from a $290,000 net loss to net income of about $16.8 million).

63.     Furthermore, the slideshow showed that Ability's reported revenues for the first two quarters of FY 2015 rose 162% to $43 million from $16.4 million for the comparable period in 2014, and its reported net income grew at an even faster rate, up 394% to $16.8 million from $3.4 million.

64.     The slideshow also showed that Ability's projected net income would increase from $27 million in FY 2015 to $80 million in FY 2018.

65.     However, the financial information provided in the slideshow and in the Form S-4 and proxy statement, which attached the Prometheus opinion, led to significant investor concern. The $65.7 million backlog included only $30.5 million in backlog for FY 2016. And the pipeline for FY 2016, when probability-weighted, was estimated to be only $17 million.  Combined, this amounted to revenue from current orders (backlog) and expected orders (pipeline) of only about $47.5 million for the year – far lower than the $108 million in forecasted revenue for FY 2016 laid out in the Prometheus report.

66.     The September roadshow failed to commit investors to support the proposed merger, in part due to concerns about Ability's financial forecast.

67.     In an October 6, 2015 email, Cambridge's CEO reported to Hurgin and others that at least three potential investors expressed the following concerns after the roadshow: "[n]one of them believes [Ability's financial] forecast," "[t]hey all think Ability got hot for a year with the Latin American projects," "[n]one of them believes it is sustainable," and "they all think Ability doesn't believe in its own growth."

68.     Another concern raised by investors during the September roadshows was that Ability's business was project-based and therefore did not have a recurring revenue stream.

69.     On November 6, 2015, the Cambridge CEO warned Hurgin and others in an email that, given the upcoming holidays, they had approximately 20 business days to raise $50 million from investors in order to consummate the merger by the December 23, 2015 deadline.

### 2.     The November 2015 Roadshow

70.     In late November 2015 and early December 2015, Cambridge and Ability made another pitch to existing shareholders and prospective investors in a second roadshow. Hurgin, on behalf of Ability, was a key presenter in this roadshow. For this second roadshow, Hurgin presented a new PowerPoint with new detailed figures.

71.     Hurgin reviewed and approved this slide presentation, which had both Cambridge's and Ability's logos on its cover page.

72.     A copy of the PowerPoint and a transcript of the roadshow presentation were filed with the SEC as additional proxy materials on November 16 and 18, 2015, respectively.

73.     Revised versions of the PowerPoint were filed with the SEC on November 24 and 30, 2015.

74.     The second roadshow touted significant improvements to Ability.

75.     First, Hurgin claimed in the PowerPoint that Ability had developed its own interception product for mobile devices called "ULIN."

76.     Hurgin also verbally stated during the roadshow presentation that ULIN was a "game changer" that was superior to other tracking programs because "we do not need to be in the vicinity of a target to be able to intercept our target…. I can be here in New York, our target can be any place in the world." Moreover, Hurgin also stated that Ability owned the ULIN product, explaining "today we are Ability the only owner for this technology."

77.     The PowerPoint similarly stated that ULIN was a "game changing" product that was "[d]eveloped in house," that "[f]irst orders" were "expected in 1Q 2016," and that ULIN was "based on a recurring revenue model."

78.     Second, the roadshow emphasized Ability's backlog of orders from its largest customer, the Latin American police agency.

79.     During the roadshow, Hurgin represented to investors that Ability had a large three-year deal with a "Latin American" police agency from 2015 through 2017 for 52 prisons that would generate $2 million in revenue per prison for Ability (or about $104 million in total revenue).

80.     Likewise, the PowerPoint included a slide that highlighted the "52 federal prisons in Latin America" and "$100 MM mandate."

81.     Hurgin repeated this statement in his own presentation, claiming the customer was "so excited … he immediately extended this order to 52 prisons, all federal prisons in the country."

82.     Third, in the November 24 and 30 versions of the PowerPoint, Ability reported that its FY 2016 revenue forecast was $108 million.  But, unlike in the September roadshow, this time the forecast was accompanied by a significantly increased backlog and pipeline revenue figure.

83.     The second roadshow PowerPoint stated that Ability's backlog and pipeline revenue for FY 2016 totaled $148 million.  This included $40 million in revenue from the projected sales of two ULIN products for the year (at $20 million apiece) and $28 million in 2016 backlog orders.

84.     Applying probability-weighting to the individual items in the backlog and pipeline, Ability and Hurgin told investors that the company estimated it would recognize about $100 million in revenue for FY 2016 from its backlog and pipeline.

85.     Unlike the backlog and pipeline amounts reported in the Prometheus fairness opinion, this $100 million of backlog and pipeline approximately matched and supported the $108

million revenue forecast for FY 2016.

