UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/4/2020____
```

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiff,

        -v-

ANATOLY HURGIN, ALEXANDER
AUROVSKY, ABILITY COMPUTER &
SOFTWARE INDUSTRIES LTD, and
ABILITY INC.,

                            Defendants.

No. 19-cv-5705 (MKV)
OPINION AND ORDER

MARY KAY VYSKOCIL, District Judge:

        The Securities and Exchange Commission brings this action against two Israeli citizens,

Anatoly Hurgin and Alexander Aurovsky, and two entities, Ability Computer & Software

Industries ("Ability") and Ability, Inc.  The Commission alleges that the defendants committed

fraud and violated proxy solicitation rules in connection with a merger between Ability and

Cambridge Capital Acquisition Corp., a publicly-traded U.S. company, that resulted in the

formation of Ability, Inc., which is also a publicly-traded U.S. company.  The entities have

entered into consent decrees with the Commission.  Aurovsky moves to dismiss the claims

against him for lack of personal jurisdiction, under Rule 12(b)(2) of the Federal Rules of Civil

Procedure, and for failure to state a claim, under Rule 12(b)(6).  Hurgin moves to dismiss the

claims against him under Rule 12(b)(6).  For the reasons set forth below, the motions to dismiss

are DENIED.

I.      BACKGROUND[1]

Ability Computer & Software Industries ("Ability") was a business based in Tel Aviv, Israel that sold cell phone and satellite interception products.  Cmpl. ¶ 23.  Anatoly Hurgin and Alexander Aurovsky co-founded and co-owned the company.  *Id.*  Hurgin was the CEO, and Aurovsky was the chief technology officer ("CTO").  *Id.*; *see also id.* ¶¶ 13, 14.  Both Hurgin and Aurovsky live in Israel.  *Id.* ¶¶ 13, 14.  Neither holds any securities licenses or has ever been registered with the SEC in any capacity.  *Id.*

Cambridge Capital Acquisitions Corporation ("Cambridge") was a publicly-traded U.S. company.  *Id.* ¶¶ 15–16.  It was a special purpose acquisition company, meaning it was formed to make money for its investors by acquiring or merging with some other, "target" company.  *Id.*  In December 2013, Cambridge conducted an initial public offering ("IPO") that raised about $81 million, but it would have to return that money to its shareholders if it did not combine with a target company within 24 months.  *Id.* ¶ 17–19.

In December 2015, Cambridge merged with Ability.  *Id.* ¶ 15.  The resulting company is Ability Inc.  *Id.*  It is a publicly-traded U.S. company.  *Id.* ¶ 12.  Hurgin is a "co-controlling shareholder, CEO, and chairman of the board" of Ability Inc.  *Id.* ¶ 13.  Aurovsky is a "co-controlling shareholder, CTO, and a board member" of Ability Inc.  *Id.* ¶ 14.

Cambridge identified Ability as a potential target company in or around June 2015.  *Id.* ¶ 22.  It was a small company with about twelve employees and a few contractors.  *Id.* ¶ 25.  In 2013, it made about $5.6 million in revenue.  *Id.*  In 2015, it made about $22.1 million.  *Id.*

In August 2015, "Hurgin created, or caused to be created, a financial forecast . . . that was sent to Cambridge" in connection with the potential merger.  *Id.* ¶ 26.  An Excel spreadsheet laid

---

[1] The facts are taken from the Complaint [ECF #1 ("Cmpl.")].  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true.").

out the specific details.  *Id*.  The forecast predicted that the company would make up to $110

million in 2016.  *Id*. ¶ 27.  "There were two significant components of this forecast: (1) the

'backlog' . . . of customer orders Ability already had in place; and (2) the 'pipeline' . . . of the

probable future orders."  *Id*.

The spreadsheet represented that the backlog of orders was worth $65.7 million.  *Id*. ¶ 28.

It contained a list of customer orders, and it "incorrectly represented that the backlog was backed

by actual purchase orders from Ability's customers."  *Id*. ¶ 29.  A key component of the backlog

was from a Latin American police agency, "Ability's single largest customer."  *Id*. ¶ 30.  The

police agency accounted for a huge percentage of its revenues in past years.  *See id*.  "Of the

$65.7 million in backlog revenue" in the spreadsheet "80% of it, or about $52 million, was from

that police agency."  *Id*. ¶ 31.

Cambridge hired two companies to evaluate the potential merger, Prometheus Financial

Advisory Ltd. and Economics Partners, LLC.  *Id*. ¶¶ 35–36.  Both "received and relied on

information provided by Ability and Hurgin, including the August 2015 spreadsheet" of backlog

and pipeline orders.  *Id*. ¶ 37.  Economics Partners, however, also conducted its own due

diligence.  *Id*. ¶¶ 37–39.  It requested copies of the purchase orders supporting the backlog

figure, and Ability acknowledged that it did not have signed purchase orders for about two-thirds

of the backlog, "only verbal agreements with customers."  *Id*. ¶¶ 39–41.[2]  As a result,

Economics Partners reported that the "high rate of projects with no [signed purchase orders] in

the backlog could indicate a significant risk."  *Id*. ¶ 42.  The Economics Partners report also

highlighted the risk from the fact that "most" of the backlog was from one Latin American police

---

[2] The CEO of Cambridge later asked Hurgin about the finding in the Economics Partners report that much of Ability's backlog was not supported by purchase orders, and Hurgin confirmed that it "was not supported by actual purchase orders, but told Cambridge's CEO that the backlog revenue numbers were still reliable because, for example, some customers had budgeted for the purchases or made partial payments on the orders."  Cmpl. ¶¶ 50–51.

