# EXHIBIT 1

**Expert Report**

**of**

**Steven Davidoff Solomon**

**Securities and Exchange Commission, Plaintiff**

**v.**

**Anatoly Hurgin, Alexander Aurovsky,**

**Ability Computer & Software Industries, Ltd., and Ability Inc.,**

**Defendants**

**Case No. 1:19-cv-05705 (S.D. NY)**

**November 1, 2021**

## I.      INTRODUCTION

1.      I have been asked to prepare this report by the Securities and Exchange Commission in the matter of *SEC v. Anatoly Hurgin, Alexander Aurovsky, Ability Computer & Software Industries, Ltd., and Ability Inc.*, Case No 1:19-cv-05705 (MKV) (S.D.N.Y).  In particular, I have been asked to: (a) provide background on customary and usual processes and procedures in public company mergers and acquisitions ("M&A") transactions; (b) provide background on the customs and practices of disclosure preparation and review in connection with public company M&A transactions; and (c) provide background on the customs and practices of controlling shareholders and officers in the review and preparation of disclosures in public company M&A transactions.

## II.     QUALIFICATIONS

2.      I am the Alexander F. and May T. Morrison Professor of Law at the University of California, Berkeley School of Law. I am also the Co-Director of the Berkeley Center for Law and Business. I teach or have taught classes in Business Associations, Capital Markets, Contracts, M&A, Securities Regulation and Law, Business & Accounting. I graduated from University of Pennsylvania in 1992 with a Bachelor of Arts degree. I have previously served as a visiting professor at the Buchmann Faculty of Law at Tel Aviv University and the Harry Radzyner Law School at the Interdisciplinary Center in Herzliya, Israel. I received my J.D. from Columbia University School of Law in 1995, and a Masters of Finance from London Business School in 2005. I have been admitted to the New York bar since 1996.

3.      My academic research focuses on the intersection of law, economics, and finance with a particular focus on economic principles as applied to corporate law and governance, M&A, and capital markets, including issues relevant to disclosure and foreign private issuers ("FPIs").[1]  I have written and been published extensively on these topics. I co-authored *Mergers and Acquisitions: Law, Theory, and Practice*, one of the leading casebooks on M&A.[2]  In the past years, seven of my

---

[1]   A "foreign private issuer" is any foreign issuer other than a foreign government, except for an issuer meeting the following conditions as of the last business day of its most recently completed second fiscal quarter: (1) More than 50 percent of the outstanding voting securities of the issuer are directly or indirectly owned of record by U.S. residents; and (2) Any one of the following: (i) the majority of the executive officers or directors are U.S. citizens or residents; (ii) more than 50 percent of the issuer's assets are located in the United States; or (iii) the issuer's business is administered principally in the United States. *See* 17 C.F.R. § 230.405, 1982; 17 C.F.R. § 240.3b-4(c), 2016.

[2]   Hill, Claire, Brian J. M. Quinn, and Steven Davidoff Solomon, Mergers And Acquisitions: Law, Theory, And Practice, Saint Paul, MN: West Academic Publishing, 2019 (2d Ed.) ("M&A Casebook").

law review articles have been selected by scholars in the field as being among the "top ten" articles published in corporate and securities law in their respective years.[3] Additionally, I have written for other national publications, such as *The Atlantic*, testified before the U.S. Senate, and frequently been quoted in the national media on issues related to capital markets and disclosure. Starting from 2007, I have been the author of a regular column for *The New York Times* as the "Deal Professor," which primarily focuses on corporate issues.

4.      Before becoming a law professor, I was a corporate attorney for almost a decade practicing at the law firm of Shearman & Sterling and the London law firm of Freshfields Bruckhaus Deringer. I practiced at Shearman from 1995 to 2002 and at Freshfields from 2002 to 2004. From 2000 to 2004 I practiced in London. In my practice, I regularly represented public companies, including FPIs, private companies, and other firms involved in a wide array of corporate matters. In all, I worked on over $100 billion worth of transactions. I also regularly advised corporate entities, including FPIs, on issues associated with disclosure requirements. As part of my practice, I also regularly advised clients on securities law issues, including customs and practices related to disclosure of non-public information by FPIs and U.S. public companies.

5.      Since becoming a law professor, I have regularly consulted and spoken on practical and theoretical issues involving corporate law, M&A, and securities regulation at law schools and practitioner-oriented events. For example, I have served as scholar in residence at Widener University School of Law in Wilmington, Delaware, where I spoke on corporate law with commentary from Chief Justice Leo E. Strine, Jr. formerly of the Delaware Supreme Court. I have three times been named one of the 100 most influential governance professionals and institutions in the country by the National Association of Corporate Directors. I was also named as one of the Top 10 Most-Cited Corporate & Securities Law Professors according to data prepared by Professor Brian Leiter of the University of Chicago Law School.[4]  I am also one of the top ten most cited academics at the University of California, Berkeley School of Law.

6.      My writings are regularly relied upon by courts to decide legal cases. For example, in *In*

---

[3] This is according to the "Corporate Practice Commentator Annual Poll of Best Corporate and Securities Articles," Professor Thompson, http://www.professorthompson.com/annual-list-of-best-corporate-articles.html, accessed June 3, 2021 (last accessed Oct. 23, 2021).
[4] Leiter Law Reports, 20 Most-Cited Corporate & Securities Law Faculty in the U.S., 2016-2020, Sept. 16, 2021, available at https://leiterlawschool.typepad.com/leiter/2021/09/20-most-cited-corporate-securities-law-faculty-in-the-us-2016-2020.html (last accessed Oct. 23, 2021).

*re Trulia, Inc. Stockholder Litigation*,[5] the Delaware Chancery Court held that it would not award a fee for a certain type of settlement in merger litigation known as "disclosure only" settlements. The court relied upon my article analyzing disclosure related to merger litigation, "Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform,"[6] for this conclusion. In a similar decision, Judge Richard Posner came to the same conclusion, also citing my article as justification for this change in law. In the course of my academic research, I have written extensively on corporate governance, securities regulation and M&A.[7] My book on corporate law entitled *Gods at War: Shotgun Takeovers, Government by Deal*

---

[5] *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884 (Del. Ch. 2016).

[6] Jill E. Fisch et al., "Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform," *Texas Law Review* 93, no. 557, 2015, pp. 557–624.

[7] Articles and book chapters I have written on corporate governance, securities regulation or M&A include: Steven Davidoff Solomon and Randall S. Thomas, "The Rise and Fall of Delaware's Takeover Standards," European Corporate Governance Institute (ECGI) - Law Research Paper No. 329, 2016; Steven Davidoff Solomon and Randall S. Thomas, "What Do We Know About Law Firm Quality in M&A Litigation?," in Research Handbook On Representative Shareholder Litigation, eds. Sean Griffith et al., (UK: Edward Elgar Publishing, 2018); Claire A. Hill et al., "Mergers and Acquisitions: A Cyclical and Legal Phenomenon," in Research Handbook On The Economics Of Corporation Law, ed. Claire Hill and Steven Davidoff Solomon, (UK: Edward Elgar Publishing, 2016); Steven Davidoff Solomon, "Takeover Theory and the Law and Economics Movement," in Research Handbook On The Economics Of Corporation Law, eds. Claire Hill et al. (UK: Edward Elgar Publishing, 2012); Steven Davidoff Solomon, "The Private Equity Contract," in The Oxford Handbook Of Private Equity, ed. Douglas Cumming, (Oxford, UK: Oxford University Press, 2012); Matthew D. Cain et al., "Fairness Opinions in Mergers and Acquisitions," in The Art Of Capital Restructuring: Creating Shareholder Value through Mergers and Acquisitions, ed. H. Kent Baker and Halil Kimaz, (Hoboken, NJ: John Wiley & Sons, 2011); Steven Davidoff Solomon, "Fairness Opinions: Thoughts, Perspectives and Legal Doctrine," in Fairness Opinions, ed. Wolfgang Essler and Sebastian Lobe, (Stuttgart: Schäffer-Poeschel-Verlag, 2008); C.N.V. Krishnan, et al., "The Impact on Shareholder Value of Top Defense Counsel in Mergers and Acquisitions Litigation," Working Paper, 2017; Matthew Cain et al., "Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers," Journal of Financial Economics 124, no. 3, 2017, pp. 464-485; C.N.V. Krishnan et al., "Who are the Top Law Firms? Assessing the Value of Plaintiffs' Law Firms in Merger Litigation," American Law And Economics Review 18, no. 1, 2016, pp. 122–154; Matthew D. Cain and Steven M. Davidoff Solomon, "Delaware's Competitive Reach," Journal of Empirical Legal Studies 9, no. 1, 2012, pp. 92–128; Matthew D. Cain et al., "Does Revlon Matter: An Empirical and Theoretical Study," California Law Review 108, no. 6, 2020; Matthew D. Cain et al., "The Shifting Tides of Merger Litigation," Vanderbilt Law Review 71 no. 2, 2018, pp. 603–640; Jill E. Fisch et al., "Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform," Texas Law Review 93 no. 557, 2015, pp. 557–624; Matthew D. Cain and Steven Davidoff Solomon, "A Great Game: The Dynamics of State Competition and Litigation," Iowa Law Review 100, no. 456, 2015, pp. 101–137; Matthew D. Cain et al., "Broken Promises: Private Equity Bid Failures and the Limits of Contract," Journal of Corporate Law 40, no. 3, 2015, pp. 565-598; Matthew D. Cain and Steven M. Davidoff, "Form Over Substance? The Value of Corporate Process and Management Buy-Outs," Abstract, 2011; Steven M. Davidoff and David Zaring, "Regulation by Deal: The Government's Response to the Financial Crisis," Administrative Law Review 61 no. 3, 2009, pp. 463–541; Steven Davidoff Solomon, "The Failure of Private Equity," Southern California Law Review 82, 2009, pp. 481–546; Steven M. Davidoff, "The SEC and the Failure of Federal, Takeover Regulation," Florida State University Law Review 34 no. 2, 2007, pp. 211–269; Steven Davidoff Solomon, "Fairness Opinions," American University Law Review 55, 2006, pp. 1557–1625; Matthew D. Cain et al., "Mootness Fees," Vanderbilt Law Review 72, 2019, pp. 1777–1816; Steven M. Davidoff and Christina M. Sautter, "Lock-up Creep," Journal of Corporate Law 38, no. 4, 2013, pp. 681–731; Steven M. Davidoff, "A Case Study: Air Products v. Airgas and the Value of Strategic Decision-Making," Columbia Business Law Review no. 2, 2012, pp. 508–552 at pp. 508–509.

