# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3                    ---oOo---

 4   SECURITIES AND EXCHANGE          :
     COMMISSION,                      :
 5                                    :
                      Plaintiff,      :
 6                                    :
                   vs.               : No. 19-cv-05705.
 7                                    :     (MKV)
     ANATOLY HURGIN, ALEXANDER        :
 8   AUROVSKY, ABILITY COMPUTER &     :
     SOFTWARE INDUSTRIES LTD, and     :
 9   ABILITY, INC.,                   :
                                      :
10                                    :
                      Defendants.     :
11   _____  :

12

13

14             REMOTE VIDEO-RECORDED

15      DEPOSITION OF STEVEN DAVIDOFF SOLOMON

16               December 13, 2021

17

18

19

20

21

22   Job No. 203713

23   Stenographically reported by:
     LAURA AXELSEN, CSR NO. 6173
24      RMR, CCRR, CRR, CRC

25
```

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3                     ---oOo---

 4   SECURITIES AND EXCHANGE              :
     COMMISSION,                          :
 5                                        :
                         Plaintiff,       :
 6                                        :
                  vs.                     :   No. 19-cv-05705.
 7                                        :      (MKV)
     ANATOLY HURGIN, ALEXANDER            :
 8   AUROVSKY, ABILITY COMPUTER &         :
     SOFTWARE INDUSTRIES LTD, and         :
 9   ABILITY, INC.,                       :
                                          :
10                                        :
                                          :
                         Defendants.      :
11   _____:

12        BE IT REMEMBERED THAT, pursuant to Notice and

13   on Monday, December 13, 2021, 9:01 a.m., with all

14   participants being present via Zoom videoconference,

15   before me, LAURA AXELSEN, a Certified Shorthand

16   Reporter, remotely appeared

17              STEVEN DAVIDOFF SOLOMON,

18   Called as a witness by the Defendants.

19                     ---oOo---

20

21

22

23

24

25
```

1                        APPEARANCES

2

3    FOR THE PLAINTIFF:

4

5         U.S. SECURITIES AND EXCHANGE COMMISSION

6         BY:  DONALD SEARLES, ESQ.

7              JENNIFER CALABRESE, ESQ.

8         444 South Flower Street

9         Los Angeles, California  90071

10

11   FOR THE DEFENDANTS:

12

13        MORRISON COHEN

14        BY:  JASON GOTTLIEB, ESQ.

15             DANIEL ISAACS, ESQ.

16        909 Third Avenue

17        New York, New York  10022

18

19        There also being present Brent Jordan,

20   videographer.

21

22                    ---oOo---

23

24

25

```
 1                        INDEX

 2

 3                                          PAGE

 4  EXAMINATION BY MR. GOTTLIEB                6

 5

 6                  ---oOo---

 7

 8               INDEX OF EXHIBITS

 9

10  EXHIBIT        DESCRIPTION          PAGE

11

12  Exhibit 264  Expert Report of Steven    11

13               Davidoff Solomon

14  Exhibit 265  Form 10-Q                   32

15  Exhibit 266  In re Ampal-American Israel 48

16               Corp., Slip Copy (2020)

17

18                  ---oOo---

19

20

21

22

23

24

25
```

1            VIDEOGRAPHER:  Good morning, Counselors.

2  My name is Brent Jordan.  I'm the certified legal

3  videographer in association with TSG Reporting, Inc.

4  Due to the severity of the COVID-19 and following

5  the practice of social distancing, I will not be in

6  the same room with the witness.  Instead, I will

7  record this videotaped deposition remotely.  The

8  reporter, Laura Axelsen, also will not be in the

9  same room and will swear the witness remotely.

10           Do all parties stipulate to the validity

11  of this video recording and remote swearing and

12  that -- and that it will be admissible in the

13  courtroom as if it had been taken following Rule 30

14  of the Federal Rules of Civil Procedures and the

15  State's rules where this case is pending?

16           MR. GOTTLIEB:  Yes.

17           MR. SEARLES:  So stipulated.

18           VIDEOGRAPHER:  Thank you.  This the start

19  of Media No. 1.  The videotaped deposition of

20  Steven D. Solomon taken in the matter of Securities

21  and Exchange Commission V. Anatoly Hurgin, et al.

22  filed in the United States District Court for the

23  Southern District of New York, Case No. 19-cv-05705.

24  This deposition is taken on December 13th, 2021,

25  at approximately 9:02 a.m.

Page 6

```
 1            My name is Brent Jordan.  I'm the legal
 2  video specialist from TSG Reporting, Inc.
 3  headquartered at 228 East 45th Street, New York,
 4  New York.  The court reporter is Laura Axelsen in
 5  association with TSG.
 6            Will counsel please introduce yourselves
 7  for the record.
 8            MR. GOTTLIEB:  I'm -- excuse me.  Good
 9  morning.  This is Jason Gottlieb from Morrison
10  Cohen.  I'm here with my partner, Dan Isaacs, also
11  from Morrison Cohen, and we represent defendants
12  Anatoly Hurgin and Alexander Aurovsky.
13            MR. SEARLES:  Donald Searles on behalf of
14  the SEC.
15            MS. CALABRESE:  Jennifer Calabrese on
16  behalf of the SEC.
17            VIDEOGRAPHER:  Will the court reporter
18  please swear in the witness.
19               STEVEN DAVIDOFF SOLOMON
20            having been duly sworn/affirmed
21               under penalty of perjury
22                testified as follows:
23            EXAMINATION BY MR. GOTTLIEB
24            MR. GOTTLIEB:   Q.  Good morning,
25  Professor Solomon.  My name is Jason Gottlieb from
```

1   Morrison Cohen, as you've just heard.  Have you ever

2   been deposed before?

3        A.   I have.

4        Q.   Okay.  So you know the basic ground rules,

5   but let's just go over them just in case.  I will be

6   taking the deposition today.  I will be asking a

7   question and you'll be answering the questions.

8   Please wait for me to finish my questions before

9   answering.  Okay?

10       A.   Okay.

11       Q.   As you know, we need verbal responses for

12  the purposes of the record, so please don't just nod

13  your head or shake your head as a response.  We need

14  the actual words to come of your mouth.  Okay?

15       A.   Okay.

16       Q.   If you don't understand my question,

17  please feel free to ask for clarification.  I want

18  to make sure we're getting clear and clean questions

19  and answers.  Okay?

20       A.   Yes.

21       Q.   Uhm, the attorneys from the SEC may make

22  objections today.  Uhm, but unless there are

23  objections on attorney-client privilege or you're

24  otherwise directed not to answer, uhm, you will

25  still have to answer the questions to which there

1   are objections.  Do you understand?

2        A.   I understand what you're saying, but I

3   defer to my counsel -- not my counsel -- counsel

4   here in terms of instructions and how to answer.

5        Q.   Fair enough.  You can take a break at any

6   point you want, you know, if you want to use the

7   facilities, stretch your legs, whatever you'd like

8   to do.  Just I ask you to wait until you've answered

9   the questions.  No breaks in the middle of a

10  question.  Okay?

11       A.   Yes, in general I like to break every hour

12  for at least five or 10 minutes, but otherwise I

13  understand.

14       Q.   Yeah.  Me too.  Me too.  There will be

15  plenty of breaks.  Don't worry.  What did you do to

16  prepare for your deposition today?

17       A.   Uhm, in general, I reviewed my report.

18       Q.   Did you review any other documents?

19       A.   I may have reviewed a few documents, yes.

20  I reviewed the report of Matthew Cain.  I reviewed

21  the complaint.  I reviewed some -- the roadshow

22  presentations made in connection with the SPAC

23  acquisition.  And in general, I may have looked

24  through some of the depositions and some of the

25  other materials.

1        Q.   Do you remember whose depositions you

2   looked at?

3        A.   In general, it was Aurovsky's and

4   Hurgin's.

5        Q.   Did you read any of the filings that

6   Aurovsky or Hurgin have filed in this litigation?

7        A.   Uhm, I've read them in connection with my

8   report, but I don't recall reading them in

9   connection with my preparation for this matter --

10  the deposition preparation.

11       Q.   Did you meet with anyone to prepare for

12  this deposition?

13       A.   I'm not sure what you mean by met, but I

14  did speak with counsel.

15       Q.   And counsel there is counsel for the SEC,

16  Mr. Searles?

17       A.   Yes.  Yes, Mr. Searles and Ms. Calabrese.

18       Q.   How many times did you meet with them in

19  preparation for this deposition?

20       A.   Twice.

21       Q.   What about the -- your total number of

22  hours you met with them to prepare?

23       A.   I didn't keep track.  About an hour or so.

24       Q.   Did you -- did you read -- excuse me --

25  did you read any documents in preparation for today

1  that were not referenced in your expert report?

2      A.    Uhm, I don't think the report of Matt Cain

3  is referenced in my report.  But otherwise I don't

4  recall any other documents.

5      Q.    Okay.  Let's just mark as an exhibit your

6  expert report.  So, Dan, how do we want to do this?

7  Do you want to put it up on the screen?  Shall I put

8  it up on the screen?

9          MR. ISAACS:  So I'm going to share in the

10  chat message the exhibit, uhm, and hopefully

11  everyone can just double click it and open it on

12  their own or save it to their computer.  And if it

13  doesn't work, we'll try something else.

14          MR. GOTTLIEB:  Okay.

15          MR. ISAACS:  I just shared it, and please

16  let me know if anyone's unable to open the document.

17          THE WITNESS:  I should add I do have a

18  hard copy of my report in front of me.  Is it

19  acceptable if I just refer to that?  It would be

20  much easier for me.

21          MR. GOTTLIEB:  That's perfectly fine with

22  me.  I think we want to formally mark it with the

23  court reporter.  And, Dan, are we starting marking

24  exhibits with Exhibit 264; is that correct?

25          MR. ISAACS:  Yes.  My records are that

1    we're starting with 264.

2            MR. GOTTLIEB:   Q.   So just to be sure

3    we're all looking at the same thing, I think we

4    should be.   I have a PDF copy of your report.   It's

5    36 pages long.   It contains your report.   It

6    contains an Exhibit 1, which has your C.V.

7    Exhibit 2, cases where expert deposition was taken

8    or testimony given in a last four years.   And

9    Exhibit 3 is a list of documents considered.

10            Is that what you have in front of you,

11   Professor Solomon?

12       A.   Yes.

13            MR. GOTTLIEB:   Okay.   So let's mark this

14   document as Exhibit 264.   And obviously it's

15   perfectly fine for you just to use the paper copy in

16   front of you.

17            (EXHIBIT 264 WAS MARKED FOR

18            IDENTIFICATION.)

19            MR. GOTTLIEB:   Q.   Seems silly to ask

20   this, but just for the record, do you recognize this

21   exhibit, Exhibit 264?

22       A.   I do.

23       Q.   And what is it?

24       A.   It appears to be a copy of my expert

25   report.

1        Q.   Who first contacted you about serving as

2   an expert in this matter?

3        A.   I believe it was Mr. Searles.

4        Q.   Did you speak with anyone else about

5   serving as an expert in this matter?

6        A.   I suppose in fullness, after I filed my

7   report I was contacted by a litigation consulting

8   firm, which I guess wasn't aware that I had filed

9   the report in this matter and asked if I would be

10  interested in serving as a rebuttal expert in this

11  matter.

12       Q.   Oh, for the defense?

13       A.   For you, yes.

14       Q.   Oh, were you interested?

15       A.   No, I asked who the parties were.  And as

16  soon as I saw the parties, I declined any

17  communication.

18       Q.   Fair enough.  Did you speak with anyone

19  else other than Mr. Searles?

20       A.   No.

21       Q.   Did you speak with Ms. Calabrese?

22       A.   No.

23       Q.   Calabrese.  I'm sorry, Jennifer.  When

24  were you initially retained by SEC?

25       A.   I don't recall.  You know, time doesn't

1    really have any meaning anymore.  Maybe five or six

2    months ago.  I just need to refresh my recollection.

3         Q.   The date of your expert report is

4    November 1st, 2021.  Were you contacted about a

5    month before then or two months or six months

6    roughly?

7         A.   I -- I believe it was the spring, but I

8    really would need to check my records.

9         Q.   Okay.  Did you execute an engagement

10   letter with the SEC?

11        A.   I don't know if we do an engagement

12   letter.  There's a formal process when you work for

13   the government where you have to sign a number of

14   documents.  I don't know if there's an engagement

15   letter or not.  I'd need to check my records.

16        Q.   What is the rate that you're charging for

17   your time on this matter?

18        A.   It's set forth in my report.  It's $900 an

19   hour.

20        Q.   How many hours have you billed for

21   preparing the report?

22        A.   Roughly 30 to 40 hours.

23        Q.   And I assume you're being paid for your

24   time here today?

25        A.   I am.

1     Q.   How many hours did you bill for preparing

2  for the deposition today?

3     A.   I'd need to check my records.  Maybe five

4  to 10 -- up to 10 hour -- I should add that the $900

5  per hour is a discount from my normal rate for the

6  government.

7     Q.   You're doing that discount because it's a

8  government case?

9     A.   Yes.  I give a discount to government

10  cases.

11     Q.   How did you go about preparing?

12     A.   I'm trying to help out all of our citizens

13  here, including you.

14     Q.   How did you go about preparing your

15  report?

16     A.   I'm not sure what you mean by that.  Can

17  you be more specific?

18     Q.   Well, Mr. Searles contacted you, said are

19  you interested in doing a report.  Clearly at some

20  point you said yes, and then you were engaged and

21  then you prepared this report.  What's your -- what

22  was your process?  How did you prepare the report?

23  What did you do?

24     A.   Well, I don't necessarily agree with your

25  description of what happened in general.  I was

1   contacted by Mr. Searles.  I was asked if I might be

2   able to offer my expertise in certain opinions in

3   this matter, which were not set therein.  I reviewed

4   the complaint.  I had a discussion with Mr. Searles

5   and felt that these were areas where my expertise

6   might be relevant and there were opinions I could

7   offer.

8           Once I was engaged, we did a process where

9   I reviewed the relevant documents.  I asked for

10  certain documents.  They were provided to me.  I had

11  certain more documents that were provided to me, and

12  then I formulated the opinions that I provided in

13  this matter.

14      Q.   Did anyone assist you in the preparation

15  of your report, other than Mr. Searles?

16           MR. SEARLES:  Objection; assumes facts not

17  in evidence.

18           THE WITNESS:  No.

19           MR. GOTTLIEB:  Q.  You didn't have any

20  teaching assistants or research assistants help you

21  out on it?

22      A.   No.  There was some footnoting that I

23  think I asked the SEC paralegal to do, but that was

24  about it.  Like cite checking.

25      Q.   Have you ever spoken with Anatoly Hurgin?

1      A.   No.

2      Q.   Have you ever spoken with Alexander

3  Aurovsky?

4      A.   No, not that I'm aware of.

5      Q.   Have you ever spoken with Ben Gordon?

6      A.   Not that I'm aware of.

7      Q.   Have you ever spoken with Mitch Gordon?

8      A.   Not that I'm aware.

9      Q.   Have you ever spoken with Shai Greenwald?

10      A.   Not that I'm aware of.

11      Q.   Please let's look at your report.  You

12  have a section on qualifications, Paragraph 2

13  through 8.

14      A.   Yes.

15      Q.   In Paragraph 4, you mentioned being a

16  corporate attorney at Shearman and Sterling and at

17  Freshfields.  You said you regularly advised clients

18  on securities laws issues, including customs and

19  practices relating to the disclosure of non-public

20  information by FPIs and U.S. public companies.

21           Do you see that?

22      A.   I do.

23      Q.   Just for our record, what is FPIs?  What

24  is an FPI?

25      A.   An FPI is a foreign private issuer.  It's

1  a defined term under the securities laws and

2  generally encompasses a non-U.S. company that is

3  listed in -- on the United States exchange or quoted

4  on the NASDAQ.

5      Q.   Tell me a little bit more about your --

6  your practice at Shearman, particularly as it

7  relates to any of the issues in the -- expounded

8  upon in your report.

9      A.   Well, that's a broad question, and I'm not

10  sure what issues you're referring to.  But in

11  general, my practice at Shearman, particularly in

12  London, focused on representing foreign private

13  issuers in connection with takeovers, corporate

14  governance, securities offerings.

15           I also did IPOs.  And as part of that, I

16  regularly advised FPIs, foreign private issuers, on

17  their disclosure obligations under the United States

18  securities law, the requirements of the SEC forms,

19  uhm, the liability that's associated with failure to

20  comply with those issues, and the processes and

21  procedures that you utilize when you're filing the

22  SEC documents and the requirements thereof,

23  particularly if you're a director or officer of the

24  company.

25      Q.   Okay.  And you were -- when you were at

1  Shearman, you were an associate, I take it?

2       A.    I was.

3       Q.    Can you estimate how many deals you worked

4  on while you were at Shearman?

5       A.    I mean, tens of deals, 50 to a hundred.

6       Q.    Were you generally the person reading

7  those deals?

8       A.    Not initially, but I was an attorney from

9  1995 to 2004 both at Shearman Sterling, Freshfields

10 and a C neighbor member.  We had the tech boom

11 starting in about '98, and so we were clearly

12 understaffed and overworked.  So starting in about

13 '98, '99, I was the senior associate on most

14 transactions.  And then when I came to London, I was

15 the primary attorney on the transactions I worked on

16 for the most part.

17      Q.    How often did you speak personally with

18 the directors and officers of companies regarding

19 their review of their public disclosures?

20      A.    I mean, it was constant.  So I made

21 presentations to boards about these issues.  I would

22 work with management to prepare these issues.  I

23 would -- and these disclosures.  It was constant.

24      Q.    Would you say that the -- the management

25 that you were working with was reliant on you to

1  guide them on federal securities laws?

2       A.   I'm not sure what you mean by that.  So in

3  general, these were not, uhm, unsophisticated

4  people.  They were people that were working in

5  western companies.  They were directors of

6  companies.  They were aware that the federal

7  securities laws, like any laws and their local laws

8  in their country, have significant obligations that

9  apply to them.

10           So they were engaged in terms of their

11  responsibilities and aware that they were taking on

12  certain responsibilities to understand these

13  disclosure issues, to read the documents that they

14  had, and to work with me to make sure that those

15  documents are accurate.

16       Q.   You said that these people were generally

17  sophisticated.  Did you ever work with less

18  sophisticated people?

19           MR. SEARLES:  Objection; vague.

20           THE WITNESS:  I think you're -- you're

21  talking about, like -- you're trying to put a

22  meaning on sophisticated.  And so I worked with a

23  variety of people from a variety of backgrounds.  So

24  some of them were start-up -- worked at start-ups

25  and didn't have college educations.  Some of them

1  were investment bankers.  Some of them were U.S.

2  citizens.  Some were German citizens.  I did a fair

3  number of Israeli deals during my time in Europe.

4  So it was a fair -- a broad panoply of backgrounds.

5          And what I'm referring to when I was

6  answering the last question is people in a position

7  of tens of millions of dollars are at stake if not

8  more.  They're directors of companies.  They're

9  officers of companies.  They have fiduciary duties

10  and obligations.  They're aware that they are

11  engaging in significant transactions, which involve

12  engaging in a foreign legal system.  They're

13  inherently aware that that involves certain new

14  obligations that they need to understand.  They're

15  aware that documents are being filed.  They're

16  signing legal contracts and know that they need to

17  be read in other laws.

18          MR. GOTTLIEB:   Q.  You just listed a -- a

19  long list of things that they are aware of.  How --

20  how are they made aware of those things?  As a

21  corporate attorney, will you tell them that they

22  need to do those things?

23      A.   So I think it comes from a couple things.

24  So one, as part of this you review the documents

25  with them.  You make sure they're aware of the

1   material terms from an attorney perspective, but I

2   think, again, serving in these roles and otherwise,

3   I never saw or met anyone that wasn't aware that

4   when you sign a contract you need to read it and

5   understand it.

6         It's no different than when you buy a

7   house and you read the contract to see what the

8   price is.  So I think that there's obligations on

9   both sides and inherent understandings on both

10  sides.

11       Q.   You -- you mentioned that you worked with

12  some other FPIs, the Israelis or Germans.  Did you

13  ever work with any officers or directors who did not

14  have a good understanding of the United States

15  federal securities laws?

16       A.   Yes.

17       Q.   And what would you do to work with them?

18       A.   In general, when we were involved in a

19  foreign private issuer, there was both local counsel

20  and U.S. counsel.  Sometimes we did both for my

21  firms.  And, again, I worked at two firms.  So when

22  I'm answering these questions generally, it's both

23  at Freshfields, which was a non-U.S. firm, and also

24  Shearman and Sterling.  Uhm, we would provide drafts

25  of the documents.

1          We reviewed material information.  We

2   would go over the contracts with them at board

3   meetings.  We would summarize those contracts.  We

4   would summarize the disclosure.  It would be signed

5   off upon.  I'm a director now of a public company,

6   and that's what we do now.

7          And that's the procedures that are

8   followed.  And directors have an inherent

9   understanding to review that.  You don't sign, for

10  example, leases or lease property to your company

11  without an understanding of the contract and -- and

12  how it works or otherwise.  And as part of that, the

13  U.S. attorney's role is to familiarize them with

14  the -- the minutiae and detailed obligations of

15  what's going on in terms of understanding by the

16  clients and otherwise.

17          And the client similarly, because they're

18  involved in a high-profile transaction, are reading

19  the documents and reviewing it.

20      Q.   Is there any particular reason you moved

21  from Shearman to Freshfields?

22      A.   You know, I mean, this is more personal

23  stuff.  But there are some personal reasons.  I

24  wanted to stay in London because of some

25  relationships I had there.  And I was offered the

1   opportunity for a high-profile position in their

2   U.S. practice, so I moved over there.

3        Q.   Since you left Freshfields in 2004, have

4   you practiced law, or have you been in academia only

5   or something else?

6        A.   Really, no.  I mean, that's a pretty broad

7   question.  You know, I have at times done legal work

8   for people.  I do expert witness.  I've started a

9   few companies.  Currently serve as a CFO of a

10  company that I started.  I'm a director of a

11  publicly traded company.  I founded a start-up that

12  raised about five or six million dollars that I was

13  COO of at the time.  And, of course, I'm a professor

14  and otherwise.  But if there's a particular area

15  you'd like to talk about, I'm happy to.

