UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:__9/23/2022__         │
└─────────────────────────────────┘
```

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

        -v-

ANATOLY HURGIN, ALEXANDER
AUROVSKY, ABILITY COMPUTER &
SOFTWARE INDUSTRIES LTD, and
ABILITY INC.,

                              Defendants.

No. 19-cv-5705 (MKV)

OPINION & ORDER
ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, District Judge:

Ability Computer & Software Industries Ltd. ("Ability") was a private, Israeli company that sold cell phone and satellite interception products. Anatoly Hurgin and Alexander Aurovsky co-founded and co-owned the company for decades. Hurgin was the chief executive officer, and Aurovsky was the chief technology officer. In 2015, non-party Cambridge Capital Acquisitions Corporation ("Cambridge"), a publicly-held special purpose acquisition company in the United States, acquired Ability.

The Securities and Exchange Commission ("SEC") alleges Ability, Hurgin, and Aurovsky violated securities laws in connection with the merger. In particular, the SEC alleges Hurgin created a false impression that Ability had a backlog of scores of millions of dollars' worth of signed purchase orders from Ability's largest customer, the Mexican federal police, when, the SEC alleges, most of those orders did not exist. The SEC also alleges that Hurgin lied to Cambridge shareholders about Ability owning a new interception technology called ULIN when, in reality,

Ability was merely a reseller of ULIN.  The SEC claims that Aurovsky should have caught and corrected the alleged misrepresentations.

Hurgin maintains that he was honest about Ability's business.  He maintains that Ability had a mix of written and verbal orders from the Mexican federal police, but orders fell through after the merger because of disclosed business risks.  Hurgin also maintains that being a reseller of ULIN was consistent with Ability's normal and disclosed business model.  Aurovsky maintains that he was not responsible for any aspect of the merger.

The SEC, Hurgin, and Aurovsky all move for summary judgment.  But disputes of fact obviously preclude granting any of the motions.  For the reasons set forth below, the motion of the SEC for summary judgment is DENIED, Hurgin's motion for summary judgment is DENIED, and Aurovsky's motion for summary judgment is DENIED.

## I.    FACTS AND PROCEDURAL HISTORY[1]

### A.  Background Facts

As noted above, Ability Computer & Software Industries Ltd. ("Ability") was a private company based in Tel Aviv, Israel that sold cell phone and satellite interception products.  SEC 56.1 ¶¶ 1, 13; Defs. Counterstatement ¶¶ 1, 13.  Anatoly Hurgin and Alexander Aurovsky co-founded and co-owned the company for decades.  SEC 56.1 ¶¶ 1, 5, 6; Defs. Counterstatement ¶¶ 1, 5, 6.  Hurgin was the chief executive officer ("CEO"), and Aurovsky was the chief technology officer ("CTO").  SEC 56.1 ¶¶ 5, 6; Defs. Counterstatement ¶¶ 5, 6.

---

[1] The facts are taken from the evidence cited in the parties' Local Civil Rule 56.1 Statements [ECF Nos. 112 ("Hurgin 56.1"), 116 ("Aurovsky 56.1"), 136 ("SEC 56.1"), 149 ("SEC Counterstatement"), 150 ("SEC Supp. 56.1"), 154 ("Defs. Counterstatement"), 160 ("Defs. Supp. Counterstatement"), 162], including the affidavits, declarations, and exhibits submitted in connection with the parties' motions [ECF Nos. 111, 115, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132 ("Cain Decl."), 133 ("Solomon Decl."), 134 ("Pottash Decl."), 135 ("Hammel Decl."), 151, 153, 157].

Cambridge Capital Acquisitions Corporation ("Cambridge") was a public company in the United States.  It was a special purpose acquisition company, meaning it was formed to make money for its investors by acquiring or merging with some other, "target" company.  SEC 56.1 ¶¶ 9, 11; Defs. Counterstatement ¶¶ 9, 11.  In December 2013, Cambridge conducted an initial public offering that raised about $81 million; however, Cambridge would have to return that money to its shareholders if it did not combine with a target company within two years, by December 2015. SEC 56.1 ¶¶ 10, 11; Defs. Counterstatement ¶¶ 10, 11.

Cambridge identified Ability as a potential target company in or around June 2015.  SEC 56.1 ¶ 12; Defs. Counterstatement ¶ 12.  At the time, Ability was a small company, but it had recently experienced major revenue growth.  SEC 56.1 ¶ 15; Defs. Counterstatement ¶ 15.  After making about $5.6 million in revenue in 2013, Ability made about $22.1 million in 2014.  SEC 56.1 ¶ 15; Defs. Counterstatement ¶ 15.  It is undisputed that Ability frequently sold its products "through resellers and agents, who then sold the products to end-user government agencies." Hurgin 56.1 ¶ 11;  Aurovsky 56.1 ¶ 11;  SEC Counterstatement ¶ 11;  SEC 56.1 ¶ 15;  Defs. Counterstatement ¶ 15.  Hurgin and Aurovsky offer evidence that Ability also frequently licensed and resold technology products [ECF Nos. 111-19 at 45; 111-28 at 101–102; 111-54 at 328].  *See* Hurgin 56.1 ¶ 82; Aurovsky 56.1 ¶ 82.

**B.  Ability's 2015 Financial Forecast**

Ability hired Migdal Capital Markets ("Migdal"), an investment bank, to create a financial forecast for Ability and to act as a liaison with the various professionals that Cambridge hired to evaluate Ability in connection with the potential merger.  SEC 56.1 ¶ 21; Defs. Counterstatement ¶ 21; Hurgin 56.1 ¶¶ 18, 22; Aurovsky 56.1 ¶¶ 18, 22; SEC Counterstatement ¶¶ 18, 22.  A Migdal banker named Hagai Yedid performed this work.  *See* Hurgin 56.1 ¶ 18; Aurovsky 56.1 ¶ 18; SEC

Counterstatement ¶ 18.  In August 2015, Yedid prepared a spreadsheet that forecasted total revenues of approximately $110 million for 2016 [ECF No. 131-23 ("August 2015 Spreadsheet") at 6].  SEC 56.1 ¶ 24; Defs. Counterstatement ¶ 24.  The parties dispute whether the August 2015 Spreadsheet was based exclusively on information Yedid received directly from Hurgin.  *See* Hurgin 56.1 ¶ 26; Aurovsky 56.1 ¶ 26; SEC Counterstatement ¶ 26.