86.     Cambridge's CEO emailed the November 2015 PowerPoint presentation to Cambridge's shareholders and potential investors and highlighted in the body of his emails Ability's $148 million backlog and pipeline figure and new ULIN product. He also emailed internet links to the draft proxy statement filed with the SEC, and a video of him and Hurgin presenting the PowerPoint presentation at the roadshow.

**F.      The Defendants' Preparation of the Proxy Materials Used to Solicit Investors**

87.     The Merger Agreement made clear that both Ability and Cambridge would be jointly responsible for the preparation of the proxy materials for the proposed Ability-Cambridge merger. These included the registration statement and the proxy statement, which were publicly filed with the SEC.

88.     Specifically, Article V of the Merger Agreement provided, among other things, that, "as soon as reasonably practicable after the execution of this Agreement, Ability and Cambridge shall prepare and file with the SEC under the Securities Act, a registration statement on Form S-4 with respect to the Surviving Pubco Shares [*i.e.*, Ability Inc.] to be issued in connection with the [Ability-Cambridge] Merger, which shall include proxy materials for the purpose of soliciting proxies from the holders of Cambridge's Common Stock … to vote in favor of … the adoption of this Agreement and approval of the Transaction…".

89.     The Merger Agreement further provided that Ability and Cambridge "shall furnish to the other all information concerning its respective company and business as may reasonably be requested in connection with the preparation of the Registration Statement and Proxy Statement/Prospectus….. [and] that Cambridge shall cause the Proxy Statement/Prospectus and Registration Statement" to be filed with the SEC.

90.    The Merger Agreement also provided that Ability and Cambridge would promptly respond to any SEC comments on such filings, and that each company would take any and all actions required to satisfy the requirements of the Securities Act and the Exchange Act.

91.    The Merger Agreement also provided that Ability and Cambridge would ensure that the registration statement and the proxy statement/prospectus complied with all applicable provisions and rules under the Exchange Act, in the preparation, filing and distribution of the proxy statements/prospectus, the solicitation of proxies thereunder, and the calling and holding of the special meeting of Cambridge's shareholder to vote on the Ability-Cambridge merger.

92.    The Merger Agreement included certain representations and warranties made by Ability and its shareholders (*i.e.*, Hurgin and Aurovsky, who each held 50% of Ability's shares) to Cambridge, which were required to be true and correct both at the time of agreement was entered into and at the closing date of the business combination.

93.    Among other things, Hurgin and Aurovsky represented to Cambridge in the Merger Agreement that there had not been any "Material Adverse Effect" on Ability at the time of the Merger Agreement, or since the date of the Merger Agreement. The Merger Agreement defined a Material Adverse Effect to include "any change, event, or circumstance or effect, individually or when aggregated with other changes, events, circumstances or effects, which has had a material adverse effect on the business, assets (including intangible assets), revenues, financial condition, or results of operations of such entity and its Subsidiaries, taken as a whole."

94.    Hurgin and Aurovsky also represented to Cambridge in the Merger Agreement that they had provided Cambridge with a complete and accurate list of "Material Company Contracts." That term was defined to include any contracts under or in respect of which Ability had any liability or obligation of any nature whatsoever (absolute, contingent or otherwise) in excess of $1,000,000,

COMPLAINT                                          17

and which were otherwise material to the business, operations, assets, conditions (financial or otherwise) or prospects of Ability.

95.     These representation were false. As detailed herein, Hurgin and Aurovsky failed to disclose to Cambridge that Ability's new "game changing" product, ULIN, was subject to a reseller agreement, which was a Material Company Contract as defined in the Merger Agreement. Hurgin and Aurovsky also failed to disclose that Ability's backlog of orders from the Latin American police agency was mainly based on oral agreements with management who had been terminated; this was a Material Adverse Effect as defined in the Merger Agreement.

96.     The Merger Agreement also contained indemnification provisions, by which the shareholders of Ability (*i.e.*, Hurgin and Aurovsky) agreed to indemnify Ability Inc. against any and all "Losses" asserted against Ability Inc., by reason of, or arising out of or resulting from the inaccuracy or breach of any representation or warranty of Ability contained in or made pursuant to the Merger Agreement. The term "Losses" was defined to include, among other things, all losses, liabilities, judgments, awards, orders, penalties, settlements, including those arising from any demands, claims, suits, actions, or notices of violation or noncompliance.

97.     These indemnification provisions recognized that Ability Inc., as a result of the reverse merger, could be held liable as a result of Hurgin's and Aurovsky's misconduct in connection with the merger.

**G.     The Joint Ability-Cambridge Proxy Statement**

98.     On December 2, 2015, the Form S-4 filed with the SEC, which included the final proxy statement for the proposed merger (the "Proxy Statement"), was declared effective. Both the Merger Agreement between the companies and the Prometheus fairness opinion were attached to the Proxy Statement.