agency.  *Id.* ¶ 43.  Prometheus, on the other hand, did not conduct its own due diligence.  It issued a report stating that the backlog was "comprised of signed purchase orders" and projecting that Ability would earn $108 million in 2016.  *Id.* ¶¶ 46–47.

In September 2015, Cambridge and Ability entered into a merger agreement, which both Hurgin and Aurovsky signed [ECF #48-1 ("Merger Agreement") at 85, 86].[3]  "As the controlling shareholders of Ability, each holding 50% of Ability's shares, both Hurgin's and Aurovsky's consent to the merger was necessary."  Cmpl. ¶ 153.  "Both Hurgin and Aurovsky consented to the merger."  *Id.* ¶ 154.

"The next step was to solicit and obtain shareholder approval for the proposed merger." *Id.* ¶ 55.  Hurgin played the "central role," *id.* ¶ 150, but Aurovsky "spoke with Hurgin on a daily basis and knew that Ability was negotiating an agreement to merge with Cambridge, and that Ability would become a public company, trading on a U.S. stock exchange," *id.* ¶ 151.  "Both Hurgin and Aurovsky permitted the used of their names to solicit proxies, consents, and authorization related to the proposed merger."  *Id.* ¶ 155.  Specifically, each "signed a form on November 17, 2015, attached as Exhibit 99.4 to Amendment No. 2 of the Form S-4 registration statement, consenting to the use of his name in the Proxy Statement as a person who would become a director of Ability Inc."  *Id.* ¶¶ 156, 157.  The proxy solicitation materials described Hurgin and Aurovsky as "highly-talented . . . industry professionals" who would bring their skills and "wide network of contacts in the fields of security and intelligence" to the company after the merger.  *Id.* ¶ 160.  The Commission alleges that their "qualifications and continued

---

[3] In his opening brief, Aurovsky asserted that he did not sign the Merger Agreement [ECF #46 ("Aurovsky Mem.") at 12].  In its response [ECF #47 ("Opp. to Aurovsky")], the Commission was adamant that Aurovsky "personally signed the merger agreement."  Opp. to Aurovsky at 12; *see also, e.g., id.* at 1, 2, 6 & n.2.  In his reply brief, Aurovsky conceded—without acknowledging his earlier contrary assertions—that he did, in fact, sign the Merger Agreement [ECF #51 at 3 (arguing that "Aurovsky's signature on the Merger Agreement is . . . irrelevant to personal jurisdiction")].  Counsel for Aurovsky confirmed on the record at Oral Argument on June 4, 2020 that Aurovsky signed the Merger Agreement [ECF #58 (Tr.") at 23:5].

participation in the newly formed public company were essential to soliciting Cambridge shareholders to vote in favor of the merger." *Id.* ¶ 168.

At the end of September 2015, "Hurgin, along with Cambridge's CEO and others, conducted an investor roadshow in New York City." *Id.* ¶ 57.  But the "September roadshow failed to commit investors to support the proposed merger, in part due to concerns about Ability's financial forecast." *Id.* ¶ 66.  "In an October 6, 2015 email, Cambridge's CEO reported to Hurgin and others that at least three potential investors expressed the following concerns after the roadshow: '[n]one of them believes [Ability's financial] forecast,' '[t]hey all think Ability got hot for a year with the Latin American projects,' '[n]one of them believes it is sustainable,' and 'they all think Ability doesn't believe in its own growth.'" *Id.* ¶ 67.  Investors also raised the concern that "Ability's business was project-based and therefore did not have a recurring revenue stream." *Id.* ¶ 68.

In late November and early December 2015, Ability and Cambridge conducted another roadshow, with Hurgin as the key presenter (the "November 2015 roadshow"). *Id.* ¶ 70.  There, Hurgin represented verbally and in a PowerPoint presentation that Ability had developed and owned a "game changing" interception product for mobile devices called ULIN. *Id.* ¶¶ 75–77.  Hurgin stated that "ULIN was a 'game changer' that was superior to other tracking programs because 'we do not need to be in the vicinity of a target to be able to intercept our target . . . . I can be here in New York, our target can be any place in the world.'" *Id.* ¶ 76.  He "stated that Ability owned the ULIN product, explaining 'today we are Ability the only owner for this technology.'" *Id.*  And he represented "that ULIN was 'based on a recurring revenue model.'"

*Id.* ¶ 77.  Hurgin also represented that Ability had a "three-year deal" with the Latin American

police agency.  *Id.* ¶ 79.

Under the Merger Agreement, Ability and Cambridge were jointly responsible for the

preparation of the proxy materials for the proposed merger that were sent to shareholders and

filed with the Commission.  *Id.* ¶ 87–91; *see also, e.g.*, Merger Agreement at 50 (providing that

"[Ability] and Cambridge shall prepare and file with the SEC . . . proxy materials for the purpose

of soliciting proxies" and that "[e]ach" must "take any and all actions required to satisfy the

requirements of the Securities Act and the Exchange Act"); Cmpl. ¶ 150 (alleging that, because

of his "central role," "Hurgin was responsible for and had ultimate authority over all statements

regarding Ability").  When the companies filed the Proxy Statement with the Commission, they

attached both the Merger Agreement and the Prometheus report, which incorrectly stated that the

backlog was comprised of signed purchase orders, among other attachments.  Cmpl. ¶¶ 98–102.

They did not attach or mention the Economics Partners report, which highlighted the risks of the

merger.  *Id.* ¶ 61.  The proxy materials also included the November 2015 roadshow transcript

and PowerPoint slides, which included Hurgin's representations about Ability owning ULIN and

its supposed three-year deal with the Latin American police agency.  *See id.* ¶ 124; *see also id.* ¶¶

60, 72, 86.