*and the Private Equity Implosion* (Wiley 2009) extensively addresses these issues in the context of the 2008 financial crisis.[8] I have also edited three scholarly books on corporate law. The first of these was the two-volume *Law & Economics of Mergers & Acquisitions*, the second is *The Research Handbook on Mergers & Acquisitions*, and the third is *The Corporate Contract in Changing Times: Is the Law Keeping Up?*

7.      I am also the director of a special purpose acquisition company (a "SPAC"), Social Capital Suvretta Holdings Corp. IV which is quoted on the Nasdaq stock exchange.  I am a member of the audit, nominating and governance committees.

8.      My further qualifications are detailed in my curriculum vitae, which is annexed hereto as **Exhibit 1**. A list of the matters in which I have testified as an expert at trial or by deposition in the last four years is included in **Exhibit 2** to this report.

### III.   ASSIGNMENT

9.      I understand that this action involves allegations against both Mr. Hurgin and Mr. Aurovsky. With respect to Mr. Hurgin the Complaint asserts allegations of fraud in the offer and sale of securities in violation of Section 17(a) of the Securities Act, and in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5 of the Exchange Act; and that he solicited and permitted the use of his name to solicit proxies by means of a false and misleading proxy statement in violation of Section 14(a) and Rule 14(a)(9) of the Exchange Act. With respect to Mr. Aurovsky the Complaint asserts allegations of fraud in the offer or sale of securities, in violation of Section 17(a)(2) and (3) of the Securities Act; and violations of Section 14(a) and Rule 14(a)(9) of the Exchange Act. The allegations stem from the acquisition of Ability Computer & Software Industries, Ltd. ("Ability Israel") by Cambridge Capital Acquisition Corporation ("Cambridge") a publicly-traded U.S. SPAC.

10.      In the course of my engagement, I have considered the documents set forth in the list annexed hereto as **Exhibit 3**, which includes the deposition testimonies of Messrs. Hurgin and Aurovsky in this matter. In addition, I have relied upon my education and professional experience. I reserve the right to update this report and any opinions contained herein to the extent new

---

[8] Steven Davidoff Solomon, *Gods at War: Shotgun Takeovers, Government by Deal and the Private Equity Implosion*, First Edition (John Wiley & Sons, Inc., 2009).

information comes to my attention or in response to any expert or other reports filed by Plaintiffs in this matter. I have been compensated for this matter at a rate of $900 per hour which is a 25% discount to my customary and usual rate. My compensation is neither contingent nor dependent on the opinions that I offer or on the outcome of this matter.

## IV.   SUMMARY OF OPINIONS

11.     In this report, I provide information and background on the role of customs and practices in M&A transactions involving SPACs and FPIs, in particular. This includes information and background on customs and practices in preparing disclosures in public company M&A transactions.  After taking into account these matters and reviewing the case record requested and made available to me, I provide the following opinions, which I summarize:

a.   *Opinion 1*: It is customary and usual practice for executive officers and directors to be knowledgeable of federal securities laws applicable to public company M&A transactions and to review the relevant SEC disclosure documents to ensure they are not false or misleading.

b.   *Opinion 2*: A controlling shareholder, director and executive officer of a publicly traded company would be expected under customary and usual practices to be knowledgeable of the company's finances, sales and contractual arrangements and to be able to review and sign-off on SEC disclosures related thereto.

c.   *Opinion 3*: A controlling shareholder, director and executive officer would not be expected under customary and usual practices to be willfully blind in execution of his or her duties and obligations, including the review of the disclosure documents in a public company M&A transaction.

12.     In the next sections, I further delineate my opinions.

## V.   Factual Background

13.     Ability Israel was founded prior to the merger as a private company wholly-owned on a 50/50 basis by Messrs. Hurgin and Aurovsky.[9] Mr. Hurgin was the chief executive officer ("CEO") and a director, and Mr. Aurovsky was the chief technology officer ("CTO") and a director.[10] Prior to the merger, Ability Israel was based in Israel and organized under the laws of Israel. Messrs. Hurgin and Aurovsky reside in Israel and have done so though throughout the period the

---

[9] Complaint, at ¶ 23.
[10] Cambridge Capital Acquisition Corp, Definitive Merger Proxy Statement on Schedule 14A, dated Dec. 2, 2015, available at https://www.sec.gov/Archives/edgar/data/0001588869/000119312515392967/d18083ddefm14a.htm [hereinafter "Proxy Statement"], p. 1; *see also* Ability Israel, Articles of Incorporation, dated December 26, 1993.

allegations cover.[11]   Ability Israel's primary business was the development and sale of cell phone and satellite interception products.[12]

14.     Cambridge was a SPAC sponsored by Cambridge Capital LLC, an affiliate of BG Strategic Advisors, which was founded and headed by Ben Gordon.[13]   A SPAC conducts an initial public offering ("IPO") and raises capital; that capital is then utilized to acquire a private company and take that company public.[14]   On December 23, 2013, Cambridge conducted an initial IPO raising $81.31 million.[15]

15.     On September 6, 2015 Cambridge, Cambridge Holdco Corp. ("Holdco") and Ability Israel entered into an Agreement and Plan of Reorganization (the "Merger Agreement").[16]   The Merger Agreement provided that (a) Cambridge would merge with Holdco, with Holdco surviving the merger and (b) the shareholders of Ability Israel would exchange 100% of the ordinary shares of Ability Israel for cash and ordinary shares of Holdco (collectively, the "merger and share exchange").[17] Under the terms of the Merger Agreement, the initial consideration to Ability Israel's shareholders was approximately 17.173 million newly-issued ordinary shares of Holdco valued at $10.10 per share plus $18.15 million in cash paid to Ability Israel's shareholders.[18]   The aggregate consideration paid by Holdco to Ability Israel's shareholders was approximately $192 million.[19] Ability Israel's shareholders also agreed not to sell any Holdco shares that they received for two

---

[11] Complaint, at ¶¶ 13, 14, 23.
[12] Complaint, at ¶ 23.
[13] *See* Cambridge Capital Acquisition Corp., Prospectus [Rule 424(b)(4)], Registration Number 333-191868, dated Dec. 17, 2013, at 48, available at
https://www.sec.gov/Archives/edgar/data/0001588869/000121390013007303/d30991.htm [hereinafter "Cambridge Prospectus"].
[14] *See generally* Usha Rodrigues & Mike Stegemoller, *Exit, Voice and Reputation: The Evolution of SPACs*, 37 DEL. J. CORP. L. 849 (2012) (discussing the structure and processes surrounding a SPAC IPO and acquisition).
[15]     Cambridge   Capital   Acquisition   Corp.,   Form   8-K,   filed   Dec.   30,   2013,   available   at https://www.sec.gov/Archives/edgar/data/0001588869/000121390013007481/f8k122313_cambridgecap.htm
[16]   Agreement and Plan of Reorganization, dated as of September 6, 2015, by and among Cambridge Capital Acquisition Corporation, Cambridge Holdco Corp, Ability Computer & Software Industries, Ltd., and the shareholders of Ability Computer & Software Industries, Ltd. [hereinafter, the "Merger Agreement"]. *See also* Press Release, Cambridge Capital Acquisition Corporation to Merge with Ability Computer & Software Industries, Ltd., dated Sept. 8, 2015, available at https://www.businesswire.com/news/home/20150908005579/en/Cambridge-Capital-Acquisition-Corporation-Merge-Ability-Computers
[17]     Cambridge   Capital   Acquisition   Corp.,   Form   8-K,   filed   Sept.   10,   2015,   available   at https://www.sec.gov/Archives/edgar/data/0001588869/000121390015006856/f8k090615_cambridgecapital.htm [hereinafter "Cambridge Sept. 10, 2015 8-K"]
[18] *Id.*
[19] Merger Agreement, at § 1.6.

years after the closing, subject to certain exceptions.[20]

16.    The Merger Agreement provided that both Ability Israel and Cambridge would be jointly responsible for the preparation of the proxy materials, including the road show materials, for the proposed merger.  These included the registration statement and the proxy statement, which were to be publicly filed with the SEC.[21] Specifically, Article V of the Merger Agreement provided, among other things, that, "as soon as reasonably practicable after the execution of this Agreement, Ability [Israel] and Cambridge shall prepare and file with the SEC under the Securities Act, a registration statement on Form S-4 with respect to the Surviving Pubco Shares [*i.e.*, Ability Inc.] to be issued in connection with the [Ability-Cambridge] Merger, which shall include proxy materials for the purpose of soliciting proxies from the holders of Cambridge's Common Stock … to vote in favor of … the adoption of this Agreement and approval of the Transaction…".[22]

17.    The Merger Agreement further provided that Ability Israel and Cambridge "shall furnish to the other all information concerning its respective company and business as may reasonably be requested in connection with the preparation of the Registration Statement and Proxy Statement/Prospectus….. [and] that Cambridge shall cause the Proxy Statement/Prospectus and Registration Statement" to be filed with the SEC.[23] The Merger Agreement also provided that Ability Israel and Cambridge would promptly respond to any SEC comments on such filings, and that each company would take any and all actions required to satisfy the requirements of the Securities Act and the Exchange Act.[24] The Merger Agreement also provided that Ability Israel and Cambridge would ensure that the registration statement and the proxy statement/prospectus complied with all applicable provisions and rules under the Exchange Act, in the preparation, filing and distribution of the proxy statements/prospectus, the solicitation of proxies thereunder, and the calling and holding of the special meeting of Cambridge's shareholder to vote on the Ability-Cambridge merger.[25]

18.    The Merger Agreement included certain representations and warranties made by Ability Israel and its shareholders (*i.e.*, Hurgin and Aurovsky, who each held 50% of Ability Israel's

---

[20] Cambridge Sept. 10, 2015 8-K, *supra* note 17.
[21] Merger Agreement, at § 5.1.
[22] *Id.* at § 5.1(a).
[23] *Id.*
[24] *Id.* at 5.1(b).
[25] *Id.*

shares) to Cambridge, which were required to be true and correct both at the time of agreement was entered into and at the closing date of the business combination.[26]  Among other things, Hurgin and Aurovsky represented to Cambridge in the Merger Agreement that there had not been any "Material Adverse Effect" on Ability Israel at the time of the Merger Agreement, or since the date of the Merger Agreement until the time of the completion of the merger.[27]  The Merger Agreement defined a Material Adverse Effect to include "any change, event, or circumstance or effect, individually or when aggregated with other changes, events, circumstances or effects, which has had a material adverse effect on the business, assets (including intangible assets), revenues, financial condition, or results of operations of such entity and its Subsidiaries, taken as a whole."[28] Hurgin and Aurovsky also represented to Cambridge in the Merger Agreement that they had provided Cambridge with a complete and accurate list of "Material Company Contracts."[29]  That term was defined to include any contracts under or in respect of which Ability Israel had any liability or obligation of any nature whatsoever (absolute, contingent or otherwise) in excess of $1,000,000, and which were otherwise material to the business, operations, assets, conditions (financial or otherwise) or prospects of Ability Israel.[30]