16       Q.   Have you represented or advised any public

17  companies, private companies, directors or officers

18  in connection with a transaction since leaving

19  Freshfields in 2004?

20       A.   I don't know what you mean by advise.  I

21  mean, I'm currently a director of a publicly traded

22  SPAC.  So I mean, that's what we're going to be

23  doing.  That's what we're involved in.  I have at

24  times given advice and consulting to parties in

25  connection with M&A transactions or capital raising

1  or otherwise.

2      Q.   That SPAC is social capitals you've read

3  off holdings for; is that correct?

4      A.   Yes.

5      Q.   How many directors does that -- I'm just

6  going to call that social capital, if that's okay

7  with you?

8      A.   Well, there's about eight of those

9  probably, but --

10     Q.   I know there's social capitals who've

11 read holdings one, two, three, and four.  But I'm

12 only going to be referring to the one that you're a

13 director of.  So I'm just going to call that --

14 let's call it Social Capital 4.  How's that?  Okay?

15     A.   Sure.

16     Q.   How many directors does Social Capital 4

17 have?

18     A.   I haven't counted.  I think it's five

19 including me.

20     Q.   When did you start service as a director

21 on Social Capital 4?

22     A.   About two months ago.

23     Q.   Other than being a director, do you have

24 any other roles or duties for Social Capital 4?

25     A.   I'm a director.  I think that's enough.

1      Q.   Other than Social Capital 4, have you ever

2  been an officer or director of a SPAC?

3      A.   No, I've been asked before, but this is

4  the first one that I've said yes to.

5      Q.   And just for our record, you understand

6  what a SPAC is.  Can you please define that?

7      A.   A SPAC is a special purpose acquisition

8  company.

9      Q.   Thank you.  Is Social Capital 4 publicly

10  traded?

11      A.   Yes.

12      Q.   Has it completed a business combination?

13      A.   No.

14      Q.   As a director of Social Capital 4, would

15  the opinions you set forth in your expert report

16  here about the customs and practices of directors be

17  equally applicable to you?

18      A.   You need to look at the opinions, but I

19  think in general these -- these opinions would be

20  applicable to me.  I mean, I filed this report

21  before -- just as I became a director otherwise.

22  But I would have filed the same report and nothing

23  in my time since has changed that.

24      Q.   Is it right that Social Capital 4 is

25  seeking to acquire a private company in the

1    biotechnology space?

2         A.    In general, although we reserve the right

3    to acquire in other space, and our particular focus

4    is in the immunology fields.

5         Q.    How much experience do you have in

6    immunology?

7         A.    In immunology?  Uhm, I mean, I'm not a

8    Ph.D. immunologist if that's your question.

9         Q.    Do you have any personal experience in

10   biotechnology at all?

11        A.    I think a fair bit, yeah.

12        Q.    Have you ever worked for a biotech

13   company?

14        A.    I've done expert services for biotech

15   companies.  I've represented biotech companies on

16   transactions, including those involved in

17   disclosure.

18        Q.    So you were a lawyer for biotech

19   companies?

20        A.    Again, that was your question if I worked

21   for them.  When you're a lawyer representing

22   someone, you're working for them.  And, again, I've

23   done expert witness services for biotechnology

24   companies.

25        Q.    But have you ever --

1        A.    I may have done other -- I'm not done.

2   Uhm, I may have done other -- other work, but those

3   are the two other areas that I recall.

4        Q.    Have you ever been employed full-time for

5   a biotechnology company?

6        A.    No.

7        Q.    Have you ever served as a director or

8   officer of a biotechnology company?

9        A.    I'm currently a director of a SPAC that's

10  in acquisition of a biotechnology company.  But

11  other than that, no.

12       Q.    Did you study biological sciences in

13  college or graduate school?

14       A.    I did a little bit.  It wasn't my major.

15       Q.    Did you ever receive any formal training

16  relating to the biotechnology field?

17       A.    I don't -- I don't know what that means.

18       Q.    Did you ever work for a lab or any other

19  biotech company doing, not legal work, but

20  biotechnology work?

21       A.    No.

22       Q.    How do you intend to comply with the

23  customs and practices of a director of a public

24  company in relation to your duties to review any

25  disclosures made by Social Capital 4 about a target

1   company?

2       A.   Well, it depends on the target company.

3   But, of course, as part of my directorship, I'll

4   read the disclosure.  And so, for example, if we're

5   making disclosure of a contract and I have knowledge

6   of whether that contract exists or not, it's my duty

7   to say that it exists.  It's my duty to make sure

8   that due diligence is properly done.  It's my duty

9   to go over the material facets of the documents.  I

10  read them and to make sure that I understand them

11  and that, to my knowledge, they correctly disclose

12  the existence of the material facts and what

13  happens.  It's my duty, if I'm signing contracts or

14  consenting to my name to be included in proxy, to

15  understand those documents, to read them, to put in

16  the material terms.

17          Now, obviously I'm not an operating person

18  so I don't have specific knowledge of facts.  But if

19  I had specific knowledge of facts, it would be to

20  disclose those facts, make sure they're correct.  As

21  part of being a director of an operating company,

22  obviously it would be going over your material

23  information.  Otherwise from the SPAC perspective,

24  this is an acquisition.  So I need to make sure that

25  the diligence is done correctly, that there's a

1  fulsome investigation.  Have to make sure that to

2  the extent reps and warranties are made, there's an

3  investigation and disclosure.  We don't think that

4  there's sufficient backing for any circumstances

5  that are there.  In general, that's -- that's my

6  duties.

7       Q.   Do you anticipate relying on your own

8  personal counsel or the SPAC's legal counsel in any

9  respects?

10          MR. SEARLES:  Objection; vague.

11          THE WITNESS:  Yeah, I don't really know

12  how to answer that.  I mean, again, I'm going to

13  read the documents and ask questions and make sure

14  that I understand it and make sure that we're

15  disclosing all material information.

16          MR. GOTTLIEB:  Q.  If there's material

17  about biotechnology that you don't understand, do

18  you anticipate relying on those with expertise in

19  the biotechnology field?

20          MR. SEARLES:  Objection; misstates his

21  testimony.

22          THE WITNESS:  Again, the duty of a

23  director is to understand the principles and to

24  inquire and not to blindly sit there and not read or

25  say that I don't understand or otherwise.  The

1   extent that, for example, we're acquiring a company

2   that has one product, it's my duty as a director to

3   make sure that we've investigated that product, that

4   the product works, that the company we're acquiring

5   owns the rights to those contract -- to the product.

6   Uhm, and that's basic understanding of -- of

7   director fiduciary duties and what directors

8   normally do.

9           And I've -- I've been doing this for 30 years.

10  And frankly, I've never seen anyone say that's not their

11  duties, or I just won't read anything so it's okay.

12  I'll buy a house, but not -- I don't need to read

13  anything or even know what the price is.  It's okay.

14  And so, you know, you have duties as directors, and you

15  have duties to do what you need to do.  And I intend

16  fully to implement those duties.  And I think and I hope

17  that one of the reasons they put me on the board is

18  because I will do that.

19          MR. GOTTLIEB:   Q.  Do you believe it's

20  your duty to review each and every disclosure and

21  independently verify each and every piece of

22  information in it?

23      A.   That's not how it works.  Uhm, and it's

24  not a you need to read every page of War and Peace

25  and memorize every word.  When you're signing

1  documents or understanding documents or putting

2  forward documents, you need to read the material

3  terms and understand the material terms.  The

4  material issues, you need the raise them and you

5  need to discuss them.  I don't look at every single

6  piece of disclosure that goes out from the SPAC, but

7  I certainly look at the 10-Qs and 10-Ks and read

8  them.

9           We just filed a 10-Q, and I read the whole

10  thing and gave comments on it.  And that is how it

11  works.  You read the significant documents.  If you

12  don't understand them, you engage with questions.

13  You know that you're in a U.S. legal system that's

14  complex, particularly if you're a non-U.S. legal

15  person and you work to understand them.  You don't

16  blindly rely on people.  And that's never been the

17  law or how things work.

18           Uhm, and if you're putting your name to a

19  document, you make sure that you understand the

20  material terms.  And if you have any questions, you

21  discuss those with counsel or the relevant person

22  and raise them.

23      Q.   Let's look at -- you mentioned the latest

24  10-Q from Social Capital 4 and that you had reviewed

25  that.  Dan, can we put that up?  I'm not sure if

1   you're going to drop it in the chat or on the

2   screen -- oh, sharing a file?

3            MR. ISAACS:  I just dropped it in the

4   chat.

5            MR. GOTTLIEB:  Great.

6            THE WITNESS:  Yes.

7            MR. GOTTLIEB:  Sorry.  I'm -- my --

8   dealing with my technology here.  So let's mark this

9   as Exhibit 265.

10           (EXHIBIT 265 WAS MARKED FOR

11           IDENTIFICATION.)

12           MR. GOTTLIEB:   Q.  Do you recognize this

13  document?

14       A.   Uhm, it appears to be the September 30th

15  10-Q of a DMA data -- what we're calling Social

16  Capital 4.

17       Q.   Are -- were you a director of this entity

18  when this was filed?

19       A.   Yes.

20       Q.   If you could turn to -- you'll see page

21  numbers in the bottom right-hand corner.  Looking at

22  page 18 of 25.

23       A.   Yep.

24       Q.   You see there's a section that says,

25  "Special note regarding forward-looking statements"?

1        A.    Yep.

2        Q.    The second paragraph under that, you see

3    the section that says, "This condensed balance sheet

4    has been reported to give effect to the restatement

5    of our financial statements as of July 2nd, 2021."

6              You see that?

7        A.    No, can you just say that again?  Oh, it's

8    the second paragraph.  Yes, I see it.

9        Q.    Start of the second paragraph.  What's a

10   restatement?

11       A.    In general, it's where you restate your

12   financial statements.  You do a SAB99 memo, and then

13   correct -- if you think that you have made a

14   material misstatement, then you correct that

15   misstatement.

16       Q.    The next sentence after the one I just

17   read says that management identified errors made in

18   its historic financial statements where, "At the

19   closing of our initial public offering, we

20   improperly valued our Class A ordinary shares

21   subject to possible redemption."

22              Do you see that?

23       A.    I do.

24       Q.    Do you think that the management of Social

25   Capital 4 committed fraud in making those errors?

1        A.    I don't even know where to begin this.

2   The SEC has been changing the accounting rules and

3   how they work for SPACs.  And so this is responsive

4   to a change in the SEC accounting rules.  No one has

5   accused us -- them of doing fraud or otherwise.

6   It's not like we, for example, said we had a

7   contract that didn't exist that was our significant

8   basis for revenue.

9        Q.    Did -- do you think that anyone was

10  negligent in making these errors?

11            MR. SEARLES:  Objection; asked and

12  answered.

13            THE WITNESS:  No, again, what's going on

14  is the SEC has been changing the accounting rules.

15  And this is a correction to the accounting rules in

16  response to SEC changes and otherwise.  I believe a

17  couple of hundred SPACs have restated their

18  financial statements -- actually more than a couple

19  hundred in the -- due to the changes in the SEC

20  accounting rules.  And so this is what is going on

21  here.

22            MR. GOTTLIEB:   Q.  Did the SEC change

23  those accounting rules between the time that the

24  original financial statements, as of July 2nd, 2021,

25  were issued and this filed?

1       A.   Yes.

2       Q.   And you think that this error is replying

3  to an SEC clarification after that?

4       A.   Again, you're -- you're misstating my

5  testimony and you're putting words in my mouth.  I'm

6  not really prepared to discuss confidential

7  information at the board level or otherwise.  But

8  the SEC actions and movements concerning

9  restatements are public knowledge, and I just

10  referred those.  There is no one -- to even say this

11  is fraud is not even --

12       Q.   I don't think it's just --

13       A.   And no, no.  Let me finish.

14       Q.   Okay.

15       A.   Please do not interrupt me.  You asked me

16  not to interrupt you.  Okay.  Again, it's in

17  response to SEC changes and otherwise.  And that's

18  what we did.  And we did a SAB99 memo, and it was

19  corrected.  And even to say it's fraud frankly is

20  offensive.  This is not, again, where you're saying

21  you have a contract and that's the bulk of your

22  revenue and it doesn't exist and you never even

23  bothered to look at it.  This is a correction made

24  in response to changing SEC rules.

25             THE REPORTER:  (Clarification.)

1            MR. GOTTLIEB:   Q.  I'll be clear.  I

2  don't think it's fraud either.  Don't get me wrong.

3            MR. SEARLES:  Objection; relevance.

4            MR. GOTTLIEB:   Q.  It's not relevant.

5  Fine.  Go ahead.  I'm just trying to be nice.

6            Look, my point is here it's possible to make

7  an error in a public -- in a public filing, isn't it?

8            MR. SEARLES:  Objection; vague.

9            THE WITNESS:  Not really sure what you

10  mean.  Again, the disclosure speaks for itself.  Is

11  there a particular type of error other than this one

12  that you're referring to?

13            MR. GOTTLIEB:   Q.  Well, it says,

14  "Management identified errors made."

15            And you've said that you don't think it's

16  fraud and you don't think it's negligent.  So it's just

17  an error; is that correct?

18            MR. SEARLES:  Objection; misstates his

19  testimony.  Asked and answered.

20            THE WITNESS:  Yeah, again, the disclosure

21  speaks for itself.  I don't see the relevance of

22  this to this case or what it has to do with this

23  case.

24            MR. GOTTLIEB:   Q.  If there is any error

25  in any of the information that is in this filing, do

1  you believe you should be personally held liable for

2  that error?

3              MR. SEARLES:  Objection; improper

4  hypothetical.

5              THE WITNESS:  I think I'm not allowed to

6  object, but I think you're misstating the federal

7  securities laws also.  If there is a material

8  misstatement or omission that's made in our

9  disclosure, I certainly have liability with respect

10 to it.  And that's why I read these documents

11 carefully and ask questions and make sure that I

12 understand the key points and that to the extent

13 that we need to, there is that disclosure.

14             MR. GOTTLIEB:  Q.  I want to get to

15 the -- to the standard of that.  What if you weren't

16 aware of the error?  Are you still liable?

17             MR. SEARLES:  Objection; improper

18 hypothetical.

19             THE WITNESS:  So, again, you're -- you're

20 saying some error that I don't know hypothetically.

21 Again, as a director, you have a duty -- and I

22 detail these in my reports to read the documents, to

23 ask questions, to understand information.  If you're

24 an officer, it's certainly -- it's -- your burden is

25 higher because your expectations are higher on you

1  on what you know.

2          If you're putting your name in a proxy

3  statement and consenting to its use, if you're

4  signing documents, if you've leasing property to the

5  company, if you're serving as a director of a

6  private company and a public company, I would expect

7  that you would be reading these documents and you

8  would understand them to your own formation and the

9  material contracts and the material -- that you own

10 the property that you say you do.  That you're

11 working on this.

12         So that's -- if there's a specific

13 hypothetical you'd like me to think about, that's

14 fine.  But in general, that's the duties that we

15 expect of directors.  And that's the duties that I

16 apply as a director.

17         MR. GOTTLIEB:  Q.  Is it a strict

18 liability standard?

19         MR. SEARLES:  Objection; vague.

20         THE WITNESS:  Again, I'm not here to

21 answer questions of what the law is.  The judge can

22 answer what the law is.  There are standards under

23 various fraud -- fraud statutes.  Some of them are

24 strict liability and some are not.

25         MR. GOTTLIEB:   Q.  Have you worked in the

1   past together with Matthew Cain?

2        A.   I have.

3        Q.   Let's start just academically.  How many

4   academic articles have you written together?

5        A.   I don't even know.  More than five.  Maybe

6   less than 10.  It's on my r?sum?.

7        Q.   Did you refer Mr. Cain to the SEC for this

8   case?

9        A.   No.

10       Q.   Do you know if he referred you?

11       A.   No.  I don't know either way, but I don't

12   believe he did.

13       Q.   Have you and Mr. Cain ever discussed this

14   case?

15       A.   Yes.

16       Q.   What did you discuss?

17       A.   Initially when I was retained, there was a

18   possibility that Dr. Cain would assist me on my

19   report.  So I believe in my contract he has some

20   hours allocated to him, but I don't think he ever

21   worked with me on my report, certainly not in a

22   material matter, as I answered earlier, in terms of

23   helping my report.  And then I think once he was

24   retained, we may have once or twice just discussed

25   that we were both retained on this matter.  And

Page 40

1    that's about it.

2         Q.   Did you discuss the substance of your

3    report with him?

4         A.   No.

5         Q.   Did you discuss the substance of his

6    report?

7         A.   Not really.  I mean, other than he

8    mentioned that he was doing a damages report.  It

9    didn't go much beyond that.

10        Q.   Do you have any written communications

11   with Dr. Cain relating to this matter?

12        A.   No.

13        Q.   When you spoke to him, you would speak to

14   him orally?

15        A.   Yes.

16        Q.   Let's look back to your report.  And

17   specifically let's look at from page 33 of the PDF.

18   Exhibit 2 is a list of cases where expert deposition

19   is taken or testimony given in the last four years.

20             Did you have other cases before the last four

21   years --

22        A.   Yes.

23        Q.   -- where you gave expert deposition or

24   other testimony?

25        A.   Yes.

1          Q.   Could you -- I'd like to call for the

2   production of a complete list of those cases where

3   you provided expert deposition or other testimony.

4   That request is to the SEC, but, Professor Solomon,

5   I assume you have a list of those cases; is that

6   correct?

7          A.   I'm going to let counsel answer those

8   questions.

9               MR. SEARLES:  We'll get back to you on

10   that request, Mr. Gottlieb.

11               MR. GOTTLIEB:  Q.  Okay, but just a

12   factual question.  You do have a list of the cases

13   where you gave expert deposition or other testimony

14   before the last four years, correct?

15          A.   I'm going to defer to counsel to answer

16   that question.

17               MR. SEARLES:  He may or may not have such

18   a list.  We'll get back to you if he does have such

19   a list, Mr. Gottlieb.  The time for discovery

20   requests is past.

21               MR. GOTTLIEB:  This is the expert

22   testimony.  I'm asking about the expert testimony

23   that he's given.

24               MR. SEARLES:  Understood.

25               MR. GOTTLIEB:   Q.  But just a factual

Page 42

1    question, and this is something that you can answer.

2    Do you have a list of cases where you gave expert

3    deposition or other testimony before the last four

4    years?

5        A.   Again, I'm going to defer to counsel

6    whether to answer that or not.

7        Q.   I don't think you can defer to counsel on

8    a fact question like that.  Please answer the

9    question.

10       A.   I'm going to defer to counsel about

11   whether to answer that question or not.  Thank you.

12            MR. GOTTLIEB:  Mr. Searles, are you

13   instructing him not to answer the question?

14            MR. SEARLES:  No, I don't know whether

15   such a list exists.

16            MR. GOTTLIEB:  Well, I know -- I know who

17   does know that question.

18            MR. SEARLES:  Well, I don't know if he

19   knows either.

20            MR. GOTTLIEB:  Well, he can answer if he

21   knows.

22            MR. SEARLES:  All right.

23            MR. GOTTLIEB:  Correct?

24            MR. SEARLES:  You may answer the question,

25   Mr. Solomon.

1              THE WITNESS:  Uhm, I do have a list.  I'm

2    not sure if it's complete or not or if it includes

3    everything.  So I'd need to confirm what it includes

4    and what it doesn't.

5              MR. GOTTLIEB:   Q.  In how many of these

6    cases -- just on this list, expert deposition taken

7    or testimony given in the last four years.  In how

8    many of these were you discussing the duties of

9    directors or officers?

10        A.   Uhm, so I'm looking at Exhibit 2.  I'd say

11   it was certainly the majority of these.  I can go

12   through each of these if you would like, but

13   certainly the majority.

14        Q.   In how many of these cases were you

15   qualified as an expert at trial?

16        A.   You mean, did I actually testify at trial?

17        Q.   Sure.

18        A.   Well, the ones that went to trial, the

19   Ulisses was an arbitration, and I testified.

20   Hussein v. Razin went to trial, and I testified.

21   McClatchy went to trial, and I testified.  Those are

22   the ones that I recall.

23        Q.   Okay.  In the Ulisses case, Item No. 3 on

24   Exhibit 2, did you provide testimony about the

25   duties of an officer or director?

Page 44

```
 1        A.    In general, yes.

 2        Q.    Did it have to do with a SPAC?

 3        A.    No.

 4        Q.    Did it have to do with an FPI?

 5        A.    Yes.

 6        Q.    Was it about a public company?  I'm sorry.

 7   Let me sharpen that question.

 8              Was the FPI a public company or a private

 9   company?

10        A.    It was public.

11        Q.    Number 10, Hussein v. Razin -- or Razin,

12   did you testify about duties of officers or

13   directors?

14        A.    Yes.

15        Q.    Did that case involve the officers or

16   directors of a public company or a private company?

17        A.    Public company.

18        Q.    Was that public company an FPI?

19        A.    No.

20        Q.    Was it a SPAC?

21        A.    No.

22        Q.    Was there a SPAC involved in that case?

23        A.    No, but the duties are the same across the

24   board.  I don't -- I don't see the distinction that

25   you're trying to draw, but it was not a SPAC.
```

1       Q.   No. 17, the McClatchy v. Pruitt case, was

2   that about -- did your testimony there involve the

3   duties of an officer or director?

4       A.   Yes.

5       Q.   Was a SPAC involved in that case?

6       A.   No.

7       Q.   Were the directors about whose -- were the

8   directors or officers about whose duties you were

9   testifying, were they directors or officers of a

10  public company or a private company?

11      A.   Public.

12      Q.   Was it a U.S. public company or a FPI?

13      A.   McClatchy is a U.S. public company.

14      Q.   Has a court ever declined to qualify you

15  as an expert in any subject matter?

16      A.   No.

17      Q.   Has an arbitrator or other tribunal ever

18  declined to qualify you as an expert in any subject

19  matter?

20      A.   No.

21      Q.   Can you estimate the portion of your

22  annual income in 2021 that comes from serving as an

23  expert witness?

24      A.   I haven't looked at 2021, but historically

25  it's about 50 percent of my income.

1        Q.    Aside from this litigation, have you ever

2   performed any other work or services for the SEC?

3        A.    Yes.

4        Q.    What type?

5        A.    I'm currently engaged by the SEC to advise

6   them on a charging decision with respect to

7   disclosure failures by officers.

8        Q.    That's not in -- not in connection with

9   this case, correct?