The parties agree that there were two main components of the financial forecast: (1) a "backlog" of customer orders that Ability already had in place; and (2) a "pipeline" of the probable future orders.  SEC 56.1 ¶ 25; Defs. Counterstatement ¶ 25.  According to the August 2015 Spreadsheet, Ability had a backlog of more than $65 million in customer orders for the remainder of 2015 and all of 2016.  *See* SEC 56.1 ¶ 27; Defs. Counterstatement ¶ 27.  About 80% of this backlog figure reflected orders from Ability's largest customer, the Mexican federal police.  SEC 56.1 ¶¶ 30, 33; Defs. Counterstatement ¶¶ 30, 33.

The August 2015 Spreadsheet that Yedid prepared stated that the "backlog" was "actual PO's," meaning actual purchase orders.  August 2015 Spreadsheet at 4.  Hurgin maintains he made clear that much of the backlog consisted of verbal agreements.  Hurgin 56.1 ¶¶ 30, 31.  Yedid testified at his deposition that "actual" purchase orders meant any "orders that the company received," including both written orders and "verbal orders" [ECF No. 111-19 ("Yedid Dep.") at 27:21– 28:4].  Hurgin 56.1 ¶ 30; Aurovsky 56.1 ¶ 30.

The SEC asserts that there were no verbal orders.  According to the SEC, there were only written orders, and false representations about orders that did not exist.[2]  SEC Counterstatement ¶

---

[2] As discussed below, the SEC has changed its position on this central accusation.  In its complaint, which was filed after a lengthy investigation, the SEC specifically alleged that "a large part of the order backlog" *was* "based only on oral agreements" [ECF No. 1 ("Cmpl.") ¶ 2].  *See* Cmpl. ¶¶ 41, 95 (alleging that Hurgin and Aurovsky "failed to disclose that Ability's backlog of orders from the Latin American police agency was mainly based on oral agreements"), 104, 134, 135, 136, 138, 139, 144, 174, 176, 180, 203, 210, 220.

33.  Yet Hurgin and Aurovsky offer evidence that Ability received payments on verbal orders.  *See* Hurgin 56.1 ¶ 32; Aurovsky 56.1 ¶ 32; Yedid Dep. at 32:20–24.  Indeed, the CEO of Cambridge, Ben Gordon, testified that he was "aware of" Ability "getting paid by a customer" without "a piece of paper" [ECF No. 111-6 ("B. Gordon Tr.") at 287:11–20].  Avi Oz, who audited Ability in connection with the merger, testified to his understanding that Ability had "oral agreements" because of the sensitive nature of its clients and products [ECF No. 111-28 ("Oz Dep.") at 47:12–14; 49:24–25].  *See also* Hurgin 56.1 ¶ 33; Aurovsky 56.1 ¶ 33; Yedid Dep. at 32:14–15 (testifying to his understanding that "in this space sometimes you get orders which are verbal").  Oz also testified that, "as an auditor," he could not "be satisfied only with oral [agreements]" and sought confirmation of certain transactions.  Oz Dep. at 50:1–2; *see also* Yedid Dep. at 32:18–24 (explaining that the auditor found "quite a few orders that there were payments made, but there were no documents," and the auditor asked Ability to get signed confirmation that revenues were payments for "specific transactions").

## C.  The Prometheus and Economics Partners Reports Prepared for Cambridge

In August 2015, Cambridge hired various professionals to evaluate the potential merger. SEC 56.1 ¶ 37; Defs. Counterstatement ¶ 37.  Cambridge hired Prometheus Financial Advisory Ltd. to issue an independent fairness opinion about the price that Cambridge contemplated paying for Ability.  SEC 56.1 ¶ 38; Defs. Counterstatement ¶ 38.  Cambridge hired Economics Partners, LLC to conduct its own due diligence on Ability's revenues and expenses.  SEC 56.1 ¶ 39; Defs. Counterstatement ¶ 39.  There is no dispute that both Prometheus and Economics Partners received information from Ability and Hurgin, including Yedid's August 2015 Spreadsheet.  SEC 56.1 ¶ 40; Defs. Counterstatement ¶ 40.  There is also no dispute that, unlike Economics Partners, Prometheus did not conduct its own due diligence; however, Hurgin adamantly disputes the SEC's

position that Prometheus relied exclusively on Hurgin's statements and, as such, that statements in the Prometheus report can be attributed to Hurgin.  *See* SEC 56.1 ¶ 40; Defs. Counterstatement ¶ 40; Hurgin 56.1 ¶¶ 22, 24, 48–50.

Prometheus issued a fairness opinion projecting that Ability would earn $108 million in 2016 (two million shy of the $110 million projection in Ability's 2015 financial forecast).  SEC 56.1 ¶ 48; Defs. Counterstatement ¶ 48.  The Prometheus opinion contained a line stating that the backlog was "comprised of signed purchase orders."  SEC 56.1 ¶ 49; Defs. Counterstatement ¶ 49. Hurgin contends that the person who prepared the Prometheus opinion independently interpreted the line about "actual PO's" in Yedid's August 2015 Spreadsheet to mean that the backlog was supported by "signed" purchase orders.  Hurgin 56.1 ¶¶ 49, 56.  Hurgin contends that he never told Prometheus, or anyone else, the backlog was supported by "signed" or "written" purchase orders. Hurgin 56.1 ¶ 62.  The SEC disputes these contentions only "to the extent" that Hurgin is arguing the false statement in the Prometheus opinion did not ultimately "come from Hurgin."  SEC Counterstatement ¶ 50.

In conducting its own due diligence, Economics Partners requested copies of written purchase orders supporting the backlog figure, and Ability explained that there were no written purchase orders for about two thirds of the backlog.  SEC 56.1 ¶ 42; Defs. Counterstatement ¶ 42; Hugin 56.1 ¶ 43; Aurovsky 56.1 ¶ 43; SEC Counterstatement ¶ 43.  As such, the Economics Partners report stated that the "high rate of projects with no PO's in the backlog could indicate a significant risk" [ECF No. 111-31 at 12].  SEC 56.1 ¶ 43; Defs. Counterstatement ¶ 43.  The Economics Partners report also found "serious geopolitical risk" because "most" of the backlog was from one Latin American police agency [ECF No. 111-31 at 12].  *See* SEC 56.1 ¶ 44; Defs. Counterstatement ¶ 44.