99.     In the Proxy Statement, Cambridge discussed the due diligence it claimed to have conducted on Ability and stated that the consideration to be paid by Cambridge to Ability's shareholders (*i.e.*, Hurgin and Aurovsky) was determined "after conducting a thorough due diligence review of Ability's operations, which included reviewing Ability's management, products, earnings and historical financial performance, new product development and backlog, sales pipeline and backlog, market perception and reputation, financial controls and oversight and discussions with suppliers and customers."

100.     The Proxy Statement stated that "[a]ll information contained in this document relating to Cambridge has been supplied by Cambridge, and all such information relating to Ability has been supplied by Ability."

101.     The Proxy Statement included sections entitled "Business of Ability," "Ability's Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), and "Estimates Furnished by Ability to Cambridge."   All of this information came from Ability.

102.     The Proxy Statement referred in several places to Prometheus' opinion that the consideration to be paid by Cambridge to Ability's shareholders was fair from a financial point of view, and attached as an exhibit the Prometheus fairness opinion which stated, incorrectly, that Ability's $65.7 million backlog was "comprised of signed purchase orders."

103.     However, the Proxy Statement did not mention or attach the Econ. Partner's Quality of Earnings report.

104.     Nor did it disclose that most of Ability's $65.7 million in backlog was based on verbal agreements with Ability's largest customer, the Latin American police agency, with management who had been terminated.

105.    The Proxy Statement also contained several representations about ULIN and Ability's financial forecasts and business prospects.

106.    In the "Business of Ability" section, Ability described its various "solutions" for the cellular interception, detection and prevention, including its ULIN product, stating, among other things, that "[o]ur "ULIN (Ultimate Interceptor) was introduced in November 2015."

107.    The "Estimates Furnished by Ability to Cambridge" section provided a FY 2016 forecast of $108 million in revenue.

108.    Also, the MD&A section touted Ability's business prospects with the Latin American police agency.  It stated that the "significant increase in revenues" in the first three quarters of 2015 "was attributable to Ability's increased focus on the Latin American market and completion of four large projects with a federal law enforcement agency in the region of which two projects ($8.1 million each) for fixed interception systems and two other projects of portable interception systems ($10.7 million and $8.3 million)."  It further stated that "Ability believes future projects in this region are likely to continue."

109.    Ability's largest customer, the Latin American police agency, was Ability's only customer in Latin America at the time.

**H.    Approval of the Ability-Cambridge Merger**

110.    The vote to approve the merger took place on December 22, 2015, the day before the expiration of the SPAC deadline.

111.    The majority of Cambridge shareholders voted to approve the merger, and on December 23, 2015, Cambridge officially acquired Ability, and Ability Inc. became the new surviving public company that continued trading on the NASDAQ.

112.    Specifically, under the terms of the Merger Agreement:  (i) Cambridge merged with and into its subsidiary, Holdco, with Holdco surviving the merger and becoming the publicly traded

company known as Ability Inc., and (ii) Ability Inc. acquired 100% of the ordinary shares of Ability (held by Ability's shareholders, Hurgin and Aurovsky), with Ability becoming a wholly-owned subsidiary of Ability Inc.

113.   Under the terms of Merger Agreement, all debts, liabilities, and duties of Cambridge became the debts, liabilities, and duties of Ability Inc.

114.   As a result of the merger, Ability Inc. acted as a holding company, operating through Ability, its wholly-owned subsidiary.

115.   As a result of the merger, Hurgin became the CEO of Ability Inc. and remained the CEO of Ability.  Similarly, Aurovsky became the CTO of Ability Inc. and remained the CTO of Ability.

116.   The merger allowed Ability to become a public company without having to go through the traditional IPO process.

117.   As explained in both of December 2015 proxy statement and in Ability Inc.'s FY 2015 Form 20-F, filed with the Commission on May 2, 2016, the business combination was a reverse merger in which Ability comprised the ongoing operations of the now public company, Ability's senior management (*i.e.*, Hurgin and Aurovsky) comprised the senior management of the now public company, and Ability's former shareholders (*i.e.*, Hurgin and Aurovsky) became the controlling shareholders of the now public company.

118.   After the merger, Cambridge's shareholders held about 37% of Ability Inc.'s stock, and Hurgin and Aurovsky held about 63% of Ability Inc.'s stock and became Ability Inc.'s co-controlling shareholders.

119.   Of the approximately $81 million placed into the trust account from the Cambridge IPO, about $60 million was used to fund the merger.

120.    The remaining $21 million was returned to the Cambridge shareholders who elected to redeem their original investment with a 1% profit and additional warrants.

121.    Of the $60 million used to fund the merger, about $19 million was paid to Ability; another $11 million was paid to various professionals.

122.    Of the remaining $30 million, Hurgin and Aurovsky each received $9,075,000, and about $12 million was placed in an escrow account at an Israeli bank for their benefit as a put option.

123.    In addition, in FY 2015 and before the close of the merger, Hurgin and Aurovsky paid themselves about $15 million in dividend distributions from Ability's then existing cash reserves. That dividend distribution was in addition to the monies they received as part of the Cambridge merger consideration.