The Merger Agreement "included certain representations and warranties made by Ability

and its shareholders (i.e., Hurgin and Aurovsky, who each held 50% of Ability's shares) to

Cambridge, which were required to be true and correct both at the time of agreement was entered

into and at the closing date of the business combination."  *Id.* ¶ 92.  Through the Merger

Agreement, Hurgin and Aurovsky represented that they had provided Cambridge with a

complete list of "Material Company Contracts."  *Id.* ¶ 94.  They also represented that there had

not been a "Material Adverse Effect" on Ability at the time of the Merger Agreement or since the date of the Merger Agreement.  *Id*. ¶ 93.

The Commission identifies a number of allegedly misleading statements and omissions in connection with the sale of the merger.  First, contrary to Hurgin's assertion at the November 2015 roadshow—an assertion that was reflected in the transcript and slides that were included in the proxy materials—"Ability did not own ULIN.  It was only a reseller of ULIN for a three-year term under an undisclosed October 20, 2015 reseller agreement."  *Id*. ¶ 126.  "Under the reseller agreement, ULIN's owner was entitled to 50% of the revenues Ability received from ULIN sales.  In addition, if Ability failed to sell $10 million worth of ULIN in a given year, ULIN's owner was entitled to a 15% penalty on any shortfall."  *Id*. ¶ 127.  "Both Hurgin and Aurovsky knew about the ULIN reseller agreement, including its three year term, revenue sharing, and penalty terms."  *Id*. ¶ 128.  Indeed, Hurgin had signed the ULIN reseller agreement.  *Id*. ¶ 129. Second, the Commission alleges that Hurgin made and the proxy materials contained misleading statements and omissions about Ability's business in Latin America.  *Id*. ¶ 131.  Specifically, "Hurgin and Aurovsky knew that the police management who had verbally agreed to purchase Ability's products[] had been terminated from their positions."  *Id*. ¶ 135.  Third, the Commission alleges that Ability's backlog and pipeline figures were misleading, in part because of the failure to disclose these facts about ULIN and the Latin American police agency.  *See id*. ¶¶ 140–146.  Finally, the proxy materials included the Prometheus report, which incorrectly stated that all of Ability's backlog was backed by signed purchase orders, but not the Economics Partners report to the contrary.  *Id*. ¶ 145.

Hurgin and Aurovsky also allegedly misled Ability's auditor, a large public accounting firm in connection with the merger.  *Id*. ¶ 182.  "Each signed representation letters dated October

25, November 2, November 25, and November 26, 2015 that were provided to Ability's auditor in connection with the issuance of the Form S-4 registration statement." *Id*. ¶ 183.  They stated that there were "[n]o occurrences or discoveries that make any part of the textual material or financial statements and notes thereto inaccurate or misleading." *Id*. ¶ 184.

A majority of Cambridge shareholders voted to approve the merger on December 23, 2015.  *Id*. ¶ 111.  As a result, Cambridge acquired Ability, and Ability Inc. became the new surviving public company that continued trading on the NASDAQ.  *Id*.  After the merger, Ability Inc. suffered net losses.  *See id*. ¶ 194–195.  Revenue from the Latin American policy agency fell far short of the 2016 projections and disappeared in 2017.  *See id*. ¶ 196.  Five months after the close of the merger, Ability Inc. filed its 2015 annual report with the Commission on Form 20-F, and disclosed publicly for the first time the ULIN reseller arrangement.  *Id*. ¶ 197.

The Commission filed a complaint asserting claims for relief against Defendants Hurgin, Aurovsky, Ability, and Ability Inc. [ECF #1 ("Cmpl.")].  The entity defendants later entered into consent decrees [ECF #36, 37].  The Complaint asserts three claims against Hurgin: fraud in connection with the purchase and sale of securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5; fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act; and violations of Section 14(a) of the Exchange Act and Rule 14a-9.  The Complaint also asserts two claims against Aurovsky: fraud in the offer or sale of securities, in violation of Section 17(a)(2) and (3) of the Securities Act; and violations of Section 14(a) of the Exchange Act and Rule 14a-9.

Hurgin and Aurovsky filed motions to dismiss and supporting papers [ECF #41, 42, 43 ("Hurgin Mem."), 44, 45, 46 ("Aurovsky Mem.")].  The Comission filed its responses [ECF #47 ("Opp. to Aurovsky") 48, 49 ("Opp. to Hurgin")].  Hurgin and Aurovsky filed reply briefs [ECF

#50, 51].  They also filed requests for oral argument [ECF #53].  The Court held oral argument

on June 4, 2020 [Minute Entry for Proceedings Held on June 4, 2020; ECF #58 (Tr.")].

## II.    LEGAL STANDARDS

### A.  Motion To Dismiss for Failure To State a Claim

To survive a motion to dismiss for failure to state a claim on which relief may be granted,

under Rule 12(b)(6), the plaintiff needs to allege only "sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "accept all factual allegations in

the complaint as true, and draw all reasonable inferences in the plaintiff's favor."  *Wilson v.*

*Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d. Cir. 2011).  The Court "may consider any written

instrument attached to the complaint, statements or documents incorporated into the complaint

by reference, legally required public disclosure documents filed with the [Commission], and

documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Rule 9(b) of the

Federal Rules of Civil Procedure imposes a heightened pleading standard on complaints alleging

securities fraud.  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

### B.  Motion To Dismiss for Lack of Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction, under Rule 12(b)(2) of

the Federal Rules of Civil Procedure, the plaintiff must make a *prima facie* showing that the

Court has personal jurisdiction over the defendant.  *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d

Cir. 2006).  "In evaluating whether the requisite showing has been made," the Court must

"construe the pleadings and any supporting materials in the light most favorable" to the plaintiff.