19.    The Merger Agreement also contained indemnification provisions, by which the shareholders of Ability of Israel (*i.e.*, Hurgin and Aurovsky) agreed to indemnify Ability Inc. against any and all "Losses" asserted against Ability Inc., by reason of, or arising out of or resulting from the inaccuracy or breach of any representation or warranty of Ability Israel contained in or made pursuant to the Merger Agreement.[31]  The term "Losses" was defined to include, among other things, all losses, liabilities, judgments, awards, orders, penalties, settlements, including those arising from any demands, claims, suits, actions, or notices of violation or noncompliance.[32]

20.    On December 22, 2015, Cambridge shareholders voted to approve the business combination contemplated by the Merger Agreement.[33] The merger and share exchange was

---

[26] *Id.* at § 6.3(a).
[27] *Id.* at §§ 3.9, 6.3(e).
[28] *Id.* at § 10.2(a).
[29] *Id.* at § 2.19.
[30] *Id.*
[31] *Id.* at Art. VII.
[32] *Id.* at § 7.1(b).
[33]    Cambridge Capital Acquisition Corp., Form 8-K, filed Dec. 23, 2015, available at https://www.sec.gov/Archives/edgar/data/0001588869/000121390015009711/f8k122315_cambridgecapital.htm. 8,186,948 shares voted for the merger, 1,202,450 voted against the merger, and 40,757 shares abstained. *Id.*

consummated on December 23, 2015, and Holdco changed its name to Ability Inc. ("Ability").[34] As a result of these transactions, Ability listed on the Nasdaq stock exchange as Ability Inc., an FPI publicly traded and organized under the laws of the Cayman Islands.[35] After the merger and share exchange, Ability remained headquartered in Israel and filed its required Securities Exchange Act of 1934 (the "Exchange Act") forms with the SEC as an FPI.[36] In addition, after the merger and share exchange, Messrs. Hurgin and Aurovsky were on the board of directors of Ability, retained their executive positions and remained the "co-controlling shareholders".

21.     In connection with the merger Cambridge issued out a proxy statement on Schedule 14A for the merger (the "Proxy Statement").[37] Holdco separately issued out a registration statement for the issuance of its shares (the "Registration Statement").[38] The Registration Statement which incorporated the Proxy Statement was filed with the SEC and declared effective on December 2, 2015.[39] The Proxy Statement (which included the prospectus for the share issuance) was then mailed to Cambridge security holders. As part of this the Merger Agreement was attached as an exhibit to the Proxy Statement and the Registration Statement. The Merger Agreement was signed by Messrs. Hurgin and Aurovsky, as the controlling shareholders of Ability Israel.[40] Messrs. Hurgin and Aurovsky also consented to the use of their names in the Registration Statement and Proxy Statement to serve as directors of the merged, public company.[41]

22.     The Proxy Statement stated that "[a]ll information contained in this document relating to Cambridge has been supplied by Cambridge, and all such information relating to Ability has been supplied by Ability."[42] The Proxy Statement included sections entitled "Business of Ability," "Ability's Management's Discussion and Analysis of Financial Condition and Results of

---

[34]     Ability     Inc.,     Form     8-K,     filed     Dec.     30,     2015,     available     at
https://www.sec.gov/Archives/edgar/data/0001652866/000121390015009803/f8k122315_abilityinc.htm
[35] *Id.*
[36] *Id.*
[37] Proxy Statement, *supra* note 10.
[38] Cambridge Holdco Corp., Registration Statement on Form S-4, Registration No. 333-206989, filed Sept. 17, 2015, available     at     https://www.sec.gov/Archives/edgar/data/0001652866/000119312515322443/d18083ds4.htm [hereinafter "Registration Statement"].
[39] Cambridge Proxy Statement, *supra* note 10, at pp. A1-A82.
[40] Merger Agreement, at p. 59-60.
[41] Cambridge Holdco Corp., Amendment No. 3 to Registration Statement on Form S-4, Registration No. 333-206989, filed Nov. 25, 2015, Ex 99.4; Ex. 99.5, available at
https://www.sec.gov/Archives/edgar/data/0001652866/000119312515388950/d18083ds4a.htm
[42] Proxy Statement, *supra* note 37, at p. 187.

Operations" ("MD&A"), and "Estimates Furnished by Ability to Cambridge."[43]    All of this information came from Ability.[44]

23.     As a result of the merger, Mr. Hurgin became the CEO of Ability Inc. and remained the CEO of Ability.  Similarly, Mr. Aurovsky became the CTO of Ability Inc. and remained the CTO of Ability.[45] After the merger, Cambridge's shareholders held about 40% of Ability Inc.'s stock, and Messrs. Hurgin and Aurovsky held about 60% of Ability Inc.'s stock and became Ability Inc.'s co-controlling shareholders.[46]

24.     In connection with the transaction, Messrs. Hurgin and Aurovsky also signed a number of related agreements, including an:

      a.  Indemnity Escrow Agreement;

      b.  Lock-Up Agreement;

      c.  Employment Agreement;

      d.  Share Purchase Agreement;

      e.  Non-Compete Agreement; and

      f.  Rental Contract, effective May 1, 2015, for Ability Israel's offices, and a Personal Guaranty by Hurgin and Aurovsky of Ability's obligations thereunder.[47]

25.     In addition, prior to the close of the merger, both Messrs. Hurgin and Aurovsky signed at least eight management representation letters to Ability Israel's auditor, BDO Ziv Haft, related to the Proxy Statement and Registration Statement.[48]

26.     Upon consummation of the merger and share exchange, the directors of Ability were Anatoly Hurgin (Chairman of the Board), Alexander Aurovsky, Efraim Halevy and Derek Zissman, who were designated by Ability Israel, and Benjamin Gordon and Mitchell Gordon, who were designated by Cambridge.[49] Both Messrs. Hurgin and Aurovsky, as officers of Ability and Ability Israel, had the highest signatory rights to contractually and financially obligate the

---

[43] *Id.* at *passim.*
[44] *Id.* at p. 187.
[45] *Id.* at p. 3.
[46] *Id.* at p. 175.
[47] Registration Statement, *supra* note 37, at II.1-II.4.
[48] Management representation letters to the auditor dated Aug. 20, 2015, Sep. 16, 2015, Oct. 25, 2015 (Ex. 104), Oct. 28, 2015, Nov. 1, 2015 (Ex. 105), Nov. 17, 2015, Nov. 25, 2015 (Ex. 106), and Nov. 26, 2015 (Ex. 106).
[49] Proxy Statement, *supra* note 10, at pp.3, 165.

company.[50] They also continued to sign management representation letters to Ability's auditor related to its financial statement audits.[51] Furthermore, as directors, both Messrs. Hurgin and Aurovsky attended Ability's board meetings and signed board resolutions.[52]

27.    The SEC alleges that after the merger closed in December 2015, Ability announced in May 2016 that it did not develop or own its "game-changing" new product, ULIN, that Ability had previously told investors that it had developed and owned.[53]  Also after the merger closed, Ability's revenues rapidly declined mainly as a result of not obtaining orders from its largest customer that Ability had previously told investors it had already obtained such orders.[54]  The SEC subsequently brought suit in this action in the U.S. District Court for the Southern District of New York.[55]

## VI.    THEORETICAL BACKGROUND

### A.    Background on Relevant Procedures in SPAC Transactions, Including Proxy Mechanics

28.    A special purpose acquisition company is organized to acquire a private company and take that company public.  To accomplish this purpose, the SPAC will conduct an IPO and raise capital for the acquisition.[56]  Under the terms of a typical SPAC offering the SPAC then has a period of time (typically 18 months to two years) to complete an acquisition of a private company.[57]  If the SPAC does not complete an acquisition during that time period it then liquidates and returns the raised funds to investors.[58]  Alternatively, the SPAC can agree to acquire, and can acquire, a company during the time period.  Typically, SPACs are raised to focus on particular industries but

---

[50] Feb. 8, 2016 board minutes, Annex E, Ability Inc. signatory rights as of Feb. 8, 2016; Feb. 25, 2016 board resolution signed by Messrs. Hurgin and Aurovsky, Annex A, Ability Israel signatory rights as of Feb. 25, 2016; March 2, 2016 excerpt of board minutes, attached Ability Inc. signatory rights as of March 2, 2016; March, ___ 2016 board resolution signed by Messrs. Hurgin and Aurovsky, Annex A, Ability Israel signatory rights as of March _____, 2016.
[51] Management representation letters to the auditor dated Apr. 28, 2016, May 1, 2016, and May 16, 2017.
[52] As documented in Ability's board meeting minutes, both Hurgin and Aurvosky attended board meetings on Feb. 8, 2016, May 10, 2016, June 5, 2016, Aug. 9, 2016, Sep. 6, 2016, Oct. 31, 2016, Nov. 14, 2016, Dec. 27, 2016, Mar. 28, 2017, Apr. 5, 2017, Apr. 6, 2017, and May 16, 2017.  Hurgin also attended board meetings on Mar. 2, 2016, Apr. 25, 2016, May 1, 2016, and Mar. 19, 2017. Both Hurgin and Aurovsky signed board resolutions on Dec. 30, 2015, Feb. 25, 2016, Mar. ____, 2016, Apr. 25, 2017, May 15, 2017, and July 5, 2017.
[53] Complaint, at ¶¶ 125-127.
[54] *Id.* at ¶ 195.
[55]  *SEC Charges Intelligence Communications Company and Top Executives with Defrauding Merger Investors*, Litigation Release No. 24505 / June 20, 2019.
[56] *See generally* Deloitte, Private-Company CFO Considerations for SPAC Transactions, Sept. 2020, pp. 2-4, available at   https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/us-private-company-CFO-considerations-for-SPAC-transactions.pdf.
[57] *Id.*
[58] Rodrigues & Stegemoller, *supra* note 14, at 886-888.

the SPAC documents typically provide the SPAC wide latitude to acquire companies in various industries and various regions.[59]

29.     When a SPAC agrees to acquire a company, it negotiates a merger agreement.  In the merger agreement the SPAC agrees to pay a certain amount of consideration for the private company. This will typically constitute cash payments to the private company shareholders as well as stock in the SPAC.

30.     The acquisition of the private company by the SPAC typically requires a shareholder vote.[60] Since the SPAC is publicly traded with securities registered under Section 15 of the Exchange Act, this vote typically involves a filing of a proxy statement on Schedule 14A for the purposes of holding the vote on the merger of the private company with the SPAC.[61]  This vote is typically required by the SPAC organizational documents as well as legal and stock exchange listing requirements.[62]  If the SPAC shareholders vote against the merger then they are entitled to redeem their shares for the offering price.  However, if shareholders approve the transaction then the merger will happen.  Those shareholders who dissent against the transaction will still have their shares redeemed for the IPO price.[63]  After the consummation of the merger, the company will then be a publicly traded operating company listed on a U.S. stock exchange.