10       A.    It's not in connection with this case.

11       Q.    Did that case involve an FPI?

12       A.    Not really comfortable talking about it

13   anymore.  It's a private -- it's a confidential

14   matter.  And I'm subject to a confidentiality

15   restriction.

16             MR. GOTTLIEB:  Okay.  We've been going

17   about an hour.  Let's take a five-minute break

18   respecting your earlier wishes.

19             THE WITNESS:  Thank you.

20             MR. GOTTLIEB:  And we'll come back on in

21   five minutes.

22             THE WITNESS:  Do we have -- just before

23   everyone leaves, do we have breakout rooms in this

24   deposition or not?

25             MR. GOTTLIEB:  I don't think we do.  Uhm,

1  you know, you're obviously -- when we -- when we go

2  on break, you can put the Zoom on mute and stop

3  video and then you're free to --

4          THE WITNESS:  That's fine.  I was just

5  curious if I should go anywhere.  But thank you for

6  letting me know.

7          MR. GOTTLIEB:  No, no.  We just -- we just

8  typically shut everything down and then come back

9  after five.

10         VIDEOGRAPHER:  Off video at 9:59 a.m.

11         (The deposition was in recess from 9:59 to

12         10:10.)

13         VIDEOGRAPHER:  Back on video at 10:10 a.m.

14         MR. GOTTLIEB:   Q.  Professor Solomon, are

15  you familiar with a case called In re Ampal-American

16  Israel Corp.?

17     A.   Yes.

18     Q.   Is that case listed on Exhibit 2 of your

19  expert report?

20     A.   I believe it is.  I would need to check

21  again, but yes.

22     Q.   Okay.  There it is.  It's the first one.

23  Were you an expert for the plaintiff or the

24  defendant in that case?

25     A.   I was an expert for the plaintiff.  I am

1  an expert for the plaintiff.

2      Q.   And were you retained as an expert on

3  corporate governance?

4      A.   In general, yes.

5      Q.   Did the court in that case exclude your

6  testimony based on your original expert report?

7      A.   No.

8          MR. GOTTLIEB:  Dan, could we put up this

9  Tab 4?  Let's mark a new exhibit.

10         MR. ISAACS:  I just dropped it in the

11 chat.

12         MR. GOTTLIEB:  This is Exhibit 266.

13         (EXHIBIT 266 WAS MARKED FOR

14         IDENTIFICATION.)

15         MR. GOTTLIEB:  Q.  A May 14th, 2020,

16 decision in In re Ampal-American Israel Corp.?

17     A.   Yes.

18     Q.   So if we look at page 4 of this PDF, down

19 towards the bottom, there's a section that says, "C,

20 the opinions."

21         Do you see that part?

22     A.   I do.

23     Q.   And you made a factual finding that the

24 special committee relied primarily on Eluz, E-l-u-z,

25 with respect to various points; is that correct?

1          A.    No, that's not correct.

2          Q.    Is that not what the court finds?

3          A.    Uhm, so, again, I filed about 40 or 50

4    reports in my career, and this is the one report out

5    of the 40 where the court felt that it wasn't

6    helpful and didn't go direct full to the testimony.

7    What was -- happened in this matter was there was a

8    motion for reconsideration filed.  The court said

9    that to the extent that I make opinions on the facts

10   and the law, the court felt that wasn't appropriate

11   testimony, which I agree.  I wasn't there to give

12   opinions on the facts of the law.  The court is

13   qualified to do that.

14          The court also, in their consideration

15   motion, felt that my opinions went to the actions of

16   the special committee and not the actual officer

17   here, which is Ms. Eluz.  The court subsequently

18   granted leave to file an amended report.  I filed

19   that amended report.  Another motion to exclude was

20   made, which was denied, and I was deposed in this

21   matter with an opposing report filed by another law

22   professor in the last month or two.  So my issue is

23   you're mischaracterizing my testimony, and the

24   record just speaks for itself.

25          Q.    The court finds that to permit -- so I'm

1    quoting here, and this is from the last page of

2    the -- of the opinions, page 5, in the second

3    column, "To permit Solomon to suggest that Eluz

4    breached her fiduciary duty because the board or the

5    special committee did not follow these best

6    practices creates the risk that a jury will

7    attribute the board's or the special committee's

8    purported failure to Eluz."

9            Did I read that correctly?

10    A.    Again, we can re-read the opinion, if

11    that's helpful to you.  But the court, in that

12    opinion, found that -- thought that these were

13    issues that were the purview of the judge and the

14    jury and, again, went to special committee

15    practices.  I subsequently filed a report, which

16    went directly to officer, director duties, and

17    customs and practices, which the court allowed to go

18    forward and be filed.  And I was deposed on this

19    matter.

20            And, again, the record just speaks for

21    itself, and I'm currently an expert in this matter

22    and have been offered to give on customs and

23    practices of officers in connection with the issues

24    in that case.

25    Q.    So you mentioned before that you were not

1   there to give opinions on the facts or the law.  Is

2   that correct?

3        A.   I'm not here to give -- and my report does

4   not give opinions on the facts or the law.  The

5   ultimate conclusions are for the judge and the jury.

6   I'm here to assist them on principles of corporate

7   governance, as I've done in many other matters and

8   the -- the attorneys can offer up those opinions for

9   the purposes that they deem appropriate.  And the

10  judge can allow them in as she deems appropriate.

11       Q.   And in this opinion, under -- still on the

12  same page, page 5 under Heading 2, improper law

13  testimony, the judge holds -- and I'm quoting here.

14  "The report contains a section titled the Law

15  Governing Conflict of Interest Transactions in which

16  Solomon provides commentary on legal matters, such

17  as the business judgment pool, the duty of loyalty,

18  and the duty of care.  Solomon's legal analysis is

19  not limited to the section and is included in other

20  parts of the report.  Testimony as to the applicable

21  legal standard is plainly improper."

22            Do you see that section of the judge's

23  opinion?

24       A.   I see that, yes.

25       Q.   Do you agree that testimony as to the

1    applicable legal standard is plainly improper?

2             MR. SEARLES:  Objection; relevance.

3             THE WITNESS:  So, again, you're taking a

4    part of an opinion, an entire back and forth,

5    that -- uhm, out of context.  Again, I've given a

6    report, which has been accepted.  A motion to

7    exclude has been denied about the issues of customs

8    and practices of officers in connection with the

9    issues in that case, which was approval of a

10   conflict of interest transaction.  And that has not

11   been excluded, and I've been deposed on it.

12            Again, without reading the full report

13   here in the Ampal case and the opinion, I think

14   you're mischaracterizing what's going on.  And I

15   don't see the relevance of that opinion or this to

16   the corporate governance opinions, which I'm giving

17   in this matter, which I've given before to courts at

18   trial and otherwise.

19            MR. GOTTLIEB:   Q.  The question I asked

20   was is it correct to say that testimony as to the

21   applicable legal standard is plainly improper?

22            MR. SEARLES:  Objection; relevance.

23   Misstates the law.

24            THE WITNESS:  So, again, I'm not here to

25   give opinions on the law.  That's for the judge.

1              MR. GOTTLIEB:   Q.   Okay.  So you're --

2        A.    You're asking me if -- if -- if -- again,

3   the opinion speaks for itself.  I'm not here to give

4   opinions on the facts of the law.  I'm here to

5   assist the jury and the judge in understanding

6   complex issues of corporate governance, how customs

7   and practices work in terms of disclosure,

8   expectations of officers in terms of those customs

9   and practices, and what they ordinarily do along

10  with lawyers.

11             And so reading one line out of an opinion

12  without going through the entire history of the case

13  where I do have an admitted report which goes to

14  those issues is -- is mischaracterizing the record

15  and not relevant to this matter.

16        Q.   I've asked it twice.  Let me see if I can

17  ask it once more and get a straight answer.

18             MR. SEARLES:  Objection; argumentative.

19             MR. GOTTLIEB:   Q.  Do you think it's

20  proper for you to provide expert testimony as to an

21  applicable legal standard?

22             MR. SEARLES:  Objection; asked and

23  answered.  Improper hypothetical.  Vague.  Misstates

24  the law.  We can proceed with another question.

25             MR. GOTTLIEB:   Q.  Please answer the

1  question.

2          MR. SEARLES:  No.

3          MR. GOTTLIEB:  I'm sorry.  Are you

4  instructing him not to answer?

5          MR. SEARLES:   We've already gone over

6  this subject twice.

7          MR. GOTTLIEB:  Q.  No, I asked a question

8  twice, and then I was informed that I was

9  mischaracterizing things when I was literally just

10  reading a sentence and asking him if it was right.

11  So let me ask the question.

12          Professor Solomon, is it proper for you to

13  provide expert testimony on an applicable legal

14  standard?

15          MR. SEARLES:  Objection; misstates the

16  law.  Misstates his testimony.

17          THE WITNESS:  I've answered that question

18  twice now, and I just ask if you want that we read

19  back my last answer, which answered your question.

20          MR. GOTTLIEB:  Q.  No, we're not going to

21  do that.  That last answer went on for too long.

22          A.  Excuse me, Mr. Gottlieb, can I ask you to

23  be respectful to me?  Like, commenting on my answers

24  and making remarks is not appropriate.  And I have

25  been nothing but respectful to you, and I just ask

Page 55

1    that you do the same with me, please.

2         Q.   You write a column for the New York Times

3    called the Deal Professor; is that right?

4         A.   I do.  Although I don't write it that much

5    anymore.

6         Q.   How long have you been doing that?

7         A.   13 or 14 years.

8         Q.   Let's take a look at one of your recent

9    articles.  Dan, can you drop in the Tab 5?

10             MR. SEARLES:  I'm having trouble

11   downloading this one.

12             MR. ISAACS:  Uhm, I just dropped it in.

13   Is anyone else unable to download it?  I can e-mail

14   it to you, Don.  But is anyone else having trouble?

15             MR. SEARLES:  Professor Solomon, are you

16   able to open it?

17             THE WITNESS:  I am.

18             MR. ISAACS:  Don, I'll send it to you in

19   an e-mail now.

20             MR. SEARLES:  All right.  Thank you.

21             MR. GOTTLIEB:   Q.  We can do the

22   preliminary boring stuff while you're waiting for

23   that.

24             Professor Solomon, do you recognize this

25   document?

Page 56

1        A.    Yes.

2        Q.    What is it?

3        A.    It appears to be a column that I wrote for

4   the New York Times back in June.

5        Q.    When you wrote this column, had you yet

6   joined the board of Social Capital 4?

7        A.    No.

8        Q.    Had you been approached to join the board

9   of Social Capital 4?

10       A.    No.

11       Q.    Let's look at the middle of page 4.

12   There's a -- in a paragraph that starts, "Are they,

13   question mark."

14             Do you see that?

15       A.    I do.

16       Q.    So right after that you say, "SPACs are

17   bringing riskier companies to market.  Stock market

18   101 suggests that with more risk come more reward

19   and more failures.  Should investors be exposed to

20   these sorts of companies, which are inherently

21   riskier, make your own judgment.  But it wasn't long

22   ago when people were worried about start-ups staying

23   private for too long depriving public investors of

24   exposure to potential gains.  Now that the SPAC

25   solves this problem, regulators are backpedaling."

1              Do you see that section?

2      A.    I do.

3      Q.    Do you have an opinion as to whether it's

4   generally good for the market to bring riskier

5   companies to market?

6              MR. SEARLES:  Objection; relevance.

7              THE WITNESS:  No, I haven't thought about

8   it.

9              MR. GOTTLIEB:   Q.  Do you think SPACs are

10  inherently riskier than non-SPACs?

11             MR. SEARLES:  Objection; incomplete

12  hypothetical.

13             THE WITNESS:  No, I mean I think the point

14  that I'm trying to make in this article is that in

15  general SPACs, certain SPACs, have brought earlier

16  stage companies to market.  Earlier stage companies

17  inherently have volatility.  And so when you assess,

18  it's more like a venture capital company where more

19  will fail, but the bigger hits will be bigger hits.

20  And so this is sort of commenting on what's been a

21  20-year debate about what type of companies should

22  be public and since Sarbanes-Oxley, the push to sort

23  of bring more companies public.

24             And I've written on these issues.  And to

25  the extent that certain SPACs are bringing earlier

1  stage companies to market, uhm, there will be more

2  volatility in their earnings.  And to the extent

3  that they're bringing smaller companies to market,

4  there will be inherently more failures.  And so this

5  is really a commentary on, uhm, a recent article by

6  Michael Klausner and -- I forgot his name --

7  Ohlrogge where they say that SPACs historically

8  haven't had great returns.  But the problem is that

9  they don't look at the risk and the size.

10          So there's a risk reward analysis.  None

11  of this is relevant to this case that I can see, but

12  that's generally what the point is that I'm trying

13  to make there.

14          MR. GOTTLIEB:   Q.   If a -- if a company

15  that is taken public by a SPAC fails, is that

16  necessarily because of fraud?

17     A.   No.  But if the company commits fraud,

18  they commit fraud.  I don't -- I don't really see

19  the relationship between the two.

20     Q.   Let me talk about SPACs just to set some

21  vocabulary for a second.  So we've been talking

22  about the SPAC.  Is SPAC the term used to refer to

23  public company that is acquiring the target company?

24     A.   Yeah, in general.  I mean the SPAC is a

25  special purpose acquisition company.  I talk about

1    it in the background of my report.  It's -- it

2    raises capital.  It then has a period of time to do

3    a transaction.  What is generally referred to as the

4    de-SPAC transaction, where they acquire a company, a

5    private company, and take it public.

6         Q.   Is there a word commonly used to describe

7    the -- the company that is acquired, like target

8    company or something else?

9         A.   I don't really know.  I mean I refer to it

10   as target.  If there's another term, I'm happy to

11   hear it.

12        Q.   No, this is really just to get some

13   vocabulary.  I'm fine with referring to it as the

14   target company.

15        A.   That's how -- that's how I refer to it.

16        Q.   Okay.  Have you ever represented -- as a

17   lawyer in private practice, have you ever

18   represented a target company in connection with an

19   acquisition by a SPAC?

20        A.   I've represented a target company that's

21   been acquired by a publicly traded company.  That's

22   no different.  So, uhm, when I was practicing, there

23   weren't SPACs.  SPACs were sort of a -- a back

24   market thing, but there's no difference between the

25   issues about a SPAC acquisition versus an

Page 60

1    acquisition of a private company by a publicly

2    traded company.  That's really what's going on.

3         Q.   Have you ever served as a director or

4    officer of a target company in connection with an

5    acquisition by a SPAC?

6         A.   No.

7         Q.   Have you ever served on the board of

8    directors of a public company, SPAC or otherwise,

9    that completed a merger or acquisition?

10        A.   No.

11        Q.   Have you ever represented or advised

12   members of a Board of Directors of a -- an FPI that

13   was acquired by a U.S. SPAC?

14        A.   Again, I've -- I've certainly advised many

15   FPIs that have been acquired by U.S. publicly traded

16   companies, but not by a SPAC, no.

17        Q.   How many transactions have you been

18   involved with personally in which a U.S. SPAC

19   acquired a foreign operating company?

20        A.   In terms of represented -- representation,

21   it's the same answer.  I don't recall any

22   specifically.  But, again, I've been involved in

23   U.S. publicly traded companies acquiring FPIs, both

24   private and public, in addition for stock or cash

25   consideration where SEC documents have been filed.

Page 61

1          Q.    About how many times did you represent a

2    target company that was acquired by any publicly

3    traded company?

4          A.    Oh, I don't know.  I mean, you know, I was

5    an M&A lawyer for nine years.  So significant number

6    of times, 10 or 20, need to refresh my recollection.

7          Q.    Did you speak with any investors in

8    Ability in order to prepare this expert report?

9          A.    No.

10         Q.    Did you speak with anyone at Cambridge in

11   order to prepare this expert report?

12         A.    No.

13         Q.    Did you speak with any members of any

14   industry to prepare this expert report?

15         A.    No.

16         Q.    Let's look back at your expert report.

17   I'm looking at page 34.  It's Exhibit 3, again, the

18   list of documents considered.  Do you see that?  For

19   the record this is --

20         A.    I do.  I mean, for good or for bad, I just

21   note -- I don't think the pagination goes to 34.  It

22   restarts, but I assume you're looking at the 34th

23   page of the PDF, which is Exhibit 3, list of

24   documents considered.

25         Q.    You are -- you are correct.  It is -- I'm

1    looking at page 34 of the PDF, Exhibit 3, list of

2    the documents considered.  And the page number on

3    the bottom is 1.  So we're -- as long as we're

4    literally on the same page, that's okay.

5          A.    We are literally on the same page.

6          Q.    Who provided you with these materials?

7          A.    The SEC did.

8          Q.    Did anyone other than the SEC ever provide

9    you with any background about this case?

10         A.    No.

11         Q.    Did anyone assist you in reviewing these

12   materials?

13         A.    No.

14         Q.    Did you read each and every word of all

15   the materials on this list?

16         A.    I don't -- I don't really know what that

17   means.  I mean I read through the materials and

18   focused on the material parts and the non-material

19   parts.  I may not have read every word or otherwise,

20   but I read them.

21         Q.    How do you know what's material and what's

22   not material?

23              MR. SEARLES:  Objection; vague.

24   Incomplete hypothetical.

25              THE WITNESS:  I don't even know how to

1  answer that.  Are we talking about in the context of

2  the securities laws?

3             MR. GOTTLIEB:  Q.  No.  I'm curious.  You

4  just said that you read through these and you read

5  the material parts.  How did you decide what parts

6  were material and what parts weren't?

7        A.    I think you're misstating what my

8  testimony is.  My testimony is I read through these

9  documents.  And you had asked whether I read every

10 word for word, and I -- I did not.  I don't want to

11 say either way because that's not how I read.  When

12 I read, if there's a part that appears important to

13 me or significant, I read it more carefully.  And as

14 I go through, I read.  Sometimes I read quicker, and

15 sometimes I read slower depending upon how I see the

16 importance of it.

17            And I gauge the importance based upon

18 my -- you know, I've been doing this for 20

19 something years, almost 25 -- no, almost 30 -- 27

20 years?  28 years?  And so I look at what's relevant

21 to these opinions, what's relevant to things that

22 are going on.  So, for example, you know, would I

23 have read my own that -- first hour I spent on my

24 own qualifications, probably not as carefully or

25 as -- I don't want to use the word carefully because

1  that's not the right word.  But it wouldn't be as

2  significant to me because I already know my

3  qualifications.

4          So when I read through things -- because

5  the record's copious here.  It extends for tens of

6  thousands of pages.  You know, I'm focused on the

7  points that are important for purposes of my opinion

8  and highlighting those in my mind.

9      Q.   The first document listed here is the

10 SEC's complaint in the case.  You do understand that

11 the information set forth in the complaint are the

12 SEC's allegations, right?

13     A.   I understand what a complaint is and that

14 these are factual allegations that the extent

15 disputed would be -- need to be proven at trial to

16 the extent they're relevant for the claims that are

17 made, the causes of action, to prove those causes of

18 action.

19     Q.   Did you assume that any of the allegations

20 in the SEC's complaint were factually true?

21          MR. SEARLES:  Objection; vague.

22 Incomplete hypothetical.  For what purpose?

23          THE WITNESS:  Yeah, I think I'd need to

24 know what we're talking about here and what fact

25 we're referring to.  Did I assume that they were an

1    Israeli company?  I just don't -- if there's a

2    specific fact you want me to look at, I'm happy to.

3    But, again, I'm not here to make conclusions based

4    upon the facts.  And my opinions are not here to be

5    given -- to give factual conclusions.

6            MR. GOTTLIEB:   Q.  Let's turn to -- did

7    you read the answer in this case?  I don't see it

8    listed in this -- in this list of the documents

9    considered.

10       A.   I don't recall either way.  But if it's

11   not listed, I don't believe that I did.

12       Q.   Let's look at -- back to page 5 of your

13   report where there's a factual background section.

14   Starting at Paragraph 13.

15            Do you see that?

16       A.   Yes, I provide a factual background -- a

17   brief, factual background of the case for purposes

18   of context the report.  But my opinions are not

19   dependent on this factual background, and it's not

20   something that I would testify to.

21       Q.   Where did you get the facts for this

22   factual background?

23       A.   Well, it's footnoted.  I mean, it speaks

24   for itself.  Is there a particular sentence you

25   would like to go to.  And generally the record, of

1    course.

2         Q.   Well, wait, those are -- those are two

3    different answers.  The footnotes part I understood.

4    Is there anything in here that's from generally the

5    record as from -- as opposed to any one of the

6    specific sites in the footnotes?

7         A.   I think we're being sort of -- I think

8    you're dancing angels on the head of a pin.  I mean,

9    I've read the record so -- that it's listed that

10   I've considered.  And so that's informed what I'm

11   writing here, but the specific factual statements

12   are footnoted to specific sources.  So, again,

13   there's a specific statement you'd like to discuss,

14   I'm happy to do so.

15        Q.   Did you write this section yourself?

16        A.   I wrote the whole report myself.

17        Q.   Did you receive a draft of this section

18   from anyone else?

19        A.   No.

20        Q.   Do you have an opinion one way or the

21   other as to whether the facts set forth in this

22   section are true or not?

23        A.   Uhm, again, it's not relevant to my

24   opinion.  But I do have opinions about whether

25   they're true or not.  I mean, these are cited to

1  primary sources for the most part.  Is there any

2  dispute that Aurovsky and Hurgin didn't consent to

3  the use of their names in their registration

4  statement?  My understanding is that these are --

5  the facts that I'm detailing here are undisputed

6  facts.  If there's a specific fact that you would

7  like me to consider, again, I'm happy to.

8            And, again, none of these are -- depend

9  upon my opinions.  I have made certain

10 conclusions -- certain conclusions about the record,

11 but I'm not opining on those here.  They're not

12 relevant to my opinion.

13      Q.   Just above the factual background, you

14 have a Section 4, still on page 5, says, "Summary of

15 opinions."  And you say in this report, "I provide

16 information and background on the role of customs

17 and practices in M&A transactions involving SPACs

18 and FPIs in particular."

19            What's -- I'm sorry.  Go ahead.

20      A.   I'm just saying, yes.  I see this, yes.

21      Q.   Okay.  What is the basis for your

22 statements about what are the customs and practices

23 in M&A transactions?