There is no dispute that "Cambridge [was] aware of all the information in [the Economics Partners] report, including the fact that Ability's backlog was not 100% backed by written purchase orders." Hurgin 56.1 ¶ 45; Aurovsky 56.1 ¶ 45; SEC Counterstatement ¶ 45. Indeed, there appears to be no dispute that, after the Prometheus and Economics Partners reports were issued, Hurgin explicitly told or reiterated to Cambridge CEO Ben Gordon that much of the backlog was verbal. *See* Hurgin 56.1 ¶ 52; SEC Counterstatement ¶ 52.

### D.  The Merger Agreement

In September 2015, Cambridge and Ability entered into a merger agreement [ECF No. 48-1 ("Merger Agreement")]. SEC 56.1 ¶ 16; Defs. Counterstatement ¶ 16. Both Hurgin and Aurovosky signed the Merger Agreement "as Ability's controlling shareholders." SEC 56.1 ¶ 17; Defs. Counterstatement ¶ 17. The Merger Agreement provides that Ability and Cambridge jointly were responsible for the preparation of proxy materials and that Ability was responsible for supplying information about Ability. *See* Merger Agreement at 48–50. The Merger Agreement also required Hugin and Aurovsky to provide Cambridge with a complete list of "Material Company Contracts." *Id*. In addition to the Merger Agreement, Hurgin and Aurovsky executed agreements to become the CEO and CTO of the company that would result from the contemplated merger, Ability, Inc. SEC 56.1 ¶ 18; Defs. Counterstatement ¶ 18

### E.  The Failed September Roadshow and Successful November Roadshow

Starting in late September 2015, Hurgin, Cambridge's CEO Ben Gordon, and others—but not Aurovsky—conducted an investor roadshow in New York City. SEC 56.1 ¶ 58; Defs. Counterstatement ¶ 58. They were unsuccessful in persuading the Cambridge shareholders to commit to the proposed merger at that time. SEC 56.1 ¶ 66; *see* Defs. Counterstatement ¶ 66. According to the SEC, shareholders expressed the following concerns: "[n]one of them believes

[the financial] forecast"; "[t]hey all think Ability got hot for a year with the Latin American projects"; and "[n]one of them believes it is sustainable." SEC 56.1 ¶ 67. The SEC further alleges shareholders were concerned Ability's business was project-based, with no "recurring revenue stream." SEC 56.1 ¶ 68. Hurgin and Aurovsky object that all of these statements are inadmissible hearsay. Defs. Counterstatement ¶¶ 67, 68.

Starting in late November 2015, Cambridge and Ability conducted another roadshow. SEC 56.1 ¶ 70; Defs. Counterstatement ¶ 70. The SEC had alleged in its complaint that, while Aurovsky was not present at the roadshows, he "spoke with Hurgin on a daily basis" throughout the efforts to secure the merger [ECF No. 1 ("Cmpl.") ¶ 151]. The facts alleged about Aurovsky's daily involvement have fallen away at the summary judgment stage.

At the November roadshow, Hurgin represented that Ability had a three-year deal involving 52 prisons in Latin American that would generate about $100 million. SEC 56.1 ¶¶ 80, 81; Defs. Counterstatement ¶¶ 80, 81. Hurgin also represented verbally and in a PowerPoint presentation that Ability had developed and exclusively owned a new interception product called ULIN that would provide a recurring revenue stream. See SEC 56.1 ¶¶ 76, 77, 78; Defs. Counterstatement ¶¶ 76, 77, 78. Specifically, it is undisputed that Hurgin verbally stated that "today we are Ability the only owner for this technology." Hurgin 56.1 ¶ 115; SEC Counterstatement ¶ 115. It is also undisputed that his PowerPoint stated that ULIN was "[d]eveloped in house." SEC 56.1 ¶ 78; Defs. Counterstatement ¶ 78. And the PowerPoint stated that ULIN was "based on a recurring revenue model." SEC 56.1 ¶ 78; Defs. Counterstatement ¶ 78. The November roadshow PowerPoint included an updated financial forecast which projected $148 million in revenue for 2016, including $40 million in revenue from two ULIN sales at $20 million per sale. SEC 56.1 ¶¶ 84, 85; Defs. Counterstatement ¶¶ 84, 85.

**F.  ULIN**

There is no dispute that, prior to the November roadshow, in October 2015, Ability had entered into a three-year Reseller Agreement with the owner of ULIN, Telcostar [ECF No. 111-46].  SEC 56.1 ¶ 123; *see* Defs. Counterstatement ¶ 123.  Under the reseller agreement, Telcostar was entitled to 50% of the revenue Ability received from ULIN sales, and Ability had to pay Telcostar a penalty if Ability failed to sell $10 million worth of ULIN in a given year.  *See* SEC 56.1 ¶¶ 141, 142; Defs. Counterstatement ¶¶ 141, 142.  With respect to Hurgin's comment at the November roadshow that Ability was "today" the "only owner" of the ULIN "technology," Hurgin maintains that he was speaking colloquially in a non-native language.  Hurgin 56.1 ¶¶ 115, 116, 117.  He avers that he meant to convey only that Ability was the only company with the legal right to sell ULIN at that time.  Hurgin 56.1 ¶ 117.

With respect to the PowerPoint slide representing that ULIN was "[d]eveloped in house," Hurgin maintains that the statement was materially true.  Hurgin 56.1 ¶¶ 113, 114.  Hurgin offers witness testimony that he became involved in ULIN when it was merely a "concept," that he came up with the name ULIN, and that he "designed the look and feel of the system" [ECF No. 111-45 ("Benshoshan Dep.") at 19-21].  Hurgin 56.1 ¶¶ 76–78.  Hurgin also offers evidence that it was contemplated that Ability would buy Telcostar and ULIN at the end of the three-year term of the Reseller Agreement, and that is what happened.  Hurgin 56.1 ¶¶ 78, 79.