## I.    Defendants' Fraudulent Statements and Conduct

124.    The proxy materials, which included the December 2015 Proxy Statement, and the November 2015 roadshow transcript and PowerPoint slides, were materially false and misleading in several ways.

125.    First, contrary to the representation in the Proxy Statement that Cambridge had conducted "thorough due diligence" on Ability's products, backlog and pipeline, Cambridge had not conducted independent due diligence on Ability's claimed ownership and development of its purportedly "game changing" new product, ULIN, and had not conducted independent due diligence on Ability's revised $148 million backlog and pipeline revenue figure.

126.    Second, contrary to the representation in the proxy materials, Ability did not own ULIN. It was only a reseller of ULIN for a three-year term under an undisclosed October 20, 2015 reseller agreement with a company incorporated in Singapore 11 days before the agreement was signed.

127.    Under the reseller agreement, ULIN's owner was entitled to 50% of the revenues Ability received from ULIN sales. In addition, if Ability failed to sell $10 million worth of ULIN in a given year, ULIN's owner was entitled to a 15% penalty on any shortfall.

128.    Both Hurgin and Aurovsky knew about the ULIN reseller agreement, including its three year term, revenue sharing, and penalty terms.

129.    Hurgin entered into and signed the ULIN reseller agreement on October 20, 2015.

130.    Neither Hurgin nor Aurovsky disclosed the ULIN reseller agreement to Cambridge, Prometheus, Econ. Partners, or to Cambridge's shareholders and prospective investors.

131.    Third, the proxy materials contained materially misleading statements about Ability's business with the Latin American police agency, its largest customer and its only customer in Latin America.

132.    The MD&A section in the Proxy Statement and the November 2015 roadshow presentation both touted Ability's prospects with the Latin American police agency and stated that Ability believed future projects in that region were likely to continue.

133.    By the end of October 2015, over 80% of Ability's backlog of orders for the remainder of 2015 and all of FY 2016, or about $51.5 million, was from the Latin American police agency.

134.    However, there were no purchase orders in place for over 70% of those orders; the orders were instead based only on verbal agreements with police management.

135.    By at least early November 2015 – before the second roadshow and the proxy vote – Hurgin and Aurovsky knew that the police management who had verbally agreed to purchase Ability's products, had been terminated from their positions.

136.    None of this information regarding the management terminations at the Latin American police agency with whom Ability had verbal agreements, was disclosed to Cambridge, Prometheus, Econ. Partners, or to Cambridge's shareholders and prospective investors.

137.    Instead, the Proxy Statement disclosed only that "[i]n November 2015, it became apparent that certain revenues that were expected to be received by Ability in the second half of 2015 will likely be delayed and received early 2016."

138.    There was no disclosure in the Proxy Statement that this delay related to Ability's largest customer, the Latin American police agency, or that the management team who had orally agreed to buy products from Ability had been terminated.

139.    Nor was there any disclosure that those terminations could negatively impact Ability's capacity to recognize revenue from those verbal orders and to obtain future business from that agency.

140.    Fourth, the $148 million backlog and pipeline revenue figure in the November 2015 roadshow presentation and the $108 million revenue forecast for FY 2016 were materially misleading.

141.    For one, prospective sales of two ULIN products for $40 million were included in the pipeline figure. But it was not disclosed to investors that 50% of this revenue had to be paid to ULIN's true owner, a third party company.

142.    Moreover, according to the November 2015 roadshow transcript, Hurgin misleadingly told investors that Ability's current gross profit margin on its total product sales was 47% and he expected ULIN sales to increase Ability's gross profit margin to 54%.

143.    Because the gross profit margin on ULIN was only 50%, any ULIN sales could not have increased to Ability's overall gross profit margin to 54%.

144.    Also, it was not disclosed that the $148 million in revenue included about $22 million in backlog orders from the Latin American police agency that were based only on verbal agreements with police management who had been terminated.

145.    Instead, the shareholders were provided with the Prometheus fairness opinion that stated that all of Ability's backlog was backed by purchase orders; and not the Econ. Partners' report.

146.    As a result, the backlog and pipeline revenue figure was materially misleading.

147.    In addition, because Ability's $108 million revenue forecast for FY 2016 was based on and supported by this misleading backlog and pipeline figure, the forecast itself was rendered materially misleading as well.

148.    All of the misleading representations and omissions, had the truth been known, would have been material to shareholders and investors in deciding whether to vote in favor of the proposed Ability-Cambridge merger.

**J.      Hurgin's and Aurovsky's Essential Roles in the Approval of the Merger**

149.    Hurgin, as CEO of Ability, took the lead in negotiating with Cambridge and providing information about Ability to Cambridge and the various professionals retained in connection with the merger.