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

### III.   ANALYSIS

A.  The Commission Plausibly Alleges Claims Against Hurgin under Section 10(b) and Rule 10b-5, Section 17(a), and Section 14(a) of the Exchange Act and Rule 14a-9.

The Commission asserts three different claims against Hurgin for allegedly misleading Cambridge shareholders in connection with the merger.  It asserts a claim under Section 10(b) of the Exchange Act and Rule 10b-5.  It asserts a claim under Section 17(a) of the Securities Act.  And it asserts a claim under Section 14(a) of the Exchange Act and Rule 14a-9.

Section 10(b) of the Exchange Act makes it unlawful for a person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" the Commission's rules.  15 U.S.C. § 78j(b).  And Rule 10b–5, which implements Section 10(b), provides that it shall be unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R § 240.10b–5.  To state a claim under Section 10(b) and Rule 10b–5, the Commission must allege that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (citation and quotation marks omitted).  A defendant makes a misstatement or omission with scienter if he acts (i) "with the intent to deceive, manipulate, or defraud," *SEC v.*

*Obus*, 693 F.3d 276, 286 (2d Cir. 2012), or (ii) with "reckless disregard for the truth," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

Section 17(a) of the Securities Act prohibits fraud in the "offer or sale of any securities." 15 U.S.C. § 77q(a). The elements of a claim under Section 17(a) of the Securities Act are "essentially the same" as those required to prove fraud under Section 10(b). *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). However, while Section 17(a)(1), which makes it illegal to "employ any device, scheme, or artifice to defraud" in the offer or sale of securities, requires scienter, the Commission need not prove that a defendant acted with scienter to succeed on a claim under Sections 17(a)(2) and (3). *See Aaron v. SEC*, 446 U.S. 680, 697 (1980). Section 17(a)(2) makes it illegal to obtain money or property by means of any untrue statement of material facts or by any material omission, and Section 17(a)(3) makes it illegal to engage "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." For Sections 17(a)(2) and (3), a "showing of negligence is sufficient." *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014); accord *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).

Section 14(a) of the Exchange Act and its implementing regulation Rule 14a-9 establish liability for material misstatements or omissions in a proxy statement. 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a–9(a). The elements of such a claim are: "(1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action." *Vides v. Amelio*,

265 F. Supp. 2d 273, 276 (S.D.N.Y. 2003).  Here, too, the Commission is required to show only that the defendant was negligent.

In pleading its three claims against Hurgin, the Commission alleges that he made, or was responsible for, several misleading statements and omissions.  As an initial matter, the Commission alleges that, by virtue of his "central role" in both Ability and the merger, "Hurgin was responsible for and had ultimate authority over all statements regarding Ability" made to the Commission and the shareholders.  Cmpl. ¶ 150.  The Commission alleges that Hurgin and the proxy materials for which he was responsible falsely represented that Ability owned ULIN and failed to disclose that Ability was only a reseller of ULIN.  Cmpl. ¶¶ 126–27; 203, 210.  The Commission alleges that Hurgin and the proxy materials created the false impression that Ability had a three-year deal with the Latin American police agency, even though Hurgin knew that Ability had only an oral agreement with management who had been terminated.  *See id*. ¶¶ 79, 135, 102, 145, 203, 210.  The Commission further alleges that Hurgin's backlog and pipeline figures were misleading.  *Id*. ¶¶ 140–146, 203, 210.  Hurgin argues that his allegedly misleading statements and omissions were not material or were merely expressions of opinion and that the Commission cannot establish scienter.  The Court finds, however, that Hurgin's arguments are not appropriate for resolution on a motion to dismiss.

1.  The Commission Adequately Alleges that Hurgin made
    Materially Misleading Representations about ULIN.

Materiality is an element of each of the Commission's claims.  In the context of a proxy solicitation, "a fact is material when 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'"  *Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir.), *amended*, 938 F.2d 1528 (2d Cir. 1990), (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  In that context and under Section 10(b) and Rule

10b–5, a fact is material if it would have been "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  Because materiality is a mixed question of law and fact, courts will not dismiss a complaint at the pleading stage unless reasonable minds could not differ on the question of materiality.  *Id.*; *see also, e.g.*, *In re Regeneron Pharms., Inc. Sec. Litig.*, 03-cv-3111 (RWS), 2005 WL 225288, at *20 (S.D.N.Y. Feb. 1, 2005) (explaining that "materiality issues are rarely appropriate for resolution on a motion to dismiss").

Hurgin argues that his allegedly misleading statements and omissions about ULIN were not material.  He argues that his false statement that Ability was "the only owner" of ULIN, Cmpl. ¶ 76, was not materially misleading because Ability had a "long-term exclusive license to sell ULIN," Hurgin Mem. at 18.  The Commission responds that being a reseller or licensee of a product is clearly different from owning the technology.  SEC Opp. to Hurgin at 18.  The Commission stresses that, under the reseller agreement, ULIN's true owner was entitled to 50% of any revenue Ability earned from selling ULIN, and Ability would have to pay a penalty if it failed to sell less than $10 million worth of ULIN in a given year.  *Id.*  The Commission adds that Hurgin's argument that the reseller agreement was immaterial is inconsistent with the later disclosure of that agreement by Ability, Inc. after the merger.  *Id.* at 19.  The Court is not remotely persuaded that the fact that Ability did not own ULIN is "so obviously . . . unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality." *Sec. & Exch. Comm'n v. Jankovic*, No. 15-cv-1248 (KPF), 2017 WL 1067788, at *10 (S.D.N.Y. Mar. 21, 2017) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009)).  Accordingly, the Court finds that the Commission adequately alleged that

Hurgin made materially misleading statements and omissions about ULIN in support of its three claims against him.