31.     These customary and usual practices were followed in the case of the merger and share exchange for Ability.  Cambridge raised approximately $81.3 million in its IPO.[64]  It then had 18 months to consummate a transaction or liquidate.[65]   Pursuant to Nasdaq listing rules, Ability was required to make an initial business combination with a target business or businesses whose collective fair market value is at least equal to 80% of the balance in Cambridge's trust account at the time of the execution of a definitive agreement for such business combination.[66]  After an

---

[59] Michael Klausner, et al., *A Sober Look at SPACs*, YALE J. REG. at 1-3 (forthcoming 2022), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3720919&download=yes.
[60] *Id.*
[61] *Id.*
[62] The stock exchanges typically require a vote if more than 20% of the SPAC's outstanding shares are being issued in the merger.  *Id.*
[63] Rodrigues & Stegemoller, *supra* note 14, at 886-888.
[64] Cambridge Capital Acquisition Corp., Form 8-K, filed Dec. 30, 2013, available at https://www.sec.gov/Archives/edgar/data/0001588869/000121390013007481/f8k122313_cambridgecap.htm
[65] The time was extended to 24 months from the closing of this offering if Ability  executed a definitive agreement for an initial business combination within 18 months from the closing of its IPO but had not completed the initial business combination within such 18-month period. Cambridge Prospectus, *supra* note 13, at p.1.
[66] *Id.* at 19.

aborted transaction with Parakou Tankers, Inc.,[67] an industrial shipping company, Cambridge agreed to acquire Ability Israel.  This was done pursuant to a merger and a shareholder vote of Cambridge shareholders and the acquisition of Ability Israel by Holdco.

## VII.   OPINIONS

A.   *Opinion 1*: **It is customary and usual practice for executive officers and directors to be knowledgeable of federal securities laws applicable to public company M&A transactions and to review the relevant SEC disclosure documents.**

32.    In this opinion, I detail the customs and practices of executive officers and directors in public company M&A transactions in their review of the relevant documents, including disclosure documents filed with the SEC in connection with the transaction as well as road show materials. More specifically, I detail the role a public company executive officer and director plays in a transaction with respect to review of relevant SEC disclosure documents, including road show materials and the proxy statement. In this regard, I focus on customary and usual expectations for executive officer and director review of these documents, their responsibilities to review these documents as well as their expected knowledge of these documents.  In detailing these expectations in this and my other opinions, I am setting forth the expectations for these matters from the perspective of accepted M&A and disclosure practices and the customary and usual practices of market participants implementing these practices.

1.   **Customary and usual obligations of a responsible executive officer or director with respect to knowledge and conduct under the federal securities laws.**

33.    Under customary and usual corporate governance norms, the officers and directors are charged with the operation and oversight of the company.[68]  The board of directors oversees the strategic direction and risk oversight processes of the company and the directors are responsible for key decisions.[69]  Meanwhile, executive officers act under the direction of the board of directors and oversee the day-to-day operations of the company.[70]

---

[67]    Cambridge Capital Acquisition Corp., Form 8-K, filed Apr. 22, 2015, available at https://www.sec.gov/Archives/edgar/data/0001588869/000119312515140845/d913587d8k.htm
[68] *See* CHARLES O'KELLEY & ROBERT THOMPSON, CORPORATIONS AND OTHER BUSINESS ASSOCIATIONS: CASES AND MATERIALS, at 149-152 (Aspen Casebook 8th Ed.).
[69] *Id.* at 150-151.
[70] *Id.* at 151-152.

34.     As part of these expectations under accepted corporate governance norms, directors and officers of public companies have responsibilities with respect to the disclosure of information in SEC filings, including road show statements.[71]  These obligations stem from multiple sources and have a central purpose of ensuring full and accurate public company disclosure in accord with the federal securities laws. More specifically, the economic premise of the federal securities laws is full disclosure by a public company of material information to investors either in connection with a purchase or sale of a security or a shareholder vote.[72]  Based on this disclosure, investors can assess the company and whether it is an appropriate and suitable investment or course of action. Under the efficient market hypothesis, this disclosure ensures that the pricing of the company's stock reflects the value of the company.[73]  Moreover, studies have repeatedly found that the requirements of material disclosure and attendant anti-fraud provisions ensure more efficient pricing of stocks as well as higher pricing due to market integrity.[74] This phenomenon has also been observed in FPIs who will list in the United States in order to bond with the U.S. securities law regime and obtain higher pricing for the FPI's securities.[75]

35.     The economic role of disclosure under the federal securities laws places officers and directors in a key role to ensure that a public company complies with its disclosure obligations and makes true and accurate disclosure.  This obligates directors and officers to serve a proactive role in the disclosure process, one which not only involves review of this disclosure but "vigorous" inquiry in order to ensure that that the statements in the disclosure are materially true and correct. As two practitioners have stated:

---

[71] See Ex. 4, Nov. 18, 2015 Ability-Cambridge roadshow transcript; Ex. 59, Nov. 16, 2015, roadshow powerpoint presentation; Ex. 82, Nov. 24, 2015, roadshow powerpoint presentation; Ex. 60, Nov. 30, 2015, roadshow powerpoint presentation.  See also Ex. 229, undated Ability powerpoint presentation in Hebrew, as an example of how materials can be translated into a foreign language.

[72] Roberta S. Karmel, *Realizing The Dream Of William O.Douglas--The Securities And Exchange Commission Takes Charge Of Corporate Governance*, 30 DEL. J. CORP. L. 79, 80 (2005) ("The federal securities laws generally have been considered full disclosure statutes, as opposed to merit regulation statutes or laws governing the internal affairs of corporations.")  Full disclosure regulation is also based on the often quoted theory that "[p]ublicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." LOUIS D. BRANDEIS, OTHER PEOPLE'S MONEY AND HOW THE BANKERS USE IT 92 (1914).

[73] *See generally* Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms Of Market Efficiency*, 70 VA. L. REV. 549 (1984).

[74] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 THE JOURNAL OF FINANCE 383 (1970).

[75] Steven M. Davidoff (Solomon), *Regulating Listings in a Global Market*, 86 N.C. L. REV. 101 (2007).

> The requirement of a vigorous and prompt inquiry is particularly true with respect to the company's public filings. The SEC has made it clear that directors and officers must adopt an aggressive posture to verify all disclosure items. Individuals who review, approve, or sign their company's proxy statements or periodic reports must take steps to ensure the accuracy and completeness of the statements contained therein. To fulfill this responsibility, directors and officers must be vigilant in exercising their authority throughout the disclosure process.[76]

36.     The obligation of directors and officers to make a "vigorous" inquiry with respect to public company disclosure has been reinforced by the anti-fraud provisions and proxy solicitation rules under the federal securities laws. These provisions place liability on officers and directors with respect to security fraud and the issuance of disclosure documents with materially false statement. As one academic has put forth this principle:

> Importantly, the core of the theory is not just a disclosure requirement. Instead, by requiring disclosures and officer and director signatures on offering documents, the SEC forces attention to the underlying details, backed up by the potential for a strict-liability cause of action in the public-offering context. Thus, by combining ex ante required disclosures with ex post liability, the securities framework places the directors in a gatekeeping role that ties to their state-law-based fiduciary duties. To meet the disclosure requirements, directors must ensure accurate and complete disclosures, and to do so, directors should dialogue with officers and peers. Once engaged and informed, they must make a choice about what else, if anything, should be disclosed and whether changes in the conduct of business should occur to lessen the risks.[77]

37.     These obligations are particularly ripe with respect to directors who are tasked with overseeing the operation of the company and having knowledge of its SEC and related documents. The SEC has put forth this framework by requiring directors to consent to being named as a director in a proxy statement.[78]  As another law review article states:

> According to the SEC, directors should be involved in reviewing and, sometimes, preparing and drafting statements. All directors should be fully aware of company statements and sufficiently engaged and active to question and correct inadequate disclosures. This role of securities monitor is yet another way of implementing the information-forcing-substance disclosure model.[79]

38.     Because of their central role directors have an affirmative obligation under customary and

---

[76] John Howard and Timothy Donovan, *On Duty at the Corporate Helm: An Overview of Director and Officer Responsibilities*, 18 No. 9 ACCADKT 36, 39-40 (2000).
[77] Hillary A. Sale & Donald C. Langevoort, *"We Believe": Omnicare, Legal Risk Disclosure and Corporate Governance*, 66 DUKE LAW J. 763, 787 (2016).
[78] Exchange Act Rule 14a-4(d)(1).
[79] Hillary A. Sale, *Independent Directors as Securities Monitors*, 61 Business Lawyer 1375, 1382 (2006).

usual disclosure practices to review disclosures as well as be knowledgeable of their content. Directors cannot sit passively aside or sign SEC disclosure documents without reading or understanding them.  To the extent M&A documents are in a foreign language, it is a customary and usual practice to have them translated, if need be.

39.    Executive officers play a similar role in ensuring that the disclosure of the public company is materially true and correct.  Thus, custom and practice has put officers and directors in an affirmative role to review and be knowledgeable of company disclosures, making them central to the economic process of disclosure.  These duties may also be reinforced through customary contractual terms, such as requiring parties to a merger agreement to make certain representations and warranties to each other, and indemnification provisions providing for liability to those making such representations and warranties for any losses arising out of resulting from the inaccuracy or breach of such representations and warranties.  Based on these customs and practices, and the attendant legal and contractual liabilities imposed on executive officers, directors, and controlling shareholders, market participants, including shareholders solicited for their proxies, may reasonably expect that executive officers, directors and controlling shareholders have abided by their duties to review company disclosures, ensured their accuracy and are knowledgeable of their content.

### 2.    Customary and usual obligations of a responsible executive for review of a proxy statement or registration statement.

40.    The corporate governance practices of director and officer oversight of disclosure and the expectations of a "vigorous" inquiry have led to common practices in the preparation of that disclosure in connection with a public company M&A transaction.  In connection with a public company M&A transaction the following steps are typically taken to ensure that directors and officers play their appropriate role in the disclosure process:

a.    The filing issuer will draft the relevant proxy statement and/or securities offering documents;

b.    The filing company and the other party will then circulate the document internally to officers and directors to comment on and finalize the document;

c.    Auditors will also audit and/or review relevant financial statements in connection

with the relevant company;

d.  Once drafts are near finalization they will be circulated to the board of both parties as well as the officers.  They will be asked to review and comment on the disclosure.  Due diligence will be conducted on the disclosure;

e.  The officers and boards of the relevant companies will then read and sign-off on the disclosure; and

f.  If directors are continuing they will sign relevant consents to have their names included in the proxy statement or other disclosure document.  Officers will sign management representations letters to the auditor.  Once there is complete sign-off the filing company will file this disclosure and it will be delivered to shareholders or prospective investors.