24      A.   So I've been doing this, as I said for 27,

25 28 years.  For now, both in practice, in writing

1   about M&A and transactions and disclosure, so

2   practice experience, I've been writing about it

3   academically and also for trade publications and

4   otherwise.  I speak to the Delaware courts regularly

5   on these issues as well as the SEC on these issues.

6   I've been retained as an expert on these issues by

7   the SEC in this matter and other matters.  I've

8   given expert witness on these cases and otherwise.

9   I regularly lecture and run conferences on these

10  issues.  And in general, I just refer to my

11  background section.

12       Q.   You're saying here that you're providing

13  information and background on roles of customs and

14  practice in M&A transactions involving SPACs, FPIs

15  in particular.  We previously talked about the

16  number of matters that you handled as a lawyer

17  dealing with -- with SPACs.  And I think that the

18  answer was that when you were practicing there

19  weren't really SPACs so that you did not have

20  experience with a SPAC in particular.  Is that

21  correct?

22       A.   I think you're mischaracterizing my

23  testimony, and I just refer back to it.

24       Q.   Okay.  Uhm, in how many SPAC transactions

25  did you speak firsthand with directors or officers

1    of a target to come to understand their practice of

2    reviewing, approving, or questioning SEC

3    disclosures?

4         A.   I mean, I think I object to your

5    fundamental question the way that it's phrased.

6    When you're doing SEC disclosures in an acquisition

7    or pro form private issuer, it's no different for a

8    SPAC than it is for a target in a SPAC transaction

9    than it is for publicly traded company to acquire a

10   privately traded one and issue stock and for that

11   acquire to have a vote.

12        And so if there's some difference that you

13   would like me to address, I'm happy to.  But I

14   regularly -- if we're talking about practice, I

15   regularly represented companies in these types of

16   transactions and practiced abroad with foreign

17   private issuers doing exactly this type of work for

18   four and a half years.  And I've written repeatedly

19   about these issues and in particular about SPACs,

20   academically and otherwise.  And my M&A case book is

21   the leading case book on acquisition transactions

22   and utilized at, not just Berkeley, but Stanford,

23   Columbia, other major schools.

24        And so these are issues that are generally

25   uniformed to FPIs and SPACs and, you know, as a

1  director of a SPAC right now, I know and see that

2  that is the case also.

3      Q.   What's your basis for saying that there's

4  no difference for SPACs?

5      A.   I just refer back to the prior answer.

6      Q.   No.  What's -- what is the basis on which

7  you say that there is no difference in the customs

8  and practices for officers and directors in a SPAC

9  versus a non-SPAC?

10     A.   Again, I'd refer --

11          MR. SEARLES:  With respect objection;

12  vague.  What side of the equation are you talking

13  about?

14          MR. GOTTLIEB:  Q.  Either side.

15     A.   Are we talking about disclosure

16  obligations?  Because if we're talking about

17  disclosure obligations, I'm happy to answer that.

18  Is there a particular facet of the transaction that

19  you're talking about?

20     Q.   Well --

21     A.   Not -- I just -- I can't answer as counsel

22  objected.  If there's a specific aspect you would

23  like me to look at, that's fine.  But in terms of

24  disclosure obligation diligence and the agreements

25  that are signed, and there's no difference in

1  general or significant difference between the type

2  of acquisition transactions that I'm talking about.

3      Q.   What is your basis for saying that there's

4  no difference?

5      A.   Again, I refer back to my former answers.

6      Q.   Well, we're talking about the customs and

7  practices of what officers and directors in certain

8  transactions do.  You've said that you have not

9  represented officers and directors of a target in

10 connection with a SPAC.  Is that correct?

11           MR. SEARLES:  Objection; asked and

12 answered.

13           THE WITNESS:  I think I've answered it,

14 but I'm not sure if I understand the question.  But

15 if the question is have I represented a target that

16 is acquired by a SPAC and that target is an FPI, the

17 answer is no.

18           MR. GOTTLIEB:  Q.  Okay.  So if you have

19 no experience representing such officers and

20 directors, how can you tell me that the custom and

21 practice for those officers and directors is any

22 different than in any other situation?

23     A.   Again, I think you're -- you're

24 pointing -- you're trying to take one little fact.

25 I've spent, as I said, almost 30 years studying the

1  M&A market.  I've written for the New York Times

2  about SPACs.  I regularly lecture on SPACs.  I've

3  written academically about SPACs.  I speak on

4  conferences about SPACs.  I just spoke recently with

5  Rob Jackson, the SEC commissioner, about SPACs and

6  how they work and other laws.  I consult on these

7  issues.  I've been an expert witness in SPAC cases.

8  My M&A case book deals with these issues.  And,

9  again, I've practiced for 10 years doing these types

10  of issues.

11          So, again, there are some features of the

12  SPAC itself that are different.  But when we're

13  talking about the disclosure obligations or how an

14  acquisition of a target works, there's no

15  substantive difference.  And, again, I've been

16  studying these issues for a long period of time.

17      Q.   I understand that you teach other people

18  about the customs and practices of directors and

19  officers in connection with SPACs.  Where did you

20  come to learn that information?

21      A.   So, again, you're mischaracterizing my

22  testimony and misstating it.  Again, I regularly

23  speak at conferences with people.  I do academic

24  studies of these issues.  I speak to regulators on

25  these issues.  I've represented companies on these

1  issues.  I'm the director of a SPAC.  And so, you

2  know, I write an M&A case book that is the textbook

3  and resource for these issues.  And so I draw on all

4  those issues.  And if there's something that's

5  different that you would like me to consider, please

6  let me know.  But you haven't, and so I'm happy to

7  talk about a specific point if you'd like.

8      Q.  Have you ever done a peer-reviewed study

9  of the customs and practices of directors of a

10  target of a SPAC in connection with their due

11  diligence obligations?

12      A.  Again, no.  That's not the way I think

13  about it.  The question is have I written

14  academically on these issues and have these articles

15  been cited or otherwise.  I've been writing about

16  SPACs since 2007 and been speaking on these issues

17  and viewed as an authority on these issues and was

18  appointed as a director on these issues.  So, again,

19  I published in articles.  If you call peer reviewed

20  being asked by journals to write them and being

21  reviewed by academics, then yes.

22      Q.  None of that was responsive except for the

23  first word you said, which was no.

24          MR. SEARLES:  Objection; argumentative.

25          MR. GOTTLIEB:  Q.  The question was have

1  you ever done a peer-reviewed study where you polled

2  a statistically significant number of directors and

3  officers of SPACs to review -- of targets in SPACs

4  to review what was their custom and practice in

5  diligencing any transaction or SEC filing?

6        MR. SEARLES:  Objection.  That wasn't the

7  prior question.

8        THE WITNESS:  That's just such a specific

9  thing I can't even -- I mean I just refer to my

10  r?sum?.  I mean I've done over 50 articles.  I can

11  look through them and see where I've touched upon

12  those issues in a empirical study of such a niche

13  issue, which is not relevant to my reports.  But I

14  can get back to you on it if you wanted me to look

15  through it while you wait.

16        MR. GOTTLIEB:  Q.  If I wanted to verify

17  that your views on what directors of SPAC targets

18  do, what is the custom and practice, how would I

19  verify that?

20     A.  So, again, this is -- this is when

21  practitioners, for example, advise officers and

22  directors on what they do.  They draw on their

23  knowledge and experience having done these

24  transactions before having studied these

25  transactions, speaking at conferences about these

1  issues to inform what the customs and practices are.

2  And so that's -- so, for example, when you have a

3  merger agreement, you don't just start it from

4  scratch.  What you do is you take the form.  You've

5  negotiated this before.  You've studied this before.

6  And there are certain outcomes that come from the

7  form itself.  And that's how customs and practices

8  is viewed.

9           And so these are informed also by the

10  National Association of Corporate Directors.  And

11  so, for example, these are issues that directors

12  need to take up.  And I've been named three times

13  one of the most influential people in the boardroom

14  by the National Association of Corporate Directors.

15  So you would look at guidelines from the NACD.  You

16  look at guidelines from treatises.  You look at case

17  books, like my case book that I did, and you draw on

18  the universe of transactions and the customs and

19  practices underneath the case law and how that

20  works.

21      Q.   What is the basis for your statements

22  about what customs and practices in M&A transactions

23  involving FPIs are?

24      A.   I just refer back.  Sorry.  I'm getting a

25  little bit frustrated because you keep asking the

1   same question.  I just refer back to the answer that

2   I gave, which is, generally speaking, you look at,

3   uhm, how the disclosure is made, how the

4   transactions are.  I've given -- I've filed expert

5   reports with respect to these practices on FPIs, and

6   you look at how directors and officers act.  I've

7   done it with Israeli companies before too.  And you

8   look at the same things that I've been talking about

9   over the past few questions.

10       Q.   Is there a peer-reviewed study that you're

11  aware of that discusses what are the customs and

12  practices of officers and directors of SPAC targets

13  in conducting their diligence for SEC filings?

14            MR. SEARLES:  Objection; vague and

15  ambiguous as to what you mean by peer reviewed.

16            THE WITNESS:  I don't even know what you

17  mean by that.  And I don't even know how it would be

18  conducted.  Is there a particular type of study that

19  you would like to do that you'd like me to think

20  about?  Again, there's a whole literature that I've

21  written in and on that looks at these customs and

22  practices.  And if you're referring to that, yes.

23            But if there's a particular type of study

24  you'd like me to look at or otherwise or you think

25  should be done, I'm happy to do so.  But I think

1   you're not sort of focused on how practitioners and

2   capital markets participants and regulators look at

3   these issues.

4           MR. GOTTLIEB:   Q.   I'm interested in how

5   directors and officers of FPI targets look at these

6   issuers.   What is their custom and practice?   And

7   what I'm asking you is what is your basis for expert

8   testimony on what their customs and practices are?

9           MR. SEARLES:   Objection; asked and

10  answered repeatedly.

11          THE WITNESS:   I'm just going to refer back

12  to my answer so we can read them back if you'd like

13  if there's something you'd like to focus on.   We're

14  also coming up on the hour so I don't want to

15  interrupt you midstream on a question, but whenever

16  you want to take a break is great.

17          MR. GOTTLIEB:   That's fair.   Let's take a

18  break.   We can -- we'll be kind.   We'll take 10.

19          THE WITNESS:   Thank you.

20          VIDEOGRAPHER:   Off video at 10:54 a.m.

21          (The deposition was in recess from 10:54

22          to 11:08.)

23          VIDEOGRAPHER:   Back on video at 11:08 a.m.

24          MR. GOTTLIEB:   Q.   Was Ability Computer

25  and Science a SPAC in 2015?

1           MR. SEARLES:  You misstated the name of

2   the defendant.

3           MR. GOTTLIEB:   Q.  Was -- was ACSI --

4   A-C-S-I -- a SPAC in 2015?

5       A.   If we're referring to the Israeli company,

6   no.  It was a private company organized under the

7   laws of Israel.

8       Q.   Was it an FPI in 2015?

9       A.   Uhm, yes and no.  I mean it wasn't

10  publicly listed, but it was -- it would qualify as

11  an FPI.

12      Q.   Why would it qualify as an FPI?  Do you

13  have to be a public company to be an FPI, or is any

14  company FPI?  A foreign company an FPI?

15      A.   Well --

16      Q.   I'm sorry.  That was a terrible question.

17  Let me ask it a better way.  What's an FPI?

18      A.   I just refer to my report.  I think I

19  dropped it in a footnote what the definition is.  So

20  maybe we can just turn to that.

21      Q.   Well, sure.  On Paragraph 3, you reference

22  FPIs.  Then you have, "A foreign private issuer is

23  any foreign issuer, other than a foreign government,

24  except for an issuer meeting the following

25  conditions."  And there are some conditions there.

1          Do you know -- do you count what was the

2     Israeli company, ACSI, an FPI in 2015?

3          A.   I think so, yes.

4          Q.   All right.  Let's -- let's turn to page 13

5     of your report.  And in particular let's look at the

6     opinions section.  Okay.  So your -- your Opinion 1

7     is, "Customary and usual practice for executive

8     officers and directors to be knowledgeable of

9     federal securities laws applicable to public company

10    M&A transactions and to review the relevant SEC

11    disclosure documents."

12          Do you see that part?

13          A.   Yes.

14          Q.   Does your opinion address how

15    knowledgeable of federal securities laws such

16    officers and directors have to be?

17          MR. SEARLES:  Objection; vague and

18    ambiguous.

19          THE WITNESS:  I don't really know how to

20    answer that.  Can you be more specific, please?

21          MR. GOTTLIEB:   Q.  Well, you say it's

22    customary and usual practice for executive officers

23    and directors to be knowledgeable of federal

24    securities laws.  How knowledgeable?

25          MR. SEARLES:  Objection; vague and

Page 80

1    ambiguous.

2           THE WITNESS:  Again, I mean I talk about

3    this in my opinion, so you want me to read my

4    opinion, I'm happy to.  But I just -- sorry.  If you

5    can be more specific.

6           MR. GOTTLIEB:  Q.  Well, there are

7    degrees of how knowledgeable a person can generally

8    be about a thing.  Is that right?

9       A.   It would help to have an example.

10      Q.   You -- you are knowledgeable about biotech

11   companies, you, Professor Solomon?

12      A.   I think I have some knowledge of it.

13   Sure.

14      Q.   But -- but you may be less knowledgeable

15   than someone with a Ph.D. in biotech who's been

16   working at a biotech company for 30 years, correct?

17      A.   On specific points, yes.  I mean,

18   certainly the practices or procedures to actually

19   work with the technology.

20      Q.   You don't have to have a biotech degree

21   to, say, serve on a SPAC looking for a biotech

22   target, right?

23      A.   No.

24      Q.   Is your view that a director has to be

25   knowledgeable enough to be comfortable that there's

Page 81

1  nothing false or misleading in the relevant

2  disclosure documents?

3          MR. SEARLES:  Objection; misstates his

4  opinions.

5          THE WITNESS:  Again, I just refer to my

6  opinions.  In general, the directors, in my

7  experience and my practice, study, and otherwise,

8  directors and officers of publicly traded companies

9  are knowledgeable of the material facts of their

10  disclosure documents, review those disclosure

11  documents, uhm, comment on those disclosure

12  documents, make sure that if they don't understand a

13  point they make comment on them.

14          And, you know, they're expected to comply

15  with these under, not just their fiduciary duties,

16  but customs and practices.  And if they see an

17  inaccuracy in those documents, they have an

18  obligation to speak up after that review.

19          MR. GOTTLIEB:   Q.  In Paragraph 32, you

20  write, "I detailed a role a public company executive

21  officer and director plays in a transaction with

22  respect to review of relevant SEC disclosure

23  documents."

24          Is that right?

25      A.   Yes, that's right.

Page 82

1        Q.    And to be clear, your opinion relates to

2   the customs and practices applicable to the officers

3   and directors of a public company, correct?

4        A.    Uhm, or becoming public.

5        Q.    Is that a distinction that you make in the

6   report?

7        A.    I didn't think that I needed to make that

8   distinction.  I think to the extent that you're

9   trying to make that distinction, I disagree.  Any

10  time you're going public or filing public documents

11  or going to follow customary and usual practices,

12  and what I talk to in Opinion 1, they don't

13  change -- you don't get a pass because your -- if

14  anything, when you're going public there's a

15  heightened scrutiny because it's your first time

16  making those disclosures.

17            MR. GOTTLIEB:   Q.  Do you form an opinion

18  as to the customs and practices for the directors or

19  officers of a target company?

20            MR. SEARLES:  Objection; misstates his

21  opinions.  Draws a false distinction.

22            MR. GOTTLIEB:  I'm just asking the

23  question.

24            MR. SEARLES:  I'm just objecting to it.

25            THE WITNESS:  I think I agree with the

1   objection.  I think -- I don't know if I can do

2   that.  But, uhm, I think you're making a false

3   distinction here.  We're talking about the

4   obligations of officers or directors in connection

5   with an M&A transaction in filing documents with the

6   SEC that carry liability with them.  Uhm, as well as

7   their obligations they're under in connection with

8   customary and usual practices.

9            And that's what that opinion goes to.  And

10  I'd rather just qualify my answers by the opinion

11  itself rather than -- uhm, I think you're

12  mischaracterizing it.  But I'm happy to try and

13  clarify things if there's something you don't

14  understand.

15            MR. GOTTLIEB:   Q.  So you're writing that

16  it's custom and usual practice for executive

17  officers and directors to be knowledgable of federal

18  securities laws applicable to public company M&A

19  transactions.  Where do you find this custom and

20  usual practice?  And I shouldn't -- before you

21  answer that, I'll break it down because we have

22  asked and answered that generally.  Let me break it

23  down more specifically.

24            Is that custom and usual practice set forth in

25  any law?

1      A.    So I do think I've answered this, and

2  we're sort of breaking it down to a micro level and

3  I don't think that that's really how that works.  It

4  works at the macro level that we were talking about

5  before the break.  In general, of course, it's

6  informed by the law, but what we were talking about

7  before the break I just refer to my answers that I

8  gave prior thereto.

9      Q.    Is there a statute that sets forth what

10  the custom and usual practice is?

11      A.    In general it's informed by the law, of

12  course.  So Section 11 liability, Section 14A

13  liability, you have liability standards.  So, for

14  example, Section 14A is a negligence standard.  And

15  so when we look to see what negligence is, I'm not

16  here to give a legal opinion or to opine whether

17  someone was negligent or not here.  But there are

18  customs and practices that have built up to comply

19  and make sure that a director or officer is doing

20  their job, frankly, in terms of reviewing these

21  documents, making sure that their material correct,

22  reviewing them, asking questions, making sure they

23  understand them.

24           And I think taking a step back in

25  particular, you have a company like Ability where

1   you have an officer and director and 50 percent

2   shareholder and someone who is signing multiple

3   legal documents, including leasing a property to the

4   company as well as signing employment contract,

5   agreeing to become a public director going forward

6   of the U.S. publicly traded company.  In my 30 year

7   experience, the expectation is and what they did,

8   and I never saw anything different, is they were

9   part of the process.  They reviewed the documents.

10  They asked questions.  If they didn't understand

11  something, they asked it.  And this involved not

12  just domestic issuers, but foreign private issuers

13  where people were not familiar with the language.

14  And so there was an obligation to understand this

15  was a significant thing.

16          This is the United States of America and

17  there's federal securities laws, and they're

18  directors of companies in western fields with their

19  own capital markets, so they know that these issues

20  come to the forefront and they act accordingly.

21      Q.   Do you remember what my last question was?

22      A.   I'm sorry?

23      Q.   Do you remember what my last question was?

24      A.   I'm not going to repeat it back, but I'm

25  happy to have the court reporter repeat it back if

1    you don't remember it.

2         Q.   No.  No.  I'm asking you do you remember

3    what my last question was?  Yes or no?

4         A.   I do.

5         Q.   What was it?

6         A.   I'm not going to -- it's not a memory

7    test.

8         Q.   It's not a memory test.

9         A.   Ask the stenographer to read it back if

10   you're going to ask me that question.

11        Q.   You referred to Section 11.  Does

12   Section 11 apply to directors or officers of a

13   target company?

14        A.   Again, I'm not here to give legal

15   standards, but Section 11 has a strict liability

16   standard.  And so it involves a process of making

17   sure that those -- that when you're doing an IPO,

18   for example, you're making sure that your disclosure

19   is true and correct to the extent that there's a

20   Section 12 liability.  That's the same thing for

21   officers and directors.  I know that neither one of

22   those is an issue in this case, but it's no

23   different than Rule 10b-5 or Section 17 or Section

24   14A.

25        Q.   Do you know one way or the other whether

1   Section 11 applies to directors or officers of a

2   target company?

3        A.   I'm not here to answer legal questions.

4   If you want to pull up the statute, we can go

5   through it.  I mean, I'm not here to answer legal

6   questions about an inapplicable statute.  If you

7   want to pull up Section 11, then let's go through

8   it.

9        Q.   Does Section 14 apply to directors or

10  officers of a target company?

11       A.   Again, I'd rather pull it up.  But yes, it

12  can.

13       Q.   It can?

14       A.   Yes, it applies in this circumstance.

15       Q.   It applies in this circumstance.  What's

16  your basis for saying that?

17       A.   I'm not here to make a legal case or

18  otherwise.  Again, the causes of action in this case

19  are under Rule 10b-5 and under Section 14A and under

20  Section 17.

21       Q.   Is custom and usual practice set forth in

22  any particular regulations under the 33 or 34 Acts?

23       A.   So, again, I give a similar answer to what

24  we said about the law, which is it's informed by

25  those regulations.  And so if you have rules, for

1  example, like Rule 10b-5, there are customs and

2  practices thereunder and that, you know, are

3  informed by what practitioners do to comply with

4  those rules.  They're informed by organizations such

5  as the National Association of Corporate Directors.

6  They're informed by practitioner memos, by academic

7  study, by what people have done in repeat

8  transactions, and what they repeatedly do going

9  forward.

10      Q.   In all the practical experience that

11  you've had, how many times did you personally ask a

12  director or officer if they had read and understood

13  every single word of a securities filing that was

14  filed with the SEC?

15      A.   So, again, that's not -- you don't sit

16  there and interrogate your directors and officers in

17  the way that you're talking about.  What you do is

18  you make sure that the documents are provided to

19  them.  You make sure that they're summarized, that

20  there's discussion at the boardroom, or if they're

21  signing documents, that there's discussion and

22  Ability drafts are provided for comment and review.

23            So in this circumstance, you not only had

24  disclosure documents, you had a merger agreement.

25  You had other contractual documents.  And so those

1    are provided and discussed and it's -- counsel will

2    make sure generally that those are provided, that

3    they're receptive to questions.  Questions are asked

4    because these are important issues and everyone's

5    well-made aware of it.  It's not five dollars at

6    stake.  It's tens of millions, hundreds of millions.

7            And so in general when I was in the

8    boardroom and when I'm in the boardroom currently as

9    a director, the expectation is that you'll ask

10   questions and understand what's being made of you

11   and that the material documents and facts will be

12   provided to you.  And if you don't think that you

13   have them or you think there's a mistake, you'll ask

14   questions and inquire.

15       Q.   How do you make sure that a director or

16   officer understands everything that's set forth in,

17   say, a proxy statement?