The parties dispute whether Hurgin misled Cambridge management about Ability's rights with respect to ULIN.  Hurgin maintains he never told anyone at Cambridge that Ability owned ULIN.  Hurgin 56.1 ¶ 86.  Hurgin offers evidence that Ability specifically told Prometheus, which reported to Cambridge, that Ability was working with a "subcontractor" on ULIN [ECF No. 111-32 ("Szewach Dep.") at 116:9-19].  Hurgin 56.1 ¶¶ 87, 88.  The SEC, on the other hand, offers

testimony from Ben Gordon, the CEO of Cambridge, that Hurgin was "lying . . . when he told us ULIN was proprietary." B. Gordon Tr. at 90–91. Hurgin responds that Ben Gordon's own business partner, the CFO of Cambridge, testified that Ben Gordon is a "pathological liar" [ECF No. 111-4 ("M. Gordon Tr.") at 121–124, 238]. The parties also dispute whether Hurgin immediately disclosed the Reseller Agreement such that he reasonably believed the professionals Cambridge had hired to evaluate Ability were aware of the Reseller Agreement. *See* Hurgin 56.1 ¶¶ 80, 81; SEC Counterstatement ¶¶ 80, 81.

Hurgin further offers evidence that Ability's role as a reseller of ULIN was consistent with its usual business model, and that business model was not only known to Cambridge management, but also disclosed to the Cambridge shareholders. *See* Hurgin 56.1 ¶ 82; Yedid Dep. at 45 ("in many of the cases [Ability] was a reseller"). When asked about "Ability's business," Ben Gordon testified that Ability "both" owned some of its own technology and would "also resell . . . other peoples' technology." B. Gordon Tr. at 111:1–15. As Hurgin points out, the proxy disclosures for the merger contained the following statement: Ability "does not own most of the technology it uses in its products" [ECF No. 111-54 ("Proxy") at 328].

### G. The Proxy Materials

The Proxy filed with the SEC and transmitted to the Cambridge shareholders spanned more than 400 pages [ECF No. 111-54 ("Proxy")]. The Proxy included, among other things, a proxy statement dated December 2, 2015, the Merger Agreement, the Prometheus fairness opinion, and a transcript of the November roadshow presentation and a copy of the PowerPoint slides from the November roadshow. *See* SEC 56.1 ¶¶ 60, 74, 98; Defs. Counterstatement ¶¶ 60, 74, 98. The Proxy did not include the August 2015 Spreadsheet, the source of the line "actual PO's," about which so much ink has been spilled. August 2015 Spreadsheet at 4*; see* SEC 56.1 ¶ 29. The Proxy

also did not include the Economics Partners report, which stressed the risks from the large number of orders in the backlog with "no PO's" and from one Latin American police agency.  *See* SEC 56.1 ¶¶ 43, 44, 61; Defs. Counterstatement ¶¶ 43, 44, 61.  The SEC has not offered any evidence to implicate Hurgin and Aurovsky in the decision to omit the report from Economics Partners, which worked for Cambridge.

The body of the proxy statement represented that Ability projected revenue of $108 million for 2016, which was in line with the Prometheus opinion, which predated the ULIN deal and, therefore, did not contemplate any revenue from ULIN.  *See* Proxy at 82.  An attachment to the Proxy mentioned Ability's projection of $148 million in revenue for 2016, including $40 million in revenue from ULIN sales.  *See* SEC 56.1 ¶¶ 84, 85; Defs. Counterstatement ¶¶ 84, 85.  The parties dispute whether a figure in the Proxy projecting an increase in gross margins from 46% to 54% contemplated revenue from ULIN.  *See* Hurgin 56.1 ¶¶ 120–125; SEC Counterstatement ¶¶ 120–125; SEC 56.1 ¶ 160; Defs. Counterstatement ¶ 160.

Both Hurgin and Aurovsky consented to the use of their names in the Proxy.  SEC 56.1 ¶ 238; Defs. Counterstatement ¶ 238.  The Proxy stated that Hurgin and Aurovsky would become directors and the CEO and CTO, respectively, of Ability, Inc., the company that would result from the proposed merger.  SEC 56.1 ¶ 242; Defs. Counterstatement ¶ 242.  The Proxy cited their knowledge and expertise.  SEC 56.1 ¶¶ 246, 247; Defs. Counterstatement ¶¶ 246, 247.

There is no dispute that Hurgin reviewed and approved the Proxy before it was filed.  SEC 56.1 ¶ 99; Defs. Counterstatement ¶ 99.  Hurgin and Aurovsky maintain that Aurovsky played no role in the merger, including in approving the Proxy.  Aurovsky testified, though, that Hurgin "explained to me what's written in this document" [ECF Nos. 111-30 ("Aurovsky Tr.") at 47:22–23].  Aurovsky 56.1 ¶¶ 165, 166.  The SEC asserts that Aurovsky did not review the Proxy at all,

which is merely the SEC's interpretation of Aurovsky's testimony that Hurgin explained it to him. SEC Counterstatement ¶¶ 165, 166.

### H.  The Merger and its Aftermath

A majority of Cambridge shareholders voted to approve the merger on December 22, 2015, and Cambridge officially acquired Ability, which resulted in the public company Ability, Inc.  SEC 56.1 ¶¶ 112, 113; Defs. Counterstatement ¶¶ 112, 113.  As a result of the merger, Hurgin and Aurovsky each received $9,075,000 in cash and "8.3 share[s] of common stock" in Ability, Inc.  SEC 56.1 ¶¶ 117, 267; Defs. Counterstatement ¶¶ 117, 267.  In addition, "approximately $12 million was placed in an escrow account at an Israeli bank for their benefit as a put option."  SEC 56.1 ¶ 261; Defs. Counterstatement ¶ 261.  The new company "received $18,995,000 of capital consideration being paid by Cambridge."  SEC 56.1 ¶ 260; Defs. Counterstatement ¶ 260; *see* SEC 56.1 ¶ 122; Defs. Counterstatement ¶ 122.

After the merger, Ability, Inc. fell far short of the revenue that had been projected in the proxy materials.  SEC 56.1 ¶ 270; Defs. Counterstatement ¶ 270.  The company recognized only about $13.6 million in revenue from the Mexican federal police for the end of 2015 and all of 2016.  SEC 56.1 ¶¶ 207–215; Defs. Counterstatement ¶¶ 207–215.  And it appears that the ULIN technology was still in "development" in 2016, although the company took in some revenue from "demo ULIN."  SEC 56.1 ¶¶ 146, 214; Defs. Counterstatement ¶¶ 146, 214.

There is no dispute that, approximately five months after the merger, Ability, Inc. publicly disclosed for the first time the ULIN Reseller Agreement, which required the company to share 50% of revenue from ULIN with Telcostar.  SEC 56.1 ¶ 271; Defs. Counterstatement ¶ 271.  The parties dispute, however, whether the Proxy adequately disclosed that Ability anticipated "cost of revenues to be about 50%."  Hurgin 56.1 ¶ 125; SEC Counterstatement ¶ 125.