150.    Because of his central role in, and intimate familiarity with, Ability's business, Hurgin was responsible for and had ultimate authority over all statements regarding Ability made in the Form S-4 registration statement, which included the Proxy Statement, and the November 2015 roadshow PowerPoint slides filed with the SEC.

151.    Aurovsky, Ability's CTO, spoke with Hurgin on a daily basis and knew that Ability was negotiating an agreement to merge with Cambridge, and that Ability would become a public company, trading on a U.S. stock exchange.

152.    As of December 22, 2015, the date of Cambridge's special meeting of shareholders to vote upon the merger agreement, there were 122,000 common shares of Ability outstanding, of which Hurgin and Aurovsky each held 61,000 shares.

153.    As the controlling shareholders of Ability, each holding 50% of Ability's shares, both Hurgin's and Aurovsky's consent to the merger was necessary.

154.    Both Hurgin and Aurovsky consented to the merger.

155.    Both Hurgin and Aurovsky permitted the use of their names to solicit proxies, consents, and authorizations related to the proposed merger and the exchange of Cambridge shares held by Cambridge shareholders for the shares of Holdco, which became Ability Inc.

156.    Hurgin signed a form on November 17, 2015, attached as Exhibit 99.4 to Amendment No. 2 of the Form S-4 registration statement, consenting to the use of his name in the Proxy Statement as a person who would become a director of Ability Inc.

157.    Aurovsky also signed a form on November 17, 2015, attached as Exhibit 99.5 to Amendment No. 2 of the Form S-4 registration statement, consenting to the use of his name in the Proxy Statement as a person who would become a director of Ability Inc.

158.    Hurgin was named approximately 49 times in the Proxy Statement; Aurovsky was named approximately 29 times in the Proxy Statement.

159.    Both Hurgin and Aurovsky were substantially connected to the solicitation of proxies for the Ability-Cambridge business combination.

160.    In the proxy solicitation materials, Hurgin and Aurovsky were presented as Ability's two-member team of "highly-talented" "industry professionals" with "strong relationships and a wide network of contacts in the fields of security and intelligence."

161.    The materials also stated that Ability's two-member management team would remain in place following the merger, with Hurgin and Aurovsky remaining as the CEO and CTO, respectively, of Ability Inc.

162.    In addition, the proxy materials represented that upon consummation of the merger, Hurgin would be appointed as the chairman of the board (as well as CEO) of Ability Inc., to provide Ability Inc. with consistent and effective leadership, both with respect to Ability Inc.'s operation and the leadership of its board of directors.

163.    As the proxy materials explained, "having Mr. Hurgin act in both of these [CEO and Chairman] roles increases the timeliness and effectiveness of the board's deliberations, increases the board's visibility into the day-to-day operations of [Ability Inc.], and ensures the consistent implementation of [Ability Inc.'s] strategies."

164.    The proxy solicitation materials also included biographical information for Hurgin and Aurovsky.

165.    Among other things, Hurgin was described as holding a Master's degree in radio electronics, the CEO of Ability since 1994, the CEO of two other cyber security companies, and that he will serve as a member of Ability Inc.'s board of directors due to his expertise in radio electronics and interception technologies and his knowledge of Ability's industry, his perspective as co-founder of Ability, and his role as Ability's CEO.

166.    Aurovsky was described as also holding a Master's degree in radio electronics, and that he will serve as a member of Ability Inc.'s board of directors due to his expertise in radio frequency communications and his knowledge of Ability's industry as a co-founder of Ability and his role as Ability's chief technology officer.

167.    In addition, the Proxy Statement represented that following the merger, Hurgin and Aurovsky would each beneficially own over 8.3 million shares of common stock, representing over 60% of all of the outstanding ordinary shares of Ability Inc.

168.    Both Hurgin's and Aurovsky's qualifications and continued participation in the newly formed public company were essential to soliciting Cambridge shareholders to vote in favor of the merger.

169.    Hurgin reviewed and approved the Proxy Statement for filing.

170.    Hurgin also reviewed, approved, and participated in the drafting of the November 2015 roadshow presentation filed with the SEC.

171.    In addition, Hurgin spoke and presented at the November 2015 roadshow, a transcript of which was filed with the SEC on November 18, 2015.

172.    Hurgin had ultimate authority over the statements regarding Ability made in these proxy materials filed with the SEC.

173.    Both Hurgin and Aurovsky, as present and future directors, officers, and controlling shareholders of Ability and Ability Inc., and as the two primary beneficiaries of the proposed merger, in soliciting proxies and in permitting their names to be used in soliciting proxies, failed to take reasonable steps to abide by their duty to ensure that the Proxy Statement and related proxy materials fully and fairly furnished all material facts and did not contain any material misstatements or omissions about Ability so as to allow a reasonably prudent investor to make an informed investment decision.