2. The Commission Adequately Alleges that Hurgin Omitted Material Facts about Ability's Relationship with the Latin American Police Agency.

Hurgin argues that his allegedly misleading representations about Ability's relationship with the Latin American policy agency were expressions of opinion and that the risks were adequately disclosed.  Statements of opinion can be a basis for liability in two circumstances. First, if either "the speaker did not hold the belief she professed" or "the supporting facts she supplied were untrue."  *Lopez v. CT Partners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 23 (S.D.N.Y. 2016).  Second, "opinions, though sincerely held or otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Id*. at 24.  Under the "bespeaks caution" doctrine, forward-looking statements are not actionable if the speaker discloses the "contingency that lies at the heart of the alleged misrepresentation."  *SEC v. Thompson*, 238 F. Supp. 3d 575, 603 (S.D.N.Y. 2017).  However, "discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized."  *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *19.

The Commission alleges that Hurgin omitted material facts about Ability's relationship with the Latin American police agency, its biggest customer, when he represented that Ability had a three-year deal with the police agency, even though he knew he had only an oral agreement with management that had been terminated, and "those terminations could negatively impact Ability's capacity to recognize revenue from those verbal orders." Cmpl. ¶¶ 135, 138-139. Hurgin argues that he believed he had a deal and cannot be faulted for failing to make "a hyper-specific disclosure about a particular consequence that Hurgin had no reasonable basis to think

was possible." Hurgin Mem. at 20. Specifically, he argues that the Commission fails to "allege any basis to infer that Hurgin knew, or should have known, that personnel turnover would affect [Ability's] capacity to realize potential orders or revenue." *Id*. He points out that a "statement believed to be true when made, but later shown to be false, is insufficient," *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), and that "lack of clairvoyance simply does not constitute securities fraud," *Acito v. IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995). He notes that Ability continued to do some business with the Latin American police agency after the personnel changes, insisting that the fact that the contracts "ultimately ended does not bear on what Hurgin reasonably believed *at the time*." Hurgin Mem. at 20. Hurgin also argues that the Proxy Statement adequately disclosed "the specific risk" of doing business with a government agency in a country subject to political and financial turmoil. *Id*. at 21.

The Court is not persuaded. The Commission alleges that Hurgin knew that the police personnel who verbally agreed to order Ability's products had been terminated before the November 2015 roadshow and the proxy vote. Cmpl. ¶ 135. It strains credulity to argue that Hurgin "had no reasonable basis to think" those terminations could endanger the potential orders and revenue from the police agency. Even if Hurgin sincerely believed the supposed three-year deal would go forward, the Commission has adequately alleged that Hurgin omitted information whose omission would make his statement about the deal misleading to a reasonable investor. *Lopez*, 173 F. Supp. 3d at 24. Moreover, notwithstanding the disclosures about potential risks of doing business in Latin America, the bespeaks caution doctrine does not apply because the

terminations at the police agency were "problems that already ha[d] materialized." *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *19.

3. The Commission Adequately Alleges that Hurgin Made Materially Misleading <u>Statements and Omissions about Ability's Pipeline and Backlog Orders</u>.

The Commission alleges that the "pipeline" and "backlog" figures Hurgin promulgated were materially misleading not only because of Hurgin's alleged material misrepresentations about ULIN and the Latin American police agency, discussed above, but also because the proxy materials falsely represented that the backlog figure was based on signed purchase orders. Specifically, the Commission alleges that the Proxy Statement contained the Prometheus report, which incorrectly stated that the backlog was "comprised of signed purchase orders." Cmpl. ¶ 102. Hurgin argues that he cannot be held liable for this alleged misrepresentation because he "did not make or supply" the statement that the backlog figure was based on "signed" purchase orders. Hurgin Mem. at 13. On the contrary, the Complaint makes clear that Hurgin disclosed to both Economics Partners and the management of Cambridge that Ability did not have signed purchase orders, but "only verbal agreements with customers," for much of the backlog. Cmpl. ¶¶ 39–41; 50–51. Hurgin also stresses that the false statement in the Prometheus report was "a 5-word mistake in a 400+ page Proxy Statement." Hurgin Mem. at 14.

For the purpose of surviving a motion to dismiss, the Commission adequately alleges that Hurgin made materially misleading statements and omissions about Ability's backlog. For a claim under Section 10(b) and Rule 10b-5, "the maker of the statement is the person or entity with ultimate authority over the content of the statement and whether and how to communicate it." *Janus Capital Group, Inc., v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The Commission alleges that, under the terms of the Merger Agreement and by virtue of his central role in Ability and the merger, Hurgin was responsible for preparing the proxy materials. Cmpl.

16

¶ 87, 150; *see also id*. ¶¶ 60, 72, 86.  He had "authority over the content" of the Proxy Statement.

*Janus Capital Group, Inc.*, 564 U.S. at 142.  The Commission alleges that Hurgin was ultimately

responsible for the choices to include the Prometheus report, which falsely stated that the

backlog was comprised of signed purchase orders, *id*. ¶¶ 98–102, and to exclude the Economics

Partners report, which stressed that the "high rate of projects with no [signed purchase orders] in

the backlog could indicate a significant risk" from the merger, *id*. ¶ 42.  The Court cannot rule, at

this stage, that Hurgin was not in fact ultimately responsible for, and thus the "maker" of, these

misleading statements and omissions.