41.  This process is iterative and is designed to ensure that the rigorous review process that is expected of SEC filings is undertaken.  This includes involving relevant officers and directors in the process in order to ensure there is full disclosure and that the officers and directors are knowledgeable of the disclosure content.  The ultimate aim is to ensure that the officers and directors of the company contribute to and ensure that the disclosure made by the company is truthful and contains all material information as required by the federal securities laws.

   **B.    *Opinion 2*: A controlling shareholder, director and executive officer of a publicly traded company would be expected under customary and usual practices to be knowledgeable of the company's finances, sales and contractual arrangements and to be able to review and sign-off on SEC disclosure related thereto.**

42.  In this opinion I set forth the customary and usual expectations for knowledge of a company's finances, sales and contractual arrangements for an officer and director who is also a controlling shareholder of the company.  Because of their role as gatekeepers, directors and officers customarily and usually have extensive knowledge of the operations of the company, and there is an expectation that these officers and directors will have such knowledge.  This expectation is particularly true when the officer or director is also a controlling shareholder.

43.  More particularly, under settled customs and expectations controlling shareholders

typically have a significant governance role in the corporation.[80]   This role is based upon the controlling shareholder's ability to control the company through the appointment of directors and exercise of the controlling shareholders voting rights.   Through these mechanisms the controlling shareholder literally controls the entire governance of the company.

44.     Because of their position as a controlling shareholder with operational control, the controlling shareholder typically has material, non-public information about the company. U.S. law and practice recognizes this expectation and controlling shareholders of U.S. public companies are subject to trading limitations under the federal securities laws which limit their ability to engage in short term trading.[81]   The controlling shareholder is also under the obligation not to engage in trading of the company stock while in possession of any material non-public information.[82]   In addition, controlling shareholders are subject to heightened disclosure requirements of their shareholdings and trading.[83] These restrictions are also applicable to officers and directors of the company as well.[84]

45.     The role and power of a controlling shareholder thus comes with the market expectation that this individual are knowledgeable of the company's major operations.   This includes sales and financial figures as well operational details and familiarity with contracts and other obligations of the company.   These obligations translate into an obligation as an officer and director as well as a controlling shareholder to ensure that there is vigorous inquiry to ensure disclosure obligations are adhered to and met.

46.     In the context of public company M&A transactions, these obligations are commonly reinforced through representations and warranties, and indemnification provisions for their inaccuracy or breach.   More specifically, the controlling shareholder will themselves often make the representations and warranties in the applicable merger agreement as well as provide indemnities for their subsequent breach.   These obligations may also manifest themselves in related party transactions.   Controlling shareholders will often engage in transactions to benefit the

---

[80] *See, e.g.*, M&A Casebook, *supra* note 2, at Ch. XIX.
[81] Section 16, Exchange Act.
[82] These are under the general antifraud rules including Rule 10b-5.
[83] These are the short-swing profit rules under Section 16 of the Exchange Act which require disclosure of trading. SEC Release No. 34-28869, 56 Fed. Reg. 7242 (February 21, 1991) ("Section 16 Adopting Release"). In addition, controlling shareholders are also subject to the reporting requirements under Section 13.   *See* 15 U.S. Code § 78m (2021) (Periodic and other reports).
[84] Section 16 Adopting Release, *supra* note 83.

company such as co-signing or guarantying leases.  They will also provide services or lend assets.  In addition, the controlling shareholder will often be involved in major decision-making for the company itself and be consulted outside the board framework on decisions.  There is thus an expectation under corporate governance norms that a controlling shareholder, director and executive officer of a publicly traded company would be knowledgeable of the company's finances, sales and contractual arrangements and to be able to review and sign-off on SEC disclosures related thereto, including in public company M&A transactions.

C.   *Opinion 3:* **A controlling shareholder, director and executive officer would not be expected under customary and usual practices to be willfully blind in execution of his or her relevant certifications and review of the disclosure documents in a public company M&A transaction.**

47.    In my preceding opinions I have detailed the customary and usual role of directors and officers in public company M&A transactions and the review of SEC disclosure documents.  I have also reviewed the role of a controlling stockholder in these disclosure processes and procedures.  Based on these analyses, it is customary and usual for a person in these roles to be knowledgeable of the company's operations and to have a corollary obligation to use their inside knowledge of the company to ensure "vigorous" inquiry in the context of the company's disclosure obligations and processes to ensure the company's disclosure are not false or misleading.

48.    It is thus the expectation under corporate governance customs and practices that directors and officers will be engaged in the disclosure process and procedures.  Moreover, because these are individuals with unique knowledge and engaged in the commercial processes of the company they are aware that they have certain legal obligations as well as obligations to adhere to custom and practice in the implementation of their responsibilities.  Moreover, while many of these documents are drafted by counsel, the ultimate source of the information regarding the company is generally the officers and directors who are acting on behalf of the company, and who are ultimately responsible for the statements contained in the documents that they sign.[85]

---

[85] *See, e.g., Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."); *Howard v. Everex*, 228 F. 3d 1057, 1061 (9th Cir. 2000) ("By standing behind a statement, the public assumes that they can trust the word of the maker of that statement."); *Special Situations Fund III QP, L.P. v. Brar*, 2015 U.S. Dist. LEXIS 38825, * 8 (N.D. Cal. 2015) ("Courts have consistently held that the signer of a corporate filing is its 'maker,' because signing a filing implies 'ultimate control' over its contents."); *Abdo v. Fitzsimmons*, 2018 U.S. Dist. LEXIS

49.     As part of this knowledge, executives and directors customarily know that willful blindness is not an accepted practice (indeed, as I detail above it is the opposite and knowledge is expected). Moreover, these executives and officers customarily know that by executing documents, such as legal agreements and other consents in the context of disclosure, they have an obligation to review and understand these documents.  More particularly, officers and directors know that the operation of a company involves legal obligations as well as customs and practices under corporate governance norms.  As a consequence, in my experience an officer or director would not be "willfully blind" or fail to review SEC disclosures and in fact would know that they have responsibilities to be engaged with the company and its practices and be knowledgeable of company disclosure.  These obligations are particularly acute at an FPI where the executive or director knows that they are engaging in a foreign legal system with significant obligations and potential liability.

## VIII.   CONCLUSION

50.     In this report I have provided three primary opinions.  These opinions concern the customs and practices of disclosure in the context of a public M&A transaction.  These customs and practices are standard and embedded in the framework of corporate governance for a company involved in a public company M&A transaction. Ultimately, I detail how executives and directors, particularly those who are controlling shareholders are viewed as gatekeepers with a responsibility to ensure that there is "vigorous" inquiry with respect to the company to ensure complete and accurate disclosure in documents filed with the SEC.  This includes a customary and usual responsibility to review and be knowledgeable of the Company's disclosures.  It would not be customarily expected that such an executive or director would be willfully blind and simply ignore his or her duty to review SEC disclosures and the framework of the M&A process is designed to ensure that this does not occur.

---

241075, * 34 (N.D. Cal. 2018) ("Since Janus, courts within this district have continued to hold that one who signs a document is the maker of statements within that document.").

Dated: November 1, 2021

_Steven Davidoff Solomon_
Steven Davidoff Solomon

# Exhibit 1
# Steven Davidoff Solomon CV

### Dated November, 2021

*Academic Appointment/Work*

**University of California, Berkeley School of Law**                          2014-
Alexander F. and May T. Morrison Professor of Law
- Teach Business Associations, Mergers & Acquisitions, and Law, Accounting/Economics and Business Workshop (have also taught Contracts & Securities Regulation)
- Co-taught with Erwin Chemerinsky Civil Liberties in a Pandemic
- Co-teach with Professor Mark Brilliant From Wall Street to Main Street, an undergraduate U.C. Berkeley class
- Faculty Co-Director, Berkeley Center for Law & Business
  - o The Center has ten employees, conducts over 50 programs and conferences a year and operates the executive education program for the law school.  In my five-year tenure as co-director we have grown revenues from 300K a year to approximately $4 million per year (and from two employees to ten).
- Named three times one of the 100 most influential governance professionals in the country by the National Association of Corporate Directors
- Seven articles selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors
- Top 10 Most-Cited Corporate & Securities Law Professors 2013-2017; 2016-2020 (per Sisk report)
- Top 10 Most-Cited U.C. Berkeley, School of Law Professors 2013-2017; 2016-2020 (per Sisk report)
- Member American Law Institute, European Corporate Governance Initiative

**Social Capital Suvretta Holdings Corp. IV**                          2021-
Director, Member of Audit, Compensation and Nominating Committees

**The New York Times**                          2007-
"Deal Professor" Columnist for N.Y. Times DealBook
- Weekly print columnist for The New York Times
- On-line columnist for N.Y. Times DealBook

*Other Academic Appointments*

**The Ohio State University Michael E. Moritz College of Law**          2011-2014
**Fisher College of Business (By Courtesy)**
Professor of Law

**University of Connecticut School of Law**          2008-2011
Professor of Law

**Wayne State University School of Law**          2006-2008
Assistant Professor of Law

## *Scholarship*

### *Casebooks*

MERGERS & ACQUISITIONS: LAW, THEORY & PRACTICE (1ST ED. WEST 2016) (2ND ED. WEST 2019) (with Claire Hill and Brian Quinn) (also first edition)

### *Books*

THE CORPORATE CONTRACT IN CHANGING TIMES: IS THE LAW KEEPING UP? (UNIV. CHICAGO 2019) (Edited volume) (with Randall Thomas)

RESEARCH HANDBOOK ON MERGERS AND ACQUISITIONS (Elgar 2016) (Edited volume) (with Claire Hill)

THE LAW AND ECONOMICS OF MERGERS AND ACQUISITIONS (Elgar 2013) (Edited volume) (with Claire Hill)

GODS AT WAR: SHOTGUN TAKEOVERS, GOVERNMENT BY DEAL, AND THE PRIVATE EQUITY IMPLOSION (John Wiley & Sons, Inc. 2009)

### *Book Chapters*

*The Rise and Fall of Delaware's Takeover Standards* (with Randall Thomas) in STEVEN DAVIDOFF SOLOMON & RANDALL THOMAS (EDS.), THE CORPORATE CONTRACT IN CHANGING TIMES: IS THE LAW KEEPING UP? (Univ. Chicago 2019)

*What Do We Know About Law Firm Quality in M&A Litigation?* (with Randall Thomas) in JESSICA ERICKSON, ET AL. (EDS.), RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION (Elgar 2018)

*Mergers & Acquisitions: A Cyclical and Legal Phenomenon* (with B. Quinn and C. Hill) in CLAIRE HILL & STEVEN DAVIDOFF SOLOMON (EDS.), RESEARCH HANDBOOK ON THE ECONOMICS OF CORPORATION LAW (Elgar 2016)