18       A.   So when you said that question you

19   emphasized the word "everything."  And, again, the

20   role of the attorney and the role of the officers

21   and the role of everyone here is to make sure -- as

22   I said in the answer to a prior question -- is to

23   make sure that there's opportunity to ask questions,

24   that the documents are reviewed, that there's

25   opportunity for the executive to read them, to

Page 90

1   understand them.  If they don't understand them or

2   read them and the discussions, so summaries are

3   given at the boardroom.  Summaries are given when

4   the documents are circulated.  Uhm, and then if the

5   executive doesn't understand them, the executive

6   will customarily ask.

7           So I can't just, for example, say well, I

8   didn't -- I agreed to buy this house but I never

9   read the documents and so now I can't -- I'm not

10  responsible for buying the house.  When you buy a

11  house you read -- you read what the price is.  You

12  read the material terms.  And the boardroom is

13  really no different.  And, in fact, the expectations

14  are higher because there's a lot of money at stake.

15  That's particularly true when you have someone who

16  is an officer, a director of both companies,

17  controlling shareholders signing multiple

18  shareholder agreements as well as a merger

19  agreement.

20          In my experience, and what I've seen and

21  what's the fundamental presumption, uhm, when people

22  discuss this, is that if an executive doesn't

23  understand something, they will ask questions.

24  That's their job.  That's their fiduciary duty, and

25  so I just -- I fundamentally disagree with your

1  presumption.

2       Q.   I'm not really presuming anything, but

3  that's okay.  Let's look at Paragraph 35 of your

4  report.  "The economic role of disclosure under the

5  federal securities laws places officers and

6  directors in a key role to ensure the public company

7  complies with its disclosure obligations and makes

8  true and accurate disclosure.  This obligates

9  directors, officers to serve a proactive role in the

10 disclosure process.  One which not only involves

11 review of this disclosure but quote vigorous end

12 quote inquiry in order to ensure that the statements

13 in the disclosure are materially true and correct."

14           Do you see that?

15      A.   I do.

16      Q.   And then you have a -- a block quote from

17 two practitioners.  That's Howard and Donovan,

18 correct?

19      A.   Yes.

20      Q.   All right.  So this -- the idea that

21 you're voicing here in Paragraph 35 of a proactive

22 role in the disclosure process, you're not citing

23 any statute for that idea in this paragraph,

24 correct?

25      A.   No, there's no statute that's cited.

1   That's correct.

2       Q.   And you're not citing a regulation?

3       A.   No, although this is drawn from my general

4   knowledge.  If you're asking what I cite here, yes.

5   For example, I just gave a disclosure process

6   opinion for Teva.  So I'm very familiar with Teva's

7   disclosure process.  And I gave one for Novo Nordisk

8   also.  And I reviewed their entire process, and it's

9   set up so that officers and directors are proactive.

10  They take a part.  They review things sometimes at a

11  disclosure committee, sometimes at not.  They have

12  the opportunity to ask questions and move forward.

13          And what this citation records is just --

14  not just that experience that I just said, but my

15  general experience as both a practitioner and

16  academic and my other experience.

17      Q.   Well, what you're citing here is just John

18  Howard and Donovan.  Do they cite any actual studies

19  of what directors and officers actually do to

20  fulfill their duties here?

21          MR. SEARLES:  Objection; misstates his

22  report.

23          THE WITNESS:  I don't recall either way.

24  If you pull up their memo, we can review it.

25          MR. GOTTLIEB:   Q.  The -- the disclosure

1   process that you're setting forth and that you

2   provided to Teva and others, is that what you would

3   call a best practices disclosure process?  Like what

4   you think are the best practices that directors and

5   officers should observe in the disclosure process?

6       A.   No.  Again, I think these are customary

7   and usual practices.  And what I'm saying is in the

8   context of both Teva, which is an Israeli foreign

9   private issuer and Novo Nordisk, they -- when I

10  reviewed this, their disclosure practices, the --

11  what this quote is citing was supported.  They're

12  implementing that and that's what I see in over my

13  practice and my other areas that I refer to in

14  answering the last question, which I guess is the

15  same question now.

16      Q.   Your opinion here does not cite anything

17  about Teva, correct?

18      A.   I mean it talks about customs and

19  practices.  And, again, as I said, my opinions are

20  informed by my experience.  So it's informed by my

21  experience, and I do record that I -- Teva is one of

22  the matters I worked on, as in the exhibit.

23      Q.   This paragraph doesn't talk about Novo

24  Nordisk, correct?

25      A.   No.

1        Q.   Paragraph 36, next paragraph, you're

2   citing another -- other academics.  See this is

3   citing to Professors Sale and Langevoort, correct?

4        A.   Yes, this is a citation of an article that

5   they wrote.

6        Q.   And they say, "Importantly the core of the

7   theory is not just a disclosure requirement.

8   Instead, by requiring disclosures and officer and

9   director signatures on offering documents, the SEC

10  forces attention to the underlying details backed up

11  by the potential for a strict liability cause of

12  action in the public offering context."

13            Do you think that the standard here is a

14  strict liability standard?

15            MR. SEARLES:  Objection; vague and

16  ambiguous by the reference to the word "here."  What

17  are you referring to?  This case?

18            MR. GOTTLIEB:  Q.  In this case, do you

19  think that if -- if Mr. Hurgin and Mr. Aurovsky --

20  let me put it this way.

21            Do you think if there are any mistakes

22  whatsoever in the disclosure documents that Hurgin and

23  Aurovsky are liable because there's a strict liability

24  standard that applies to them?

25            MR. SEARLES:  Misstates the action.

1    Misstates the report.  Misstates the standard of

2    liability in this case.  Otherwise irrelevant.

3              THE WITNESS:  Again, I'm aware that

4    Section 11 -- there's no Section 11 claim in this

5    case, which is the strict liability standard.  But

6    that's not relevant to my opinions.

7              MR. GOTTLIEB:  Q.  So do you think that a

8    strict liability standard applies in this case?

9              MR. SEARLES:  Objection; beyond the scope

10   of his report and his opinions.

11             THE WITNESS:  I think that's vague.  And I

12   mean in the interest of time, we should go through

13   the causes of action.  They each have their own

14   elements, uhm, but strict liability as -- in the

15   interest of time because this is dragging, frankly,

16   none of the elements that are the causes of action

17   here have a strict liability component.

18             MR. GOTTLIEB:  Q.  Okay.  In Paragraph

19   37, you cite another academic, Professor Sale again.

20   Uhm, then she says, "All directors should be fully

21   aware of company statements and sufficiently engaged

22   and active to question and correct inadequate

23   disclosures."

24             She doesn't say how much engagement is

25   sufficient here, does she?

Page 96

1      A.   I can't even answer that.  I think, again,

2  you're sort of trying to overparse words "director

3  should be engaged."

4      Q.   Okay.  But that's not a strict liability

5  standard, at least not in this case?

6      A.   Again, the causes of action here that I'm

7  aware of do not contain a strict liability standard.

8      Q.   So really there's -- it's a matter of

9  degree, like, how much or to what extent directors

10  and officers must inquire or what they have to do to

11  fulfill their duties.  Is that correct?

12           MR. SEARLES:  Objection; misstates his

13  testimony.

14           THE WITNESS:  No, that's incorrect.  And

15  frankly the line of question's irrelevant to my

16  opinions.

17           MR. GOTTLIEB:   Q.   I would like you to

18  answer the question.

19      A.   I said it's incorrect.  You asked me the

20  question.

21      Q.   There isn't a strict liability standard?

22  What's the standard?

23      A.   Again, there's a legal cause of action,

24  and I'm not here to give testimony on the law.  But

25  there is customs and practices that executives

1  engage in when you do publicly traded disclosure,

2  and across the board that's what I'm talking about.

3  And so for proxy statements, for annual reports, for

4  registration statements, executives need to be

5  engaged and are customarily and usually engaged

6  because this has liability.  And the whole process

7  is designed to make sure that they're engaged and

8  they follow those customs and practices.

9       Q.   So I read this article from -- from

10 Professor Sale and literally the first paragraph of

11 it she writes, "An officer or director may rely upon

12 the company's procedures for determining what

13 disclosure is required only if he or she has a

14 reasonable basis for believing that those procedures

15 have resulted in full consideration of those

16 issues."

17           Do you agree with that statement?

18      A.   I'm not going to agree with the statements

19 that are not put up.  If you want to put the article

20 up, I'll take a look at it and we can discuss it.

21 But I'm not going to -- I don't give opinions to

22 read articles or one sentence of it without seeing

23 the whole article in front of me.

24      Q.   Do you think that one could have a

25 reasonable basis for believing that a company's

1  procedures result in full consideration of issues?

2          MR. SEARLES:  Objection; incomplete

3  hypothetical.

4          THE WITNESS:  I don't really know what

5  that means.  I don't think someone has a reasonable

6  basis to not read the documents.  I don't think

7  there's a reasonable basis for someone to say I'm

8  just not going to look at them.  I don't think

9  there's a reasonable basis for someone to say if I

10  know that there is, uhm, material misstatements or

11  omissions in a document, I'm just going to ignore

12  them.  And it's okay because well, you know, I know

13  I'm an officer or director and controlling

14  shareholder, but I just don't pay attention to it so

15  it's okay.  That's just not how the world is set up.

16  And that's not how securities laws work.  And that's

17  not how people customarily and usually engage.

18          If you want me to look at Professor Sales'

19  article and, you know, I've spoken on behalf of

20  Professor Sale about these issues and otherwise,

21  and -- I'm happy to do so.  And I just prefer that

22  we look at the article itself rather than you

23  quoting it or maybe paraphrasing it.  I just don't

24  know.

25          MR. GOTTLIEB:   Q.  It was a quote, but is

1    that what you think happened here, that -- that

2    people looked at the material -- material

3    misstatements and said I just don't care?

4         A.   You'd need to be more specific.  I have no

5    idea what you mean here.  I have no idea what you

6    mean by people.  Who are you talking about?  Uhm,

7    and so I would be more specifics on that question.

8         Q.   This is -- this is what you brought up.

9    I'm curious as to -- as to why you would say that,

10   you know, it's not reasonable to read a material

11   misstatement and just ignore it.  Is that what you

12   think happened in this case?

13        A.   So, again, I've reviewed the Aurovsky

14   deposition and his main -- his main point that he

15   says in the deposition is I didn't read anything.

16   So, again, it's not relevant to my opinions, but

17   yeah, I think that's not an excuse.  And I think

18   that the system's set up so you're informed so you

19   know about things.  And I think given that this is

20   not a hundred-thousand person operation, it's a

21   small operation.  To think that he can just say when

22   he's signing all these documents or otherwise that

23   hey, I just didn't read anything.  I just signed my

24   employment agreement and everything else and didn't

25   review -- and didn't know anything about ULIN or

1    otherwise.  I find that problematical, frankly.

2            It's not relevant to my opinions, and I'm

3    not here to make factual conclusions.  But since

4    you're asking me, yes.  That's not in accord with

5    the customs and practices that I've seen.  Uhm,

6    frankly I've never seen that.  And I lecture -- I

7    lecture in Israel.  I teach in Israel in law

8    schools.

9            I know what we teach.  I mean I know what

10   we lecture in Israeli law schools.  I mean I work

11   with Israeli companies.  I'm supposed to be in

12   Israel next week for a conference at Tel Aviv, and

13   unfortunately they won't let me in the country,

14   which is unfortunate, but, you know, the

15   expectations are no different there.  And, in fact,

16   they're probably higher because it's a more

17   regulated society.

18       Q.   Are you providing that opinion on the

19   facts of this case?

20       A.   No, that's not -- that's -- if I'm asked

21   by the judge to do so, I will.  But that's

22   certainly -- that is not my opinion for purposes of

23   this report.  I'm giving you my opinion because you

24   asked me.

25       Q.   So looking back -- thinking back to this

1   concept that Professor Sale raises about relying on

2   a company's procedures for determining what

3   disclosure is required, is it reasonable for a

4   director to defer to companies' lawyers or other

5   experts to assist in reviewing prospective

6   disclosures?

7          A.   So, again, I agree.  Are we talking about

8   the -- which statement of Hillary Sale?  The front

9   page one?

10         Q.   Yes.

11         A.   So can you put it up, please?  I'm happy

12  to wait.  But I prefer to see the whole quote in

13  front of me if I'm going to answer questions about

14  it.

15         Q.   Here, I'll just -- just going to put this

16  one in the chat so everyone has it.

17         A.   I want the whole article.  I'm not going

18  to just --

19         Q.   Okay.

20         A.   I don't even know where that's from or who

21  it is or what it is.

22         Q.   It -- it's literally --

23         A.   You want to take a break and get the

24  article?

25         Q.   It's literally the first paragraph of the

1 article that you are citing in your expert opinion.

2      A.   And I have no problem answering questions

3 about it.  The only thing I'm asking is that we have

4 the article in front of us so that we make sure we

5 have the whole thing.  And like I said, I'm happy to

6 take a break if you want to get it.  But I'm not

7 answering questions about an article that you're not

8 going to let me see and that you're not going to

9 give me context to.

10           It's just -- it's not how Hillary Sale

11 writes.  It's not how I write.  And like I said, if

12 you want to put the article in and mark it as an

13 exhibit.  Feel free.

14      Q.   Is a director entitled to rely on the

15 assistance of lawyers or experts in reviewing

16 respective disclosures?

17           MR. SEARLES:  You're attempting -- Jason,

18 are you attempting to paraphrase what's in the chat

19 room now?

20           MR. GOTTLIEB:   Q.  No.  I'm asking a

21 simple question.

22      A.   So a director is entitled to act

23 reasonably in accord with customs and practices.

24 And as part of that, they can reasonably rely on

25 directors and officers who are part of their

1   informational duties.  But it doesn't relieve them

2   of their ability to assess that independently, their

3   ability to reasonably rely on those issues in accord

4   with custom and practice, and their requirements

5   that they read documents and liaise and discuss

6   these documents.

7           And it doesn't -- and in accord with

8   custom and practice, sophisticated counsel and

9   transactions will provide those documents.  They'll

10  provide drafts.  They'll provide summaries.  There

11  will be discussions at the board levels.  And the

12  executive is not entitled to blindly do nothing.

13  They are entitled -- they are required, as Professor

14  Sale says in the quote that I put up, to engage with

15  management to make sure that there's accurate

16  disclosure, to review that disclosure, uhm, and to

17  operate from -- on that basis.  And if they don't

18  understand something, there's an expectation that

19  they'll ask questions and move forward.

20      Q.   Is it your opinion that the customs and

21  practices that you're talking about are required by

22  federal securities laws?

23      A.   I don't even think I can answer that.  I

24  mean, again, the issue is that there are customs and

25  practices that have been developed.  And underneath

1    the federal securities laws, they're not legal

2    requirements.  But they're informed by what the

3    legal requirements are and people typically adhere

4    to them.  Sometimes they overlap with the legal

5    requirements.  But in general when you're assessing

6    whether someone's conduct is customary and usual,

7    there are customs and practices that have been

8    associated with that.

9           And I am aware that at times when we've

10   looked at people's conduct and otherwise.  We assess

11   them in this context in terms with their -- how

12   they -- with how they acted and whether they acted

13   in accord with those customs and practices.

14        Q.   Are directors and officers permitted to

15   rely on their attorneys to advise them on how to

16   comply with federal securities laws?

17             MR. SEARLES:  Objection; vague.

18   Incomplete hypothetical.

19             THE WITNESS:  So I just go to the answer

20   two answers before, which is it's within the context

21   of reasonableness, within the context of

22   expectations, within the context of what they know

23   and don't know in their duty to be engaged and to

24   inquire.

25             MR. GOTTLIEB:   Q.  Is it customary for

1   directors and officers to rely on their attorneys to

2   advise them on how to comply with federal securities

3   laws?

4       A.   Again, reasonable reliance.  So the

5   attorneys would be providing information about the

6   federal securities laws.  They would be providing

7   drafts of the documents.  They would be providing

8   material issues.  The executives would engage with

9   those issues.  They would review the documents.

10  Uhm, they would sign off on them.

11          You know, again, typically you have a

12  process.  Teva had a process.  Novo Nordisk got a

13  process.  There's a process in a transaction where

14  your going public, whether it's a de-SPAC

15  transaction or an IPO.  And that's all building to

16  ensure that the executive or the officer or the

17  person signing agreements understands those

18  agreements, has input with them, is engaged with

19  them, and corrects any material terms or

20  misinformation in those documents.

21      Q.   Is it customary for directors and officers

22  to rely on other people in the company, other

23  company personnel, to assist them with respective

24  disclosures in areas that are outside their area of

25  expertise?

1          MR. SEARLES:  Objection; incomplete

2    hypothetical.

3          THE WITNESS:  I think it depends.

4          MR. GOTTLIEB:  Q.  So just for an example

5    from your own experience, if you're the director of

6    a SPAC looking to acquire a biotech company and the

7    particular target provides technical information

8    that is outside your personal sphere of knowledge,

9    is it reasonable for you to rely on other people to

10   help you understand those things?

11        A.   I think I need to know what the

12   information is.  And obviously it's reasonable

13   reliance.  It's not blind reliance.  So I'd be

14   subject to -- under custom and practice, for

15   example, it's a key technology, uhm, you know,

16   the -- the custom and practice would be that I would

17   make sure that if I don't have the expertise to

18   examine it, that competent people are hired to

19   examine it.  I'm asking the right questions.  I

20   understand what they're saying and that they're

21   reliable.

22        Uhm, and I think it depends upon your

23   position.  So if you're a controlling shareholder

24   and an officer and a director, uhm, reasonable

25   reliance in those circumstances is different than --

1  than what my reasonable reliance is because you're

2  involved in the day-to-day operations of the

3  company.  You're a senior executive.  You're --

4  you're one of the controlling shareholders.  And so

5  you have to take that into account.

6      Q.  Do you know any directors and officers who

7  are not lawyers who would not rely on lawyers to

8  advise them in connection with an M&A?

9          MR. SEARLES:  Objection; speculation.

10         THE WITNESS:  Too many knots in that

11  question.  I'm sorry.  Can you just repeat it or --

12         MR. GOTTLIEB:  Q.  I agree.  It was too

13  knotty.  Do you know -- let me ask it -- let me ask

14  it this way.

15         Do directors and officers typically retain a

16  counsel in connection with large M&A transactions?

17     A.  So the only reason I'm pausing at your

18  question is you're saying do they personally retain

19  that?  I mean, the company has counsel.

20     Q.  Yeah, sure.  Any lawyers.  Personal

21  lawyers, company lawyers, any lawyers.  Do they --

22  do they use lawyers?

23     A.  Yeah, so the company will retain lawyers

24  and also, for example, if you have selling

25  shareholders, they might have their own lawyers or

Page 108

1    they have their own.  They rely on the company

2    lawyers to the extent that there's a conflict for

3    their own lawyers.  In conflict of interest

4    transactions involving public companies, it's not

5    unusual for special subcommittees to be formed to

6    hire their own lawyers.

7            Uhm, but typically, yes, there are

8    certainly lawyers involved, and there may be

9    multiple law firms depending upon the type of

10   transaction.

11       Q.  In your Opinion 1, you say it's customary

12   and usual practice for executives officers --

13   executive officers and directors to be knowledgeable

14   of federal securities laws applicable to public

15   company M&A transactions and to review the relevant

16   SEC disclosure documents to ensure they are not

17   false and misleading.  But what type of SEC

18   disclosure documents are you referring to there?

19       A.  In general, the main documents, the proxy

20   statement or tender offer estimate or registration

21   statement, if there's a press release or otherwise

22   significant announcement, some material terms.

23       Q.  Does it mean reading each and every word

24   of every single disclosure?

25            MR. SEARLES:  Objection; asked and

1    answered.

2           THE WITNESS:  I think we started with

3    that.  I'll just refer back to my answer we did in

4    the first hour.

5           MR. GOTTLIEB:   Q.  Does it also mean

6    reviewing statements made by consultants hired by

7    the public company, such as its auditors or fairness

8    opinion authors?

9       A.   I'm not sure what you mean by statements.

10   But certainly when you get a fairness opinion,

11   there's a presentation and there's a duty -- uhm,

12   it's custom and practice to engage with the fairness

13   opinion provider and to ask questions about the law.

14   And that's no different than with a consultant.

15      Q.   The question is is there a custom and

16   practice for directors and officers to read every

17   single word of the fairness opinion after it is

18   published?

19      A.   Well, so a couple of things.  So one is

20   what happens at the meeting is, generally speaking,

21   the investment banker will give a financial

22   presentation and that would be a PowerPoint that

23   typically, although not always, is provided prior to

24   the meeting.  And then there will be a draft to the

25   fairness opinion that's circulated and given to the

1   board.  And it is custom and practice to review

2   those in connection with the fairness opinion.

3        Q.   Do --

4        A.   Just go back to sort of the issues around

5   the Van Gorkom case back in 1980s.

6        Q.   In a SPAC transaction, is it the custom

7   and practice for the target company officers or

8   directors to review the statements of consultants

9   hired by the SPAC?

10            MR. SEARLES:  Objection; incomplete

11   hypothetical.

12            THE WITNESS:  It really just depends.  I

13   mean are these statements that are in the proxy?

14   Are these statements that they're utilizing?  What

15   are the discussions?  What's -- I just can't answer

16   that question without more facts.  I also -- we're

17   sort of coming on the noon hour.  So I just, again,

18   if -- I don't want to interrupt your questioning,

19   but if we could just keep that in mind for the

20   break.

21            MR. GOTTLIEB:  Q.  Yeah, I'll go a little

22   bit more and then we can take a lunch break.  In

23   your experience, is it common for officers of a

24   company to be somewhat specialized in the subject

25   matter for which they are responsible?

1            MR. SEARLES:  Objection; vague.

2            THE WITNESS:  I don't really know what you

3    mean by that.

4            MR. GOTTLIEB:   Q.   Like is it common for

5    a chief financial officer to be more specialized in

6    finance and accounting?

7            MR. SEARLES:  Objection.  Vague.

8            THE WITNESS:  Yeah, I mean I think

9    you're -- look, I mean, when you have officers, they

10   have titles and roles and responsibilities, whether

11   it's chief technology officer, chief financial

12   officer, or otherwise.  But then obviously those

13   duties overlap.  So if they're a director, they have

14   more responsibilities than that.  They're signing

15   agreements or they're controlling shareholders.

16   They have even more responsibilities.  And so it

17   really just depends.