The SEC contends that Ability, Inc. also disclosed for the first time a "lack of orders with the Mexican federal police," but Hurgin and Aurovsky adamantly dispute this contention. SEC 56.1 ¶ 277; *see* Defs. Counterstatement ¶ 277. Hurgin and Aurovsky maintain that orders they had in place from the Mexican federal police fell through because of developments that materialized after the merger. Hurgin 56.1 ¶ 154; Aurovsky 56.1 ¶ 154. Specifically, they offer evidence that a change in the cellular network in Mexico disabled Ability, Inc. technology and that the principal reseller that sold its products to the Mexican federal police stopped paying Ability [ECF No. 111-48 ("Hurgin Tr.") at 235:15–16, 301:10–22]. Hurgin 56.1 ¶ 155; Aurovsky 56.1 ¶ 155. Indeed, the SEC acknowledges that the Mexican reseller signed a letter confirming that it owed Ability, Inc. several million dollars. SEC 56.1 ¶ 219; Defs. Counterstatement ¶ 219. Hurgin and Aurovsky maintain that the Proxy adequately disclosed the risks that revenues might not materialize, citing a number of different paragraphs in the Proxy that describe risks associated with relying on revenue from government contracts, large projects, third party resellers, and sales in Latin America. Hurgin 56.1 ¶ 157 (quoting Proxy); Aurovsky 56.1 ¶ 157 (same).

## I.  Procedural History

On June 18, 2019, the SEC filed a complaint against Ability, Ability, Inc., Hurgin, and Aurovsky alleging violations of the securities laws in connection with the merger [ECF No. 1 ("Cmpl.")]. The complaint does not assert any claims against Cambridge, although the Merger Agreement provides that Cambridge was jointly responsible for the preparation of the materials that were filed with the SEC and transmitted to the Cambridge shareholders. Merger Agreement at 48–50. The complaint asserts four counts.

Count One alleges securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 against Hurgin and the companies. Count Two alleges securities fraud in violation of

Section 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act against Hurgin and the companies. Count Three alleges that Aurovsky violated Sections 17(a)(2) and 17(a)(3) of the Securities Act. Count Four alleges that Hurgin, Aurovsky, and the companies violated Section 14(a) of the Exchange Act and Rule 14a-9.

The companies entered into consent judgments as to the liability of Ability and Ability, Inc. [ECF Nos. 36, 37]. Hurgin and Aurovsky moved to dismiss the complaint. The Court denied the motions to dismiss after oral argument [ECF No. 59]. The parties completed discovery. Now before the Court are cross-motions for summary judgment on the claims against Hurgin and Aurovsky. The Court held oral argument on those motions on September 6, 2022 [("OA Tr.")].

## II.   LEGAL PRINCIPLES

### A.  Standard on Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 69 (2d Cir. 2015). A court must draw all reasonable factual inferences in favor of the party against whom summary judgment is sought. *Ya-Chen Chen*, 805 F.3d at 69. The Second Circuit has made clear that whether a given intent existed is a question of fact that is rarely appropriate on summary judgment. *See SEC v. Cole*, No. 12-cv-8167 (RJS), 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) (collecting Second Circuit cases); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999).

A court may conclude that there is no genuine dispute only if no rational trier of fact could find for the non-moving party. *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 192 (2d Cir. 2014). A mere "scintilla" of evidence is not enough to

create a genuine dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  However, in ruling on a motion for summary judgment, a court "may not make credibility determinations or weigh the evidence."  *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).  As such, if there is any evidence in the record that supports a reasonable inference in favor of the opposing party, then granting summary judgment is inappropriate.  *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 64 (2d Cir. 2021).

### B.  Applicable Securities Laws

As indicated above, the SEC brings three claims against Hurgin and two claims Aurovsky under three different statutes.

### 1.  Section 10(b) and Rule 10b-5

In Count One of the complaint, the SEC brings a claim against Hurgin under Section 10(b) of the Exchange Act and its implementing regulation, Rule 10b-5.  Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b) (2012).  Rule 10b–5 makes it unlawful: "(a) To employ any device, scheme, or artifice to defraud"; "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or"; "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5 (2013).

To prove a violation of Section 10(b) and Rule 10b–5, the SEC must prove Hurgin: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak,

or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 284–85 (2d Cir. 2013) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).  Hurgin acted with scienter if he made a misstatement or omission "with the intent to deceive" or "reckless disregard for the truth." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

### 2.  Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act

In Count Two of the complaint, the SEC alleges that Hurgin violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act.  In Count Three, the SEC alleges that Aurovsky violated Sections 17(a)(2) and 17(a)(3).

Section 17(a) of the Securities Act makes it unlawful for any person in the offer or sale of any securities . . .
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (2012).  The requirements for the SEC to prove a violation of Section 17(a) "are the same as Section 10(b) and Rule 10b–5, except that 'no showing of scienter is required for . . . Section 17(a)(2) or (a)(3).'" *Pentagon Cap. Mgmt.*, 725 F.3d at 285 (alteration omitted) (quoting *Monarch Funding*, 192 F.3d at 308).  For Sections 17(a)(2) and 17(a)(3), a "showing of negligence is sufficient." *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

### 3.  Section 14(a) of the Exchange Act and Rule 14a-9

In Count Four, the SEC alleges that both Hurgin and Aurovsky violated Section 14(a) of the Exchange Act and Rule 14a-9.  To prevail on this claim, the SEC must establish: "(1) that the

proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action." *Vides v. Amelio*, 265 F. Supp. 2d 273, 276 (S.D.N.Y. 2003).

### III.   DISCUSSION

#### A.  Issues of Fact Preclude Summary Judgment
####     for Either Side on All Claims against Hurgin.

The SEC moves for summary judgment on all of its claims against Hurgin based on his alleged material false statements in the proxy materials.  In particular, the SEC alleges that Hurgin knew or should have known that he misled Cambridge shareholders about (1) having actual, signed purchased orders from the Mexican federal police, (2) owning ULIN, and (3) Ability's financial forecast, which included scores of millions of dollars in allegedly non-existent orders from the Mexican federal police and in revenue from ULIN that Ability knew it had to share with ULIN's real owner.  Hurgin cross-moves for summary judgment, arguing that he told the truth and made adequate disclosures.  Disputed issues of fact clearly preclude granting summary judgment for either party on any claim.