174.    Hurgin knew, or was reckless or negligent in not knowing, that the proxy materials contained material misrepresentations and omissions concerning Ability's ownership of ULIN; its relationship with its largest customer, the Latin American police agency, with which Ability mainly

had oral agreements with management who had been terminated; Ability's $148 million backlog and pipeline revenue figure and $108 million FY 2016 revenue forecast, which were misleading; and Ability's backlog of orders, the majority of which were not backed by actual purchase orders.

175.    As an officer, director, and controlling shareholder of Ability, Aurovsky was aware of the merger transaction and the related proxy materials, and a copy of those materials were available to him for his review and approval.

176.    Aurovsky knew about the ULIN reseller agreement and its terms, and knew about the management terminations at Ability's largest customer with whom Ability mainly had oral agreements for projects.

177.    To the extent, Aurovsky did not, in fact, review the Proxy Statement or related proxy materials, he did not act with reasonable care in violation of his duty as a present and future director, officer, and controlling shareholder of Ability, and Ability Inc., and as one of the primary beneficiaries of the proposed merger, to ensure that the proxy materials fully and fairly furnished all material facts and did not contain any material misstatements or misleading omissions about Ability so as to allow a reasonably prudent investor to make an informed investment decision.

178.    Defendants Hurgin and Aurovsky, in engaging in the conduct alleged in this complaint, acted within the course and scope of their employment and authority as the CEO and CTO, respectively, of both Ability and Ability Inc. As such, their knowledge, recklessness, and negligence are imputed to both Ability Inc. and Ability.

179.    Cambridge's CEO negligently failed to take reasonable steps to ensure that the Cambridge shareholders were provided with material and accurate information concerning Ability's prospects. Cambridge represented in the Proxy Statement it had conducted "thorough due diligence" on Ability, including its products, backlog, and pipeline. Cambridge and the Cambridge

CEO, however, did not disclose to investors that they had not conducted additional due diligence on ULIN, Ability's claimed ownership of that product, or the $148 million backlog and pipeline revenue figure presented in the November 2015 roadshow.

180.    Cambridge's CEO was also aware of sufficient information that should have reasonably required him to make more fulsome disclosures to the shareholders about the lack of purchase orders supporting the backlog, and the management terminations at Ability's largest customer, the Latin American police agency, with whom Ability mainly had verbal agreements.

181.    Cambridge's CEO, in engaging in the conduct alleged in this complaint, acted within the course and scope of his employment and authority as the CEO of Cambridge, which later merged with Cambridge Holdco and became known as Ability Inc. As such, his negligence is imputed to Ability Inc.

### K.    Hurgin's and Aurovsky's Misrepresentations to Ability's Auditors

182.    In an effort to cover up the truth, Hurgin and Aurovsky misled Ability's auditor, a large public accounting firm.

183.    Each signed representation letters dated October 25, November 2, November 25, and November 26, 2015 that were provided to Ability's auditor in connection with the issuance of the Form S-4 registration statement.

184.    In those letters, Hurgin and Aurovsky represented to Ability's auditor, among other things, that there were "[n]o occurrences or discoveries that make any part of the textual material or financial statements and notes thereto inaccurate or misleading."

185.    Hurgin and Aurovsky also represented to the auditor in those letters that there were "[n]o instances identified of material fraud or any other fraud that, although not material, involves senior management…"

186.    These representations to Ability's auditor were false because Hurgin, Aurovsky, and Ability were defrauding Cambridge's shareholders in soliciting their vote to approve the merger. As alleged in more detail above, they misled the voting shareholders about claims regarding Ability's ownership of the so-called "game changing" ULIN product, about Ability's backlog with its largest customer, and about its backlog and pipeline figures.  Also, as alleged above, Hurgin knew, or was reckless in not knowing that these statements were false and misleading, and both Aurovsky and Hurgin did not act with reasonable care to ensure that these statements were not false or misleading.

**L.    Defendants' Financial Motives to Commit Fraud**

187.    As a result of the merger, Ability received approximately $19 million of capital consideration being paid by Cambridge.

188.    As a result of the merger, Hurgin and Aurovsky each received $9,075,000, and approximately $12 million was placed in an escrow account at an Israeli bank for their benefit as a put option, which they can access after a specified period of time after the merger by tendering a set number of Ability Inc. shares to Ability Inc.

189.    In addition to the cash consideration they would receive as a result of the merger, both Hurgin and Aurovsky would be paid additional compensation in the form of increased salaries.

190.    As CEO of Ability, Hurgin's total compensation, including salary and other benefits, in 2013 was $68,870, and in 2014 was $60,030.

191.    As CTO of Ability, Aurovsky's total compensation, including salary and other benefits, in 2013 was $61,559, and in 2014 was $53,077.

192.    Following the merger, both Hurgin and Aurovsky would be paid a salary of $30,800 per month, or $369,600 per year.