### 4.   Hurgin's Arguments that the Commission Cannot Establish Scienter are Not Appropriate for Resolution on a Motion To Dismiss.

Hurgin argues that the Commission cannot establish that he acted with scienter, but his

arguments are not appropriate for resolution on a motion to dismiss.  As noted above, scienter is

required for the Commission's claims under Section 10(b) and Rule 10b–5 and Section 17(a)(1),

but not for its claims under Sections 17(a)(2) and (3), or Section 14(a) of the Exchange Act and

Rule 14a-9.  The element of scienter requires the Commission to plead facts to support a strong

inference that Hurgin acted either with the intent to deceive, or with reckless disregard for the

truth.  *S. Cherry St., LLC*, 573 F.3d at 108–09.  The Second Circuit has made clear that, where a

complaint pleads such facts, it is rarely appropriate for a district court to decide questions of

scienter as a matter of law.  *See SEC v. Cole*, No. 12-cv-8167 (RJS), 2015 WL 5737275, at *5

(S.D.N.Y. Sept. 19, 2015) (collecting cases).

Hurgin argues that his "one-time extemporaneous comment" claiming ownership of

ULIN was not "uttered with any intent to deceive."  Hurgin Mem. at 19.  And he notes that

"English is a third language."  *Id*. at n.3.  But the Commission does not rely on Hurgin's false

assertion of ownership alone.  The Commission alleges that Hurgin touted ULIN as Ability's

"game-changing" technology that it "developed in house," Cmpl. ¶ 76, and signed a Merger

Agreement that required him to disclose all "Material Company Contracts," *id.* ¶ 94, but,

nevertheless, failed to disclose a reseller agreement that made ULIN far less valuable to Ability

than if it owned the technology.  These allegations support the inference that, in making the

alleged statements and omissions about ULIN, Hurgin acted with an intent to deceive or reckless

disregard for the truth.  *See S. Cherry St., LLC*, 573 F.3d at 108–09.

Hurgin's other arguments that the Commission cannot establish scienter likewise fail.  He

argues that the Commission cannot establish that he acted with an intent to deceive Cambridge

shareholders and potential investors because he sincerely believed his allegedly misleading

representations about Ability's relationship with the Latin American police agency and disclosed

the lack of signed purchase orders to Economics Partners and Cambridge management.  The

Commission has clearly pleaded facts that, if true, could support the inference that Hurgin acted

with at least a reckless disregard for the truth.  Thus, the arguments about Hurgin's mental state

are questions of fact that the Court cannot decide as a matter of law.  *See SEC v. First Jersey

Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) ("Whether or not a given intent existed, is, of

course, a question of fact.").  Accordingly, Hurgin's motion to dismiss for failure to state a claim

is denied.

B.  The Court has Personal Jurisdiction Over Aurovsky.

For the Court to exercise personal jurisdiction over a defendant, it "must have a statutory

basis for asserting jurisdiction over [the] defendant," and the exercise of jurisdiction must satisfy

the constitutional requirements of due process.  *Azer. Corp. v. State Oil Co. of Azer. Republic*,

582 F.3d 393, 396 (2d Cir. 2009).  Due process requires sufficient "minimum contacts" with the

forum.  *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014).  "Where the claim arises out of, or

relates to, the defendant's contacts with the forum—i.e., specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed [himself] of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci*, 732 F.3d at 170 (brackets omitted) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). If the plaintiff makes a threshold showing of minimum contacts, the defendant must show that the exercise of jurisdiction is nonetheless unreasonable. *Id.* at 173 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, (1985)).

Aurovsky argues that the Court lacks personal jurisdiction over him. Aurovsky Mem. at 1, 9–16. He stresses that he "resides in Israel, does not hold a securities license, and never has been registered with the [Commission]." *Id.* at 1; *see also id.* at 12. He contends that he was barely involved in the merger and that his "status as a board member is not alone sufficient to establish jurisdiction." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008). In particular, unlike Hurgin, Aurovsky did not travel to New York to present to Cambridge investors. *Id.* at 12. In his opening brief, Aurovsky asserted that he did not sign "any relevant documents filed with the [Commission], such as the merger agreement or the Proxy Statement." *Id.* But Aurovsky later conceded—both in his reply brief and on the record at the June 4, 2020 Oral Argument—that he did, in fact, sign the Merger Agreement, which was attached to the Form S-4 registration statements filed with the Commission. He also concedes that he "signed a form on November 17, 2015, attached as Exhibit 99.4 to Amendment No. 2 of the Form S-4

registration statement, consenting to the use of his name in the Proxy Statement as a person who would become a director of Ability Inc." Cmpl. ¶ 157; Aurovsky Mem. at 13.

The Court finds that the Commission has made a *prima facie* showing that the Court has specific personal jurisdiction over Aurovsky. The statutory basis for the Court's personal jurisdiction over Aurovsky is Section 27 of the Exchange Act, which permits the exercise of personal jurisdiction "to the limit of the Due Process Clause of the Fifth Amendment." *SEC v. Unifund SAL*, 910 F.2d 1029, 1033 (2d Cir. 1990). The Commission has pleaded facts and provided supporting materials showing that Aurovsky purposefully availed himself of the privilege of doing business "within the United States," *id.*, and could "reasonably anticipate" being haled into court in the Southern District of New York, *id.* (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)), in connection with the merger between Ability and Cambridge.