*Takeover Theory and the Law and Economics Movement,* in CLAIRE HILL & BRETT MCDONNELL (EDS.), RESEARCH HANDBOOK ON THE ECONOMICS OF CORPORATION LAW (Elgar Press 2012)

*The Private Equity Contract*, in DOUGLAS CUMMING (ED.), THE OXFORD HANDBOOK OF PRIVATE EQUITY (Oxford University Press 2012)

*Fairness Opinions in Mergers and Acquisitions*, in H. KENT BAKER (ED.), THE ART OF CAPITAL RESTRUCTURING (John Wiley & Sons 2011) (with Anil K. Makhija and Rajesh P. Narayanan)

*Fairness Opinions: Thoughts, Perspectives and Legal Doctrine,* in WOLFGANG ESSLER & SEBASTIAN LOBE (EDS.), FAIRNESS OPINIONS (2008)

### *Working Articles*

*How Do Representations and Warranties Matter? Risk Allocation in Acquisition Agreements* (with Omri Even-Tov & James Ryans), revise and resubmit *Review of Accounting Studies*

*As California goes, so goes the nation? Gender quotas and the legislation of non-economic values* (with Felix von Meyerinck, Alexandra Niessen-Ruenzi and Markus Schmid), revise and resubmit *Journal of Accounting and Economics*

*Peer Reviewed Articles*

*Placement Agents and Private Equity: Information Production or Influence Peddling?*, 55(4) J. FIN. & QUANT. ANAL. 1095 (2020) (with Matt Cain and Stephen McKeon)

*An Empirical Study of Special Litigation Committees*, 60 J. CORP. FIN. 101543 (2020) (with CV Krishnan and Randall Thomas)

*The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers*, 74 THE BUSINESS LAWYER 967 (2019) (with Robert Bartlett, Matt Cain, and Jill Fisch)

*What Happened in 1998? The Demise of the Small IPO and the Investing Preferences of Mutual Funds*, 47 J. CORP. FIN. 151 (2017) (with Robert Bartlett and Paul Rose)

*Top Defense Counsel in Mergers & Acquisitions*, 45 J. CORP. FIN. 480 (2017) (with CV Krishnan and Randall Thomas)

*Do Takeover Laws Matter? Evidence from 50 Years of Hostile Takeovers*, 124(3) J. FIN. ECON. 464 (2017) (with Matt Cain and Stephen McKeon)

*Who are the Top Law Firms? Assessing the Value of Plaintiffs' Law Firms in Merger Litigation*, 18(1) AM. LAW AND ECON. REV. 122 (2016) (with Randall Thomas and CNV Krishnan)

*Delaware's Competitive Reach*, 9(1) JOURNAL EMP. LEG. STUD. 92 (2012) (with Matt Cain) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Law Review Articles*

*Do Social Movements Spur Corporate Change? The Rise of "MeToo Termination Rights" in CEO Contracts*, INDIANA L. J. (forthcoming 2022) (with Rachel S. Arnow-Richman and James Hicks)

*The Future or Fancy? An Empirical Study of Public Benefit Corporations*, 11 HARV. BUS L. REV. 114 (2021) (with Michael B. Dorff and James Hicks)

*Does Revlon Matter: An Empirical and Theoretical Analysis*, 108 CALIFORNIA L. REV. 1683 (2020) (with Matt D. Cain, Sean Griffith and Robert Jackson, Jr.) (winner of the John L. Weinberg/IRRCI Research Award Competition) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*The New Titans of Wall Street: A Theoretical Framework for Passive Investors*, 168 U. PENN. L. REV. 17 (2019) (with Jill Fisch & Assaf Hamdani) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Is Say on Pay All About Pay? The Impact of Firm Performance*, 8 HARV. BUS. L. REV. 101 (2018) (with Jill Fisch and Darius Palia)

*Settling the Staggered Board Debate*, 166 U. PENN. L. REV. 1475 (2018) (with Yakov Amihud & Markus Schmid) reprinted in 30 J. APP. CORP. FIN. 61 (2018) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Transactional Administration*, 106 GEORGETOWN L. REV. 1097 (2018) (with David Zaring)

*The Shifting Tides of Merger Litigation*, 71 VAND. L. REV. 603 (2018) (with Matt Cain, Jill Fisch and Randall Thomas)

*How Corporate Governance is Made:  The Case of the Golden Leash*, 164 U. PENN. L. REV. 649 (2016) (with Matt Cain, Jill Fisch and Sean Griffith) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*The Disappearing IPO and the Lifecycle of Small Firms*, 6 HARV. BUS. L. REV. 83 (2016) (with Paul Rose)

*Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 TEX. L. REV.557 (2015) (with Sean Griffith and Jill Fisch) (selected for reprint in 57 Corp.

Practice Comm. 493 (2015)) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*A Great Game: The Dynamics of State Competition and Litigation*, 100 IOWA L. REV. 165 (2015) (with Matt Cain) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*After the Deal: Fannie, Freddie and the Financial Crisis*, 95 BOSTON U. L. REV. 371 (2015) (with David Zaring)

*Broken Promises: Private Equity Bid Failures and the Limits of Contract*, 40 J. CORP. LAW 565 (2015) (with Matt Cain and Antonio Macias) (selected as best paper from over 80 submissions at the George Washington C-LEAF Business and Financial Law Junior Faculty Workshop; selected to be presented at American Finance Association 2012 meeting)

*Do Outside Directors Face Labor Market Consequences?  A Natural Experiment from the Financial Crisis*, 4 HARV. BUS. L. REV. 53 (2014) (with Andrew Lund and Robert Schonlau)

*Computerization and the ABACUS: Reputation, Trust, and Fiduciary Duties in Investment Banking*, 37(3) J. CORP. LAW 101 (2012) (with Alan D. Morrison and William J. Wilhelm)

*Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, 36 DEL. J. CORP. L. 849 (2011) (with Matt Cain) (Symposium organized around article) (selected for reprint in 54 Corp. Practice Comm. 793 (2012-13))

*Regulation by Deal: The Government's Response to the Financial Crisis*, 61 ADMIN. L. REV. 463 (2009) (with David Zaring)

*The Failure of Private Equity*, 82 S. CAL. L. REV. 481 (2009)

*Regulating Listings in a Global Market*, 86 N.C. L. REV. 101 (2007) (selected for reprint in 50 Corp. Practice Comm. 959 (2009))

*Black Market Capital*, 2008 COLUM. BUS. L. REV. 172

*The SEC and the Failure of Federal Takeover Regulation*, 34 FLA. ST. U. L. REV. 211 (2007)

*Fairness Opinions*, 55 AM. U.L.REV. 1557 (2006) (cited in HA Liquidating Trust v. Credit Suisse Securities LLC, -- F.3d. -- (7th Cir. 2008) (Easterbrook, J.))

*Getting U.S. Security Holders to the Party:  The SEC's Cross-Border Release Five Years On*, 12 U. PENN J. INT'L ECON. L. 455 (2005) (with Brett Carron)

### Symposium Articles

*Synthetic Governance* (forthcoming COLUM. BUS. L. REV.) (with Jill Fisch, Panos N. Patatoukas and Byung Hyun Ahn)

*Should Corporations Have a Purpose?*, 99 TEX. L. REV 1311 (2021) (with Jill Fisch)

*Centros, California's "Women on Boards" Statute and the Scope of the Internal Affairs Doctrine*, 20 EUR. BUS. ORG. L. REV. 493 (2020) (with Jill Fisch)

*Mootness Fees*, 72 VAND. L. REV. 1777 (2019) (with Matt Cain Jill Fisch, Randall Thomas)

*The Problem of Sunsets*, 99 B.U. LAW REV. 1057 (2019) (with Jill Fisch)

*Lock-up Creep*, 38 J. CORP. L.  681 (2013) (with Christina Sautter)

*Limits of Disclosure*, 36 SEATTLE U. L. REV. 599 (2013) (with Claire Hill)

*Airgas and the Value of Strategic Decision-Making*, 2012 COLUM. BUS. L. REV. 502

*Uncomfortable Embrace: Federal Corporate Ownership Amidst the Financial Crisis*, 95 MINN. L. REV. 1733 (2011)

*Rhetoric and Reality: A Historical Perspective on the SEC's Regulation of Foreign Private Issuers*, 79 CINC. L. REV. 619 (2010)

*Paradigm Shift:  Securities Regulation in the New Millennium*, 2 BROOK. J. CORP. FIN. & COM. L. 340 (2008) (included as a paper presented at the AALS annual meeting of the securities regulation section and selected for inclusion in the Securities Law Review 2009 as one of the top papers in the field of securities regulation in 2008)

### Selected Other Writings

*Is The Staggered Board Debate Really Settled?: A Coda*, 168 U. PA. L. REV. ONLINE 113 (2020), http://www.pennlawreview.com/online/168-UPa-L-Rev-Online-113.pdf (with Yakov Amihud, Markus Schmid)

*What CEOs Get Wrong About Activist Investors*, HARVARD BUSINESS REVIEW (May 2018) (with Frank Partnoy)

*Frank & Steve's Excellent Corporate Raiding Adventure*, THE ATLANTIC MONTHLY (May 2017) (with Frank Partnoy)

*Tenure Voting and the U.S. Public Company*, 72(2) THE BUSINESS LAWYER 295 (2017) (with David Berger & Aaron Benjamin)

*Yearly Takeover Litigation Reports* (2011-2015), available at http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=576465#reg

*Section 632:  An Expanded Basis of Federal Jurisdiction for National Banks*, 123 BANKING L.J. 687 (2006)

*A Comparative Study of the Jewish and the United States Constitutional Law of Capital Punishment*, 3 ILSA J. INT'L & COMP. L. 93 (Fall 1996)

### Education

**London Business School**
Masters in Finance, Sept 2005

**Columbia University School of Law**
*Juris Doctor*, May 1995, Harlan Fiske Stone Scholar

**University of Pennsylvania**
Bachelor of Arts, History, *Cum Laude* with Distinction, May 1992
Honors Thesis:  *Raphael Lemkin and the Conceptual Evolution of Genocide*

***Other Work
Experience***

**Freshfields Bruckhaus Deringer**                                    2002-2004
Senior Associate, U.S. Corporate Group (London)

**Shearman & Sterling**
Senior Associate, Mergers and Acquisitions Department (New York/London)        1995-2002

***Testimony, Presentations, Conferences and Panels***

*Testimony*

*Filling Gaps and Black Holes: Restructuring the Financial Regulatory Apparatus for the Next Crisis*, Testimony before the U.S. Senate Committee on Homeland Security and Governmental Affairs, Where Were the Watchdogs? The Financial Crisis and the Breakdown of Financial Governance (January 2009)

*Presentations*

*Should Corporations Have a Purpose?*, Duke Law School Faculty Workshop (Nov. 2020); Harvard Law and Economics Workshop (Oct. 2020); Stanford Law and Economics Workshop (Oct. 2020); Duke Law and Economics Workshop (Apr. 2020)

*Does Revlon Matter*, Corporate Law Academic Workshop (Jun. 2020); Harvard Law School Law and Economics Workshop (Nov. 2019); London School of Economics (Oct. 2019); University of California, Los Angeles (Sept. 2019); National Business Law Scholars Conference (Jun. 2019); BYU Winter Deals Conference (Feb. 2019)

*As California goes, so goes the nation? Gender quotas and the legislation of non-economic values*, American Law and Economics Associations Annual Meeting (May 2019)

*The Problem of Sunsets,* U. Penn. Law and Economics Roundtable (May 2019), Boston University School of Law (Nov. 2018)

*Mootness Fees*, Institute for Law and Economic Policy, San Juan, Puerto Rico (Apr. 2019)

*The Myth of Morrison*, University of Texas, Austin School of Law (Oct. 2018)

*The New Titans of Wall Street*, Vanderbilt Law School (Jan. 2018); Boston University School of Law (Nov. 2018); Northwestern Law School (Oct. 2018); University of Wisconsin Law School (Oct. 2018); U. Penn. Law and Economics Roundtable (May 2018); NYU Law and Economics Roundtable (Apr. 2018)

*Settling the Staggered Board Debate*, Penn/NYU Conference on Law and Finance (Apr. 2018)

*An Empirical Study of Special Litigation Committees*, American Law and Economics Associations Annual Meeting (May 2018); University of California Los Angeles (Oct. 2017).