18            Also, you know, in terms of disclosure

19   processes, typically these are involving the

20   significant officers of the company.  Uhm, and so

21   because you want to make sure that they all have

22   input, to make sure that all the good disclosure is

23   done -- when I say good, I mean correct and

24   compliant disclosure and that there's no fraud being

25   committed or material misstatements or omissions

1  being made that would otherwise violate the federal

2  securities laws.  So it really just depends.

3          MR. GOTTLIEB:  Q.  Well, we're talking

4  about customs and practices here.  Is it the custom

5  and practice for a chief technology officer to be as

6  knowledgeable about the financials of the company as

7  the chief financial officer?

8          MR. SEARLES:  Objection; incomplete

9  hypothetical.  Vague.  Ambiguous.

10          THE WITNESS:  So, again, if this is a CTO

11  who's a director and controlling shareholder, I

12  would expect them to have similar knowledge because

13  their roles are different.  Again, they may not know

14  the exact intricacies of specific accounting roles.

15  But for the material aspects of business, I would

16  have the expectation that they would have similar

17  knowledge of the finances.

18          MR. GOTTLIEB:  Q.  And would you expect

19  the chief financial officer to have similar

20  knowledge of the technology of the company?

21          MR. SEARLES:  Same objection.

22          THE WITNESS:  So, again, it -- it really

23  just depends.  But in a technology company, remember

24  the CFO is drafting -- is part of drafting audited

25  financial statements.  They're part of drafting

1   disclosure.  They need knowledge of the contracts.

2   They need knowledge of the technology.  They need

3   knowledge of the ownership.  And the -- the -- the

4   process is collaborative, and it's designed so

5   everyone is engaging so that they're putting forth

6   all the material disclosure.

7           So, again, I wouldn't expect the CFO to

8   know how to code, for example.  But the CFO, I would

9   expect and has been my experience, knows significant

10  amount about the technology and the material terms

11  and how it's worked and who owns it and its

12  prospects.

13          MR. GOTTLIEB:  Q.  So you -- you would

14  expect that the custom and practice for different

15  officers would be to have different levels of

16  expertise and knowledge about the areas of their

17  company?

18          MR. SEARLES:  Objection; misstates his

19  testimony.

20          THE WITNESS:  Yeah, I wouldn't summarize

21  it like that.  I just refer back to my prior answer.

22  For some things, I would expect them to have the

23  same knowledge and for other things maybe not.  But

24  on the -- on the material issues, I expect them to

25  have the same knowledge.

1              MR. GOTTLIEB:   Q.  Well, I mean, do

2   you -- you said that a CFO may not have to know how

3   to code.  I mean does the CFO of Apple know how to

4   build an iPhone with his bare hands?

5              MR. SEARLES:  Objection; argumentative.

6              THE WITNESS:  You'd have to ask him or

7   her.

8              MR. GOTTLIEB:   Q.  Are the duties that

9   inure in public company directors and officers the

10  same duties as inure in controlling shareholders of

11  a private company?

12             MR. SEARLES:  Objection; incomplete

13  hypothetical.  Asked and answered.

14             THE WITNESS:  What -- what duties are you

15  talk about?  Legal duties?  Talking about cust- --

16  how -- it's sort of in the air, so to speak.  I'm

17  not sure of the relevance in my opinion.

18             MR. GOTTLIEB:   Q.  The duties to --

19  knowledgeable about every area of their company?

20             MR. SEARLES:  Objection; misstates his

21  testimony.

22             THE WITNESS:  I don't see how that's an

23  issue in this case.  The issue in this case is

24  significant disclosure that's made by an officer, a

25  director, and controlling shareholder who put his

1  name on a proxy consenting to be put forward as

2  this.  I think you need to flush out your

3  hypothetical a bit more for me to see the relevance

4  of it.

5          MR. GOTTLIEB:  We can -- we can stop here.

6  Do you want to take -- let's go off the record

7  before we talk about time for lunch breaks.

8          VIDEOGRAPHER:  Off video at 11:57 a.m.

9          (The deposition was in recess from 11:57

10         to 12:19.)

11         VIDEOGRAPHER:  Back on video at 12:19 p.m.

12         MR. GOTTLIEB:   Q.   Professor Solomon, at

13  the time of the business combination between

14  Cambridge and Ability, did you know that the

15  publicly traded company was organized under the laws

16  of Delaware?

17     A.   The publicly traded --

18     Q.   The SPAC.

19     A.   -- SPAC.  Yes, I believe I was.  Yes.

20     Q.   Did you do any particular evaluation of

21  Delaware law as it might relate to the customs and

22  practices of executive officers or directors of a

23  public company?

24     A.   Not really sure what you're talking about.

25     Q.   Did you review Delaware law for guidance

1    as to what the customs and practices of an executive

2    officer or director of a public company should do?

3         A.   Again, I'm really not sure how to answer

4    that because I didn't specifically review Delaware

5    law for this.  I'm not here to give a Delaware law

6    opinion, but obviously there are customs and

7    practices in terms of corporate governance operating

8    under Delaware law and those inform what you do when

9    you do a disclosure -- when you do disclosure also.

10        Q.   Are you aware that the holdco, the entity

11   that absorbed Ability, that the target company was a

12   Cayman's company?

13        A.   Yeah, it didn't absorb it.  I mean

14   basically it purchased the shares and so -- but yes,

15   I am aware.  So that the hold -- the operating

16   company remained an Israeli company, and a publicly

17   traded company remained a Caymans Island company.

18        Q.   Did you review Caymans law in connection

19   with your opinion?

20        A.   I didn't specifically review any Caymans

21   law in connection with this opinion.

22        Q.   I'm sorry.  I -- I missed the answer.  The

23   word got swallowed.

24        A.   I didn't specifically review Caymans law

25   for purposes of this opinion.  I didn't deem it

1    relevant.

2        Q.   Okay.  Thank you.  And you know that ACSI

3    was an Israeli company, right?

4        A.   Yes.

5        Q.   Did you evaluate Israeli law in connection

6    with your opinion?

7        A.   So, again, I didn't specifically review

8    Israeli law for the purposes of my opinion.  Uhm,

9    again, I have background in Caymans Island law,

10   Israeli law, and Delaware law.  So it's -- it's -- I

11   do have background and research experience in those

12   areas.  But I didn't specifically review any laws

13   for these purposes, and I didn't -- I don't view

14   reliance on those laws as relevant for purposes of

15   my opinion.

16       Q.   You're a U.S. qualified lawyer, right?

17       A.   I am.

18       Q.   Are you a Cayman qualified lawyer?

19       A.   No.

20       Q.   Are you an Israeli qualified lawyer?

21       A.   No.

22       Q.   We've been spending a lot of today

23   reviewing the basis for your opinion about customs

24   and practices in this first opinion.  We looked at

25   some academic studies.  Uhm, we covered laws and

1   regulations.  I want to ask you about any kind of

2   empirical review.

3           And just very specifically, are you aware of

4   any empirical studies or reviews that say here are the

5   things that the directors of a SPAC target customarily

6   do to ensure that their SEC filings comport with U.S.

7   securities law?

8           MR. SEARLES:  Objection; vague and

9   ambiguous as to the term empirical.

10          THE WITNESS:  Couple things.  So one is,

11  you know, I've done Israeli transaction.  I've done

12  Cayman Island transactions.  I've done Delaware

13  transactions.  I'm the director of a Cayman Islands

14  company.  You know, all these are probably similar

15  fiduciary duty laws.  I think in terms of -- of what

16  you're talking about, I just don't know how you

17  would do that.  I'm not aware of any such study for

18  regular fiduciary duties.

19          It's not just how we look at it or customs

20  and practices, what you're talking about.  It's not

21  how lawyers do it.  Lawyers don't do empirical study

22  when they're looking for the customs and practices

23  of how we negotiate a merger agreement or how

24  corporate governance works.  So I don't know how

25  such a study would work or what would be done.  I'm

1    not aware of such a study.

2         MR. GOTTLIEB:   Q.   In Paragraph 38 of

3    your opinion, towards the bottom of the paragraphs,

4    the top of page 16, you say, "To the extent M&A

5    documents are in a foreign language is a customary

6    and usual practice to have them translated if need

7    be."

8         How often did you see a full proxy statement

9    being translated in their entirety for a non-English

10   speaking director?

11        A.   I don't -- I don't really know either way.

12   I mean we often translated key parts of documents

13   and key parts of disclosure documents.  So I just --

14   I just don't know either way.  But certainly if we

15   had an executive who is signing a document who

16   didn't speak the language, we would have it

17   translated.

18        Q.   So if there was a 404-page proxy

19   statement, you would have the entire thing

20   translated word for word?

21        A.   I don't know if you need to do that.

22   Again, I think this goes back to the line of

23   questioning we've already gone over, like why would

24   you need to consent to translate sort of the, you

25   know, who the lawyers are in the transaction.  You

1    would translate the material terms that were

2    important that the executive looked at, and

3    obviously you would summarize them and you discuss

4    them.

5         Q.   Who decides what the material terms are

6    for translation in a case like that?

7         A.   It's a give or take.  I mean so, again,

8    you're discussing these at the board level.  You're

9    discussing these in both the native language and the

10   other language.  And so the parties are discussing

11   what's important or whatnot.  Certainly things like

12   key contracts, key financial disclosures, roadshow

13   presentations, other things you would translate.

14        Q.   And who decides what's a key contract or

15   key financial disclosure?

16        A.   I think there is a give and take.  So,

17   again, you know, it's you're representing -- you

18   know, there's key contracts.  There's a materiality

19   threshold within the SEC rules.  In this case,

20   there's a merger agreement threshold also.  So you

21   look at the circumstances of where you were.

22   Certainly think if your key technology is subject to

23   contractual commitment, the disclosure around that

24   would be translated to the extent the executive was

25   saying that they didn't understand it or didn't

1    speak the language or otherwise.

2            And, of course, they would be -- because

3    they're signing these documents, they're under that

4    affirmative obligation to -- to do that, to express

5    if they didn't understand something or otherwise.

6        Q.   Who decides whether the technology is key

7    technology?

8        A.   So, again, there was a give and take.

9    There's a discussion.  It's not one individual.

10   There's discussion at the board level.  There's

11   discussion between the executives and the lawyers

12   and the investment bankers.  There's discussion

13   between the target and the buyer, and it comes about

14   in various circumstances including the proxy

15   disclosures, merger agreement, the disclosure

16   schedules to the merger agreement, uhm, and those

17   areas.  But there's a process where everyone's

18   involved and everyone has obligations.

19       Q.   So if you had a situation where none of

20   those people you mentioned, the officers or

21   directors, the lawyers, the bankers, the advisors,

22   if -- if you had a situation where nobody thought

23   that a particular piece of technology was key tech,

24   is that something that you would expect would be

25   translated and reviewed by everyone anyway?

1      A.    There's a lot of assumptions in that -- in

2 that question, and I just can't answer it.  I know

3 you have a technology that, for example, you call

4 game changing to investors.  There would be a give

5 and take about what the disclosure is around that.

6 But is there are specific factual situation you

7 would like me to consider?

8      Q.    No.  Let's move on.  Let's talk about your

9 second opinion.  So let's move to page 17.

10     A.    Sure.

11     Q.    So just so that we have it in the record,

12 Opinion 2, "A controlling shareholder, director, and

13 executive officer of a publicly traded company would

14 be expected under customary and usual practices to

15 be knowledgeable of the company's finances, sales,

16 and contractual arrangements and to be able to

17 review and sign off on SEC disclosure related

18 thereto."

19          Does your opinion relate to the customs and

20 usual practices for officers and directors of a public

21 company?

22     A.    Well, it's about -- it's concerning

23 disclosure.  So -- and so it's a publicly traded

24 company or a company that's going public and filing

25 those documents.  I suppose we could talk about

1  private companies too, but that's what this opinion

2  is directed.

3      Q.   In Paragraph 42, you write, "Directors and

4  officers customarily and usually have extensive

5  knowledge of the operations of the company, and

6  there is an expectation that these officers and

7  directors will have such knowledge."

8           There is an expectation that these officers

9  and directors will have such knowledge.  Whose

10  expectation are you referring to?

11      A.   These are market expectations.  They're

12  customs and practices.  So they're generally the

13  obligations that executives, directors, and officers

14  have both legally and what investors expect of them

15  and what the practices are in terms of their

16  organizational behavior and operations within the

17  company itself.

18      Q.   But, again, there's no statute or

19  regulation requiring particular levels of knowledge,

20  is there?

21      A.   I don't think that's true.  I mean that's

22  not what this opinion goes to, but certainly you

23  have fiduciary duties to be informed.  Certainly you

24  might have legal obligations otherwise to be

25  informed.  But my opinion is going to the customs

1   and practices and what the market expectations are

2   of -- of those executives, officers who also happen

3   to be controlling shareholders.

4        Q.   What -- what does extensive knowledge

5   mean?

6        A.   In general, I think we're back to the

7   conversation we had in the second session.  So I'd

8   refer back to those answers.  But in general, they

9   know the material issues around the company.  They

10  know, for example, if the company had a key

11  technology, whether they owned it, what the

12  arrangements were for it, what the financial

13  arrangements were for it, if they had the key

14  aspects of the revenue of the company, and how it

15  worked and otherwise.

16            Again, this is not a -- imagine you're

17  selling your house and you're walking through it and

18  you're like oh, I didn't know we didn't have an oven

19  in the kitchen.  You're in the house every day.  How

20  could you see there's no oven?  So, you know, these

21  are just common expectations of what these

22  individuals would have particularly in a smaller

23  company like Ability.

24       Q.   What does operations of the company mean?

25       A.   I just refer back to my prior answer.  I

1    think you're deconstructing words at this point.

2         Q.   You used words in a opinion.  I'm

3    literally just asking you what they mean.

4              MR. SEARLES:  And his prior answer

5    addressed that question, Jason.

6              MR. GOTTLIEB:   Q.  You're talking about

7    Opinion 2.  We haven't talked about this yet.  What

8    does operations of a company mean?

9         A.   I guess I just ask that we read back my

10   prior answer.  I think I answered it.  If I didn't

11   answer it in that prior question, I'm happy to try.

12        Q.   Rather than going back and searching

13   several hours of testimony, maybe you can just

14   answer what does operations of the company mean?

15        A.   I'm not asking you to search several hours

16   of testimony.  I'm asking you to go back three

17   minutes to my last answer and read it back.

18        Q.   Okay.  If you don't want to answer it,

19   that's fine.  We can move on.

20        A.   That's not what I said.  So, as I said --

21        Q.   I'm --

22        A.   -- if you would like me to try and -- and

23   I -- if you want me to try and address it, I'm happy

24   to go back.  But I'd appreciate if you didn't typify

25   what my answers are.

1        Q.   I'm trying.  I'm just -- I'm just

2   trying -- I'm just asking -- ask a question.  I just

3   want you to answer the question.  That's all.

4        A.   And I'm doing so to the best of my

5   ability.  I'm sorry that you're frustrated and

6   you're not getting the answers you want.  But I'm

7   really trying to help you here, and I'm happy to

8   stay as long as need be to try to help you.

9        Q.   It would -- it would be helpful if you

10  would just answer the questions I'm asking.  Okay.

11  What does operations of the company mean in the

12  opinion?

13       A.   Great.  Could we read back my answer two

14  answers ago?

15       Q.   Sure.  Go ahead.  Read back the answer two

16  answers ago and see if this works.

17       A.   Thank you.

18       Q.   And when it doesn't, please answer my

19  question.

20            (Record read by the reporter:

21            "ANSWER:  In general, I think we're back to

22            the conversation we had in the second

23            session.  So I'd refer back to those

24            answers.  But in general, they know the

25            material issues around the company.  They

1          know, for example, if the company had a key

2          technology, whether they owned it, what the

3          arrangements were for it, what the financial

4          arrangements were for it.  If they had the

5          key aspects of the revenue of the company

6          and how it worked and otherwise.

7          Again, this is not a -- imagine you're

8          selling your house and you're walking

9          through it and you're like oh, I didn't know

10         we didn't have an oven in the kitchen.

11         You're in the house every day.  How could

12         you see there's no oven?  So, you know,

13         these are just common expectations of what

14         these individuals would have particularly in

15         a smaller company like Ability.

16         "QUESTION:  What does operations of the

17         company mean?

18         "ANSWER:  I just refer back to my prior

19         answer.  I think you're deconstructing

20         words at this point.")

21           THE WITNESS:  Again, I think that answered

22    your question.  The operations of the company and

23    material aspects of the company account, there are

24    the contracts.  They are the technology.  They're

25    the finances.  You know, knowing that you own your

1    key technology, knowing how it's developed, knowing

2    how it's disclosed, knowing your revenue sources,

3    knowing the certainty of your revenue and otherwise.

4          These are just basic functions concerning the

5    operations of the company that the expectation would be

6    a controlling shareholder or officer or director would

7    know and particularly someone who is off the rate in a

8    less than 20 person operation.

9          MR. GOTTLIEB:   Q.  So you're -- where

10   does this custom and usual practice come from?  We

11   have asked these questions before.  So I apologize

12   if we're revisiting anything, but I want to explore

13   where the practice comes from.  It's not set forth

14   specifically in laws or regulations.  Where do

15   customs and practices come from?

16        A.   I think I'd refer back to my prior

17   answers.  I think we spent a lot of time on this.

18   There's laws, and there's regulations.  And when

19   practitioners look at things, when academics look at

20   things, they don't just start from scratch.  So the

21   example I gave I think to one of the times you asked

22   this question, because it's been multiple times, was

23   in an M&A transaction you don't just start with the

24   merger agreement.  You start with, you know, a form

25   and then people have been negotiating this.  So you

1  draw on sort of the universe of what these terms

2  look like and where it applies.

3          Similarly, in a disclosure context or what

4  expectations are, there's customs and practices that

5  are formed by the laws as well as the norms,

6  accounting standards, other standards, and

7  otherwise.  And those are how people implement them

8  and that's -- you know, I've given these opinions

9  before as I mentioned in Novo Nordisk or Teva.

10 They're disclosures processes and procedures that

11 directors and officers utilized to ensure that

12 they're engaged and appropriately acting to ensure

13 that material information is disclosed, that they

14 are -- understand the business, the disclosures, not

15 just drafted correctly but informatively.

16      Q.   I'm not sure that answers the question,

17 which is where does this custom and practice come

18 from?

19      A.   I don't -- I think I answered the

20 question.  If I don't understand it, I apologize.

21 But I think I answered the question.  If you want to

22 try and ask it a different way, feel free to try and

23 I'll try and help.  But I don't -- I don't really

24 understand how you think that I didn't answer the

25 question.

1        Q.   Well, you know, you've said that these

2   customs and practices are informed by or influenced

3   by statutes and regulations.  I'm paraphrasing and I

4   think that's -- I agree with that, whatever that's

5   worth.  But informed by is not the same as required

6   by.  And I'm asking you what requires these customs

7   and usual practices?  Where does that requirement

8   come from?

9        MR. SEARLES:  Objection; misstates his

10  testimony.  Vague and ambiguous.

11        THE WITNESS:  Again, I don't -- if you're

12  saying is there a legal requirement that you follow

13  certain customs and practices, again, it's informed

14  by that.  And it's how practitioners act, implement

15  the laws and everything in the laws, and it's

16  reflected.  I guess when you're saying where does it

17  come from, I sort of will repeat part of my answer.

18  But it comes from how practitioners interact, their

19  understanding of the laws, how academics interact

20  and write about these things, uhm, how people

21  studied these things, pronouncements by the NACD,

22  practitioners memos.

23        Basically that's what I've done for the

24  last 30 years, which is sort of a -- read these and

25  absorb these and actually practice these customs and

1    practices and advise on these customs and practices.

2    So, again, I'd also incorporate my prior answers

3    because I've touched on those before.

4                MR. GOTTLIEB:   Q.   If an officer or

5    director does not perform that custom and practice,

6    have they necessarily violated securities laws?

7                MR. SEARLES:   Objection; incomplete

8    hypothetical.

9                THE WITNESS:   I'd need -- I'd need more

10   information.   Again, I'd need to know what the

11   standard is, what they actually did.   It's -- just

12   need more information.

13               MR. GOTTLIEB:   Q.   Well, is it possible

14   in a particular case for someone to deviate from

15   whatever the custom and practice is and still have

16   acted responsibly and legally?

17               MR. SEARLES:   Objection; vague and

18   ambiguous.   Incomplete hypothetical.

19               THE WITNESS:   Again, I think I need -- I

20   need more information.   If you're saying that, you

21   know, an executive officer or director, shareholder

22   can simply decide I'm not going to read the

23   documents, then that clearly, to me, is both a legal

24   violation and a violation of custom and practice.

25   There's another factual pattern you would like me to

1  consider, I'm happy to consider it.

2          But, again, I'm not here to make

3  conclusions about law or facts.  I'm here to give

4  the customs and practices and those do inform

5  expectations of conduct and how officers, directors

6  are expected to act particularly when they're

7  involved in disclosure or consenting to the use of

8  their name in registration statements or providing,

9  you know, auditors letters or otherwise.

10         MR. GOTTLIEB:  Q.  Let me give you

11 specific examples.  Let's say somebody misses a typo

12 when they're reviewing a prospectus.  They read the

13 whole thing.  There was a typo in it.  They missed

14 the typo.  Does that necessarily violate the law?

15         MR. SEARLES:  Objection; incomplete

16 hypothetical.  Beyond the scope of his opinions.

17 He's not offering legal conclusions here.

18         THE WITNESS:  I'm not sure it violates

19 custom and practice, well, on the law.  So what's

20 the nature of the typo?  What is it?  What were they

21 reading?  So I just can't answer that, but it's

22 not -- doesn't necessarily violate the custom and

23 practice or the law.

24         MR. GOTTLIEB:  Q.  Does every single

25 officer or director of a public company have to know

1    each and every detail of the company's finances?

2              MR. SEARLES:  Objection; vague and

3    ambiguous.  Incomplete hypothetical.  Asked and

4    answered.

5              THE WITNESS:  Yeah, I mean you've asked

6    this question about three or four times so I'm just

7    going to refer back to my prior answers.

8              MR. GOTTLIEB:  Q.  Okay.  Again, I'm

9    asking these questions.  Uhm, they're generally

10   somewhat different.  You're answering questions --

11             MR. SEARLES:  Can I object to that, Jason?

12             MR. GOTTLIEB:  Q.  You're answering

13   questions that you think that I'm asking, but you're

14   not necessarily asking the question that I'm asking.