The SEC places great weight on the fact that the Prometheus fairness opinion, which was included in the Proxy, falsely stated that Ability's backlog was supported by "signed" purchase orders.  SEC 56.1 ¶¶ 48, 49; Defs. Counterstatement ¶¶ 48, 49.  However, the SEC cannot prevail on any of its claims merely by identifying a false statement in the Proxy.  For its claims under Section 10(b) and Section 17(a)(1), the SEC must show that Hurgin intentionally or recklessly deceived the Cambridge shareholders.  *Obus*, 693 F.3d at 286; *S. Cherry St.*, 573 F.3d at 109.  For its claims under Sections 17(a)(2) and (3), the SEC must show that Hurgin negligently made the

false statement.  *See Ginder*, 752 F.3d at 574.  For its claim under Section 14(a), the SEC must show that the false statement in the Prometheus opinion was a "result" of Hurgin's negligence.  *Vides*, 265 F. Supp. 2d at 276.  Although the SEC offers more than a scintilla of evidence as to Hurgin's intent, a reasonable trier of fact could find for Hurgin on the record before the Court.  *See Chabad*, 768 F.3d at 192.

The record establishes that Prometheus was retained by and worked for Cambridge.  SEC 56.1 ¶¶ 37, 38; Defs. Counterstatement ¶¶ 37, 38.  Hurgin asserts that he never told anyone at Prometheus, or anyone else, that Ability's backlog was supported by signed or written purchase orders.  Hurgin 56.1 ¶ 49.  The SEC "disputes" this assertion only insofar as it insists that Hurgin is generally responsible for creating a false impression about the backlog.  Hurgin 56.1 ¶¶ 48–50; SEC Counterstatement ¶ 50.

In attempting to attribute the false statement in the Prometheus opinion to Hurgin, the SEC stresses that the August 2015 Spreadsheet represented that the backlog was comprised of "actual PO's."  August 2015 Spreadsheet at 4.  To be sure, Ability hired Yedid, the Migdal banker who prepared the August 2015 Spreadsheet, to liaise with the professionals that Cambridge hired to evaluate the merger, including Prometheus, and Prometheus reviewed the spreadsheet.  *See* SEC 56.1 ¶¶ 21, 40; Defs. Counterstatement ¶¶ 21, 40; Hurgin 56.1 ¶¶ 18, 22; SEC Counterstatement ¶¶ 18, 22.  But Yedid testified that he meant "actual" purchase orders to include "verbal" orders.  Yedid Dep. at 27:21–28:4.  And the August 2015 Spreadsheet itself was not included in the proxy materials that went to the shareholders.  Moreover, Hurgin expressly told Cambridge management, which was jointly responsible for the preparation of the proxy materials, that there were no written orders for much of the backlog.  Hurgin 56.1 ¶¶ 43, 52; SEC Counterstatement ¶¶ 43, 52; SEC 56.1 ¶ 42; Defs. Counterstatement ¶ 42.

More broadly, there are triable issues of fact regarding whether Hurgin misled Cambridge shareholders about Ability's projected revenue from the Mexican federal police. The false statement in the Prometheus opinion that Ability's backlog was comprised of signed purchase orders matters only because most of the backlog of orders from the Mexican federal police, which accounted for a huge percentage of Ability's projected revenue, did not materialize. The same is true of Hurgin's allegedly false representation at the November roadshow that Ability had a three-year deal involving 52 prisons that would generate about $100 million. SEC 56.1 ¶¶ 80, 81; Defs. Counterstatement ¶¶ 80, 81.

The SEC contends that, in reality, there were no verbal orders. According to the SEC, there were only written orders and lies. SEC Counterstatement ¶ 33. But that is clearly in dispute. In particular, Hurgin and Aurovsky offer evidence of Ability receiving payments on verbal orders. *See* Hurgin 56.1 ¶ 32; Aurovsky 56.1 ¶ 32; Yedid Dep. at 32:14–24; Oz Dep. at 47:12–14; 49:24–25; B. Gordon Tr. at 287:11–20.

At oral argument, the SEC insisted that Arik Goldshtein, an individual who had worked at Ability, established at his deposition that Hurgin lied to the Cambridge shareholders about having orders for 52 prisons when Ability really had orders for only 8 prisons. OA Tr. at 37:1–6. The SEC badly overstates its evidence. At Goldshtein's deposition, he was asked "how many prisons did *you* work on?" [ECF No. 111-56 ("Goldshtein Tr.") at 52:10–11 (emphasis added)]. He responded, "At this stage, eight." Goldshtein Tr. at 52:12. Goldshtein went on to explain, "We were supposed to move to another stage with lots more, but it was – somehow it didn't happen." Goldshtein Tr. at 52:15–16. Counsel for the SEC showed Goldshtein a written invoice for certain prisons and pressed him to agree that Ability "didn't receive any additional orders for any additional prisons," beyond what was reflected in writing, but Goldshtein replied only that he did

not "remember" others "moving to a serious stage." Goldshtein Tr. at 55, 95:24–96:4. Goldshtein did not testify that Hurgin lied.

Moreover, as the Court discussed with counsel at the oral argument, even if the SEC actually had a witness to testify that Hurgin falsely represented that Ability had more orders than Hurgin knew Ability had, such testimony would establish only "a direct conflict on a material issue of fact." OA Tr. at 39:1–2. Hurgin is prepared to testify that Ability had precisely the number of orders reflected in the proxy materials. He offers evidence that Ability had verbal agreements for which revenues never materialized because of developments after the merger closed, including the change in the Mexican cellular network and the Mexican reseller's undisputed failure to pay several million dollars that it owed to Ability. Hurgin Tr. at 235:15–16, 301:10–22; SEC 56.1 ¶ 219; Defs. Counterstatement ¶ 219.