193.    In addition, following the merger Hurgin and Aurovsky would become directors of Ability Inc., and would each beneficially own over 8.3 million shares of common stock, representing over 60% of all of the outstanding ordinary shares of Ability Inc.

**M.    Post-Merger Events**

194.    After the merger closed, Ability Inc. suffered a significant decline in revenue, incurred net losses, and quickly burned through the $19 million it received from the merger.

195.    For the fourth quarter of 2015, Ability Inc. only recognized about $2 million in revenues, and had about $380,000 in net losses. For FY 2016, Ability Inc. only recognized about $16.5 million in revenues (as compared to $52 million in FY 2015), and had about $8.1 million in net losses. For FY 2017, Ability Inc. recognized only about $3 million in revenues, and had about $9.1 million in net losses. For FY 2018, Ability had only about $500,000 in revenues, and incurred about $10.2 million in net losses.

196.    Also, of the $51.5 million in 2015 and 2016 backlog from the Latin American police agency, Ability Inc. only recognized about $8.5 million in the third quarter of 2015 and about $4 million from the fourth quarter of 2015 through the fourth quarter of 2016. The remaining $39 million in backlog orders was never recognized. In addition, Ability Inc. did not recognize any revenue from the Latin American police agency in FY 2017.

197.    On May 2, 2016, approximately five months after the close of the Ability-Cambridge merger, Ability Inc. filed its 2015 annual report with the SEC on Form 20-F, disclosing publicly for the first time the ULIN reseller arrangement.

198.    In that report, Ability Inc. acknowledged that "[a]ll our ULIN sales are based on a reseller agreement" and that "[t]he owner of ULIN is an unrelated third party supplier" and "is a newly established corporation with a short operating history and is still unknown in the industry."

199.    A press release issued that same day also disclosed that Ability Inc. only had about $2 million in revenue and incurred about $380,000 in net losses for the fourth quarter of FY 2015

200.    The 2015 annual report and press release were filed before the market opened on Monday, May 2, 2016.

201.    Ability Inc.'s stock price dropped by about 33% from the prior trading day, Friday, April 29, 2016, at a close of $7.32 per share to Monday, May 2 at a close of $4.90 per share.

### FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Hurgin, Ability and Ability Inc.)**

202.    The SEC realleges and incorporates by reference paragraphs 1 through 201 above.

203.    Hurgin, Ability, and Ability Inc., in connection with soliciting shareholders and prospective investors to vote in favor the Ability-Cambridge merger, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading in the proxy materials, and otherwise undertook several deceptive acts and practices to give Cambridge's shareholders and prospective investors a false appearance about Ability's business prospects. This included false claims concerning Ability's ownership of ULIN and the expected revenues to be derived from the sale of that product; its relationship with its largest customer, the Latin American police agency, with which Ability mainly had oral agreements with management who had been terminated; its $148 million backlog and pipeline revenue figure and its $108 million FY 2016 revenue forecast, which were misleading; and Ability's backlog of orders, the majority of which were not backed by actual purchase orders. In addition, Hurgin was aware of the October 2015 ULIN reseller agreement in October 2015, but did not disclose the agreement and concealed it from various parties working on the merger. He also misled Ability's auditor in

connection with the merger.

204.    Hurgin also violated his duty as a present and future director, officer, and controlling shareholder of Ability and Ability Inc., to take reasonable steps to ensure that the proxy materials fully and fairly furnished all material facts and did not contain any material misstatements or misleading omissions about Ability so as to allow a reasonably prudent investor to make an informed investment decision.

205.    By engaging in the conduct described above, Hurgin, Ability, and Ability Inc., and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

206.    Hurgin, Ability, and Ability Inc. knew, or were reckless in not knowing, that they employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

207.    Ability Inc., as a result of the reverse merger by which Ability merged into and comprised the ongoing operations of Ability Inc., is liable for Hurgin's and Ability's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

208.    By engaging in the conduct described above, Hurgin, Ability, and Ability Inc. violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendants Hurgin, Ability, and Ability Inc.)

209.    The SEC realleges and incorporates by reference paragraphs 1 through 201 above.

210.    Hurgin, Ability, and Ability Inc., in connection with the solicitation of shareholders and prospective investors to vote in favor the Ability-Cambridge merger, obtained money and property by means of untrue statements of material fact and material omissions in the proxy materials, and otherwise undertook several deceptive acts and practices to give Cambridge's shareholders and prospective investors a false appearance about Ability's business prospects. This included false claims concerning Ability's ownership of ULIN and the expected revenues to be derived from the sale of that product; its relationship with its largest customer, the Latin American police agency, with which Ability mainly had oral agreements with management who had been terminated; its $148 million backlog and pipeline revenue figure and its $108 million FY 2016 revenue forecast, which were misleading; and Ability's backlog of orders, the majority of which were not backed by actual purchase orders. In addition, Hurgin was aware of the October 2015 ULIN reseller agreement, but did not disclose the agreement and concealed it from various parties working on the merger. He also misled Ability's auditor in connection with the merger.