The Commission has alleged that Aurovsky was involved in the merger, which the Court, at this stage, must accept despite Aurovsky's denials. *See Licci ex rel. Licci*, 732 F.3d at 167. The Commission does not rely on Aurovsky's status as a board member alone. It alleges that, as a fifty-percent owner of Ability, Aurovsky's consent was necessary for the merger to proceed and that he expressly consented to the merger by signing the Merger Agreement. Cmpl. ¶ 153–54; Merger Agreement at 86. He also consented to the use of his name in the Proxy Statement, as a future board member, to persuade Cambridge shareholders that Ability Inc. would be run by a "highly-talented" team. *Id.* ¶ 156. The Commission further alleges that, although Hurgin played the "central role" in soliciting shareholder approval, Aurovsky "spoke with Hurgin on a daily basis and knew that Ability was negotiating an agreement to merge with Cambridge, and that Ability would become a public company, trading on a U.S. stock exchange." *Id.* ¶ 151. By

participating in the merger, Aurovsky availed himself of the privilege of doing business here, even though he remained in Israel. It is blackletter law that a defendant who has availed himself of the privilege of conducting business in a forum cannot avoid jurisdiction "merely because [he] did not physically enter the forum State." *Burger King*, 471 U.S. at 476.

Significantly, Aurovsky signed two documents filed with the Commission as part of the allegedly misleading proxy materials that form the basis for the Commission's claims against him. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 399 (S.D.N.Y. 2005) ("The signing of documents filed with the SEC which form the basis for Plaintiffs' claims is sufficient contact with the jurisdiction to justify this Court's exercise of jurisdiction over [the signatory]."); *cf. Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, No. 17-cv-4937 (JPO), 2019 WL 1407453, at *6 (S.D.N.Y. Mar. 28, 2019) ("Courts in this District have regularly held allegations that a defendant signed off on materially misleading SEC filings to be sufficient at the pleading stage to establish minimum contacts."); *In re VEON Ltd. Sec. Litig.*, No. 15-cv-8672, 2018 WL 4168958, at *6 (S.D.N.Y. Aug. 30, 2018) (concluding that plaintiffs made a *prima facie* showing of minimum contacts where they alleged that "each Individual Defendant signed specific SEC filings that contained allegedly misleading information"). To be sure, the Commission does not allege that Aurovsky personally drafted the allegedly misleading proxy materials. Rather, the Commission alleges that Aurovsky signed a form consenting to the use of his name in the Proxy Statement and the Merger Agreement, which were filed with the proxy materials. The Commission also alleges that the Merger Agreement "included certain representations and warranties" that "were required to be true and correct both at the time of

agreement was entered into and at the closing date of the business combination" but, in fact, "were false."  Cmpl. ¶¶ 92–95.

Moreover, Aurovsky could foresee being haled into this Court in connection with his role in the merger between Ability and Cambridge because the Merger Agreement contains a broadly-worded "consent to jurisdiction" in this Court.  Aurovsky signed the Merger Agreement as a "signing securityholder[], for the purposes of . . . Article[] . . . X."  Merger Agreement at 86. Article X provides, in Section 10.13, in large, bold, capital letters, that "each party" to the Merger Agreement, "hereby irrevocably submits to the exclusive jurisdiction of any federal or state court located in the county of New York of the State of New York in respect of any action . . . arising in connection with this agreement and the documents and the transactions contemplated hereby . . . ."  Merger Agreement at 81.

It is well established that "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 ("And it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court . . . ."); 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1064, at 344 (3d ed. 2002)).  Indeed, courts in this district have ruled that "a valid and enforceable forum selection clause" renders the ordinary statutory and constitutional personal jurisdiction analysis unnecessary.  *MTS Logistics, Inc. v. Innovative Commodities Grp., LLC*, No. 19-cv-4216 (PAE), 2020 WL 917321, at *5 (S.D.N.Y. Feb. 26, 2020) (explaining that the district court would proceed to the ordinary two-part personal jurisdiction analysis "to the extent that the forum selection clause does not supply personal jurisdiction over a particular claim or claims");

*Exp.-Imp. Bank of U.S. v. Hi-Films S.A. de C.V.*, No. 09-cv-3573 (PGG), 2010 WL 3743826, at
*4 (S.D.N.Y. Sept. 24, 2010).

Aurovsky argues that the Commission cannot "enforce" the forum selection clause of the
Merger Agreement against him because the Commission was not a party to the Merger
Agreement, nor is it "closely related" to any of the parties. The "closely related" test "hold[s]
that a non-signatory to a contract containing a forum selection clause may enforce the forum
selection clause against a signatory when the non-signatory is 'closely related' to another
signatory." *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013)
(citation omitted). This test generally requires it to be foreseeable that the non-signatory would
seek to enforce the forum selection clause against the party resisting enforcement. *See id*.
However, the Court need not decide whether the Commission is "closely related" to Cambridge,
whose shareholders lost millions of dollars as a result of the merger.

The Commission is not seeking to "enforce" the forum selection clause, nor is the Court
dispensing with the ordinary statutory and constitutional analysis of personal jurisdiction over
Aurovsky. Rather, the Court finds the broadly-worded clause germane to its constitutional
analysis. The Court finds that the Commission has made a *prima facie* showing of minimum
contacts with its allegations and supporting materials showing that, despite his denials, Aurovsky
was involved in the merger and signed documents filed with the Commission. The Court further
finds that Aurovsky cannot show that it is nonetheless unfair and unreasonable under the Due
Process Clause to force him to appear in the forum that he selected to litigate disputes about the
merger. *See Koninklijke Philips Elecs. v. Digital Works, Inc.*, 358 F. Supp. 2d 328, 333–34
(S.D.N.Y. 2005) ("It can hardly be unfair to subject a defendant to suit in a place where he has

voluntarily agreed to have disputes resolved.").  The Court therefore finds that it has personal

jurisdiction over Aurovsky.