*Does the Staggered Board Affect Firm Value?*, Hebrew University, Jerusalem School of Law (May 2017); 2017 GSU CEAR-Finance Conference (May 2017)

*Top Defense Counsel in Mergers & Acquisitions*, American Law and Economics Association Annual Meeting (May 2017), Chicago Kent School of Law (2016)

*How Corporate Governance is Made:  The Case of the Golden Leash*, University of Pennsylvania School of Law, Law and Economics Roundtable (Dec. 2015); Willamette Law School (Sept. 2015); Southwestern Law School (Oct. 2015); American Law and Economics Association Annual Meeting (May 2015); Tel Aviv University School of Law, Law and Economics Workshop (Mar. 2015)

*After the Deal: Fannie, Freddie and the Financial Crisis*, University of San Diego School of Law (Nov. 2014)

*Fairness Opinions as Magic Pieces of Paper*, American Society of Appraisers-CICBV Business Valuation Conference (Oct. 2014)

*Do Takeover Laws Matter? Evidence from 45 Years of Hostile Takeovers*, University of Southern California (Sept. 2016); University of California Los Angeles (Oct. 2015); American Law and Economics Association Annual Meeting (May 2014)

*Placement Agents and Private Equity: Information Production or Influence Peddling?*, American Law and Economics Association Annual Meeting (May 2014)

*The Disappearing IPO and the Lifecycle of Small Firms*, U.C. Irvine, School of Law (Jan. 2015); Conference of Empirical Legal Studies (Nov. 2014); Fordham University Law School (Nov. 2013)

*Deficits of Disclosure*, USC Law and Economics Workshop (Nov. 2012)

*A Great Game: The Dynamics of State Competition and Litigation*, University of Pennsylvania, Institute for Law & Economics Roundtable (Apr. 2013); University of California, Berkeley School of Law (2013); Minnesota Law School (Jan. 2012); American Law and Economics Association Annual Meeting (May 2012); University of Virginia School of Law (Dec. 2011); Vanderbilt Law School (Nov. 2011)

*Broken Promises:  Private Equity Bid Failures and the Limits of Contract*, Minnesota Law School (Mar. 2012); George Washington C-LEAF Business and Financial Law Junior Faculty Workshop (Feb. 2012); Suffolk Law School (Sept 2011); Midwest Corporate Legal Scholars Conference (Jun. 2011); Denver Law School (Jan. 2011); Argentum Conference, Stockholm, Sweden (Oct. 2010); Fordham Law School (Apr. 2010)

*Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, Widener Law School (Apr. 2011); Conf. Emp. Legal Studies (Nov. 2010); SEALS (Aug. 2010); Midwest Corporate Law Colloquium (Jun. 2010); Delaware Bar Association CLE (May 2010)

*Delaware's Competitive Reach: An Empirical Analysis of Public Company Merger Agreements*, University of Pennsylvania Law School (Feb. 2012); Stanford Law School (Oct. 2009)

*Regulation by Deal:  The Government's Response to the Financial Crisis,* University of Pennsylvania, Institute for Law & Economics Roundtable (May 2009)

*Private Equity: Past, Present and Future*, Keynote Presentation, Private Equity M&A Section, ABA Business Section Annual Meeting in Vancouver (Apr. 2009)

*The Failure of Private Equity*, Illinois Corporate Law Colloquium, University of Illinois School of Law (Nov. 2008); Widener University School of Law, 2008 Widener Scholar in Residence in Corporate Law (Oct. 2008); The James E. Rogers College of Law at The University of Arizona (Fall 2008)

*Paradigm Shift:  Securities Regulation in the New Millennium*, AALS Annual Meeting, Securities Regulation Section (Jan. 2008)

*Regulating Listings in a Global Market*, University of Connecticut Law School Faculty Workshop (Dec. 2007)

*Black Market Capital*, Brooklyn Law School Faculty Workshop (Sept. 2007)

### *Academic Conferences and Symposiums*

Commentator, Conference on Empirical Legal Studies, Claremont-McKenna (Nov. 2019)

Commentator, *Centros and European Company Law: Twenty Years of Living Dangerously*, 3rd Annual Oxford Business Law Blog Conference, Oxford University (Mar. 2019)

Commentator, NYU / Penn Conference on Law & Finance (Feb. 2019)

Presenter, Institutional Investor Activism in the Trump Era: Responses to a Changing Landscape, Boston University School of Law (Nov. 2018)

Co-Founder and Organizing Committee, National Business Law Scholars Conference (2008-2018)

Organizer, *Corporate Law Symposium at U.C. Berkeley* (2016 & 2018)

*IP & Dealmaking*, Art & Science of the IP Deal, University of Washington School of Law (Apr. 2017) (Keynote Speech)

*The Rise and Fall of Delaware's Takeover Standards*, Can Delaware Be Dethroned? Evaluating Delaware's Dominance of Corporate Law, UCLA Law School (Feb. 2017)

*The Dealmaking State:  Executive Power in the Trump Administration*, Financial Regulation Roundtable, George Mason Law School (Aug & Dec. 2016)

Presenter, *Fairness Opinions as Magic Pieces of Paper*, ASA-CICBV Business Valuation Conference (Nov. 2014)

Panel Participant, *Texas Tech Conference on Multi-Jurisdiction Deal Litigation* (Apr. 2014)

Panel Participant, University of Virginia Law & Business Law Review Symposium on Corporate Governance (Feb. 2014)

Presenter, *University of San Diego-Oxford Media and Markets Conference*, Proliferation of Stakeholders and Audiences (Jan. 2014)

*Does Plaintiffs' Law Firm Market Share reflect Performance?,* Corporate and Securities Litigation Workshop (Nov. 2013)

*Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform,* Corporate and Securities Litigation Workshop (Nov. 2013)

*Do Outside Directors Face Labor Market Consequences?  A Natural Experiment from the Financial Crisis,* American Law and Economics Association Annual Meeting (May 2013)

*Lock-up Creep, Ten Years After Omnicare: The Evolving Market for Deal Protection* Devices, University of Iowa College of Law (Feb. 2013)

*Deficits of Disclosure*, Berle IV, *The Future of Financial/Securities Markets*, Seattle University School of Law (Jun. 2012)

Presenter, *Airgas and the Value of Strategic Decision-Making*, The Delaware Court of Chancery: Change and Continuity, Columbia University School of Law (Nov. 2011)

Symposium Organizer, *Irreconcilable Differences: Director, Manager and Shareholder Conflicts in Takeovers*, Widener Law School (Apr. 2011).

Presenter, *The Social Dimension of Regulatory Capture*, Fordham Journal of Corporate & Financial Law Symposium, Regulatory Capture (Feb. 2010)

Presenter, *Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, Yale University School of Law, Conference of Empirical Legal Studies (Nov. 2010)

Presenter, *Uncomfortable Embrace: Federal Corporate Ownership Amidst the Financial Crisis*, University of Minnesota Law School, Government Ethics & Bailouts: The Past, Present, & Future (Oct. 2010)

Presenter, *Rhetoric and Reality: A Historical Perspective on the SEC's Regulation of Foreign Private Issuers*, University of Cincinnati Law School, Globalization of Securities Regulation Symposium (Feb. 2010)

Commentator, *Conference on Executive Compensation*, Vanderbilt Law School (Feb. 2010)

Presenter, *Fear, Fraud and the Future of Financial Regulation*, New York Law School (Apr.2009)

Presenter, *Private Equity: Past, Present and Future*, The Rise (and Fall?) of the New Shareholder: Sovereign Wealth Funds, Hedge Funds, and Private Equity, Villanova University School of Law (Mar. 2009)

Moderator, *The Subprime Crisis: Going Forward,* Commentator, Containing Global Contagion and Systemic Risk, University of Connecticut School of Law (November 2008)

Panelist, *The State of the Global Mergers & Acquisitions (M&A) Marketplace*, The History and Future of U.S. and Global Takeover Regulation: The Williams Act 40 Years On, Georgetown Law School (May 2008)

Discussant, *Securities Regulation, Corporate Governance, and Corporate Finance: Global Markets, Law, and Culture*, International Conference on Law and Society in the 21st Century: Joint Annual Meetings of LSA and the Research Committee on Sociology of Law (July 25, 2007)

Moderator and Organizer, *How Much is Enough?  U.S. Securities Regulation in the Face of Global Capital Markets*, ABILA International Law Weekend 2006 (Oct 27, 2006)

Presenter, *Oh, The Places You'll Go!  European Takeover Law*, ABILA International Law Weekend 2006 (Oct 27, 2006)

### *Panels and Roundtables and Practitioner Conferences*

Organizer, Annual Symposium on Corporate Governance (2016-2018)

Organizer, Annual M&A and Antitrust Litigation Conference with Cleary Gottlieb (2015-2018)

Organizer, Yearly M&A Roundtable with Kirkland & Ellis (2012-2018)

Panelist, M&A Law, Hebrew University, Jerusalem (April 2017)

Commenter, *The Eclipse of the Shareholder Paradigm*, U. Penn Law and Economics Corporate Roundtable (Apr. 2015)

Panelist, *Innovation in State Securities Regulation*, NASAA Public Policy Conference (Apr. 2015)

Panelist, Honoring Chief Justices Strine & Steele at NYU School of Law (May 2014)

Panelist, *NACD Leading Minds of Governance* (Dec. 2013)

Moderator, *Hedge Fund Activism Panel*, Second Annual DealBook Conference, (Nov. 2013)

Panelist, *Securities Litigation Update*, 2013 Ohio Securities Conference (Oct. 2013)

Panelist, *Business Litigation and the Supreme Court*, Institute for Law and Economic Policy, (Apr. 2013)

Panelist, *The JOBS Act, and the Future of Small Business Finance and the U.S. Equity Markets*, AALS (Jan. 2013)

Panelist, *Securities Litigation Update*, 2012 Ohio Securities Conference (Oct. 2012)

Panelist, *The JOBS Act*, Council of Institutional Investors Fall Conference, (Oct. 2012)

Panelist, *Good, Bad or Stupid? Debating the STOCK and JOBS Act at the National Business Law Scholars Conference*, National Business Law Scholars Conference, (Jun. 2012)

Panelist, *Selling the Deal*, Tulane 24th Corporate Law Institute (Mar. 2012)

Panelist, *The New Internationalism: Regulatory Practices and Global Private Equity Opportunities*, Columbia Business School Private Equity & Venture Capital Conference (Jan. 2010)

Panelist, *Revisiting the Conventional Wisdom of Poison Pills and other Anti-Takeover Defenses*, Forum for Institutional Investors (Oct. 2009)

Participant, *Proxy Access Roundtable, Harvard Law School*, Harvard Law School Program on Corporate Governance (Oct. 2009)

Participant, *The Research Roundtable on Corporate Governance*, Searle Center on Law, Regulation, and Economic Growth at Northwestern University School of Law (April 2009).