15   So I would just ask you let me ask the questions.

16   You can answer the questions.  And it's fine.

17             MR. SEARLES:  And I can object to the

18   question that the extent they're the same.

19             MR. GOTTLIEB:  Absolutely.  You can say

20   asked and answered to your heart's content and

21   then --

22             MR. SEARLES:  Thank you, Jason.

23             MR. GOTTLIEB:  Q.  And then I'd like you

24   to answer my question.  I promise you it will

25   probably make this go faster.

1          Must every single officer and director of

2    a public company know each and every detail of the

3    company's finances?

4          MR. SEARLES:  Objection; vague and

5    ambiguous.  Incomplete hypothetical.  Asked and

6    answered.

7          THE WITNESS:  I'm happy to answer it, but

8    I think I've answered it.  And it might help me if

9    you tell me how it's different so then maybe I can

10   try and answer it differently if there's a different

11   answer.

12          MR. GOTTLIEB:   Q.  I don't want to have

13   meta debates about my questions.  I'm going to ask

14   you questions.  You're going to answer the

15   questions.  That's was the rule of the deposition

16   that we agreed to right at the beginning.  Please

17   listen to the question.  I'll ask it --

18      A.   And -- and -- and I'm sorry to interrupt.

19   But you asked me to speak up if I don't understand

20   the question, and I've sworn to answer the questions

21   fully, truthfully, and correctly.  And I don't

22   understand how this question is different than your

23   other questions.  And if you can't answer that,

24   that's fine.  But I just -- I'd like to try and

25   answer your questions, but it doesn't seem like

1  there's a difference between your questions.  So in

2  order for me to answer them truthfully and fully,

3  can you please help me out and let me know how

4  they're different?

5      Q.   You're working really hard to understand

6  differences and strategies.  Just answer the

7  questions, please.

8           MR. SEARLES:  Objection; argumentative.

9           MR. GOTTLIEB:   Q.  Does every single

10 officer and director of a public company know each

11 and every detail of the company's finances?

12          MR. SEARLES:  Same objections.

13          THE WITNESS:  So I just incorporated my

14 answers from before.  And what I said before was of

15 course they don't need to know every single detail

16 of everything.  You don't know every single detail

17 of your house.  But if you're walking around and the

18 oven isn't there, you should -- you would presume to

19 know the oven isn't there.  And similarly, when you

20 have officers and directors and controlling

21 shareholders who are involved in disclosure and

22 disclosure matters, there is an expectation that

23 they'll engage with the lawyers, with the other

24 officers, the other directors to prepare that

25 disclosure to make sure that it's true and correct,

1   to make sure that the material circumstances are

2   disclosed, that they understand those material

3   circumstances.  And that if they don't understand

4   something, that they acquire about it.

5          MR. GOTTLIEB:  Q.  Do you know whether

6   Israeli law permits a director to rely on experts or

7   others with knowledge in connection with information

8   about the company that may be outside the director's

9   personal knowledge?

10          MR. SEARLES:  Objection; improper

11   hypothetical.

12          THE WITNESS:  I think you're misstating

13   Israeli law to the extent I'm familiar with it.  But

14   I don't know.  I know that NOTE based upon the

15   Delaware law, but I want to look at the exact

16   provision if we're going to talk about it.

17          MR. GOTTLIEB:  Q.  I'm just asking

18   whether you know Israeli law permits that or not?

19   It's a yes or no question.

20     A.   I can't answer it.  I don't know either

21   way.

22     Q.   Okay.  Do you know whether Caymans law

23   permits a director to rely on experts or others with

24   knowledge in connection with information about the

25   company that may be outside the director's personal

1    knowledge?

2         A.    I don't recall at this moment.

3         Q.    Okay.

4         A.    I think I've looked at that previously,

5    but I don't recall either way at this moment.

6         Q.    In Paragraph 42 of your report, you're

7    writing, "Under settled customs and expectations,

8    controlling shareholders typically have significant

9    governance role in the corporation."

10            Whose expectations are you referring to there?

11        A.    Expectations of capital markets

12   participants, expectations of the controlling

13   shareholders, expectations of the officers and

14   directors and those involved in the company.

15   Expectations of the other shareholders.

16        Q.    And those customs and exceptions that

17   you're referring to here refers to shareholders of

18   public companies?

19        A.    I think it's both.  But certainly I think

20   Mark Zuckerberg, for example, he's a controlling

21   shareholder of Facebook.  I think there's an

22   expectation he has a significant amount of

23   involvement in it.  As well as an officer and

24   director.

25        Q.    Is it possible that shareholders of a

1   small private company may conduct their affairs

2   differently?

3        A.    I think there's less of an expectation for

4   that.  I mean in a publicly traded company once

5   you're publicly traded, uhm, you have more

6   oversight, more issues.  But in a small publicly

7   traded -- a small private company -- I mean if I had

8   a $200 million company that I controlled, I think

9   I'd be involved in it substantially or at least be

10  knowledgeable about it.  That's a lot of money, and

11  so I think the expectations are similar, but they

12  may be more acute.

13           Generally speaking, when you have

14  controlling shareholders of small companies, they

15  are what we call -- I mean they're entrepreneurs.

16  They're -- they're -- it's what we call closed

17  corporation where the officers, directors, and

18  executives are all overlap.  And so the law looks at

19  those issues and has actually developed special

20  doctrines in those circumstances to allow for the

21  fact that the controller is often the one who is

22  sort of most intimately involved in the company

23  willing to act in those cases inappropriately or

24  oppressively is we call it towards the MRA

25  shareholders.

1          Q.   These are all expectations of U.S. law?

2          A.   No, I think these are capital markets

3     expectations.  I think those are expectations across

4     the western world for any sophisticated capital

5     market.

6          Q.   Are you --

7          A.   I think -- I think that they run the same

8     in Israel as they do in Germany or the U.K. or the

9     U.S.  And that's been my experience having -- over

10    the last 30 years or so.  I guess 27 years.

11         Q.   In Paragraph 44, you refer to the general

12    anti-fraud rules including Rule 10b-5.  Let's see.

13    That may not be right.  It's in the -- it's in the

14    footnote there, Footnote 82.

15         A.   Yeah.

16         Q.   So you're referring to -- let's just read

17    the sentence here so we're grounded.  "U.S. law and

18    practices recognizes this expectation and

19    controlling shareholders of U.S. public companies

20    are subject to trading limitations under the federal

21    securities laws, which limit their ability to engage

22    in short term trading."

23              And that -- that is footnoting to -- is that

24    the right footnote?  That's from Section 16 of the

25    Exchange Act.  That's right.  So you're referring to

1  practices from federal securities laws here, right?

2  That's from Section 16 of the Exchange Act.  The next

3  sentence about trading role and possession material,

4  non-public information is from Rule 10b-5.  You're

5  talking about obligations that stem from the federal

6  securities laws, right?

7       A.   Yeah, in general I'm setting forth the

8  expectations of the federal securities laws, which

9  guide the expectations of investors.

10      Q.   Right.  Those are actually set forth in

11 the securities laws, right?

12           MR. SEARLES:  Objection; vague and

13 ambiguous.

14           THE WITNESS:  Not really sure what you're

15 talking about.  Again, expectations of investors are

16 set by the laws sometimes and what the customs and

17 practices are.  And so, for example, an insider

18 trading policies of a company -- publicly traded

19 company will have D&O questionnaires, which Mr.

20 Aurovsky filled out.  And they'll have an insider

21 trading policy, which will implement and vary

22 depending upon custom and practice to implement,

23 uhm, the underlying principle that executives

24 shouldn't be trading on material non-public

25 information.

1           MR. GOTTLIEB:   Q.  But you can source

2    these in the federal securities laws themselves,

3    right?  I mean, there's a limit on short term

4    trading in the securities laws.

5           A.   Well, I'm --

6           Q.   I can be a little bit more vague, but it's

7    sourced from 10b-5?

8           A.   I think what I'm saying is it's broader

9    than that, the custom and practice.  So one of the

10   sources, as I said before, can come from the law.

11   But then when you have an insider trading policy,

12   for example, many times it will limit putting your

13   shares on margin so that you don't have a sale that

14   would be triggered by insider information.  If there

15   is a disclosure problem on -- you have broader

16   principles that apply around trading, you know,

17   whether or not you have a 10b-51 plan or otherwise.

18           And so investors generally expect

19   integrity in the markets.  And the point that I'm

20   trying to make here is that there's an expectation

21   that investor -- that controlling shareholders have

22   material information in their possession.  And one

23   of the reasons why that's regulated -- and that's

24   why one of the reasons that expectation is also

25   within the federal securities laws, but it's within

1    other areas.  I think -- I have the expectation that

2    Mark Zuckerberg has material information about

3    Facebook that I don't have.  And so that's -- that's

4    what this is talking to generally.

5        Q.   And there would be customs and practices

6    around, say, insider trading laws, as you just said,

7    that a company might institute an insider trading

8    policy that is governed by customs or best

9    practices; is that right?

10       A.   Yeah, in general I think, you know, there

11   are forms and it's not dissimilar to a merger

12   agreement or otherwise.  It would be discussed at

13   the board level.  It would be debated.  They'll make

14   policy decisions between what other companies are

15   doing by looking at non-empirical study, but a

16   general sense of what other companies are doing.

17            Uhm, I apologize.  I don't want to

18   interrupt your questioning, but I have to do

19   something at 1:00 for five minutes.  So if we could

20   break soon, I'd appreciate it.

21       Q.   We'll -- we'll break soon for that.

22       A.   Thank you.

23       Q.   If a company doesn't promulgate an insider

24   trading policy that conforms with whatever the best

25   practices and customs are, is that in violation of

1    securities laws?

2              MR. SEARLES:  Objection; vague and

3    ambiguous.  Ambiguous as to conflating customs and

4    practices with best practices.

5              THE WITNESS:  In general, it depends.  So

6    I may have missed the best practices point, uhm, but

7    in general it just really depends on what the policy

8    says and what it is.  So it could be.  It could not

9    be.

10             MR. GOTTLIEB:  Q.  If a -- if a company

11   never promulgates any particular insider trading

12   policy but nobody at the company ever trades on any

13   material non-public information, has anyone violated

14   the securities laws?

15             MR. SEARLES:  Objection; improper

16   hypothetical.  Beyond the scope of his opinions.

17             THE WITNESS:  Yeah, I just don't know.  I

18   don't know what the securities are.  I don't know

19   where it is or otherwise.  I mean certainly that

20   would be, you know, to me, for a publicly traded

21   company, we're looking to see whether they're --

22   they care about the risk, whether they're addressing

23   them, what the customs and practices are, engaging

24   in the expectations of their duties and otherwise.

25   So I wouldn't expect that any significant company or

1  publicly traded company today would not have an

2  insider trading policy.

3          MR. GOTTLIEB:   Q.  I guess --

4      A.   The scope may vary.  Uhm, and as I said,

5  you're right.  It may or may not violate the federal

6  securities laws.  But, again, the expectation is

7  that they would have one.

8      Q.   But if they don't have one, is that in and

9  of itself a violation of the federal securities

10 laws?

11         MR. SEARLES:  Objection; improper

12 hypothetical.  Incomplete hypothetical.

13         THE WITNESS:  The best I can say is I

14 don't know.  I need more facts and circumstances.  I

15 need to know what the trading is.  I need to know

16 what the company is.  I need to know what's being

17 done.  There are lots of ways to violate the federal

18 securities laws.  It would be, you know -- the fact

19 that you didn't have an insider trading policy seems

20 to me to be negligence.  Seems to be -- you know,

21 scienter, and so that might inform things.  But

22 again, it just depends.

23         MR. GOTTLIEB:   Q.  Here's the complete

24 hypothetical.  I'll do it one more time.  If not a

25 single person at the company ever traded any of the

1  company's securities ever, but the company failed to

2  have insider policy promulgated, would it have

3  violated federal securities laws with insider

4  trading?

5          MR. SEARLES:  Objection; incomplete

6  hypothetical.

7          THE WITNESS:  They might have.  I mean

8  maybe they told their brother.  Maybe they told

9  their sister.  I mean, you know, there's 10b-5

10 extensions.  There's state all-holders rules,

11 frankly.  You know, holders rules, holders actions

12 in California and otherwise, those aren't federal

13 obviously.  But, you know, I just don't know.  I

14 mean if you're saying would they personally -- just

15 because I do have to go at 1:00 -- would they

16 personally violate a 10b-5 if they didn't personally

17 trade, uhm, as an insider trading, I don't think

18 they would have.  You know, so that's -- that's the

19 best --

20          MR. GOTTLIEB:  Q.  That's fine --

21 A.   -- I can give you without more

22 information.

23          MR. GOTTLIEB:  Yeah, take your -- take

24 your -- let's take a break.  Do you need 10 minutes?

25 10 is fine.

Page 146

1           THE WITNESS:  I just need five.  But if

2    you want to take 10, that's fine.

3           MR. GOTTLIEB:  Yeah, I'll take 10.  All

4    right.  See you then.

5           VIDEOGRAPHER:  Off video at 12:59 p.m.

6           (The deposition was in recess from 12:59

7           to 1:14.)

8           VIDEOGRAPHER:  Back on video at 1:14 p.m.

9           MR. GOTTLIEB:  Q.  Professor Solomon,

10   have you ever provided expert testimony for a

11   defendant accused of violating the securities laws?

12        A.   Uhm, yes, yes.

13        Q.   Can you tell me about that?

14        A.   So well Teva and Novo Nordisk.  I need to

15   refresh any recollection.  But if you let me, I can

16   look at my list.  But Teva and Novo Nordisk were

17   defendants in federal securities litigation.  And

18   they were individuals there also.  It was officers

19   and directors.

20        Q.   Do you have written expert reports in

21   those proceedings that are -- are publicly

22   available?

23        A.   I don't know either way.  I mean, I know

24   the record's sealed so I don't think they are, but

25   you could view the record and see they're both in

1  federal court.

2      Q.   Is your -- are your opinions there subject

3  to any kind of confidentiality agreement?

4      A.   I mean, there's a stip.  And I think it's

5  been sealed and they are subject to a

6  confidentiality agreement.  So I don't recall

7  exactly, but they're not -- to my -- as far as I'm

8  aware, they're not publicly available.  I'm not

9  permitted to disclose them, but they may be -- but

10 like I said, that's as far as I'm aware of.  If you

11 did a search of the docket, you could see, but I

12 don't think it's -- the priors can be disclosed.

13     Q.   Okay.  I would call for the disclosure of

14 those opinions to the extent they are not covered by

15 a court stipulation sealing them.  I'm obviously not

16 calling for anything that's -- that's sealed under

17 order of the court.

18     A.   I will review the stip, but I think it's

19 sealed.  But I defer to my attorney, but I'll review

20 it with -- not my attorney, I'll review to counsel

21 in this case and take their direction on it.

22     Q.   Uhm, other than Teva and Novo Nordisk,

23 have you ever provided expert testimony for a

24 defendant accused of violating the securities laws?

25     A.   I need to refresh my recollection.  Do you

1  want me to do that?

2      Q.   Yeah, let's just quickly flip to

3  Exhibit 2, which is the cases just from the last

4  four years.

5      A.   So Teva was defendant.  Ulisses was a

6  plaintiff.  Modany was a corporate governance case,

7  but it was in bankruptcy denial of the securities

8  laws.  Novo Nordisk we talked about.  Razin was not

9  a federal securities law case, but it was a holder's

10 action.  And that was for a defendant.  That's it on

11 this list.  There may be others before then, but I

12 don't -- I don't recall them either way.

13     Q.   Okay.  Let's look at Opinion 3.  So let's

14 turn to page 19 of your statement.

15     A.   Okay.

16     Q.   And just for myself, I'll read it.  "A

17 controlling shareholder, director, and executive

18 officer would not be expected under customary and

19 usual practices to be willfully blind in execution

20 of his or her relevant certifications and review of

21 the disclosure documents in a public company M&A

22 transaction," right?

23     A.   That's what it reads.  Yes, that's

24 correct.

25     Q.   Just one thing I note.  So looking at

1    Opinion 1 on page 13, this is geared towards the

2    customary usual practice for executive officers and

3    directors.  And then Opinion 2 is directed towards a

4    controlling shareholder, director, and executive

5    officer of a publicly traded company.  Similarly,

6    Opinion 3 is a controlling shareholder, director,

7    and executive officer.  So in Opinions 2 and 3, are

8    you focused on individuals who are a controlling

9    shareholder, director, and executive officer?

10   Someone with all three of those roles?

11        A.   Yeah, so I think on Opinion 2 it really is

12   an opinion that goes to someone who is also a

13   controlling shareholder as well as also happens to

14   be an executive officer.  When we think about

15   Opinion 3, it's -- it can apply really across the

16   board.  So it probably -- the "and" should probably

17   be an "or" in Opinion 3 and that's the way that it's

18   written, which is that, uhm, no -- none of these

19   parties would be expected to be willfully blind.

20   The fact that they have all three roles I suppose

21   makes it more egregious, but it's the same principle

22   that applies to each of them.

23        Q.   In your view, in -- in Opinion 3, when we

24   say in a public company M&A transaction, are you

25   referring to transactions between two public

1    companies or between a public company and a private

2    company, a private company going public?  All of

3    those?  None of those?  What were you referring to

4    there?

5        A.   Uhm, generally a public company

6    transaction where disclosure documents are being

7    filed.  There could be any of those.

8        Q.   So are there any differences for what the

9    public company is required to do versus what a

10   private company involved in a transaction with a

11   public company is supposed to do?

12            MR. SEARLES:  Objection; incomplete

13   hypothetical.

14            THE WITNESS:  Well, again, there's

15   different documents.  There's different

16   certifications.  There's different issues.  It

17   depends on the consideration being paid.  So in a

18   situation where stock consideration is being issued

19   or a proxy statement being filed and disclosure

20   being made concerning the target, the principles

21   that I'm talking about would apply.

22            MR. GOTTLIEB:   Q.  In Paragraph 48, under

23   Opinion 3, you write, "While many of these documents

24   are drafted by counsel, ultimate source of the

25   information regarding the company is generally the

1  officers and directors who are acting on behalf of

2  the company and who are ultimately responsible for

3  the statements contained in the documents that they

4  sign."

5          Do you see that?

6      A.   I do.

7      Q.   What are we -- what are we citing there?

8  That -- that cite is to the Janus case, right?

9      A.   It's a "see" example.  So these are

10 examples where courts have said that, but that

11 generally is the expectation.  In my experience and

12 study, that's the expectation.  The officers know

13 the facts of the company the best.  Directors, you

14 know, know them as well.  Uhm, and that's the source

15 of the facts.  So, for example, in the Ability

16 transaction, that's why you have audit letters that

17 Mr. Hurgin and Aurovsky signed so that the officers

18 and directors are providing relevant information to

19 auditors.

20          Similarly with an M&A agreement, when you

21 have an M&A agreement you're making reps and

22 warranties.  In my experience, you sit down with the

23 executives.  You go through them -- the disclosure

24 schedules, make sure the disclosure is appropriate.

25 Otherwise not -- that comes from the officers and

1  directors of the company.

2      Q.   In a SPAC transaction, who is the maker of

3  the statements in the public companies proxy

4  statement?

5          MR. SEARLES:  Objection; calls for --

6  calls for a legal conclusion.

7          THE WITNESS:  I haven't thought about

8  that.  I need to think about it in context of what

9  we're talking about and where they are.  It just

10  varies.  And if we're talking about a specific case,

11  I'll consider it.  I haven't really considered it.

12          MR. GOTTLIEB:  Q.  Okay.  In Paragraph 48

13  you also write, "Moreover, because these are

14  individuals with unique knowledge and engaged in the

15  commercial processes of the company, they are aware

16  that they have certain legal obligations as well as

17  obligations to adhere to custom and practice in the

18  implementation of their responsibilities."

19          At the risk of overrunning trod ground, what

20  are the legal obligations you're referring to here?

21      A.   Well, the legal obligations of directors

22  and officers are their fiduciary duties.  Uhm,

23  they're subject to those, of course.  There can be

24  other legal obligations, including the disclosure of

25  federal securities law obligations in connection

1  with disclosures.  Those are the two main ones.

2      Q.   And then you see -- you're writing, "As

3  well as obligations to adhere to custom and practice

4  in the implementation of their responsibilities."

5           What is the source of those obligations to

6  adhere to custom and practice?

7      A.   So in general, officers and directors just

8  don't suddenly appear in a company.  They're

9  operating in the company.  They're being advised by

10 advisors.  They have processes and procedures for

11 disclosure.  They have meetings.  They have minutes.

12 So they know, for example, when you have a meeting.

13 There are minutes that are kept because that's done

14 again.  And so the -- they know that they have

15 fiduciary duties because that comes up in the

16 context of being a board member.

17          And otherwise they know that public

18 disclosure obligations or conflict of obligations

19 because they fill out a D&O questionnaire.  And so

20 we don't assume -- just like I'm walking around my

21 kitchen and I see all the appliances every day --

22 that executives and officers just come to everything

23 new and wake up and it's like Groundhog Day.  In

24 fact, there's a history where they're acting within

25 a company.  They're acting under their obligations.

1  They're aware that there are customs and practices

2  that are being done involving -- notes are involved.

3  And they're aware that if there's a change of

4  circumstance, they'll be new customs and practices

5  to reflect those circumstances such as, for example,

6  public listing in the U.S. when you're an FPI.

7       Q.   Is there a source of these customs and

8  practices?  Where would a director look if they

9  wanted to know what were the customs and practices

10 that they are supposed to adhere to?

11           MR. SEARLES:  Objection; asked and

12 answered.

13           THE WITNESS:  Yeah, I have answered that.

14 I, uhm, note that at least one person put their

15 hands over their head when you asked it.  But, uhm,

16 I, again -- I just refer back to this.  I'll answer

17 if you want, but it's the same answer given.

18           MR. GOTTLIEB:  Q.  No.  This is a

19 specific question and a different question.

20      A.   Sure.

21      Q.   Where -- where would a director or officer

22 look to understand what is the custom and practice

23 in what they're supposed to be doing?

24      A.   So, again, that's their advisors, their

25 experience, what they learn in terms of the market,

1   and how they've been -- they're approaching it.  So,

2   again, that's the experience of a being an officer

3   or director.  I think I did answer it in that prior

4   question.  But so, for example, if you have an audit

5   restatement, you have to do a SAB 99 memo.  Your

6   lawyers come to you.  You deliberate this.  You have

7   to do XYZ and you know going forward -- you know,

8   that's how you deal with those issues.