The SEC cites the shareholders' concern, expressed after the failed September roadshow, that Ability "got hot for a year with the Latin American projects" but its success was not "sustainable," SEC 56.1 ¶ 67, in order to suggest that Hurgin had a motive to lie about having locked in orders that did not exist to obtain shareholder approval for the merger. The SEC cites the omission of the unfavorable Economics Partners report from the Proxy as further evidence that Hurgin had something to hide. *See* SEC 56.1 ¶ 61; Defs. Counterstatement ¶ 61. However, the SEC offers no evidence to implicate Hurgin in the decision to omit the report from Economics Partners, which was retained by and worked for Cambridge. *See* SEC 56.1 ¶ 39; Defs. Counterstatement ¶ 39. Hurgin, on the other hand, offers evidence that the risks that ultimately materialized were disclosed to the shareholders. Hurgin 56.1 ¶ 157 (quoting several paragraphs of the Proxy describing risks associated with relying on revenue from government contracts, large projects, third party resellers, and sales in Latin America). Moreover, drawing all inferences in

Hurgin's favor, the evidence of concerns the shareholders expressed after the failed September roadshow, to the extent that evidence is even admissible, could show that shareholders were aware that acquiring Ability was risky.  *See Ya-Chen Chen*, 805 F.3d at 69.

Turning to Hurgin's allegedly false representations about ULIN, there are, likewise, issues of fact.  It is undisputed that, at the time of the shareholder vote, Ability was a reseller of the technology and had to share profits with—and possibly pay penalties to—ULIN's owner.  *See* SEC 56.1 ¶¶ 141, 142; Defs. Counterstatement ¶¶ 141, 142.  Thus, the SEC contends that Hurgin lied when he said Ability owned and developed ULIN in house.  *See* SEC 56.1 ¶ 78; Defs. Counterstatement ¶ 78; Hurgin 56.1 ¶ 115; SEC Counterstatement ¶ 115.

Hurgin offers evidence that complicates this picture.  He offers witness testimony that Hurgin became involved when ULIN was merely a "concept," he came up with the name ULIN, and he "designed the look and feel of the system."  Benshoshan Dep. at 19–21.  Hurgin also offers evidence that Ability always planned to buy ULIN and later did so.  Hurgin 56.1 ¶¶ 78, 79.  Hurgin maintains that he never told anyone at Cambridge that he owned ULIN, and Ability told Prometheus, which reported to Cambridge, that Ability was working with a "subcontractor" on ULIN.  Szewach Dep. at 116:9-19; Hurgin 56.1 ¶¶ 87, 88.  The SEC offers testimony from Ben Gordon, the CEO of Cambridge, that Hurgin lied to him about owning ULIN.  B. Gordon Tr. at 90–91.  Whether to believe Hurgin or Ben Gordon is a straightforward credibility determination that the Court cannot make.  *Jaegly*, 439 F.3d at 151.

Moreover, to some extent, what Hurgin said to the CEO of Cambridge is beside the point.  What matters is whether Hurgin misled the shareholders.  There is no dispute that Hurgin stated at the November roadshow, "today we are Ability the only owner for this technology."  Hurgin 56.1 ¶ 115; SEC Counterstatement ¶ 115.  And a transcript of that statement was included in the Proxy.

SEC 56.1 ¶ 74; Defs. Counterstatement ¶ 74.  However, as explained above, the SEC must prove

scienter for its claims under Sections 10(b) and 17(a)(1) and negligence for its claims under

Sections 17(a)(2), 17(a)(3), and 14(a).  *See Obus*, 693 F.3d at 286; *S. Cherry St.*, 573 F.3d at 109;

*Ginder*, 752 F.3d at 574; *Vides*, 265 F. Supp. 2d at 276.

Hurgin maintains that he used the phrase "only owner" colloquially, while speaking in a

non-native language, to convey that Ability was the only company with the legal right to sell ULIN.

Hurgin 56.1 ¶¶ 116, 117.  Furthermore, Hurgin offers evidence that Ability's role as a reseller of

ULIN was consistent with its usual business model, and that business model was disclosed to the

shareholders.  Proxy at 328 (Ability "does not own most of the technology it uses in its products").

A reasonable jury could accept Hurgin's explanation and reject the SEC's assessment that Hurgin

was, at least, negligent.  *See Chabad*, 768 F.3d at 192.

The SEC argues that Hugin is liable for misleading the shareholders based on the slides

from the November roadshow PowerPoint that projected $40 million in revenue from two ULIN

sales in 2016.  SEC 56.1 ¶¶ 84, 85, 161.  The SEC argues that Hurgin misled the shareholders

because he failed to disclose the Reseller Agreement, which required Ability to share 50% of any

revenue from ULIN.  Hurgin responds that gross revenue is different from net profits, and the

Proxy adequately disclosed that Ability anticipated "cost of revenues to be about 50%."  Hurgin

56.1 ¶ 125.  The SEC also argues that Hurgin falsely represented that ULIN was ready for sale

when, in reality, it was still in the development stage.  SEC 56.1 ¶ 125.  To this, Hurgin responds

that his overly optimistic prediction about the timeline for the development of ULIN is not

actionable.  *See* Defs. Counterstatement ¶ 125, 161; *Omnicare, Inc. v. Laborers Dist. Counsel

Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2014).  It is for a jury to decide whether or not

Hurgin intentionally, recklessly, or negligently misled Cambridge shareholders about the prospects from ULIN. *See Press*, 166 F.3d at 538.

### B. Issues of Fact Preclude Summary Judgment for Either Party on Both Claims Against Aurovsky.

There is no genuine dispute that Aurovsky made no false statements—indeed, he made no statements at all—to the Cambridge shareholders. There is also no dispute that Aurovsky played no role in preparing the proxy materials. Rather, the thrust of the SEC's case against Aurovsky is that he should have played a role. The SEC maintains that Aurovsky had a duty to review and correct errors in the Proxy because he was the CTO and co-owner of Ability, he signed the Merger Agreement, he signed a form consenting to the use of his name in the Proxy, and the Proxy stated that Aurovsky would become a director and the CTO of Ability, Inc.

The SEC is not required to establish that Aurovsky personally made or disseminated the allegedly misleading statements in the Proxy to prevail on its claims against Aurovsky. *See U.S. S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 465–66 (S.D.N.Y. 2012). Specifically, Section 17(a)(2) prohibits a defendant from obtaining money "by means of" a false statement, "whether prepared by himself or by another." *Id*. at 465. Section 17(a)(3) requires the SEC to establish that Aurovsky engaged in a deceptive scheme or course of conduct. *See id*. at 467; *In re Alstom SA, Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005). Finally, for its claim under Section 14(a) and Rule 14a-9, the SEC must establish that Aurovsky "knew or in the exercise of due diligence should have known that the Proxy Statement contained false or misleading statements or omissions." *Del Noce v. Delyar Corp.*, 1976 WL 813, at *23 (S.D.N.Y. July 30, 1976). For each of its claims, however, the SEC must establish that Aurovsky was at least negligent.