211.    Ability Inc., as a result of the reverse merger by which Ability merged into and comprised the ongoing operations of Ability Inc., is liable for Hurgin's and Ability's violation of Section 17(a) of the Securities Act.

212.    By engaging in the conduct described above, Hurgin, Ability, and Ability Inc., and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

213.    Hurgin, Ability, and Ability Inc., knew, or were reckless in not knowing, that they employed devices, schemes and artifices to defraud.

214.    Hurgin, Ability, and Ability Inc., knew, or were reckless or negligent in not knowing, that they obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

215.    Hurgin, Ability, and Ability Inc. also knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

216.    Hurgin, also violated his duty as a present and future director, officer, and controlling shareholder of Ability and Ability Inc., to take reasonable steps to ensure that the proxy materials fully and fairly furnished all material facts and did not contain any material misstatements or misleading omissions about Ability so as to allow a reasonably prudent investor to make an informed investment decision.

217.    In addition, under the terms of Merger Agreement, Ability Inc. assumed and is liable for Cambridge's negligent violation of Sections 17(a)(2) and (3) of the Securities Act, based on the conduct alleged in paragraphs 179-181 of this complaint, among other allegations.

218.    By engaging in the conduct described above, Hurgin, Ability, and Ability Inc. violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3)].

### THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(2) and (3) of the Securities Act

### (against Defendant Aurovsky)

219.    The SEC realleges and incorporates by reference paragraphs 1 through 201 above.

220.    Aurovsky, in connection with the solicitation of shareholders and prospective investors to vote in favor the Ability-Cambridge business combination, obtained money and property by means of untrue statements of material fact and material omissions in the proxy materials and otherwise undertook several deceptive acts and practices to give Cambridge's shareholders and prospective investors a false appearance about Ability's business prospects, including Ability's false claim of ownership of ULIN and the expected revenues to be derived from the sale of that product; Ability's relationship with its largest customer, the Latin American police agency, with which Ability mainly had oral agreements with management who had been terminated; Ability's $148 million backlog and pipeline revenue figure and its $108 million FY 2016 revenue forecast, which were misleading; and Ability's backlog of orders, the majority of which were not backed by actual purchase orders.

221.    In addition, Aurovsky failed to take reasonable steps to review the Proxy Statement or related proxy materials, in violation of his duty as a present and future director, officer, and

controlling shareholder of Ability, and Ability Inc., to ensure that the proxy materials fully and fairly furnished all material facts and did not contain any material misstatements or misleading omissions about Ability so as to allow a reasonably prudent investor to make an informed investment decision; and signed false management representation letters to Ability's auditors in connection with the Form S-4 registration statement.

222.    By engaging in the conduct described above, Aurovsky, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, negligently: (a) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

223.    By engaging in the conduct described above, Aurovsky violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act, [15 U.S.C. §§ 77q(a)(2) & (a)(3).]

## FOURTH CLAIM FOR RELIEF

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### (against Defendants Hurgin, Aurovsky, Ability, and Ability Inc.)

224.    The SEC realleges and incorporates by reference paragraphs 1 through 201 above.

225.    By engaging in the conduct described above, Defendants Hurgin, Aurovsky, Ability, and Ability Inc., directly or indirectly, by use of mails, or the means or instrumentalities of interstate commerce or any facility of a national securities exchange, or otherwise, in contravention of Rule 14a-9, solicited or permitted the use of their names to solicit proxies, consents, or authorizations in respect of non-exempt securities registered with the SEC pursuant to Section 12 of

the Exchange Act [15 U.S.C. § 78l], by means of a proxy statement, form of proxy statement, notice of meeting and other communications that contained statements, which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

226.    In engaging in the conduct described above, Hurgin, Aurovsky, Ability, and Ability Inc. acted at least negligently.

227.    Defendant Ability Inc., as a result of the reverse merger by which Ability merged into and comprised the ongoing operations of Ability Inc., is liable for Hurgin's, Aurovsky's and Ability's violation of Section 14(a) of the Exchange Act and Rule 14a-9.

228.    By engaging in the conduct described above, Defendants Hurgin, Aurovsky, Ability and Ability Inc. have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 14(a) of the Exchange Act [15 U.S.C. § 78n(q)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Hurgin, Ability, and Ability Inc., and their agents, servants,

employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Sections 10(b) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78 n(a)] and Rules 10b-5 and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.14a-9].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Aurovsky and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(2) & (3)], and Section 14(a) of the Exchange Act [15 U.S.C. § 78 n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

## IV.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Enter an order against Defendant Hurgin pursuant to Sections 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Sections 2l(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  June 18, 2019

*/s/ Donald W. Searles*
DONALD W. SEARLES
Attorney for Plaintiff
Securities and Exchange Commission