C. **The Commission Plausibly Alleges its Claim Against Aurovsky**
   **under Sections 17(a)(2) and (3) and Section 14(a) and Rule 14a-9.**

The Commission asserts claims against Aurovsky under 17(a)(2) and 17(a)(3) and under

Section 14(a) and Rule 14a-9.  As explained above, Section 17(a)(2) makes it illegal to obtain

money "by means of" a material false statement or omission in connection with the offer or sale

of securities, and Section 17(a)(3) makes it illegal to engage "in any transaction, practice, or

course of business which operates or would operate as a fraud or deceit upon the purchaser."

Section 14(a) and Rule 14a-9 establish liability for material misstatements or omissions in a

proxy statement.  For each of these claims, the Commission need not establish scienter, and must

plead only that Aurovsky was negligent in connection with the merger.  *See Ginder*, 752 F.3d at

574 (Sections 17(a)(2) and (3)); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir.

1988) (Section 14(a) and Rule 14a-9).

Aurovsky first argues that the Commission cannot establish that he was negligent because

he did not personally make the allegedly misleading representations or prepare the proxy

materials.  Aurovsky Mem. at 19–20.  The Commission responds that it is not required to allege

that Aurovsky personally made or disseminated the allegedly misleading statements to plead

claims under Section 17(a)(2) and (3) and Section 14(a) and Rule 14a-9.  The Court agrees with

the Commission.  *See U.S. S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 465–66 (S.D.N.Y. 2012)

(collecting cases ruling that *Janus* does not apply to Section 17(a) because, unlike Section 10(b),

the word "make" does not appear in the language of the statute).  Specifically, Section 17(a)(2)

prohibits a defendant from obtaining money "by means of" a false statement, "whether prepared

by himself or by another."  *Id.* at 465.  Section 17(a)(3) requires the Commission to allege that

Aurovsky engaged in a deceptive scheme or course of conduct distinct from the specific alleged misrepresentations.  *See id.* at 467; *In re Alstom SA, Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005).  For its claim under Section 14(a) and Rule 14a-9, the Commission must allege only that Aurovsky "knew or in the exercise of due diligence should have known that the Proxy Statement contained false or misleading statements or omissions."  *Del Noce v. Delyar Corp.*, No. 72-cv-1819 (CLB), 1976 WL 813, at *23 (S.D.N.Y. July 30, 1976).  Thus, none of these claims requires the Commission to allege that Aurovsky personally made allegedly misleading statements or personally prepared the proxy materials.

Aurovsky next argues that he did not owe a duty to the Cambridge shareholders to review the proxy materials to ensure that they did not contain material false statements and omissions. The Commission maintains that Section 14(a) imposes such a duty on anyone who consents to the use of his name to solicit proxies.  Opp. to Aurovsky at 22.  The Second Circuit has not addressed whether a defendant may be liable simply because his name is used in an allegedly misleading proxy statement.  The text of Section 14(a) forbids a person to "permit the use of his name to solicit any proxy . . . in contravention" of the Commission's regulations.  15 U.S.C. § 78n(a).  Other courts, however, have concluded that Section 14(a) requires "a substantial connection between the use of the person's name and the solicitation effort."  *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C.C. 1980).  That is, when individuals listed in a proxy statement "hav[e] put their reputations in issue, [they] cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names."  *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F.

Supp. 2d 260, 294 (S.D.N.Y. 2010) (quoting *Chris–Craft Indus., Inc. v. Indep. Stockholders Comm.*, 354 F. Supp. 895, 915 (D. Del. 1973).

In its complaint, the Commission adequately alleges that Aurovsky put his reputation in issue in the proxy materials such that he owed a duty to the Cambridge shareholders.  Aurovsky consented to the use of his name "as a person who would become a director of Ability Inc." to solicit proxies."  Cmpl. ¶ 155–57.  The Commission alleges that his "qualifications and continued participation in the newly formed public company were essential to soliciting Cambridge shareholders to vote in favor of the merger."  Cmpl. ¶ 168.  It specifically alleges that the proxy materials contained information about his background and assured shareholders that he was a "highly-talented . . . industry professional[]" who would bring his skills to the company after the merger.  *Id*. ¶ 160.  Indeed, the Commission alleges that the Proxy Statement invoked Aurovsky's name "approximately 29 times."  *Id.* ¶ 158.

Aurovsky insists that he was barely involved in the merger, but the Commission pleads enough facts about his involvement to survive his motion to dismiss its negligence-based claims against him.  It alleges that Aurovsky was a 50% owner of Ability, his consent was necessary for the merger to take place, and he became a "co-controlling shareholder, CTO, and a board member" of Ability Inc.  *Id*. ¶¶ 14, 153.  He signed the Merger Agreement, which included "representations and warranties made by Ability and its shareholders (i.e., Hurgin and Aurovsky, who each held 50% of Ability's shares) to Cambridge, which were required to be true and correct both at the time of agreement was entered into and at the closing date of the business combination."  *Id*. ¶ 92.  The Commission alleges that Aurovsky "spoke with Hurgin on a daily basis" and knew all about the merger—a deal from which Aurovsky would make millions and

millions of dollars.  *Id.* ¶¶ 3, 151.  Accordingly, Aurovsky's 12(b)(6) motion to dismiss the claims against him is denied.

IV.    <u>CONCLUSION</u>

For the reasons set forth above, the defendants' motions to dismiss are DENIED.  The defendants shall file their answers by September 22, 2020.

**SO ORDERED.**

**Date:   September 4, 2020**                  **MARY KAY VYSKOCIL**
**          New York, NY**                             **United States District Judge**