Panelist, *Delaware Law Developments and Issues*, 27th Annual Federal Securities Institute (Feb. 2009) (with Justice Jack B. Jacobs and Vice Chancellor Donald F. Parsons)

Panelist, *Broken Deals: Who's to Blame?*, Mergers, Acquisitions and Split-offs class, taught by Prof. Robert C. Clark and Vice Chancellor Leo E. Strine, Jr., Harvard Law School (November 2008)

## Significant University Service

Merit review advisory committee; strategic committee (chair); hiring committee; other committee service available upon request
Chair, U.C. Berkeley Chancellor's Committee on Jewish Life
Referee: Journal of Law, Economics & Organizations, Journal of Empirical Legal Studies, Review of Financial Studies. Confidential reviews also provided to California, Harvard, Stanford and Yale law reviews.
Area Coordinator (Corporate Governance): American Law and Economics Annual Meeting (2017, 2019).

## PhD/JSD Committees

Ogi Radic, Sociology (Member)
Huanting Wu, J.S.D. (Chair)
Amit Elazari, J.S.D. (Chair)
Tristan Fitzgerald, Finance Haas (Member)
Margaret Fong, Accounting Haas (Member)
Lukasz Langer, Accounting Haas (Member)
Alvaro Pereira, J.S.D. (Chair)
James P. Ryans, Accounting Haas (Member), Assistant Professor of Accounting, London Business School
Samuel Tan, Accounting Haas (Member), Assistant Professor, Singapore Management University
Cait Unkovic, J.S.P. Program (Chair)

## Outside Service

Member of Review Committee, The University of Auckland,
the Department of Commercial Law (2020)
Member, Board of Directors, Israel Institute
Member, Board of Directors, Academic Engagement Network

## Bar Admissions

New York State
U.S. District Court:  Southern District of New York

**EXHIBIT 2**

Cases where expert deposition taken or testimony given (in last four years):

1.   Alex Spizz, as Chapter 7 Trustee for Ampal-American Israel Corp. v. Irit Eluz, Case No. 14-02110 (S.D.N.Y.)

2.   In re Teva Securities Litigation, 3:17-cv-00558-SRU (D. Conn.)

3.   Ulisses Cardinot v. Arco Platform Limited, EAS Educação S.A. and Arco Educação S.A. (arbitration)

4.   Caruso v. Modany, Case No. 1:18-cv-02182-JPH-TAB (D. Indiana)

5.   Hope Solo v. United States Soccer Federation, Inc. (United States Olympic and Paralympic Committee arbitration)

6.   In re Novo Nordisk Securities Litigation, No. 3:17-cv-00209 (D.N.J.)

7.   In re WeWork Litigation, C.A. 2020-0258-JTL (Del. Ch.)

8.   PersonalizationMall.com, LLC v. Tolaney (DuPage Cty. Ill, No. 2015 MR 1726/2017 MR 381)

9.   Joy Global Inc. v. Columbia Casualty Company, et al., Case No. 18-cv-2034 (E.D. Wis.)

10.  Hussein v. Razin, et al. (Sup. Ct. Cal. Orange Cty. No. 30-2013-00679600-CU-NP-CJC)

11.  AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC, et al. (Del. Ch., C.A. 2020-0310-JTL)

12.  Cypress Partners Investments, LLC v. Philip R. Shawe, et al. (arbitration proceeding)

13.  ITV Gurney Holding Inc., et al. v. Scott Gurney, et al. (Sup Ct. California, Los Angeles)

14.  Onyx Pharmaceuticals, Inc. v. Old Republic Insurance Co., et al., CIV 538248 (Sup. Ct. California, San Mateo)

15.  Wynn Resorts, Limited v. Kazuo Okada, et al., A-12-656710-B (Nev. Dis. Ct. Clark Cty.)

16.  North American Soccer League, LLC v. United States Soccer Federation, Inc., C.A. No. 1:17-cv-05495-MKB-ST (Eastern District of New York)

17.  McClatchy v. Gary B. Pruitt, et al., Case No. PES -11- 294985 (Sup. Ct. California, San Francisco)

18.  Global Gaming Philippines LLC and GGAM Netherlands B.V. v. Bloomberry Resorts & Hotels Inc. and Sureste Properties Inc. (arbitration proceeding)

**EXHIBIT 3**
**LIST OF DOCUMENTS CONSIDERED**

- Complaint, *Securities and Exchange Commission, v. Anatoly Hurgin, Alexander Aurovsky, Ability Computer & Software Industries, Ltd., and Ability Inc*., Case No. 1:19-cv-05705 (S.D.N.Y. June 18, 2019)

- Investigative Testimony Transcripts and Exhibits
  - AUROVSKY_ALEXANDER_2018_03_28-Full
  - AUROVSKY_ALEXANDER_2018_03_29-Full
  - AVRAHAM, ZOHAR_2018_02_28-Full
  - COHEN_EVYATAR_2018_05_10-Full
  - DICK_AMNON_2017_08_09-Full
  - GORDON_BENJAMIN_2018_03_15-Full
  - GORDON_BENJAMIN_2018_03_16-Full
  - GORDON_BENJAMIN_2018_04_13-Full
  - GORDON_MITCHELL_2018_03_08-Full
  - GORDON_MITCHELL_2018_03-09-Full
  - HALEVY_EFRAIM_2017_09_01-Full
  - HURGIN_ANATOLY_2018_03_20-Full
  - HURGIN_ANATOLY_2018_03_21-Full
  - HURGIN_ANATOLY_2018_03_22-Full
  - HURGIN_ANATOLY_2018_03_27-Full
  - INTERVIEW WITH DAVID NUSSBAUM 2018.09.12
  - INTERVIEW WITH RICHARD POWELL 2018.09.12
  - LEVIN_AVI_2018_04_04-Full
  - Malka_Amos Errata Sheet 2021_04_22
  - MALKA_AMOS_2017_08_16-Full
  - MOSHE_MEIR_2017_08_14-Full
  - NARDINI, JOSEPH_2018_10_02-Full
  - OZ_AVI_2018_05_03-Full
  - POTTASH_CARTER_2017_04_13-Full
  - SINGER_SHALOM_2017_08_15-Full
  - SZEWACH_EYAL_2018_05_01-Full
  - YEDID_HAGAI_2018_04_25-Full
- Depositions and Exhibits
  - Aurovsky, Alexander_2021.07.29
  - Aurovsky, Alexander_2021.07.30
  - Hurgin, Anatoly_2021.07.22
  - Hurgin, Anatoly_2021.07.22
- Wells Submission
  - In the Matter of Ability Inc. (No. LA-4673)  Alexander Aurovsky Wells Submission
  - In the Matter of Ability Inc. (No. LA-4673)  Anatoly Hurgin Wells Submission
  - In the Matter of Ability, Inc. (No. LA-4673) Ability, Inc. Wells Submission

- 2020.11.05 SEC Initial Disclosures
- Gordon AP Release No 34-86164
- Board Minutes
  - 2016-02-08 Board Minutes
  - 2016-03-02 Board Minutes
  - 2016-04-25 Board Minutes
  - 2016-05-01 Board Minutes
  - 2016-05-10 Board Minutes
  - 2016-06-05 Board Minutes
  - 2016-08-09 Board Minutes
  - 2016-09-06 Board Minutes
  - 2016-10-31 Board Minutes
  - 2016-11-14 Board Minutes
  - 2016-12-27 Board Minutes
  - 2017-01-24 Board Minutes
  - 2017-03-19 Board Minutes
  - 2017-03-28 Board Minutes
  - 2017-04-05 Board Minutes
  - 2017-04-06 Board Minutes
  - 2017-05-16 Board Minutes
- Board Resolutions
  - 2015-12-30 Board resolution
  - 2017-04-25 Board resolution
  - 2017-05-15 Board resolution
  - 2017-07-05 Board resolution
- Management Representation Letters to the Auditor
  - 2015-08-20 MRL Signed
  - 2015-09-16 MRL Signed
  - 2015-10-28 MRL Signed
  - 2015-11-17 MRL Signed
  - 2016-04-28 MRL Signed
  - 2016-05-01 MRL Signed
  - 2017-05-16 MRL Signed
  - 2015-10-25 MRL Signed (Exhibit 104)
  - 2015-11-01 MRL Signed (Exhibit 105)
  - 2015-11-25 and 2015-11-26 MRLs Signed (Exhibit 106)
- Signatory Rights
  - 2016-07-11 Signatory rights email with attachments
    - 2016-03-02 ACSI signatory rights
    - 2016-02-25 ACSI Signatory rights
    - 2016-03-02 Ability Inc signatory rights
  - 2016-02-08 Board Minutes w-signatory rights
- Signed merger agreement, ACSI original charter agreement, lockup agreement, JV acquisition agreement, employment agreements, non-compete agreements.
- 2015-11-17 Aurovsky Consent for Proxy
- 2015-11-17 Hurgin Consent for Proxy

- 2016-03-02 ASM Board Appointment – Aurovsky
- 2016-04-18 Aurovsky D&O Questionnaire for FY 2015 Form 20-F
- 2017-01-30 Quarterly Auditor Questionnaire - Aurovsky
- 2017-07-02 Quarterly Auditor Questionnaire - Aurovsky
- Exhibit 229 – Ability powerpoint presentation in Hebrew