9           So that's what you do in a board meeting,

10  you know, that there are advisors there.  They're

11  advising you.  You have obligations.  You have

12  fiduciary duties.  You have other obligations.  Uhm,

13  and so that's why there's been a real focus on

14  director training in the past two decades or so,

15  particularly from the NACD to ensure that directors

16  are aware of these from the get-go.  But when you

17  have people who have been around for a while, uhm,

18  they learn them as they go and from their advisors

19  and otherwise.  Particularly in a -- in a

20  significantly size operation in terms of net worth.

21      Q.   What about someone who's never been a

22  public company director or officer before?  Where is

23  that person supposed to learn what their customs and

24  practices should be?

25      A.   They're supposed to ask.  They're supposed

1   to know that they're new and they're not aware of

2   the customs and practices.  And that if they have

3   disclosure documents sent to them, what do I do with

4   them, how do I understand them?  What am I supposed

5   to do with them?  They're certainly aware that there

6   are obligations that come with being a director and

7   they have responsibilities to learn about and

8   fulfill those obligations.  And willful blindness is

9   certainly not the expectation let alone defense,

10  just like it's not an offense to.

11              I signed an agreement to sell my house for

12  a dollar, but I didn't read the contract so I

13  shouldn't be bound to it.  It's just -- you know,

14  that's not the expectation.  And particularly when

15  you have public companies, where there's significant

16  responsibilities and it's -- people know there's

17  significant responsibilities.

18      Q.   Would a first time public company officer

19  and director be entitled to rely on experts that

20  they hire to tell them what the customs and

21  practices are?

22      A.   Again, it's a reasonable reliance, and

23  it's not passivity or willful blindness.  They have

24  a responsibility to question things, to review

25  things that they're signing, ask questions about

1  them.  And so if the advisors told them nothing,

2  that wouldn't excuse them.  I mean that's the

3  hypothetical, but you just don't blindly just go

4  ahead.  That's not been my experience, frankly.

5  I've never actually seen that.

6      Q.   I'm sorry.  You've never -- you've never

7  seen what?

8      A.   I've never advised or seen or studied a

9  board where there's no discussion of practices or

10 governance or how it works or those issues.  I mean

11 those are really deep issues these days.  Public

12 companies have corporate governance charters.  They

13 have compensation committee charters, audit

14 committee charters.  There are lots of rules around

15 this, particularly post Sarbanes-Oxley, and lots of

16 literature on how boards are supposed to work and

17 their obligations and their duties to act reasonably

18 and effectively.

19     Q.   Did you study in this case whether

20 Cambridge complied with customs and practices?

21          MR. SEARLES:  Objection; vague.

22 Ambiguous.

23          THE WITNESS:  I'm not even sure how to

24 answer that.  But, uhm, is there a particular custom

25 and practice?  But my opinions go generally to

1    corporate governance expectations or otherwise.

2    Like I said, I'm not here to give opinions on the

3    facts or the law.

4              MR. GOTTLIEB:   Q.   Okay.   And your report

5    doesn't make any conclusion about whether Anatoly

6    Hurgin violated any laws; is that right?

7         A.   That's correct.

8         Q.   And your report doesn't make any

9    conclusion about whether Alex Aurovsky violated any

10   laws, correct?

11        A.   Yes.

12        Q.   Does your report make any conclusion about

13   whether Anatoly Hurgin failed to fulfill whatever

14   level of duty you think is appropriate?

15        A.   No, I mean we had this discussion.  I have

16   my personal opinions about what happened here, but I

17   don't -- I'm not here to give an opinion on the

18   ultimate issues.  I'm here to assist the trier of

19   fact and -- on issues of corporate governance that

20   are relevant and help them understand any principles

21   that they may deem appropriate and the conduct of

22   parties under these laws in accord with custom and

23   practice.

24        Q.   Your report also doesn't make any

25   conclusions about whether Alex Aurovsky failed to

1  fulfill whatever levels of duty you believe is

2  appropriate?

3        A.    It's the same answer I just gave, which is

4  no, it doesn't.  As we discussed, I do have some

5  thoughts about it.

6        Q.    Your report doesn't define what level of

7  duty you think is actually appropriate other than to

8  return to the reasonable reliance standard that

9  you've said over and over again here today.  Is that

10 right or is there something else?

11            MR. SEARLES:  Objection; misstates his

12 testimony and his report.

13            THE WITNESS:  That's a vague question.

14 I'm not sure what duty we're talking about.  Again,

15 I'm giving opinions on customs and practices.  And

16 to the extent we're discussing custom and practices,

17 I'm happy to.  But I don't really understand the

18 question or what it refers to.

19            MR. GOTTLIEB:  Q.  Well, let's -- it's a

20 good point.  I agree with this.  Is your report

21 trying to define a level of duty that is appropriate

22 for an officer or director to fulfill in evaluating

23 SEC disclosures?

24       A.    Uhm, I think the answer is I don't think

25 so.  I mean it can be.  The answer is that in

1    general define the duty, to me, seems to be a legal

2    conclusion.  When you're looking at the actions of

3    people, you look at what the customs and practices

4    are to see how they comply with that duty to the

5    extent applicable.

6            And so to the extent that's relevant, I'm

7    offering -- I'm giving opinions and the lawyers in

8    this case can offer opinions to the extent they go

9    to that.  But if -- I don't think I'm here to give a

10   legal conclusion.

11       Q.   One moment.  All right.  So you understand

12   that Hurgin and Aurovsky were directors, officers,

13   and controlling shareholders of a foreign target,

14   i.e. a non-U.S. company in a SPAC transaction,

15   right?

16       A.   I think so if I understood the question.

17       Q.   Right.  But it wasn't a trick question.

18   You're -- does your opinion specifically address the

19   customs and practices of directors and officers of a

20   foreign target in a SPAC transaction?

21            MR. SEARLES:  Objection; asked and

22   answered.

23            THE WITNESS:  Yes.  I mean, I think we've

24   gone over this.  I think these are issues that

25   are -- my opinion of customs and practices and

1  acquisition transactions and disclosures.  And

2  that's what's going on here.

3              MR. GOTTLIEB:  Q.  Well, let's be

4  specific about two things.  One is scope and we'll

5  get to methodology.  So on the scope, you mentioned

6  that you had not represented as counsel any

7  directors or officers who were -- directors or

8  officers of a foreign target in a SPAC.

9              Is that your testimony?

10             MR. SEARLES:  Asked and answered.  Asked

11  and answered.

12             THE WITNESS:  I'm not sure that's my exact

13  testimony.  I think the question that you asked was

14  whether I had represented a private FPI that was

15  acquired by a SPAC, and I had said that I have not.

16             MR. GOTTLIEB:  Q.  Okay.  Let's ask both

17  then.  Had you represented a director or officer in

18  such a company?  A foreign target of a SPAC?

19       A.    Yeah, I answered that.  I mean, I just

20  answered it.  And I answered it a couple of hours

21  ago.

22       Q.    Well, you said you didn't answer -- you

23  said you didn't represent the company, which I think

24  you did say a couple of hours ago.  But here, have

25  you ever represented a director or officer of such a

1  company in such a transaction?

2       A.   No, I have not.

3       Q.   Okay.  And you said there were no

4  empirical studies of these customs and practices.

5  You said you wouldn't even know how that would be

6  done?

7            MR. SEARLES:  Objection; vague and

8  ambiguous as to the term empirical study.

9            THE WITNESS:  I just refer back to my

10 prior answer.

11           MR. GOTTLIEB:  Q.  Okay.  Are there any

12 law review articles that lay out where the customs

13 and practices for directors and officers of a

14 foreign target in a SPAC?

15      A.   I think so, yeah.

16      Q.   Are any cited in your expert report?

17      A.   Yeah, I mean the Hillary Sale articles.

18 The articles that I did.  I mean there's lots of

19 writings on customs and practices of targets when

20 they're selling or making disclosure.

21      Q.   No.  The Hillary Sale article is more

22 general.  It's not about the duties of a director or

23 officer in a foreign target of a SPAC.

24           MR. SEARLES:  Objection; vague and

25 ambiguous.  You're drawing a false distinction with

1    respect to a SPAC.

2            MR. GOTTLIEB:   Q.   Mr.  Searles, that's

3    getting a little bit too argumentative and

4    instructive for the Southern District of New York.

5    How about just objection?

6            So the Hillary Sale article doesn't

7    address specifically duties of -- the customs and

8    practices for directors or officers of a foreign

9    target in a SPAC.

10           MR. SEARLES:   Objection; vague and

11   ambiguous.   Irrelevant.

12           THE WITNESS:   I disagree with that

13   statement.   Again, I think you're making -- you're

14   trying to say because it doesn't contain the word

15   SPAC that these are inapplicable.   But these are

16   general principles that are applied when you have a

17   disclosure being made just like there are general

18   principles when you acquire a company or sell a

19   company or if you're target directors or acquire

20   directors.   You don't need the word SPAC to do it.

21   And you don't need an empirical study that's so

22   confined.

23           Like you said, these are general

24   principles of custom and practice that there's been

25   frankly hundreds of articles written on, probably

1   thousands.  And I've written on them myself both in

2   my M&A case book and in my academic articles.

3            MR. GOTTLIEB:   Q.  The key here is that

4   the target is a private company, a private foreign

5   company.  So let's talk about that for a second.

6   Are there empirical studies specifically reviewing

7   the customs and practices of a director or officer

8   in a foreign private company that is being acquired

9   and going -- thus going public in the U.S.?

10           MR. SEARLES:  Asked and answered.

11           THE WITNESS:  I think you have to define

12   for me what empirical studies are and what aspects

13   they're looking at and otherwise.  There are

14   thousands of empirical studies looking at foreign

15   private issuers.  I've written on foreign private

16   issuers extensively, and I cite many of them.  So I

17   think you need to be more specific.

18           And, again, the line of questioning that

19   you have is just -- it's wholly irrelevant because

20   that's not how custom and practice looks at.  That's

21   not how the market looks at it.  These are general

22   principles and disclosure.  There's no such thing as

23   because you're a SPAC you're exempt from disclosure

24   principles.  The same rules apply and the same

25   customs and practices apply across the board.  And

1   so -- I mean I've answered these questions before so

2   it seems like --

3           MR. GOTTLIEB:   Q.  So is that a no you're

4   not aware of any empirical studies about duties of

5   directors or officers who are foreign targets of a

6   SPAC?

7       A.   No -- oh, sorry.

8       Q.   Okay.  Let's let me go back to FBI -- FPIs

9   for a second.  I know you defined what a foreign

10  private issuer is, but why would a foreign private

11  company like ACSI be an FPI?  I mean it literally

12  never issued anything.  Why would it be a foreign

13  private issuer?

14      A.   Again, I'm not really sure what the

15  context is.  You asked me what the definition of

16  foreign private issuer is and it's within the

17  federal securities laws.  And within those, I'd need

18  to look at it again.  But from my read of it,

19  Ability is a foreign private issuer under that

20  definition.  Not really sure what the -- what you're

21  getting at.

22      Q.   Okay.  If Ability -- and here we mean

23  pre-merger Ability, ACSI.  ACSI was not an FPI,

24  would that change your opinion materially?

25      A.   No.  I said no.

1    Q.   Yeah, I heard.  So you mentioned that you

2   had represented 10 or 20 foreign private companies

3   that were acquisition targets.  You didn't write

4   about any of those in your expert report, did you?

5    A.   I don't really know what you mean.  Again,

6   I'm drawing on my background, experience of extent

7   that that informed my opinions.  I was writing about

8   them.  I didn't mention a specific transaction if

9   that's the question.

10   Q.   Well, the question is -- is this.  You're

11   telling me what the customs and practices are for

12   directors and officers of foreign targets in -- in a

13   SPAC.  But you've never done one of those.  You're

14   telling me that you're -- you're telling me customs

15   and practices for directors and officers who are

16   foreign targets in non-SPAC acquisitions and you say

17   you've done 10 or 20 of those, but none of those are

18   actually listed in your expert report.

19        What I'm trying to get at is, how do I know

20   that what you're saying about what their customs and

21   practices are is correct?  Like how could that be

22   verified or tested?

23        MR. SEARLES:  Objection; vague and

24   ambiguous.  Question is previously been asked

25   regarding verification.  You're just repeating

1   yourself at this point, Jason.

2           MR. GOTTLIEB:   Q.   You can answer the

3   question.

4       A.   I think you're misstating my testimony and

5   typifying it.  And essentially, again, I'm giving a

6   report and opinions on what the customs and

7   practices are in these issues.  And I've spent

8   almost a decade as an M&A practitioner, both in

9   London and New York, representing both publicly

10  traded companies, foreign companies, foreign private

11  issuers, private companies, foreign companies, and

12  disclosure including preparation of proxy

13  statements, registration statements, tender offer

14  documents, or otherwise.

15          I've done repeated expert witness

16  testimony on issues of disclosure and disclosure

17  process as well as corporate governance of fiduciary

18  duties.  I've written an M&A case book.  I've been

19  named three times by the National Association of

20  Corporate Directors one of the most --

21          THE REPORTER:  (Clarification.)

22          THE WITNESS:  One of the most influential

23  people in the boardroom.  And so when I give these

24  customs and practices opinion, they draw on all

25  that.  I'm also, as we discussed, a director of a

1    SPAC.  And so in general the principles that we're

2    talking about are principles that apply in

3    acquisitions generally, to boards generally, to

4    disclosure generally, and so -- and that's been my

5    observations throughout my entire career.

6            And so the disclosure obligations of

7    willful blindness or the customary and usual

8    practices on it don't change because it's a SPAC

9    acquisition versus a biotech acquisition.  Just like

10   principles concerning acquisitions don't generally

11   change, there's not an industry type of acquisition.

12   So it's on not a biotech acquisition versus a car

13   company acquisition in terms of processes and

14   procedures or fiduciary kids.  Those don't change.

15   And those don't change in a SPAC or otherwise.

16           Now, there may be issues that are for

17   salient because it's a foreign issuer or foreign

18   private issuer.  But as I've said, I've regularly

19   worked with and represented foreign private issuers.

20   I've written about them multiple times.  I've

21   lectured on these issues.

22           I'm going to teach a Tel Aviv law school

23   in the spring if they let me in.  I was supposed to

24   go in December to teach on these issues, including

25   M&A, in the context of Israeli companies or

1    otherwise.  I've done M&A with Israeli companies

2    that are private and bought Israeli companies that

3    are private as well as done transactions with them

4    and given opinions in the Tel Aviv court on issues

5    of the corporate governance, uhm, that generally

6    apply in terms of customs and practices.

7              So in terms of what I've seen in the world

8    and how it's gone, uhm, I could continue.  But

9    that's generally where I've gone, where I'm informed

10   by, and where I think that the customs and practices

11   that I'm giving -- and generally speaking I think

12   that's the uniform opinion -- applied in this

13   circumstance.

14             MR. GOTTLIEB:  Q.  Your -- your personal

15   experience on these issues as a practicing lawyer

16   ended in 2004; is that right?  That was the last

17   time you --

18             MR. SEARLES:  Objection --

19             MR. GOTTLIEB:  Q.  -- private practice?

20             MR. SEARLES:  Objection; misstates his

21   prior testimony on this subject.

22             THE WITNESS:  Uhm, I finished my law firm

23   experience at Freshfields in 2004.  Since that time,

24   I have done some legal work for companies, as well

25   as done expert witness, as well as advised on

1  corporate governance and corporate governance

2  procedures and otherwise and created corporate

3  governance policies for organizations.

4       MR. GOTTLIEB:  Q.  And you said you've

5  done a lot of expert testimony about this, but that

6  expert testimony is supposed to be based on

7  something, right?

8       MR. SEARLES:  Objection; vague and

9  ambiguous.

10      THE WITNESS:  I don't even know what that

11  means.

12      MR. GOTTLIEB:  Q.  I asked you about

13  your -- your -- the source of this and you told me

14  about your personal experience working at law firms,

15  which ended in 2004.  And then you talked about

16  expert testimony, and you wrote an M&A case book and

17  you're teaching and all sorts other stuff.  But all

18  that other stuff, being an expert, writing a case

19  book, teaching, those all have to be based on

20  something.  You're -- you're not a freestyle

21  freelance expert.  You're expert on something.

22  You're not writing an M&A case book about nothing.

23  You're writing about something.

24      So what I'm trying to get at here is your

25  actual personal experience, what you know about what

1  directors and officers actually do, their customs and

2  practices, and particularly the customs and practices of

3  directors and officers in foreign private companies.  I

4  wanted to talk about foreign private SPAC targets, but

5  we've established you've got nothing on that.  We're

6  just looking at foreign --

7          MR. SEARLES:  Objection; argumentative.

8  You keep on mischaracterizing his testimony, Jason.

9  It's drawing this false distinction between SPACs

10  and other public companies or private companies.

11  The distinction you're attempting to draw has been

12  repeatedly rebutted by this expert.  So to the

13  extent you continue to use this distinction to now

14  insult our expert is simply argumentative and

15  inappropriate.

16          You're also asking the same question over

17  and over again about some vague source about

18  something that your questions are now becoming

19  incomprehensible perhaps because it's late in the

20  day.

21          MR. GOTTLIEB:  I believe the word you're

22  looking for, Don, is objection.

23          MR. SEARLES:  Yeah, and I just made one.

24          MR. GOTTLIEB:  Q.  And that's it.  What

25  I'm trying to get at -- what I'm trying to get at

Page 172

1    all day and I haven't really yet heard it --

2              MR. SEARLES:  Objection; argumentative.

3              MR. GOTTLIEB:   Q.  -- what is the source,

4    your personal experience, of the duties -- what

5    directors and officers actually do, their actual

6    customs and practices of what they do when they are

7    directors and officers of a foreign private company

8    in acquisition?

9              MR. SEARLES:  Asked and answered.

10             MR. GOTTLIEB:   Q.  And -- and all I

11   wanted to know -- not where you taught.  Not what

12   case books you wrote.  All I want to know was what

13   is the source, your personal source, of that

14   information?  Is it your own studies?  Peer reviewed

15   studies?  Articles?  Or is it just your personal

16   experience as a lawyer that ended in 2004?

17             MR. SEARLES:  You're asking for the

18   foundation of his opinion?  Is that right, Jason?

19             MR. GOTTLIEB:  I asked the question, Don.

20   Please stop interrupting.

21             MR. SEARLES:  It's --

22             MR. GOTTLIEB:  It's really improper.

23             MR. SEARLES:  It's so improper to be

24   continuing to be asking the same question over and

25   over again.  To be getting the same answer over and

1  over again.  Excuse my frustration.  Objection.

2          MR. GOTTLIEB:  Every time I ask a question

3  I get a recitation of a C.V.  It's a very long

4  impressive C.V.  It's very nice.  What I'm asking

5  for is the basis of his opinion.

6          MR. SEARLES:  One more time,

7  Professor Solomon.

8          THE WITNESS:  Can you just read back my

9  prior answer in full?

10          MR. GOTTLIEB:   Q.  No.

11      A.   No.  That's my answer.  That's my answer.

12  And I'm allowed to give an answer that's true and

13  correct and as I understand the question.  There's

14  something I don't understand about the question.

15  I'm happy to discuss with you.  But I believe I just

16  answered the question, and I'm going to answer it

17  again by reading back my prior answer.  And I think

18  I've answered the question multiple times.  If

19  there's something I'm missing, I'm happy to try and

20  understand it.  But I would ask that my prior answer

21  be re-read as that's my answer.

22          MR. GOTTLIEB:  Let's -- let's take a

23  five-minute break, and we'll come back and see if we

24  can close this out.

25          VIDEOGRAPHER:  Off video at 1:52 p.m.

Page 174

1              (The deposition was in recess from 1:52 to

2         2:03.)

3              VIDEOGRAPHER:   Back on video at 2:03 p.m.

4              MR. GOTTLIEB:   We have no more questions.

5    Thank you, Professor Solomon.

6              THE WITNESS:   Thank you.

7              MR. SEARLES:   No questions on behalf of

8    the SEC.

9              VIDEOGRAPHER:   This concludes today's

10   deposition.   Off video at 2:03 p.m.

11             THE REPORTER:   Could I just ask before you

12   go if the SEC side wants to order a transcript?

13             MR. SEARLES:   We do.   Let me make sure,

14   through my paralegal, that we have the funding in

15   place to do that.

16         (The deposition was concluded at 2:03 p.m.)

17

18

19

20

21              _____

                 STEVEN DAVIDOFF SOLOMON
22

23

24

25

1                           CERTIFICATE

2

3          I, the undersigned, a Certified Shorthand

4    Reporter, State of California, hereby certify that

5    the witness in the foregoing deposition was by me

6    first duly sworn to testify to the truth, the whole

7    truth, and nothing but the truth in the

8    within-entitled cause; that said deposition was

9    taken at the time and place therein stated; that the

10   testimony of the said witness was reported by me, a

11   disinterested person, and was thereafter transcribed

12   under my direction into typewriting; that the

13   foregoing is a full, complete, and true record of

14   said testimony; and that the witness was given an

15   opportunity to read it and, if necessary, correct

16   said deposition and to subscribe the same.

17          I further certify that I am not of counsel

18   or attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said caption.

22          Executed this 23rd day of December, 2021.

23

24          _____
             LAURA AXELSEN, C.S.R. 6173
25

Page 176

1        ERRATA SHEET FOR THE TRANSCRIPT OF:

2        Case Name:  SEC vs. Hurgin

3        Dep.  Date: 12/13/21

4        Deponent: Steven Davidoff Solomon

5     Pg.     Ln.    Now reads        Should read        Reason

6     _____   _____  _____   _____   _____

7     _____   _____  _____   _____   _____

8     _____   _____  _____   _____   _____

9     _____   _____  _____   _____   _____

10    _____   _____  _____   _____   _____

11    _____   _____  _____   _____   _____

12    _____   _____  _____   _____   _____

13    _____   _____  _____   _____   _____

14    _____   _____  _____   _____   _____

15

16                   _____

17                   SIGNATURE OF DEPONENT

18     SUBSCRIBED AND SWORN BEFORE ME

19     THIS_____DAY OF_____, 2021

20

21       _____

22       (Notary Public)

23       MY COMMISSION EXPIRES:_____

24

25