Thus, as an initial matter, the SEC must establish that Aurovsky owed a duty to the Cambridge shareholders to review the proxy materials to ensure that they did not contain material

false statements and omissions.  The SEC contends that Aurovsky owed a duty to the Cambridge

shareholders because he consented to the use of his name in the Proxy.  The text of Section 14(a)

forbids a person to "permit the use of his name to solicit any proxy . . . in contravention" of SEC

regulations.   15 U.S.C. § 78n(a).   However, the Second Circuit has not addressed whether a

defendant may be liable simply because his name is used in an allegedly misleading proxy

statement.   Other courts have concluded that Section 14(a) requires "a substantial connection

between the use of the person's name and the solicitation effort."  *SEC v. Falstaff Brewing Corp.*,

629 F.2d 62, 68 (D.C.C. 1980).  That is, when individuals listed in a proxy statement "hav[e] put

their reputations in issue, [they] cannot divorce themselves from improper actions taken in the

proxy battle by the participants acting under the banner of their names."  *In re Bank of Am. Corp.*

*Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 294

(S.D.N.Y. 2010) (quoting *Chris–Craft Indus., Inc. v. Indep. Stockholders Comm.*, 354 F. Supp.

895, 915 (D. Del. 1973)).

    With respect to the SEC's claim against Aurovsky under Section 14(a), there is a question

of fact whether there was "a substantial connection" between the use of Aurovksy's name and the

solicitation effort.   *Falstaff Brewing Corp.*, 629 F.2d at 68.  The Court notes that the SEC's

allegations about Aurovsky's "daily" involvement in the merger efforts have now fallen away.

Cmpl. ¶ 151.  Whether Aurovsky was daily consulted or informed about Hurgin's efforts to secure

the merger impacts whether the SEC can prove that Aurovsky "knew or in the exercise of due

diligence should have known that the Proxy Statement contained false or misleading statements or

omissions."  *Del Noce*, 1976 WL 813, at *23.

    The SEC suggests that, in any event, Aurovsky had owed a duty by virtue of the facts that

he was the CTO and co-owner of Ability, and he would be the CTO and a director of Ability, Inc.

However, the SEC has not offered any authority holding that, in the context of a merger, an executive or co-owner of a *private* company owes a duty to the shareholders of the public company that will acquire the private company to ensure that the proxy materials are accurate.  The Court is not prepared to rule that a person's position of authority in a private company establishes a "substantial connection" to a solicitation effort as a matter of law.

The SEC cites the statements in the Proxy that Aurovsky would become a director and CTO of Ability, Inc. and that Aurovsky had knowledge and expertise in his field.  SEC 56.1 ¶¶ 242, 247; Defs. Counterstatement ¶¶ 242, 247.  In the context of a Proxy that spanned more than 400 pages and two investor road shows, a rational jury could conclude that the cited statements in the Proxy are not enough to establish a substantial connection between the use of Aurovsky's name and the solicitation effort.  At oral argument, the Court asked the SEC if it had any evidence that shareholders considered Aurovsky's name and role an important fact in approving the proposed merger.  *See* OA Tr. at 72:11.  The SEC cited declarations from shareholders named Dr. Carter Pottash [ECF No. 134 ("Pottash Decl.")] and Bob Hammel [ECF No. 135 ("Hammel Decl.")].  OA Tr. at 72:14–15.  Those declarations merely state, in relevant part, that those shareholders believed "both Hurgin and Aurovsky reviewed the proxy materials to assure they were complete and accurate in all materials respects," and, had they "known that Hurgin or Aurovsky had not reviewed the proxy materials," they would not have voted to approve the merger.  Pottash Decl. at 4; Hammel Decl. ¶ 14.  On this record, whether Aurovsky even owed a duty to the Cambridge shareholders is not appropriate for resolution on summary judgment.

In all events, for both of its claims against Aurovsky, the SEC must establish that Aurovsky was negligent in failing to catch and correct the allegedly material misrepresentations in the Proxy.  According to the SEC, Aurovsky failed to review the Proxy at all, and that is

sufficient to establish that he was negligent.  *See* SEC Counterstatement ¶¶ 165, 166.  But Aurovsky contends that "Aurovsky reviewed the Proxy Statement" with Hurgin's help.  Aurovsky 56.1 ¶ 166.  Aurovsky testified, "[Hurgin] explained to me what's written in this document."  Aurovsky Tr. at 47:22–23.  Even assuming Aurovsky had a duty to review the Proxy, on summary judgment, the Court cannot weigh the parties' competing interpretations of a snippet of testimony and decide, as a matter of law, whether Aurovsky performed a reasonably careful review of the Proxy.  *Jaegly*, 439 F.3d at 151.

Moreover, even if Aurovsky is held responsible for all of the statements the SEC attributes to Hurgin, the fact that preclude summary judgment with respect to Hurgin likewise preclude summary judgment with respect to Aurovsky.  In arguing that he was not negligent for failing to correct the false statement about "signed" orders in the Prometheus fairness opinion, Aurovsky points out that nobody at Cambridge or the professional organizations that Cambridge hired in connection with the merger caught and corrected that error, either.  Aurovsky 56.1 ¶¶ 66–68.  Similarly, Aurovsky contends, it is unrealistic to expect that Aurovsky would find and quibble with the word "owner" in the transcript of Hurgin's remarks about ULIN contained in the more than 400-page Proxy.  Aurovsky MSJ at 4.  Whether Aurovsky was negligent in any respect is a question for a jury to decide.

## CONCLUSION

For the reasons stated above, the motion of the SEC for summary judgment is DENIED.  Based on the Court's searching examination of the record, the SEC's evidence falls well short of its arguments.  Indeed, a jury might conclude the SEC's evidence is so underwhelming—especially in contrast to its pitched accusations—that the jury finds that neither Hurgin nor Aurovsky is liable for any of the violations alleged in the complaint.  However, the SEC has cited more than a scintilla of evidence in support of its claims, and the Court may not weigh the evidence on summary

judgment.  As such, and for the reasons stated above, Hurgin's motion for summary judgment is DENIED, and Aurovsky's motion for summary judgment is DENIED.

The Clerk of Court is respectfully requested to terminate the motions pending at docket entries 110, 114, and 121.

**SO ORDERED.**

**Date:  September 23, 2022**
        **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**